# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Loma Linda – Inland Empire Consortium<br>For Healthcare Education<br>d/b/a<br>Loma Linda University Health<br>Education Consortium<br>11175 Campus Street<br>Loma Linda, CA 92354<br><br>Plaintiff<br><br>    v.<br><br>National Labor Relations Board<br>1015 Half Street, SE<br>Washington, DC 20003<br><br>        Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 21-cv-00688-CKK<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## STATEMENT OF POINTS AND AUTHORITIES

93336530v.1

## <u>TABLE OF CONTENTS</u>

**Page**

I.  FACTS ....................................................................................................... 2

    A.  Loma Linda University Health Education Consortium Is A Religious Education Institution ......................................................................... 2

    B.  Long-Standing and Well-Established Church Doctrine Prevent LLUHEC From Recognizing and Bargaining With the Union of American Physicians & Dentists ............................................................. 5

    C.  Procedural History ................................................................................ 5

II.  ARGUMENT .............................................................................................. 6

    A.  The Supreme Court In *NLRB v. Catholic Bishop* Removed  Religious Educational Institutions From The Board's Jurisdiction ........................ 6

    B.  *University of Great Falls v. NLRB* Reinforces *Catholic Bishop*'s Holding That The Board May Not Subject Religious Educational Institutions To Its Jurisdiction And Adopted a Three-Prong Test To Identify Such Institutions ............................................................................................ 8

    C.  Under *Catholic Bishop*, The Board May Not Exercise Jurisdiction Over LLUHEC Because LLUHEC Satisfies The *University of Great Falls* Three-Pronged Test And Because The Exercise Of Jurisdiction Would Implicate Serious First Amendment Concerns ................................... 10

        1.  LLUHEC Satisfies The *University of Great Falls* Three-Pronged Test ................................................................................................. 10

        2.  Exercising Jurisdiction Over LLUHEC Would Implicate Serious First Amendment Concerns ................................................... 11

    D.  LLUHEC Has Already Been Forced to Suffer The Very Harm That *University of Great Falls* And *Bethany College* Sought To Prevent The Board From Inflicting on Religious Educational Institutions ............................. 14

    E.  RFRA Prohibits the Board from Asserting Jurisdiction and Requiring LLUHEC To Recognize And Bargain With A Union. ........................................ 16

        1.  RFRA ......................................................................................... 17

        2.  Substantial Burden on LLUHEC's Religious Free Exercise .................... 18

i

3.      The Board Cannot Demonstrate a Compelling Governmental
        Interest that Would Require LLUHEC to Violate its Religious
        Beliefs About Unions..................................................................... 20

        a.      Plaintiff-specific compelling interest ............................... 21

        b.      Underinclusiveness and other exemptions..................... 25

4.      Requiring LLUHEC to Violate its Religious Beliefs Is Not the
        Least Restrictive Means of Achieving the Alleged Governmental
        Interest.......................................................................................... 28

5.      The Board's Outdated *Ukiah* Decision Neither Is Binding Nor
        Persuasive. ................................................................................... 31

F.      The Court Has Jurisdiction To Review a Non-Final Order Of The Board
        Pursuant To The Supreme Court's *Leedom v. Kyne* Doctrine And Because
        The Non-Final Order Violates RFRA ................................................... 35

III.    CONCLUSION............................................................................................... 39

93336530v.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adventist Living Centers, Inc. v. NLRB*,
119 LRRM 2407 (N.D. Ill. 1984) ......................................................................................19

*Bernal v. Fainter*,
467 U.S. 216 (1984)............................................................................................................21

*Bethany College*,
369 NLRB No. 98 (2020) .......................................................................................... *passim*

*Burwell v. Hobby Lobby Stores, Inc.*,
134 S. Ct. 2751 (2014)................................................................................................ *passim*

*Cap Santa Vue, Inc. v. NLRB.*,
424 F.2d 883 (D.C. Cir. 1970) ....................................................................................19, 20

*Carroll College, Inc. v. NLRB*,
558 F.3d 568 (D.C. Cir. 2009) .......................................................................................8, 32

*Carroll College*,
345 NLRB 254 (2005) ...................................................................................................19, 32

*Caulfield v. Hirsch*,
1977 WL 15572 (E.D. Pa. 1977) .......................................................................................37

*Church of The Lukumi Babalu Aye, Inc. v. Hialeah*,
508 U.S. 520 (1993).............................................................................................21, 25, 26

*Contract Servs., Inc. & Nat'l Maritime Union*,
202 NLRB 862 (1973) ........................................................................................................27

*Cottonwood Christian Center v. Cypress Redevelopment Agency*,
218 F. Supp. 2d 1203 (C.D. Cal. 2002) .............................................................................32

*Council 19, Am. Fed'n v. NLRB*,
296 F. Supp. 1100 (N.D. Ill. 1968) ...................................................................................27

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
518 U.S. 727 (1996) (Kennedy, J. concurring)...................................................................30

*Duquesne University of the Holy Spirit v. NLRB*,
947 F.3d 824 (D.C. Cir. 2020) ...........................................................................................8

iii

*EEOC. v. Catholic Univ. of Am.*,
  83 F.3d 455 (D.C. Cir. 1996) ............................................................................24

*EEOC. v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
  884 F.3d 560 (6th Cir. 2018) .............................................................................22

*Elrod v. Burns*,
  427 U.S. 347 (1976).....................................................................................35, 36

*Elsinore Christian Ctr. v. City of Elsinore*,
  270 F. Supp. 2d 1163 (C.D. Cal. 2003) .............................................................32

*Employment Division v. Smith*,
  494 U.S. 872 (1990).............................................................................................17

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*,
  546 U.S. 418 (2006)..................................................................................... *passim*

*Hankins v. The New York Annual Conference of United Methodist Church*,
  516 F. Supp. 2d 225 (E.D.N.Y. 2007), *aff'd*, 351 F. App'x 489 (2d Cir. 2009).....................24

*Hartz Mountain Corp. v. Dotson*,
  727 F.2d 1308 (D.C. Cir. 1984) .........................................................................35

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
  132 S. Ct. 694 (2012)..........................................................................................24

*Jones v. Slade*,
  23 F. 4th 1124 (9th Cir. 2022) ...........................................................................30

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) .................................................................18, 33, 34

*Lawrence Typographical Union v. McCulloch*,
  349 F.2d 704 (D.C. Cir. 1965) ...........................................................................35

*Leedom v. Kyne*,
  358 U.S. 184 (1958)...........................................................................35, 36, 37, 38

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971) (Douglas, J. concurring) ...................................................12

*Mayweathers v. Terhune*,
  328 F. Supp. 2d 1163 (C.D. Cal. 2003) .............................................................32

*McAllen Grace Brethren Church v. Salazar*,
  764 F.3d 465 (5th Cir. 2014) ...............................................................26, 28, 33

iv

*McCormick v. Hirsch*,
   460 F. Supp. 1337 (M.D. Pa. 1978) ..........................................................................37, 38, 39

*McCulloch v. Libbey-Owens-Ford Glass Co.*,
   403 F.2d 916 (D.C. Cir. 1968) ...............................................................................................35

*McDaniel v. Essex Int'l, Inc.*,
   696 F.2d 34 (6th Cir. 1982) ...................................................................................................19

*Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*,
   437 F.3d 1256 (D.C. Cir. 2006) .............................................................................................35

*Navajo Nation v. U.S. Forest Serv.*,
   535 F.3d 1058 (9th Cir. 2008), *cert. denied*, 556 U.S. 1281 (2009)...............................17, 18

*Navy Seal 1 v. Austin*,
   2022 WL 534459 (M.D. Fla. 2022) .......................................................................................18

*New York Racing Ass'n v. NLRB*,
   708 F.2d 46 (2d Cir. 1983)......................................................................................................27

*NLRB v. Bishop Ford Central Catholic High School*,
   623 F.2d 818 (2d. Cir. 1980).....................................................................................................8

*NLRB v. Catholic Bishop*,
   440 U.S. 490 (1979)...................................................................................................... *passim*

*NLRB v. Jones & Laughlin Steel Corp.*,
   301 U.S. 1 (1937).....................................................................................................................23

*NLRB v. Salvation Army of Mass, Dorchester Day Care Ctr.*,
   763 F.2d 1 (1st Cir. 1985).......................................................................................................20

*Nottelson v. A.O. Smith Corp.*,
   481 F. Supp. 756 (E.D. Wis. 1979).........................................................................................19

*Ohio Pub. Interest Campaign*,
   284 NLRB 281 (1987) ............................................................................................................27

*Pacific Lutheran University*,
   361 NLRB 1404 (2014) .............................................................................................................8

*Res-Care, Inc.*,
   280 NLRB 670 (1986) ............................................................................................................27

*Retail, Wholesale & Dep't Store Union v. NLRB*,
   745 F.2d 358 (6th Cir. 1984) .................................................................................................27

v

*Sherbert v. Verner*,
374 U.S. 398 (1963) ..................................................................................................18, 20

*Slatterly v Hochul*,
No. 21-911 (2d Cir. 2023) ..................................................................................................1

*Smith v. Arkansas State Highway Emp., Local 1315*,
441 U.S. 463 (1979) ..................................................................................................24

*St. Elizabeth Cmty. Hosp.*, 259 NLRB 1135 (1982) .............................................19, 24

*St. Joseph's College*,
282 NLRB 65 (1986) ..................................................................................................26

*Thomas v. Review Bd. of the Indiana Employment Sec. Div.*,
450 U.S. 707 (1981) ..................................................................................................18

*Tooley v. Martin-Marietta Corp.*,
648 F.2d 1239 (9th Cir. 1981) .....................................................................................19

*Ukiah Adventist Hospital d/b/a Ukiah Valley Medical Center*,
332 NLRB 602 (2000) ................................................................................... *passim*

*United States v. Wilgus*,
638 F.3d 1274 (10th Cir. 2011) ...................................................................................34

*Universidad Central de Bayamon v. NLRB*,
793 F.2d 383 (1st Cir. 1986) (*en banc*)........................................................................8

*University of Great Falls v. NLRB*,
278 F.3d 1335 (D.C. Cir. 2002) ................................................................... *passim*

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ..................................................................................................18, 20

*Yellowbear v. Lampert*,
741 F.3d 48 (10th Cir. 2014) ......................................................................... *passim*

**Statutes**

29 U.S.C. §152(2)-(3) ..................................................................................................26

29 U.S.C. §158(d) ..................................................................................................20

42 U.S.C. §2000bb–1(b) ..................................................................................................21, 28

42 U.S.C. §2000bb-2(3) ..................................................................................................18

42 U.S.C. §2000bb(a) ..................................................................................................17

42 U.S.C. §2000bb(b)(1) ................................................................................................20

California Nonprofit Religious Corporation Law .........................................................11

National Labor Relations Act .................................................................................. *passim*

Religious Freedom Restoration Act........................................................................ *passim*

Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq. ..............30, 32

**Other Authority**

29 C.F.R. §103.3 ..........................................................................................................27

Establishment Clause of the First Amendment to the U.S. Constitution............................. *passim*

Free Exercise Clause of the First Amendment to the U.S. Constitution............................. *passim*

*Horse-racing and Dog-racing Industries*, 38 Fed. Reg. 9507 (April 17, 1973).........................27

NLRB, *Outline of Law & Procedure in Representation Cases* (June 2017) .........................27, 28

William Jefferson Clinton, *Remarks at RFRA Signing Ceremony*, November 16, 1993.........................................................................................................................17

**Suspects**

Title VII ....................................................................................................................19, 24, 25

Loma Linda – Inland Empire Consortium For Healthcare Education d/b/a Loma Linda University Heath Education Consortium ("LLUHEC") is a religious educational facility that is part of the Seventh-day Adventist Church (the "Church").  As such, the National Labor Relations Board ("Board" or "NLRB") is prohibited by the Religious Clauses of the First Amendment, decisions of the Supreme Court, the District of Columbia Circuit, and the Board itself, as well as the Religious Freedom Restoration Act ("RFRA") from exercising jurisdiction over it.[1] Nonetheless, the Board has asserted its jurisdiction in a case involving a petition by medical residents and fellows for a union representation election, as well as (to date) a second case alleging that LLUHEC committed various unfair labor practices.

The NLRB's exercise of jurisdiction over LLUHEC under these circumstances has caused and will continue to cause LLUHEC irreparable harm.[2]  Accordingly, this Court should issue a declaratory judgment holding that the NLRB lacks jurisdiction over LLUHEC, order the Board to immediately dismiss case numbers 31-RC-312064 and 31-CA-312278, enjoin the Board from further processing case numbers 31-RC-312064 and 31-CA-312278 except as necessary to dismiss them, and grant all other relief that is just and proper.

---

[1] The Board's exercise of jurisdiction over LLUHEC also raises First Amendment free speech and freedom of association concerns. *See e.g., Slatterly v Hochul*,  No. 21-911 (2d Cir. 2023). Further, the ministerial exception to jurisdiction applies as to some or all of the residents and fellows.

[2] The irreparable harm being suffered by LLUHEC does not end if the representation hearing currently being conducted by Region 31 of the Board concludes before the issuance of the requested preliminary injunction because the hearing is only one step of many that the LLUHEC will be forced to participate in so long as the Board continues to exercise jurisdiction over it.

I.      **FACTS**

     A.      **Loma Linda University Health Education Consortium Is A Religious Education Institution**

LLUHEC is a non-profit religious corporation and part of the Church. (Exhibit A, Declaration of Dr. Daniel Giang, ¶ 4; Exhibit B Articles of Incorporation and Bylaws). It was granted 501(c) status by the Internal Revenue Service in July 2014. (Exhibit A, ¶ 4; Exhibit B; Exhibit C, IRS Determination Letter).

Loma Linda University Health ("LLUH") is a center for Christian medical education and patient care.  It consists of six hospitals, including Loma Linda University Medical Center ("LLUMC"), Loma Linda University ("LLU"), a physician practice corporation, and is affiliated with other hospitals and clinics throughout the United States and the world. (Exhibit A, ¶¶ 5 and 6). Both LLUHEC and LLUMC function within the LLUH system. (*Id.*).

LLUHEC operates approximately 70 residency programs for the purposes of educating approximately 800 fellows and residents regarding how to minister to patients in a manner that is consistent with Church teachings and for the purpose of training the next generation of Seventh-day Adventist doctors so they can become medical Board-certified. (*Id.*; Exhibit N, ¶ 12 Declaration of Dr. David Trim). While all residents and fellows are under LLUHEC, they gain their educational experience at LLUMC, Loma Linda University and other health care facilities. (*Id.*).

The Church's heritage remains the central focus of LLUHEC as expressed in its mission statement: "...to continue the healing ministry of Jesus Christ, 'to make man whole,' in a setting of advancing medical science and to provide a stimulating clinical and research environment for the education of physicians, nurses and other health professionals." (*Id.*; *see also* https://lluh.org/health-professionals/gme/prospective-residents). To this end, residents and

2

fellows at LLUHEC are encouraged to conduct themselves in accordance with the Church's teachings, to educate less senior fellows and residents and medical students on both clinical matters and Church doctrine, to learn and implement the Seventh-day Adventist doctrine and concepts of whole person care, and to participate in prayer sessions with patients. (*Id.*). The Church's mission is conveyed to residents and fellows during their interviews, orientations, and throughout their educational experience with LLUHEC. (*Id.*; Exhibit D, Resident Orientation PowerPoint).

LLUHEC is exclusively a teaching and educational learning consortium of residency and fellowship programs that exists for the sole purpose of facilitating the education of residents and fellows in programs approved by the Accreditation Council for Graduate Medical Education ("ACGME"). (Exhibit A, ¶ 10; Exhibit E, ACGME Accreditation Letter).  The ACGME is a private, not-for-profit organization that sets standards for United States graduate medical education (residency and fellowship) programs and the institutions that sponsor them, and renders accreditation decisions based on compliance with these standards. (Exhibit A at ¶ 8). Accreditation is achieved through a voluntary process of evaluation and review based on published accreditation standards. (*Id.*). ACGME accreditation provides assurance that LLUHEC's residency and fellowship programs meet the quality standards of the specialty or subspecialty practice(s) for which it prepares its graduates. (*Id.*).

LLUHEC is not engaged in the business of providing patient care, and specifically is not a hospital or clinic. (*Id.* at ¶ 10). Rather, patients receive care from the licensed medical practitioners working for separate entities within the LLUH system (but not for LLUHEC) or at 60 or more other non-LLUH locations where residents may be assigned (such as VA hospitals, other medical centers, clinics, doctor's offices) and so forth. (*Id.*).

3

LLUHEC does not bill Medicare, Medicaid, or any private insurance for any time that residents and fellows spend being taught and educated by faculty and other attending physicians. (*Id.* at ¶ 11). Even if a resident or fellow assists an attending physician with a procedure -- which is solely for educational purposes -- that time and service is not billed. (*Id.*). LLUHEC is neither a licensed hospital nor licensed to provide medical care. (*Id.* at ¶ 10). Along those lines, LLUHEC does not maintain patient records.

LLUHEC holds itself out as a Seventh-day Adventist institution on numerous publicly-available websites. (*Id.* at ¶ 12; Exhibit F, LLUH Website Screen Captures; *see also* www.lluh.org/aboutus; https://lluh.org/health-professionals/gme; https://lluh.org/health-professionals/gme/prospective-residents). LLUHEC's Church affiliation, mission and values are also expressed in numerous other written materials. (Exhibit G, Resident job description; Exhibit I, LLUH Who Are the Seventh-day Adventists; Exhibit J, LLUH Spiritual Plan; Exhibit L, Resident Agreement). Moreover, LLUHEC's Christian affiliation is apparent from the prominent display of Christian symbols on LLUH website and the LLUH campus. For example, the Christian cross, bible, and symbols of the Seventh-day Adventist Church are featured on its crest, many of its campus buildings prominently display Bible verses on their facades and there are numerous chapels on the campus grounds. (Exhibit A, at ¶ 13).

In addition to their studies as residents and fellows, residents and fellows in the LLUHEC programs are expected to teach, assist in teaching and train others in medical knowledge and the values and mission of LLUHEC. (Exhibit A, ¶¶ 6, 14; Exhibit G, p. 2; Exhibit L, paragraph 11(c)).

93336530v.1

**B.     Long-Standing and Well-Established Church Doctrine Prevent LLUHEC From Recognizing and Bargaining With the Union of American Physicians & Dentists**

The Church has a well-established historic teaching that prohibits Church institutions such as LLUHEC from recognizing and bargaining with labor organizations. (Exhibit A, ¶ 15; Exhibit K, pp. 5-7; Exhibit M, p. 3-6; ). *See also infra* at p. 19.

**C.     Procedural History**

On February 13, 2023,[3] the Union of American Physicians & Dentists (the "Union") filed a petition with NLRB Region 31 seeking to represent "[a]ll residents and fellows employed" at LLUHEC. (Exhibit H, Board Docket at pp. 1-2).  This petition was docketed by Region 31 as case number 31-RC-312064 and a representation hearing was scheduled for March 6. (*Id.* at pp. 1, 5).[4]

On February 27, LLUHEC filed two motions with the Regional Director of NLRB Region 31. The first motion requested that the issue of whether the Board may properly exercise jurisdiction over LLUHEC be bifurcated and that all other proceedings be stayed until the jurisdictional issue is resolved. (*Id.* at pp. 24-34). The second motion requested that the representation hearing be continued until at least March 13. (*Id.* at pp. 35-39).  On February 28, the Union filed its opposition to both of LLUHEC's motions. (*Id.* at pp. 40-43). On that same day, the Regional Director issued an order denying LLUHEC's request to bifurcate and stay and granting LLUHEC's motion to continue the representation hearing until March 13. (*Id.* at p. 44).

On March 2, LLUHEC filed a request for expedited review with the Board asking it to reverse the Regional Director's denial of LLUHEC's request to bifurcate the jurisdictional

---

[3] All dates hereafter are in 2023 unless otherwise noted.

[4] On February 21, the Union also filed an unfair labor practice charge against LLUHEC. It was docketed by Region 31 of the Board as case number 31-CA-312728.

5

determination and stay the other proceedings. (*Id.* at pp. 45-55).  On March 3, the Union filed its

opposition to LLUHEC's request for expedited review. (*Id.* at pp. 56-58). On March 13, the

Board denied LLUHEC's request that it reverse the Regional Director's refusal to bifurcate the

jurisdictional determination and stay all other proceedings. (*Id.* at p. 59, Denial of Request for

Review).  As a result, the representation hearing went forward beginning on March 13.

## II.     ARGUMENT

### A.      The Supreme Court In *NLRB v. Catholic Bishop* Removed  Religious Educational Institutions From The Board's Jurisdiction

In *NLRB v. Catholic Bishop*, the Supreme Court addressed whether the NLRB has

authority to exercise jurisdiction over schools that were not "completely religious." 440 U.S.

490, 493 (1979). The Court began its analysis by recounting how the Board had increasingly

expanded its jurisdiction over religious schools despite the First Amendment objections and

concerns raised by those institutions. *Id.* at 497-499. The Court detailed how the religious

elements of education are inseparable from and inextricably intertwined with the secular

components, and how any effort by the Board to differentiate between the two risks

constitutionally impermissible government entanglement in the religious mission of a school. *Id.*

at 501-502.

Turning to the Board's enforcement of the National Labor Relations Act ("NLRA" or

"the Act"), the Court anticipated religious schools defending against an unfair labor practice

charge by asserting their religious creeds mandated the allegedly unlawful action and "[t]he

resolution of such charges by the Board, in many instances, will necessarily involve inquiry into

the good faith of the position asserted by the clergy-administrators and its relationship to the

school's religious mission" *Id.* at 502. The Court also found constitutionally troubling the

obligation placed on religious schools to bargain over the "terms and conditions of employment"

6

and recognized doing so would inevitably "implicate sensitive issues that open the door to conflicts between clergy-administrators and the Board, or conflicts with negotiators for unions." *Id.* at 503-504.

Given this constitutional minefield and the danger that the Board would explode the First Amendment rights of religious schools by attempting to cross it, the Court stated "[i]t is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, *but also the very process of inquiry leading to findings and conclusions.*" *Id.* at 502 (emphasis added).

Seeing "no escape from conflicts flowing from the Board's exercise of jurisdiction over teachers in church-operated schools and the consequent serious First Amendment questions that would follow" the Court looked to whether the Act clearly expressed an intention of Congress for it to cover religious schools. *Id*. 504. The Court's "examination of the statute and its legislative history indicate[d] that Congress simply gave no consideration to church-operated schools." *Id.* Given the absence of such intent, the Court held straightforwardly that the Act does not grant the Board jurisdiction over religious schools. *Id.* at 507.

Recognizing the force of *Catholic Bishop*, the Board noted that it "has an important mission to protect employees' rights set forth in the National Labor Relations Act, but those rights are subordinate to those enshrined in the Constitution where there is a potential conflict between the two." *Bethany College*, 369 NLRB No. 98, slip op. at 7 (2020). As such, the Board understood that it is improper for it to "engage in a balancing of competing statutory and constitutional interest," and the Act must be "interpreted to avoid the substantial risk of infringement of the rights contained in the Religious Clauses." *Id.* The Board further acknowledged that it has no expertise in interpreting the Religious Clauses of the First

93336530v.1

Amendment and should therefore refrain from engaging in analysis of what "does and does not constitute a religious function" at religious educational institutions. *Id.* at 8.

Despite the limitations on Board jurisdiction underscored in *Catholic Bishop*, and the Board's own recognition of those limitations in *Bethany College*, the Board inappropriately seeks to exercise jurisdiction over a religious educational institution in this case.[5]

**B.    *University of Great Falls v. NLRB* Reinforces *Catholic Bishop's* Holding That The Board May Not Subject Religious Educational Institutions To Its Jurisdiction And Adopted a Three-Prong Test To Identify Such Institutions**

Building upon *Catholic Bishop*'s foundation, in *University of Great Falls v. NLRB, supra*, the D.C. Circuit established a three-part test to identify those religious educational institutions that are exempted from Board jurisdiction. 278 F.3d 1335 (D.C. Cir. 2002). That test subsequently was adopted by the Board in *Bethany College.*[6]

In *University of Great Falls*, the educational institution in question was a Catholic university located in Montana.  In 1995, the Board commenced proceedings to determine if a majority of the university's faculty desired the Montana Federation of Teachers as their collective-bargaining representative. *Id.* at 1137-1338. Throughout the administrative process, Great Falls argued that it was exempt from the Board's jurisdiction under *Catholic Bishop.  Id.*

---

[5]  More generally, *Bethany College* has been targeted by the current General Counsel of the Board as precedent that should be overruled and replaced by a standard that would expand NLRB jurisdiction. *See* Memorandum GC 21-04 (2021) at pp. 1, 5.

[6] Prior to its decision in *Bethany College*, the Board repeatedly had sought to exercise jurisdiction over religious educational institutions. *See e.g.*, *Pacific Lutheran University,* 361 NLRB 1404 (2014). Numerous circuit court decisions, however, took the Board to task for jurisdictional overreach. *See e.g., University of Great Falls, supra*; *Duquesne University of the Holy Spirit v. NLRB,* 947 F.3d 824 (D.C. Cir. 2020); *Carroll College, Inc. v. NLRB,* 558 F.3d 568 (D.C. Cir. 2009); *Universidad Central de Bayamon v. NLRB,* 793 F.2d 383 (1st Cir. 1986) (*en banc*); *NLRB v. Bishop Ford Central Catholic High School,* 623 F.2d 818 (2d. Cir. 1980).

The Board refused to acknowledge this limitation on its jurisdiction, and subjected the university to an invasive and constitutionally impermissible examination of its religious practices and mission. *Id*. at 1338-1340. The Board considered itself a competent and legitimate judge of the university's religious beliefs and scrutinized the university's curriculum, the policies adopted by the board of trustees, the qualification requirements of the president and other administrators, the school's admission requirements, and the beliefs of faculty and students in concluding that Great Falls did not have a "substantial religious character." *Id*. at 1340.

The D.C. Circuit, affording the Board's determination no deference, recounted the First Amendment pitfalls recognized by the Supreme Court in *Catholic Bishop* that necessarily arise from the Board exercising jurisdiction over religious educational institutions: an inquiry that intrudes upon the school's religious mission in its processes, findings and conclusions and an unavoidable entanglement between the religious mission of the schools and the collective-bargaining process. *Id.* at 1341.

The Court admonished the Board for "trolling through the beliefs of the University, making determinations about its religious mission, and that mission's centrality to the 'primary purpose' of the University." *Id*. at 1342. As examples of how the Board's processes implicate the Religious Clauses of the First Amendment, the Court highlighted questions asked by the Board's Hearing Officer at the representation hearing, including requiring the university president "to justify the method in which the University teaches gospel values, and to respond to doubts that it was legitimately 'Catholic.'" *Id.* at 1343.

To prevent the Board from "delving into matters of religious doctrine or motive" and "coercing an educational institution into altering its religious mission to meet regulatory demands," the D.C. Circuit established a three-pronged "bright line test" to determine whether

9

the Board has jurisdiction over an institution under *Catholic Bishop*. *Id.* at 1345, 1347. The three

components are whether an institution: (1) holds itself out to the public as a religious institution;

(2) is non-profit; and (3) is religiously affiliated. *Id.* at 1347. If this showing is made, the Board

lacks jurisdiction and cannot further process the case without implicating the Religious Clauses

of the First Amendment. *Id.*

> **C.    Under *Catholic Bishop*, The Board May Not Exercise Jurisdiction Over LLUHEC Because LLUHEC Satisfies The *University of Great Falls* Three-Pronged Test And Because The Exercise Of Jurisdiction Would Implicate Serious First Amendment Concerns**

> **1.    LLUHEC Satisfies the *University of Great Falls* Three-Pronged Test**

LLUHEC satisfies the *University of Great Falls* three-pronged test and thus is a religious

education institution exempt from Board jurisdiction because it (i) holds itself out to the public

as a religious institution, (ii) is non-profit, and (iii) is part of the Seventh-day Adventist Church.

LLUHEC and LLUH -- of which LLUHEC is a part -- hold themselves out to the public

as religious institutions in many ways. The public-facing website discusses their religiously-

inspired mission and identifies LLUH as a Church institution on numerous pages. (Exhibit A,

¶12; Exhibit F; *see also* Loma Linda University Health: The Regional Leader In Health Care

(lluh.org)). Many publicly-available documents also clearly identify LLUH, and therefore

LLUHEC, as a religious institution. (Exhibit I; Exhibit J).

Moreover, the LLUH crest – which is ubiquitous on the LLUH website, and in

documents and on campus – features a Christian cross, a Bible and Seventh-day Adventist

symbols (a torch). It also contains the Seventh-day Adventist inspired teaching and motto, "To

make man whole."  Many buildings on the LLUH campus prominently display quotes from the

Bible on their facades, and there are numerous religious statues and chapels on the LLUH

campus. (Exhibit A, ¶ 13).

LLUHEC meets the second prong because it is organized under the California Nonprofit Religious Corporation Law and was granted 501(c) status by the Internal Revenue Service in 2014 (Exhibit A, ¶ 4; Exhibit B, pp. 1, 4; Exhibit C).

LLUHEC satisfies the last prong of *University of Great Falls* test because, it is not only affiliated with a religious organization, it is an actual part of the Church. (Exhibit A; Exhibit B; Exhibit F; Exhibit I; Exhibit J; Exhibit L; Exhibit O, p. 38).

### 2. Exercising Jurisdiction Over LLUHEC Would Implicate Serious First Amendment Concerns

As discussed above in Section II.A, the Supreme Court in *Catholic Bishop* removed religious educational institutions from the jurisdiction of the Board. 440 U.S. at 507.  As the Court recognized, to hold otherwise would risk serious infringement of the Religious Clauses of the First Amendment. *Id.*

We anticipate that the Board will argue that *Catholic Bishop* and its progeny apply only to teachers.  However, even if the Board makes this argument: (1) the residents and fellows have significant teaching responsibilities in relation to other residents and fellows, as well as to medical school students: and (2) the First Amendment issues regarding teachers at a religious institution are equally present regarding religious school students as they are with respect to teachers.

Residents and fellows at LLUHEC are graduate medical students, but they also have substantial and important teaching obligations regarding junior residents and LLU medical students. (Exhibit A, ¶¶ 6, 14; Exhibit G, p. 2; Exhibit L at paragraph 11(c)). The education that the LLUHEC residents and fellows provide is part medical knowledge and part Church doctrine. (Exhibit A, ¶¶ 6, 14). Further, residents and fellows at LLUHEC are encouraged to conduct themselves in accordance with the Church's teachings for the benefit of other students. (*Id.*).

11

Because the residents and fellows are providers of religiously-infused education, the Board's exercise of jurisdiction over them would implicate the very same First Amendment concerns that the Supreme Court raised in *Catholic Bishop* regarding teachers at religious educational institutions. Therefore, in order to avoid likely First Amendment violations, the Court should hold that the Board also lacks jurisdiction over the residents and fellows at LLUHEC.

Even if the Court were to entirely disregard the teaching responsibilities of the residents and fellows at LLUHEC and treat them only in their capacity as students, First Amendment conflicts cannot be avoided. While neither the courts nor the Board have expressly addressed whether the *University of Great Falls* test applies to students as well as teachers at religious institutions[7], the same First Amendment issues are present for the Board's exercise of jurisdiction over either. This is true for at least three reasons, all related to the immutable nature of a religious educational institution.

First, the purpose of a religious educational institution is inherently bound up with the teaching of its students. Indeed, providing an education informed by its particular religious beliefs is a fundamental reason for such a school's existence. *See Lemon v. Kurtzman,* 403 U.S. 602, 628 (1971) (Douglas, J. concurring) (emphasizing that "the admitted and obvious fact that the *raison d'être* of parochial schools is the propagation of a religious faith."). The Supreme Court in *Catholic Bishop* acknowledged this by repeatedly invoking the mission of a religious

---

[7] The facts demonstrate that the residents and fellows at LLUHEC are both students and non-employee teachers. (Exhibit A, ¶¶ 6, 14; Exhibit G at p. 2; Exhibit L at paragraph 11(c)).  But even if the medical fellows and residents have dual status as both students and employees, this does not change the analysis, especially because the purpose of the LLUHEC residency programs is to train new physicians in a manner consistent with the Church's education and healing ministries. (Exhibit A, ¶¶ 6, 14; Exhibit G). Put another way, the residency programs are inextricably intertwined with the Church's religious mission and this would not be changed even if the fellows and residents wore two hats: student and employee.

school and recognizing there was no way in which the Board could exercise jurisdiction over the teachers at such an institution without unconstitutionally invading its religious mission. 440 U.S. at 501-502. *Catholic Bishop* also keenly observed that the instruction provided by a religious institution, even in ostensibly secular subjects like reading, is infused with religious doctrine. *Id.* at 501.

Second -- and closely linked to the first reason -- is the reciprocal interest shared among teachers and students in the religious nature of the instruction. The former provides the instruction, and the latter receives the instruction. And regardless of whether one is the teacher or the student, the instruction maintains its religious elements. To make a distinction between teacher and student for First Amendment purposes would make no sense and is constitutionally proscribed.

Indeed, in any educational institution – and especially ones of religious character -- the educational process often blurs distinctions between "students" and "teachers" as to spiritual matters.  In either case, the students are in communion with the teachers, and the religious nature of the institution infuses and is inseparable from the curriculum.[8]

Third, if the Board were to exercise jurisdiction over the residents and fellows, it would be necessary for it to inquire into, among other things, whether certain actions were required or prohibited by the tenets and teachings of the Seventh-day Adventist faith and what constitutes a term and condition of employment.[9] *See Catholic Bishop,* 440 U.S. at 502-503. As noted, those

---

[8] The Supreme Court in *Catholic Bishop*, while not expressly addressing whether its reasoning also applies to students at a religious institution, made numerous references to the Board's lack of jurisdiction over religious  "educational institutions." If the Board cannot exercise jurisdiction over an employee because he or she is a teacher at a religious school, the very same rationale would prohibit the Board from exercising jurisdiction over the students at that institution.

[9] Indeed, the Union has already filed an unfair labor practice charge against LLUHEC. *See* Case No. 31-CA-312728.

considerations are inextricably intertwined. For instance, the Board would have to determine whether a requirement that a resident or fellow engage in prayer with a patient is a religious matter or a term and condition of employment. Or whether two residents who refuse to engage in such a requirement are engaged in protected, concerted activity.

Such are the constitutional pitfalls of exercising jurisdiction over students at religious educational facilities and the Board is not empowered to undertake such doctrinal assessments. Moreover, the Court underscored that the way to avoid such entanglements is to categorically divest the Board of jurisdiction over the institution.

Accordingly, because the First Amendment considerations and conflicts are the same for teachers and students at religious educational facilities, the test to determine whether the Board may constitutionally exercise jurisdiction over them should be the same.

### D. LLUHEC Has Already Been Forced to Suffer The Very Harm That *University of Great Falls* And *Bethany College* Sought To Prevent The Board From Inflicting on Religious Educational Institutions

As detailed above in Section II.B, the D.C. Circuit made it clear in *University of Great Falls* that the Board may not "troll" through the religious practices of a school to determine if they are sufficiently central to the school's mission to remove it from the Board's jurisdiction. 278 F.3d at 1342. In order to the prevent this unconstitutional conduct, *University of Great Falls* created the three-pronged test to allow "the Board to determine whether it has jurisdiction without delving into matters of religious doctrine or motive, and without coercing an educational institution into altering its religious mission to meet regulatory demands." *Id.* at 1345. The Board in *Bethany College* adopted the three-pronged test for the same reasons. 369 NLRB No. 98, slip op. at 7-9.

On three separate occasions, LLUHEC asked the Board to bifurcate the religious jurisdictional issue and allow it to make the limited showing necessary to meet the *University of*

*Great Falls* and *Bethany College* tests. (Exhibit H, pp. 24-34, 45-55; Exhibit O, Day One Representation Hearing Transcript pp. 4-9). On each occasion, LLUHEC cited to *Catholic Bishop, University of Great Falls* and *Bethany College*. (*Id.*) The Board therefore was well aware of the First Amendment rights at risk and the test that the D.C. Circuit and the Board had adopted to protect the First Amendment rights of religious educational institutions.

The Board denied each of LLUHEC's requests. (Exhibit H, pp. 44, 59; Exhibit O, pp. 36-37). In doing so, it forced LLUHEC to participate in a representation hearing that considered issues and facts far beyond those necessary to decide whether LLUHEC satisfies the *University of Great Falls* and *Bethany College* three-pronged tests. Indeed, LLUHEC had to endure the very same unconstitutional questioning that the D.C. Circuit described in *University of Great Falls*. *See* 278 F.3d at 1343.

The Union's counsel repeatedly asked LLUHEC witnesses about LLUHEC's education ministry, its healing ministry, the role of religion in its curriculum, the role of religion in ranking prospective residents, and the religious beliefs and practices of its residents. Specific questions include the extent to which LLUHEC considers whether a person is a member of the Church when ranking prospective residents (Exhibit O, p. 16-17); the extent to which residents engage in spiritual treatment with patients (*Id.* at pp. 18-19, 35); the number of residents that have attended training on spiritual health curriculum (*Id.* at p. 24); the departments in which spiritual health is a mandatory part of the curriculum (*Id.* at pp. 24-25); whether spiritual treatment and spiritual history are considered in resident evaluations (*Id.* at pp. 25-26); the extent to which residents are required to interact with the school of religion and center for whole person care (*Id.* p. 27); how many of LLUHEC's residents are members of the Church (*Id.* at p. 35); the Church's religious beliefs regarding labor organizations (Exhibit P, Day 2 Representation Hearing, pp. 4-7);

whether residents are required to attend church services and practice Seventh-day Adventism (*Id.* at p. 23); whether LLUHEC requires residents to convert to Seventh-day Adventism (*Id.*); and whether residents are forced to lead or participate in prayer (*Id.* at pp. 29-30).[10]

These questions are of the very same nature as those expressly identified *University of Great Falls* as implicating *Catholic Bishop* and creating "constitutional infirmities." 278 F.3d 1343-1344. The Board should have been aware this; if it wasn't, LLUHEC provided more than sufficient notice. The Board, however, refused to follow its own and D.C. Circuit precedent and instead wantonly violated LLUHEC's First Amendment rights and inflicted irreparable harm on LLUHEC. This Court cannot condone such behavior.

### E.   RFRA Prohibits the Board from Asserting Jurisdiction and Requiring LLUHEC To Recognize And Bargain With A Union.

RFRA also mandates that the Board may not exercise jurisdiction over LLUHEC. As explained below, the U.S. Supreme Court has repeatedly affirmed RFRA's broad protections for religious exercise, most recently in its *Hobby Lobby* decision. Because -- as even the NLRB found in *Ukiah Adventist Hospital d/b/a Ukiah Valley Medical Center*, 332 NLRB 602 (2000) -- the Act substantially burdens the religious exercise of an Adventist organization, the Board has an "exceptionally demanding" burden to show its jurisdiction is the least restrictive means to achieve its goals.  *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).

The Board cannot meet this high burden. Nor may the Board simply fall back on its *Ukiah* decision because, as explained below, it preceded *Hobby Lobby* and other governing

---

[10] This is just a sample of questions from the first two days of the representation hearing that the First Amendment, *University of Great Falls* and *Bethany College* prohibit. LLUHEC will supplement this filing with additional excerpts once the transcript from day three and subsequent days of the representation hearing becomes available.

cases, applied an insufficiently demanding and erroneous legal standard, and is factually distinguishable.

### 1.    RFRA

Congress enacted RFRA in response to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), which held that the Free Exercise Clause does not bar the government from burdening the free exercise of religion with a "valid and neutral law of general applicability." *Id.* at 879. In passing RFRA, Congress recognized that "laws 'neutral' towards religion may burden religious exercise as surely as laws intended to interfere with religious exercise" and that "governments should not substantially burden religious exercise without compelling justification." 42 U.S.C. §2000bb(a).[11]

To establish a RFRA claim, a plaintiff must "present evidence sufficient to allow a trier of fact rationally to find" that a government action "substantially burden[s]" the plaintiff's exercise of religion. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008), *cert. denied*, 556 U.S. 1281 (2009), quoting 42 U.S.C.§ 2000bb–1(a); *accord Hobby Lobby, supra*. Once a plaintiff has done that, "the burden of *persuasion* shifts to the government to prove that the challenged government action is in furtherance of a 'compelling governmental interest' and is implemented by 'the least restrictive means.'" *Navajo Nation*, 535 F.3d at 1068, quoting

---

[11] President Clinton, who attributed the extraordinary coalition behind RFRA to "the power of God," further explained at the signing ceremony:

> The free exercise of religion has often been called the first freedom, that which originally sparked development of the full range of the Bill of Rights. Our founders cared a lot about religion. And one of the reasons they worked so hard to get the First Amendment into the Bill of Rights, at the head of the class, is that they well understood what could happen ... if there were not some space created and some protection provided.

William Jefferson Clinton, *Remarks at RFRA Signing Ceremony*, November 16, 1993.

42 U.S.C. § 2000bb–1(b) (emphasis added).[12]  "If the government cannot so prove, the court *must* find a RFRA violation." *Id.* (emphasis added).

Here, as shown below, and as admitted by the Board in *Ukiah,* subjecting LLUHEC to Board jurisdiction—and requiring it to recognize and bargain with a union—would substantially burden its religious exercise without compelling justification.

### 2.    Substantial Burden on LLUHEC's Religious Free Exercise

A "substantial burden" is imposed under RFRA when plaintiffs "are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." *Navajo Nation*, 535 F.3d at 1069-1070 (citing *Sherbert v. Verner*, 374 U.S. 398 (1963)) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). As the Tenth Circuit has underscored, "[c]reating a situation that forces the religious claimant to choose between following the dictates of his faith and winning an important benefit or forgoing a considerable penalty is coercion enough." *Yellowbear v. Lampert*, 741 F.3d 48, 56 (10th Cir. 2014); *accord Thomas v. Review Bd. of the Indiana Employment Sec. Div.,* 450 U.S. 707, 717-718 (1981).

All that is required is that the claimant has an "honest conviction" that what the government is requiring, prohibiting, or pressuring him to do conflicts with his religion.  *Korte v. Sebelius,* 735 F.3d 654, 683 (7th Cir. 2013). See also *Thomas*, 450 U.S. at 715, ("Thomas drew a [religious] line, and it is not for us to say that the line he drew was an unreasonable one.");

---

[12] RFRA "proscribes any substantial burden on Free Exercise unless the government 'demonstrates' (a statutorily defined term) that the substantial burden (1) "is in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of furthering that compelling governmental interest."  *Navy Seal 1 v. Austin*, 2022 WL 534459, at *15 (M.D. Fla. 2022).  In particular, RFRA defines "demonstrates" as "meets the burdens of going forward with the evidence and of persuasion."  42 U.S.C. § 2000bb-2(3).

*Hobby Lobby*, 134 S. Ct. at 2779 (sufficient that for-profit employers had honest conviction that contraceptive coverage mandate would violate their religious belief that life begins at conception).

Here, there is no question that the "honest conviction" or similar standards are easily met. The Church's historic doctrine prohibiting recognition of and bargaining with labor organizations has long been recognized by the courts and the Board. *See, e.g., Cap Santa Vue, Inc. v. NLRB.*, 424 F.2d 883, 885 (D.C. Cir. 1970); *Adventist Living Centers, Inc. v. NLRB,* 119 LRRM 2407, 2408 (N.D. Ill. 1984); *St. Elizabeth Cmty. Hosp.*, 259 NLRB 1135, 1139 (1982) (recognizing Church "doctrine which in effect prohibits its members from joining or bargaining with labor unions"); *Carroll College,* 345 NLRB 254, 259 (2005) (noting that "the teachings of the Adventist faith prohibit Adventist institutions …from recognizing or bargaining with unions."); *Ukiah Adventist Hospital,* 332 NLRB 602, 603 n. 5 (2000).[13]

Against this background, LLUHEC has plainly shown a substantial burden on its religious exercise in this case.  As explained in Section I.B, the Church's historic teachings explicitly prohibit LLUHEC from recognizing or bargaining with any union. As such, allowing the Board to exercise jurisdiction over LLUHEC would force it to choose between violating Church teachings and risking a considerable penalty.

Indeed, assertion of jurisdiction by the Board would create two distinct types of "substantial burden." First, it would directly require LLUHEC to violate the Church's settled

---

[13] Title VII cases also have recognized that employers must accommodate, and may not discriminate against, Adventist employees with religious objections to unions.  *See, e.g., Tooley v. Martin-Marietta Corp.,* 648 F.2d 1239, 1241 (9th Cir. 1981) (holding Adventist employee may not be compelled to pay union dues); *McDaniel v. Essex Int'l, Inc.*, 696 F.2d 34 (6th Cir. 1982) (affirming judgment on Title VII claim in favor of Adventist employee who was discharged for refusing to join union or pay dues); *Nottelson v. A.O. Smith Corp.*, 481 F. Supp. 756 (E.D. Wis. 1979) (same).

prohibition on recognizing or bargaining with a labor union. But as demonstrated above, the Church simply cannot, as a matter of its basic faith, participate in a collective bargaining process that it believes is antithetical to an individual relationship with God.

Second, many of LLUHEC's religious-based practices are incompatible with the duty to bargain in good faith over the terms and conditions of employment, 29 U.S.C. § 158 (d).  *See NLRB v. Salvation Army of Mass, Dorchester Day Care Ctr.*, 763 F.2d 1, 7-8 (1st Cir. 1985); *Cap Santa Vue, Inc. v. NLRB*, 424 F.2d 883, 889 (D.C. Cir. 1970). For example, the Church's beliefs prevent LLUHEC from bargaining over matters such as opening meetings with a prayer; ceasing non-essential functions on Friday at sundown in celebration of the Sabbath; refusing to serve meat in the LLUMC cafeteria; abstaining from alcohol, tobacco, and other mind-altering drugs; and requiring employees to comport themselves, while on duty (and in some circumstances, off duty), in a manner consistent with the dictates of the Church.

> **3.**    **The Board Cannot Demonstrate a Compelling Governmental Interest that Would Require LLUHEC to Violate its Religious Beliefs About Unions.**

RFRA explicitly adopts the compelling interest standard "as set forth in" the Supreme Court's decisions in *Sherbert* and *Yoder*.  42 U.S.C. §2000bb(b)(1).  Under those decisions, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."  *Yoder*, 406 U.S. at 215 (permitting exemption for Amish children from compulsory school attendance law). Put another way, only "the gravest abuses, endangering paramount interest, give occasion for permissible limitation" of religious observance.  *Sherbert*, 374 U.S. at 406 (upholding religious exemption from law denying unemployment benefits to those who would not work on Saturdays).

Statutes survive this exacting "strict scrutiny" standard "only in rare cases." *Church of The Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993); *Bernal v. Fainter*, 467 U.S.

216, 220 n.6 (1984) ("Only rarely are statutes sustained in the face of strict scrutiny. As one commentator observed, strict-scrutiny review is 'strict' in theory but usually 'fatal' in fact.")[14]

Two important requirements delineate the NLRB's burden to show a compelling interest. It cannot meet either requirement in this case.

### a.       Plaintiff-specific compelling interest

RFRA requires the Board to prove the government has a compelling interest in applying the law *to the particular claimant* at issue. *See* 42 U.S.C. §2000bb-1(b) (focusing on the "burden to the *person*") (emphasis added). This means that the Board cannot automatically apply (its wrongly-decided) *Ukiah* decision to LLUHEC.

In 2006, the Supreme Court confirmed that this plaintiff-specific inquiry is necessary under RFRA. In *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 431 (2006), a religious sect that receives communion by drinking a sacramental tea containing a hallucinogen sued to block enforcement against it of the Controlled Substances Act. The government advanced three compelling interests: "protecting the health and safety of [sect] members, preventing the diversion of [the drug] from the church to recreational users," and complying with a 1971 drug treaty signed by the United States. "Under the Government's view, there [was] no need to assess the particulars of the [the sect's] use or weigh the impact of an exemption for that specific use, because the Controlled Substances Act serves a compelling purpose and simply admits of no exceptions." *Id.*

---

[14]  President Clinton observed that RFRA permits the federal government to interfere with a person's exercise of religious convictions "almost never" (President's Remarks on Religious Liberties, 1995 WL 410673, *5 (White House)), or in other words "unless it's really going to threaten to bring the Government down or something terrible." 11/4/96 *Wkly. Compilation Presidential Documents* 2241, 1996 WL 13336126.

The Supreme Court, however, squarely rejected this "categorical approach." *Id.* at 431. It held that "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.*

Under this "more focused inquiry required by RFRA," the Court held "Congress's determination that [a hallucinogen] should be listed under Schedule I simply does not provide a categorical answer that relieves the Government of the obligation to shoulder its burden under RFRA." *Id.* And because the Government failed to demonstrate a compelling interest in applying the Act *to that particular sect*, it failed to meet its burden under RFRA. *Id.* at 434.

Thus, *O Centro* underscores the high burden established by RFRA. Even where a statute serves a beneficial purpose—and even where that purpose is protecting public health and safety through the regulation of "exceptionally dangerous" drugs—"under RFRA invocation of such general interests, standing alone, is not enough." *Id.* at 432. The government must show its compelling "*particular* interest in burdening this plaintiff's *particular* religious exercise …" *Yellowbear v. Lampert*, 741 F.3d 48, 57 (10th Cir. 2014) (emphasis added); *see also EEOC. v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018) (to demonstrate under RFRA that compelling interest is satisfied through application of the challenged law to the particular religious claimant, government must look beyond broadly formulated interests justifying the general applicability of the law and scrutinize the asserted harm of granting a specific exemptions to the particular claimant).

Here, the Board simply cannot demonstrate a compelling *particular* interest in burdening LLUHEC's *particular* religious exercise. It cannot show that exempting LLUHEC would endanger "paramount interests" of the Government, cause "grave abuses," or "threaten to bring

the Government down." There simply is no evidence that declining to exercise jurisdiction over LLUHEC would lead to such dire consequences.

Instead, the Board might rely on generalities, as it did in *Ukiah*, which is insufficient under the Supreme Court's subsequent *O Centro* decision. First, it might argue that the Act as a whole serves a compelling governmental interest because collective bargaining is "often an essential condition of industrial peace." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 42 (1937). But as the Supreme Court made clear in *O Centro*, the relevant inquiry under RFRA is whether the Board can show a compelling governmental interest in applying the Act *specifically to LLUHEC*. It cannot do so.

Generalized unsupported concerns about industrial peace are insufficiently compelling because there is no threat to industrial peace at LLUHEC. Seventh-day Adventist organizations have operated for over 140 years without unions, and there never has been a strike in the United States, including at LLUHEC.[15]  (Exhibit N, ¶ 15).  A broad assertion that there is a *compelling* governmental interest in upsetting the labor stability that has long existed at LLUHEC is simply insufficient under RFRA.

---

[15] This lack of labor strife exists in no small measure because Seventh-day Adventist institutions are guided by the teachings of the Church, which promote the ideals of harmony and conciliation, rather than conflict. Church directors and employees are expected to live by these management principles, and to promote the religious mission of the hospital.  The relationship that Seventh-day Adventist organizations enjoy with their employees is intimate and non-confrontational, in accordance with the teachings of the Church.  And part of the basis for Seventh-day Adventist beliefs against unionization of its religious institutions is to avoid destruction of this harmony by the influence of outside organizations, which are often accustomed to resolving disputes in a manner wholly inconsistent with Church teachings.

93336530v.1

In fact, the involvement of unions in the healthcare and educational sectors have not resulted in labor peace.[16] This is especially noteworthy when contrasted with the actual labor peace that has existed at Church organizations for over 140 years.

Second, the Board might rely on a generalized right of employees to self-organize.  But even such a right could not mean employees have a right to compel a religious educational institution to recognize a union. *Smith v. Arkansas State Highway Emp., Local 1315*, 441 U.S. 463, 464 (1979); *St. Elizabeth Cmty. Hosp.*, *supra*.  Rather, the contours of union representation rights are a creature of statute, *i.e.*, the Act. Thus, this argument only begs the question whether these Act-created rights can trump LLUHEC's specific, religious objections to union activity protected under RFRA and the Free Exercise Clause. They cannot.

Indeed, other federal employment rights have yielded under a RFRA challenge because the asserted interests were not sufficiently compelling. *See e.g. Hankins v. The New York Annual Conference of United Methodist Church*, 516 F. Supp. 2d 225, 237 (E.D.N.Y. 2007), *aff'd*, 351 F. App'x 489 (2d Cir. 2009) ("after applying the RFRA strict scrutiny test, … application of the ADEA to Defendants would place a substantial burden on their right to cho[o]se their own clergy and … the government does not possess a compelling interest in prohibiting age discrimination in the employment thereof."); *EEOC. v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996) (holding RFRA barred Catholic nun's Title VII sex discrimination claim).

Similarly, federal employment rights have yielded in the face of religious rights protected under the Constitution.  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S.

---

[16] Since January 2020, there have been approximately 300,000 union employees in the healthcare and education fields involved in work stoppages. See https://www.bloomberglaw.com/search/results/8d1e251d68b22eee8d27734acd0968e3 and https://www.bloomberglaw.com/search/results/ba8f606efac71eb0b0fc04c857c82eec.

Ct. 694 (2012) (finding "called" teacher could not assert Title VII claim against Lutheran Church). This is significant because, as *Hobby Lobby* confirms, RFRA provides even broader protection than the Free Exercise Clause. 134 S. Ct. at 2767.

Third, the Board may not merely rely on the fact that the Act applies to other non-educational institutions *generally*. Such reliance does not show a compelling interest in applying the Act to LLUHEC specifically. As established above, RFRA forbids the assertion of jurisdiction absent a *particularized* showing of a compelling interest, which cannot be made here. Moreover, this bridge already has been crossed when the Supreme Court in *Catholic Bishop* found that religious schools were outside of the ambit of Board jurisdiction, a holding adopted by the Board in *Bethany College.*

Finally, the Board may raise the specter of a dangerous "slippery slope" if LLUHEC is afforded a jurisdictional exemption. But such a concern is simply does not exist: LLUHEC is the only medical residency program that is a Seventh-day Adventist General Conference institution, and *Catholic Bishop* already has exempted faculty at religious educational facilities from the Board's jurisdiction.

In sum, the NLRB will be unable to demonstrate any LLUHEC-specific interest that is so compelling as to satisfy strict scrutiny. Thus, LLUHEC should prevail on its RFRA claim.

### b.     Underinclusiveness and other exemptions

Where a challenged statute or government action allows for other exceptions, this greatly undermines a showing of compelling interest. As the Supreme Court recognized in *Hialeah*, 508 U.S. at 547, "a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited."

Put differently, "[a] law's underinclusiveness—its failure to cover significant tracts of conduct implicating the law's animating and putatively compelling interest—can raise with it the

inference that the government's claimed interest isn't actually so compelling after all." *Yellowbear*, 741 F.3d at 60 ("why is this religious exemption offensive to the prison's putatively compelling no-lock-down interest when other secular exemptions are not?"); *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014) ("The very existence of a government-sanctioned exception to a regulatory scheme that is purported to be the least restrictive means under RFRA could, in fact, demonstrate that other, less-restrictive alternatives exist.").

Several Supreme Court cases have recognized this underinclusiveness principle. *See O Centro*, 546 U.S. at 432-434 (finding because Congress decreed a religious exemption for Native American use of peyote, "it [was] difficult to see how" those same concerns could "preclude any consideration of a similar exception for" religious use of hoasca); *Hialeah*, 508 U.S. at 547 (holding interest in protecting animals did not justify ordinance prohibiting ritual animal sacrifice where municipality permitted killing of animals in several other contexts); *Hobby Lobby, supra* (holding several exceptions to contraceptive mandate "arguably" undermined asserted compelling interest).

Here, the Act's numerous statutory and discretionary exemptions squarely establish that the asserted interest "isn't actually so compelling after all." *Yellowbear, supra*.  First, the statute expressly excludes from coverage federal, state, and local government employers; federal reserve banks; and domestic employees.  29 U.S.C. §152(2)-(3). Second, the Supreme Court and the Board have recognized implied statutory exemptions for church-operated secondary schools and institutions of higher education.  *See, e.g., Catholic Bishop, supra*; *St. Joseph's College*, 282 NLRB 65 (1986).

Third, the Board frequently has exercised its discretion to decline jurisdiction over individual employers or groups of employers for various reasons. *See Retail, Wholesale & Dep't Store Union v. NLRB*, 745 F.2d 358 (6th Cir. 1984); *Council 19, Am. Fed'n v. NLRB*, 296 F. Supp. 1100, 1104 (N.D. Ill. 1968) ("The NLRB may decline to assert jurisdiction on an *ad hoc* basis over religious, educational, and eleemosynary employers") (collecting cases); *Res-Care, Inc.*, 280 NLRB 670 (1986) (government contractor exempted); *Ohio Pub. Interest Campaign*, 284 NLRB 281 (1987) (non-profit corporation that does not have substantial impact on commerce exempted); *Contract Servs., Inc. & Nat'l Maritime Union*, 202 NLRB 862 (1973) (finding U.S. business in Panama Canal Zone exempted for foreign policy reasons, stressing the Board's "complete discretionary power to determine in each case whether the public interest requires it to act."); NLRB, *Outline of Law & Procedure in Representation Cases* ("*Outline*") (June 2017), pp. 21-23  (describing Board "discretion . . . to decline to assert jurisdiction over any labor dispute" where it determines "the effect of such dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction," or where "it concludes that it would not effectuate the purposes of the Act to assert jurisdiction in a particular case.").[17]

The NLRB has even promulgated a regulation declining to exercise jurisdiction over "the horseracing and dog racing industries," 29 C.F.R. §103.3, in part because few labor disputes had occurred in these industries, and because those horse racing and dog racing labor disputes do not sufficiently impact interstate commerce to warrant exercise of the Board's jurisdiction. *Horse-racing and Dog-racing Industries*, 38 Fed. Reg. 9507 (April 17, 1973); *New York Racing Ass'n*

---

[17] Although the Board has changed its position on some of these exemptions over time, it has never denied that it has authority to exempt employers from coverage of the Act for a wide range of policy reasons.  The mere vesting of such discretionary authority in the Board shows that Congress *did not* view uniform application of the Act to *all* employers to be an important governmental interest, much less a compelling one.

*v. NLRB*, 708 F.2d 46, 48 (2d Cir. 1983) ("[S]ince its creation the NLRB has never exercised all of its broad statutory jurisdiction, which extends to the limits of the commerce clause.").

If the horse and dog racing industries can be exempted from Board jurisdiction without frustrating some vital public interest, there can be little doubt that LLUHEC's sincere religious beliefs warrant a similar exemption.

Moreover, even in industries that it has not categorically exempted, the Board "[i]n its exercise of administrative discretion," routinely exempts employers from jurisdiction "based on the volume and character of the business done by the employer." *See Outline* at 1.  The fact of such exemptions "calls into doubt the [Board's] claims that someone in [LLUHEC's] position should find [its] religious practices hindered simply to further a goal that history demonstrates is achievable even when there are exceptions in place." *McAllen Grace Brethren Church*, 764 F.3d at 477.

RFRA requires the NLRB to prioritize concerns for religious freedom above the many other types of considerations that have led to employer exemptions.  Because Congress, the courts, and the Board have carved out numerous exemptions, RFRA requires a similar exception to protect LLUHEC's religious exercise.

### 4.      Requiring LLUHEC to Violate its Religious Beliefs Is Not the Least Restrictive Means of Achieving the Alleged Governmental Interest.

RFRA requires the Board to prove that burdening LLUHEC's religious exercise is "the least restrictive means of furthering" its asserted compelling interest.  42 U.S.C. § 2000bb–1(b).

In *Hobby Lobby*, the Supreme Court held that the "least restrictive means" test is "exceptionally demanding."  134 S. Ct. at 2780. Going further, the Court held that the least-restrictive-means test provides "even broader protection for religious liberty than was available" under the pre-RFRA decisions interpreting the Free Exercise Clause.  *Id.* at 2761, n. 3. *Hobby*

*Lobby* thus establishes that RFRA is a formidable hurdle for the government to meet, even higher than was thought at the time the Board decided *Ukiah*.

Indeed, the Court noted that when the government "provides an exception to a general rule for secular reasons (or for only certain religious reasons), it must explain why extending a comparable exception to a specific plaintiff for religious reasons would undermine its compelling interests." *Id.* at 2783, n. 41; *accord Yellowbear*, 741 F.3d at 62-63 (government "must of course refute ... alternative schemes … to achieve that same interest and show why they are inadequate."). The Board cannot satisfy this rigorous standard.

Applying this "exceptionally demanding" standard, the Court held that parts of the Affordable Care Act's ("ACA") contraceptive coverage mandate violated RFRA when applied to three for-profit employers who believe that life begins at conception. Specifically, there were less restrictive means available to provide employees with the contraceptive coverage—more specifically, an existing alternative in the ACA that was available only to religious non-profits—that fulfilled the government's interest without burdening religious exercise. Accordingly, the Court determined that the government failed to meet its heavy burden under RFRA.  134 S. Ct. at 2780-2782.

Here, as the NLRB is unable to satisfy the "exceptionally demanding" least-restrictive-means requirement, the Court should not allow the Board to assert jurisdiction over LLUHEC. In this regard, ACGME requires institutions such as LLUHEC to have a policy  outlining the procedures for submitting and processing resident/fellow grievances at the program and institutional level, and one which minimizes conflicts of interest.  ACGME Institutional Requirements section IV.E.

29

Even if LLUHEC did not have such procedures, there are numerous less restrictive alternatives than union recognition and collective bargaining. These include, for example: (1) the use of employee committees; (2) mediation; (3) grievance and arbitration procedures; (4) administrative charges before state and federal agencies other than the NLRB or a state labor relations board (*e.g.*, the EEOC and DFEH); (5) the ability of the government to seek injunctive relief to end strikes; (6) employee-initiated litigation to enforce workplace rights; and (7) a myriad of other well-recognized means of establishing good employee-employer communications and relationships. In addition, labor disputes conceivably could be addressed through the Federal Mediation and Conciliation Service or a state equivalent. These alternatives can achieve the goals of protecting employee rights and preventing labor strife without forcing LLUHEC to deal with unions in violation of its religious beliefs.

The Board will be unable to meet its burden to show—with concrete evidence—that these alternatives "are inadequate." *Yellowbear*, 741 F.3d at 62-63; *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 807 (1996) (Kennedy, J., concurring) (noting courts "will not assume plausible alternatives will fail to protect compelling interests;" "there must be some basis in the record, in legislative findings or otherwise, establishing the law enacted as the least restrictive means."); *Jones v. Slade*, 23 F. 4th 1124, 1144 (9th Cir. 2022) (finding that to carry its burden, the government "must show 'it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.'") (*quoting Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005)) (RLUIPA context). Indeed, in light of LLUHEC's historically harmonious relationship with its employees, there is little doubt the existing non-union alternatives will more than suffice to meet the government's goals.

Moreover, in light of the numerous exceptions to NLRB jurisdiction that already exist, the Board cannot possibly meet its burden to "explain why extending a comparable exception to a specific plaintiff for religious reasons would undermine its compelling interests." *Hobby Lobby,* 134 S. Ct. at 2782, n. 41.

Finally, *Hobby Lobby* makes clear that RFRA protects religious rights even if countervailing employee rights are implicated. In *Hobby Lobby*, the government argued that there can be no RFRA challenge when the challenged law confers benefits on third parties, *i.e.*, the female employees in that case. The Supreme Court held that there was no such categorical rule: "it could not reasonably be maintained that any burden on religious exercise, no matter how onerous …, is permissible under RFRA so long as the relevant legal obligation requires the religious adherent to confer a benefit on third parties." 134 S. Ct. at 2781, n.37. It thus upheld the employers' right not to provide certain contraceptive coverage for their employees. *Id.* at 2780-2782.

Similarly, employee representation rights under the Act do not automatically trump LLUHEC's religious rights. Far from it, under the stringent least-restrictive-means test applied in *Hobby Lobby*, the Board must affirmatively prove that there are no other alternatives to full-scale union recognition and bargaining, which it has not done and cannot do. This especially is true in light of the numerous alternatives and existing exemptions discussed above.

### 5. The Board's Outdated *Ukiah* Decision Neither Is Binding Nor Persuasive.

The Board may argue that its 2000 decision in *Ukiah* —which rejected an Adventist hospital's RFRA challenge—dictates the result in this case. That is not so. While LLUHEC maintains that *Ukiah* was wrongly decided from the start, post-*Ukiah* legal developments, including decisions of the Supreme Court and the D.C. Circuit, have only strengthened

31

protections for religious exercise and made it clear that the outdated *Ukiah* decision is inapplicable.

First, *Ukiah* relied on the Board's own decision in *University of Great Falls*, *supra*, which found no RFRA violation in exercising jurisdiction over a religious university.  But, shortly thereafter, the D.C. Circuit found the Board's RFRA analysis faulty and insufficiently rigorous.  *See University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002).

Specifically, the D.C. Circuit noted that, contrary to the Board's conclusion, "RFRA presents a separate inquiry from *Catholic Bishop*," and requires careful, independent consideration.  *Id.* at 1347.  And the Court recognized that, "even if the act of collective bargaining would not be a 'substantial burden'" in violation of RFRA, "remedying a particular NLRA violation" could be.  *Id.* Thus, *Ukiah* was based on a discredited (and unduly narrow) reading of RFRA, and does not govern, much less is persuasive.  *See also Carroll College,* 558 F.3d at 575 (reversing Board decision and finding no Board jurisdiction under *Great Falls*).

Second, since *Ukiah*, there have been over two decades' worth of decisions that underscore the vigorous protections RFRA affords religious exercise, and the high hurdle the government must overcome to burden that exercise.[18] As discussed above, those post-*Ukiah*

_____

[18] Indeed, the week before *Ukiah* was issued, Congress passed a related religious freedom statute, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq*. ("RLUIPA"), which employs the same three-pronged "substantial burden," "compelling interest," and "least restrictive means" test as RFRA, but in the context of protecting religious freedom in land use and prisons.  A substantial body of case law has subsequently developed applying the three-pronged test under RLUIPA, which confirms that a rigorous, plaintiff-specific analysis is required before a law can be allowed to substantially burden religious exercise.  *See e.g. Mayweathers v. Terhune,* 328 F. Supp. 2d 1163 (C.D. Cal. 2003) (granting exemption from grooming regulations for inmates who refused to shave on religious grounds); *Elsinore Christian Ctr. v. City of Elsinore*, 270 F. Supp. 2d 1163, 1174 (C.D. Cal. 2003) ("Even significant governmental interests will not necessarily rise to the requisite level."); *Cottonwood Christian Center v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1228 (C.D. Cal. 2002).

cases—most notably *Hobby Lobby* and *O Centro* (Supreme Court), *Yellowbear* (10th Circuit), and *Korte* (7th Circuit), among others—confirm that courts must "look[ ] beyond broadly formulated interests" and "scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants."  *O Centro*, 546 U.S. at 431.

Finally, courts must closely scrutinize the government's selective application of a law, or its failure to rebut alternative means that do not burden free religious exercise.  *Id.* For this reason, courts have expressed hesitancy in relying on decisions construing RFRA "before the Supreme Court's holding in *Hobby Lobby* clarified how heavy the burden is on the [government] to demonstrate that the regulatory framework is the least restrictive means."  *McAllen Grace Brethren Church*, 764 F.3d at 479.

That is not the analysis *Ukiah* undertook. The Board did not consider—let alone decide—that the government had a compelling interest in applying the Act to the hospital in *Ukiah* Instead, it relied on the fact that it had previously applied the Act to other Adventist institutions, and on broadly-stated interests in "preventing labor strife" and upholding the "right of employees to self-organization."  *Ukiah Adventist Hospital*, 332 NLRB at 603. But articulating the alleged compelling interest at the highest level of abstraction—and with reference to other institutions in other cases—is precisely the opposite of the plaintiff-specific inquiry demanded by RFRA. *Korte*, 735 F.3d at 686 ("Stating the governmental interests at such a high level of generality makes it impossible to show that the mandate is the least restrictive means of furthering them.").

The *Ukiah* Board also found a compelling government interest because Congress purportedly intended the Act to cover religious healthcare institutions (an intent the Board

---

Certainly, religious institutions such as LLUHEC, are, at the very least, entitled to the same religious protections as prisoners.

gleaned from the legislative history of the Act).[19] But this analysis simply begs the question: Congressional intent to apply the Act and thereby burden religion is precisely what RFRA addresses.  And as noted above, RFRA is a "super-statute" superimposed on every statute. *Korte*, 735 F.3d at 673; *O Centro*, 546 U.S. at 432 ("The Government repeatedly invokes Congress' findings and purposes underlying the Controlled Substances Act, but Congress had a reason for enacting RFRA, too.").

To assert that a compelling interest is shown by passage of the very legislation imposing the burden on religion is circular and is patently wrong, given RFRA's "super-statute" status.  *O Centro*, 546 U.S. at 432 ("RFRA … plainly contemplates that courts would recognize exceptions—that is how the law works."); *Yellowbear*, 741 F.3d at 62 ("The whole point of RFRA … *is to make exceptions* for those sincerely seeking to exercise religion.") (emphasis in original).

The Board's analysis of the "least restrictive means" prong in *Ukiah* was similarly flawed. It cited general concerns about labor strife, threat to self-organization rights, and disruption of vital healthcare services, ignoring that there was absolutely no record of any such problems Ukiah Valley Medical Center and without considering any other means to accomplish the Act's goals that did not burden religious freedom.[20] In other words, the Board simply assumed its conclusion—precisely the opposite of what recent RFRA case law demands. *United*

---

[19] Congress' intent is relevant under the *Catholic Bishop* abstention doctrine, but not under RFRA.

[20] Notably, since the petitioning union in *Ukiah* withdrew its election petition, no other union has filed an election petition to represent that hospital's employees, and there have been no employee work stoppages.  This alone shows the problem with relying on generalized statements of government interest, as opposed to looking at the particular facts of the case.

93336530v.1

*States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011) (government must "refute … alternative schemes").

Finally, regardless of the result in *Ukiah*, RFRA demands an independent, evidence-based inquiry of the burden on LLUHEC's religious exercise, the government's alleged compelling interest, and whether application of the Act is the least restrictive means *in this case*. That inquiry can lead to but one conclusion here—applying the Act to LLUHEC violates RFRA.

### F.      The Court Has Jurisdiction To Review a Non-Final Order Of The Board Pursuant To The Supreme Court's *Leedom v. Kyne* Doctrine And Because The Non-Final Order Violates RFRA

NLRB actions arising during representation proceedings are not in general directly reviewable in court. *See Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1310 (D.C. Cir. 1984). In *Leedom v. Kyne*, however, the Supreme Court recognized an exception to this usual rule. 358 U.S. 184 (1958). In order to come within the exception, a plaintiff must show: (1) that the Board has acted in excess of its delegated powers; and (2) that excepting district court review of the Board's action, the plaintiff would be deprived of a meaningful and adequate method of vindicating its rights. *Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006). The D.C. Circuit has recognized that the *Kyne* exception applies to strong and clear allegations that the Board has violated a party's constitutional rights. *See Lawrence Typographical Union v. McCulloch,* 349 F.2d 704, 708 (D.C. Cir. 1965); *McCulloch v. Libbey-Owens-Ford Glass Co.,* 403 F.2d 916, 917 (D.C. Cir. 1968). Regarding the infringement of First Amendment rights, the Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The first criterion for the application of the *Kyne* exception is met here because, if the Board were to continue exercising authority over LLUHEC, it would constitute a strong and

clear violation of LLUHEC's First Amendment rights. The Supreme Court's *Catholic Bishop* decision recognized that even subjecting a religious school to the Board's procedures would violate the First Amendment and that the only means to avoid such a violation was to rule that the Board lacked jurisdiction over such institutions. The D.C. Circuit's *University of Great Falls* decision established the test this Court must apply in determining whether LLUHEC is a religious educational institution. As shown above in Section II.C, LLUHEC satisfies this test. Accordingly, the Board's exercise of jurisdiction over teachers – or students – at a religious educational institution like LLUHEC is necessarily beyond the authority that Congress constitutionally could grant to the Board.

The second criterion for the application of the *Kyne* exception also is satisfied. As recognized by the Supreme Court, the denial of a plaintiff's First Amendment rights for even a minimal amount of time is an irreparable harm. *See Elrod v. Burns*, 427 U.S. at 373. As such, anything but an immediate and full vindication of LLUHEC's constitutional rights falls far short being "adequate and meaningful."

Indeed, without immediate review and action by this Court, LLUHEC would be forced to suffer -- and is suffering -- the trampling of its First Amendment rights by the NLRB until an indefinite date that may be years away. LLUHEC would have to participate in the Board's representation procedures, commit an unfair labor practice by refusing to bargain with the Union in order to obtain judicial review, depend upon the Union to file a charge with the Board, participate in an administrative hearing, wait for the administrative law judge to issue a decision, file exceptions and a brief with the Board, and then wait for the Board to issue its "final" decision. Only then could LLUHEC obtain judicial review of the Board's jurisdictional

determination. Clearly a situation in which a plaintiff must suffer recognized irreparable harm for months and likely longer is intolerable and cannot be countenanced by the Court.

*Caulfield v. Hirsch*, 1977 WL 15572 (E.D. Pa. 1977) and *McCormick v. Hirsch*, 460 F. Supp. 1337 (M.D. Pa. 1978) involve similar facts, procedural postures and arguments as those before the Court in this case and should inform the outcome here. In both *Caulfield* and *McCormick*, like here, the court considered whether the NLRB's attempted exercise of jurisdiction over religious educational institutions violated the First Amendment. Also like here, the plaintiff religious educational institutions requested the court to enjoin the Board from further processing representation proceedings under Section 9 of the NLRA. And, as here, the courts evaluated whether an injunction could issue under the *Leedom v. Kyne* exception.

In *Caulfield,* the Eastern District of Pennsylvania found that it had jurisdiction over the case, held that the NLRB's exercise of jurisdiction over the plaintiff religious educational institution violated the First Amendment, and permanently enjoined the Board from further "asserting jurisdiction or taking any administrative action by reason of the [Act]." 1977 WL 15572 at p. 14. The court characterized the case before it as "whether the NLRA . . . is unconstitutional as applied to the local parish elementary schools of the Archdiocese of Philadelphia" and then found it had jurisdiction, at least in part, because Kyne stands "for the proposition that where plaintiff is not seeking review of an NLRB representation order in the manner in which it would normally be reviewed [under Section 10 of the Act], but rather is seeking relief from NLRB conduct which exceeds its statutory or constitutional power, then district court jurisdiction lies." *Id.* at pp. 3-5.

After undertaking a detailed examination of First Amendment principles and the Act, the Court concluded that allowing the Board to exercise jurisdiction over a religious institution

would violate both the Free Exercise and Establishment Clauses of the First Amendment. *Id.* at pp. 4-13. As a remedy, the court issued a permanent injunction prohibiting the Board from further processing the case. *Id.* at p. 14.

Likewise, the Middle District of Pennsylvania in *McCormick* found that it had jurisdiction under the *Kyne* exception and enjoined the Board from exercising jurisdiction over a religious education institution on First Amendment grounds. 460 F. Supp at 1358. In doing so, the court emphasized that "if the protection of any right is sufficiently extraordinary to require immediate review, it is an allegation that First Amendment Rights are on the verge of being abused," and that the exercise of jurisdiction by the court was "the only method of safeguarding the Plaintiff's rights as the alleged harm is in the Board taking any action, not in whatever action that may eventually result if the proceedings are permitted to continue." 460 F. Supp. 1337, 1343. *McCormick* also recognized that requiring the plaintiff to suffer the trampling of its First Amendment rights during protracted Board proceedings (as LLUHEC also would be required to endure) was unjust and inconsistent with the "great importance with which we view our First Amendment rights." *Id.* at 1346.

The harm being suffered by LLUHEC is concrete and has been inflicted by the very operation of the Board's process. In the representation hearing conducted by NLRB Region 31, and as a result of the Board's refusal to bifurcate the religious jurisdictional issue, the organization and administration of the Church and its entities, and the Church's beliefs were all deemed to be relevant and scrutinized through the questioning of LLUHEC witnesses. Section II.D above details how this violated D.C. Circuit and Board precedent and caused LLUHEC irreparable harm by infringing its First Amendment rights.

93336530v.1

Importantly, LLUHEC is not asserting that the Board "committed an error in administering the Act that requires review." *McCormick v. Hirsch*, 460 F.Supp. at 1344. Rather, LLUHEC is advancing First Amendment and RFRA claims that take issue with the Board's ability to assert jurisdiction over it at all. As the D.C. Circuit underscored in *University of Great Falls,* "[w]hen considering limitations placed on the Board's jurisdiction by the Constitution, the Board's construction and application of the religious institution exception to its own jurisdiction receives no deference from federal courts. *Univ. Great Falls,* 278 F.3d at 1340; *Bethany College,* 369 NLRB No. 98, slip op. at 8.

Further, the Court also has jurisdiction to review and invalidate the non-final Board order at issue here and to enjoin further action by the Board in 31-RC-312064 and 31-CA- 312278 because, as shown above in Section II.E, the Board's actions violate RFRA.

## III.    CONCLUSION

LLUHEC indisputably is a religious education institution. Its religious character is inseparable from its educational mission and activities. The residents and fellows at LLUHEC, as both students and teachers, are integral to its educational and religious mission. Consequently, consistent with the reasoning of *Catholic Bishop*, the Board cannot exercise jurisdiction over LLUHEC without raising serious First Amendment implications. Moreover, if the Board were to force LLUHEC to recognize or bargain with the Union its actions would violate RFRA.

The Board's ongoing representation process already is causing LLUHEC to experience irreparable harm. The Court should grant the requested relief in its entirety.

Respectfully submitted,

SEYFARTH SHAW LLP

*/s/ Samantha L. Brooks*

Samantha L. Brooks (D.C. Bar. No. 1033641)
Michael Berkheimer (admitted *pro hac vice*)
Jack Toner (to be admitted *pro hac vice*)
Seyfarth Shaw LLP
975 F Street
Washington, DC 20004
(202) 828-3560
Fax: (202) 641-9209
sbrooks@seyfarth.com
mberkheimer@seyfarth.com
jtoner@seyfarth.com

Joshua L. Ditelberg (to be admitted *pro hac vice*)
233 S. Wacker Drive
Suite 8000
Chicago, IL 60606-644
jditelberg@seyfarth.com

Jeffery Berman (to be admitted *pro hac vice*)
2029 Century Park East
Suite 3500
Los Angeles, CA 90067-3021
jberman@seyfarth.com

Christian J. Rowley (to be admitted *pro hac vice*)
crowley@seyfarth.com
Jennifer L. Mora (to be admitted *pro hac vice*)
jmora@seyfarth.com
560 Mission Street
Suite 3100
San Francisco, CA 94105-2930

*Attorneys for Loma Linda University Health Education Consortium*

Dated: March 21, 2023

93336530v.1