EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Loma Linda University Heath Education Consortium 11175 Campus Street Loma Linda, CA 92354 | ) ) ) ) ) | |
| Plaintiff | ) ) ) | Civil Action No. _____ |
| v. | ) ) | |
| National Labor Relations Board 1015 Half Street, SE Washington, DC 20003 | ) ) ) ) | |
| Defendant | ) ) | |

## DECLARATION OF DR. DAN GIANG

1.      I am the Associate Dean, Graduate Medical Education ("GME"), and the President of Loma Linda-Inland Empire Consortium for Healthcare dba Loma Linda University Health Education Consortium ("LLUHEC"). I have worked for Loma Linda University Health ("LLUH") facilities in some capacity since 1996. I am a Medical Doctor and Board-certified Neurologist. I have been the Associate Dean, GME, for 27 years and the President of LLUHEC for more than 10 years. The General Conference has issued to me an administrative ministries credential.

2.      I also have served as the Chair of the Group on Resident Affairs at the American Association of Medical colleges (AAMC).  I am currently on the faculty at the AAMC for the leadership development course.

3.      In my role as Associate Dean, GME, I oversee all of LLUHEC's residency and fellowship programs to ensure, among other things, their continued adherence with Accreditation

EXHIBIT A

EXHIBIT A

Council for Graduate Medical Education ("ACGME") educational and accreditation requirements and the teachings and mission from the Seventh-day Adventist Church ("the Church").

4. Loma Linda – Inland Empire Consortium For Healthcare Education ("LLIECHE"), which does business under the name of LLUHEC, is a non-profit corporation and is part of the Church. It was incorporated as a Section 501(c) non-profit religious corporation in September 2012 and granted 501(c) status by the Internal Revenue Service in July 2014. (Attached as Exhibit A is a true and correct copy of the IRS's determination letter.) It also is a religious non-profit incorporated under the laws of the State of California. (Attached as Exhibit B is a true and correct copy of LLUHEC's Articles of Incorporation and Bylaws.)

5. LLUH is an academic medical center operating six hospitals (including Loma Linda University Medical Center ("LLUMC")), a physician practice corporation, remote clinics, and affiliate organizations around the world. Along with Loma Linda University ("LLU"), LLUHEC, LLUMC, and the other Loma Linda entities make up our healthcare focused university. Both LLUHEC and LLUMC are nestled within the LLUH system.

6. Established by the Seventh-day Adventist church, LLUHEC and LLUMC serve as a center for Christian medical education. LLUHEC operates approximately 70 residency programs for the purpose of educating approximately 800 fellows and residents regarding how to minister to patients in a manner that is consistent with Church teachings. While all residents and fellows are under LLUHEC, they gain their educational experience at LLUMC and other health care facilities (such as the Veterans Administration hospital). The Church's heritage remains our central focus as articulated in our mission statement: "...to continue the healing ministry of Jesus Christ, 'to make man whole,' in a setting of advancing medical science and to provide a stimulating clinical and research environment for the education of physicians, nurses and other health

2

EXHIBIT A

EXHIBIT A

professionals."   https://lluh.org/health-professionals/gme/prospective-residents   To   this   end,
residents and fellows at LLUHEC are encouraged to conduct themselves in accordance with the
Church's teachings, educate junior fellows and residents and, medical students on Church doctrine,
and participate in prayer sessions with patients. The Church's mission is conveyed to residents and
fellows during their interviews, orientations, and throughout their educational experience with
LLUHEC, including during didactics, lectures, and other educational tools.

      7.     Our faculty, fellows, and residents possess diverse beliefs and religious
preferences, but they share a commitment to provide excellent and compassionate patient care. We
seek to offer the finest graduate medical education possible. We believe this means developing the
ability to provide care to the whole person in addition to learning the latest diagnostic techniques
and therapeutics. We seek residents and fellows from all backgrounds who approach training with
enthusiasm and a dedication to excellence, and are committed to further our Mission. In turn, we
are committed to providing superb training to each of our residents and fellows in a supportive and
respectful atmosphere.

      8.     The ACGME is a private, not-for-profit organization that sets standards for United
States graduate medical education (residency and fellowship) programs and the institutions that
sponsor them, and renders accreditation decisions based on compliance with these standards.
Accreditation is achieved through a voluntary process of evaluation and review based on published
accreditation standards. ACGME accreditation provides assurance that LLUHEC's residency and
fellowship programs meet the quality standards (Institutional and Program Requirements) of the
specialty or subspecialty practice(s) for which it prepares its graduates. ACGME accreditation is
overseen by a review committee made up of volunteer specialty experts from the field that set

3

EXHIBIT A

EXHIBIT A

accreditation standards and provide peer evaluation of specialty and subspecialty residency and fellowship programs.

9.      The ACGME Common Program Requirements are a basic set of standards (requirements) in training and preparing resident and fellow physicians. These requirements set the context within clinical learning environments for development of the skills, knowledge, and attitudes necessary to take personal responsibility for the individual care of patients. In addition, they facilitate an environment where residents and fellows can interact with patients under the guidance and supervision of qualified faculty members who give value, context, and meaning to those interactions.

10.     LLUHEC is solely a teaching and educational learning consortium of residency and fellowship programs that exists for the sole purpose of facilitating the education of residents and fellows in programs approved by the ACGME. LLUHEC is not engaged in the business of providing patient care. Rather, patients receive care from the licensed medical practitioners working for separate entities within the LLUH system (but not for LLUHEC).  LLUHEC is not a licensed hospital or any other time of entity that is authorized to practice medicine.

11.     LLUHEC does not bill Medicare, Medicaid, or any private insurance for any time that residents and fellows spend being taught and educated by faculty and other attending physicians. Even if a resident or fellow assists an attending physician with a procedure, which is solely for educational purposes, that time and service is not billed.

12.     LLUHEC holds itself as a Seventh-day Adventist institution on numerous publicly available websites, including at www.lluh.org/aboutus  and numerous links thereunder including but   not   limited   to   https://lluh.org/health-professionals/gme   and   https://lluh.org/health-professionals/gme/prospective-residents.  LLUHEC's Church affiliation, mission and values are

4

EXHIBIT A

EXHIBIT A

also contained in numerous other written materials, including the description of Resident responsibilities and the Graduate Medical Education Training Agreement, true and correct copies of which are Exhibits C and D.

13.     That LLUHEC is a religious institution is also apparent from the prominent display of Christian symbols on the LLUH website and the LLUH campus. For example, the Christian cross is featured on its crest, many of its campus buildings prominently display Bible verses on their facades, and there are numerous chapels on the campus grounds.

14.     Residents and Fellows in LLUHEC programs have as an integral part of their duties to teach and assist in teaching and training medical students and other residents.  As part of this teaching and training they are expected to transmit not only medical knowledge, but also to incorporate, represent and transmit the values and mission of LLUHEC.  The Description of Resident responsibilities, and the Graduate Medical Education Training Agreement, Exhibits C and D, confirm that fellows and residents are required to teach other residents and medical students.

15.     The Seventh-day Adventist Church has a well-established historic teaching that prohibits Church institutions such as LLUHEC recognizing or bargaining with labor organizations. See section FL 30 of the General Conference Working Policy, attached as Exhibit E.  See also, footnote 5 and the accompanying text in *Ukiah Adventist Hospital,* 332 NLRB 602 at p. 603.

15.     Ellen G. White, one of the founders of the Church and a prophetess was personally involved in the selection of the site that Loma Linda University Health sits on.  Mrs. White also counseled the Church to provide all the education needed for Adventist young people to meet the requirements of the American Medical Association as fully certified physicians.

5

EXHIBIT A

A-5

# EXHIBIT A

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on ___MARCH  13, 2023___

# EXHIBIT A

Exhibit A to Dr. Giang Declaration

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH  45201

DEPARTMENT OF THE TREASURY

Date:  **JUL 1 1 2014**

LOMA LINDA-INLAND EMPIRE CONSORTIUM
 FOR HEALTHCARE EDUCATIO
C/O DANIEL GIANG
11175 CAMPUS ST CSP 11006
LOMA LINDA, CA  92354

Employer Identification Number:
 46-1612773
DLN:
 17053219322003
Contact Person:
 CUSTOMER SERVICE          ID# 31954
Contact Telephone Number:
 (877) 829-5500

Accounting Period Ending:
 December 31
Public Charity Status:
 509(a)(2)
Form 990 Required:
 Yes
Effective Date of Exemption:
 September 19, 2012
Contribution Deductibility:
 Yes
Addendum Applies:
 No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax
exempt status we have determined that you are exempt from Federal income tax
under section 501(c)(3) of the Internal Revenue Code.  Contributions to you are
deductible under section 170 of the Code.  You are also qualified to receive
tax deductible bequests, devises, transfers or gifts under section 2055, 2106
or 2522 of the Code.  Because this letter could help resolve any questions
regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified
as either public charities or private foundations.  We determined that you are
a public charity under the Code section(s) listed in the heading of this
letter.

For important information about your responsibilities as a tax-exempt
organization, go to www.irs.gov/charities. Enter "4221-PC" in the search bar
to view Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities,
which describes your recordkeeping, reporting, and disclosure requirements.

Sincerely,

*Tamera Ripperda*

Director, Exempt Organizations

Letter  947

Exhibit A to Dr. Giang Declaration

Exhibit B to Dr. Giang Declaration

3508041

**ENDORSED - FILED**
in the office of the Secretary of State
of the State of California

SEP 19 2012

**ARTICLES OF INCORPORATION**
**OF**
**LOMA LINDA – INLAND EMPIRE CONSORTIUM FOR HEALTHCARE EDUCATION**

I

The name of the corporation is LOMA LINDA – INLAND EMPIRE CONSORTIUM FOR HEALTHCARE EDUCATION.

II

A. This corporation is a Religious Corporation and is not organized for the·private gain of any person.   It is organized under the Nonprofit Religious Corporation Law exclusively for religious purposes.

B.    The specific purpose of this Corporation is to continue the teaching and healing ministry of Jesus Christ through:

1.  Supporting Graduate Medical and Dental Education with necessary educational, financial and human resources;

2.  Maintaining an ethical, professional and education environment in which curricular requirements and applicable requirements for scholarly activity and the general competencies can be met;

3.  Providing leadership, organizational structure and resources to allow substantial compliance with Institutional Requirements of the Accreditation Council on Graduate Medical Education and to enable the programs which are accredited through the Accreditation Council for Graduate Medical Education to achieve substantial compliance with program requirements;

4.  Serving the healthcare needs of underserved patient populations (including under-represented minorities and other high risk populations) both in the present through healthcare services and in the future as the medical and dental residents continue to serve these populations after graduating;

5.  Assessing the quality of Graduate Medical Education programs, the performance of residents and using results of outcome assessment for program improvement as essential components of this commitment;

6.  Providing excellent, Christ-centered Graduate Medical Education to allow its resident physicians to develop both their professional and personal lives; and

7.  Other purposes permitted by law and consistent with the corporate mission.

Page 1 of 2

Exhibit B to Dr. Giang Declaration

Exhibit B to Dr. Giang Declaration

III

The name and address of the corporation's initial agent for service of process is:

Kent A. Hansen
601 S. Main Street
Corona, CA 92882

IV

A. This corporation is organized and operated exclusively for religious purposes within the meaning of Internal Revenue Code § 501(c)(3).

B.   No substantial part of the activities of this corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation and this corporation shall not participate in or intervene in (including publishing or distributing statements) any political campaign on behalf of any candidate for public office.

V

The property of this corporation is irrevocably dedicated to charitable purposes and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person.    Upon the dissolution or winding up of this corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation shall be distributed to a nonprofit fund, foundation or corporation which is organized and operated exclusively for religious purposes and which has established its tax exempt status under Internal Revenue Code section 501(c)(3).

Date: 9/18/2012

Daniel Giang, Sole Incorporator

SophiaHamilton\LL-IECFHCE.art[2]

Page 2 of 2

Exhibit B to Dr. Giang Declaration

Exhibit B to Dr. Giang Declaration



I hereby certify that the foregoing transcript of ___2___ page(s) is a full, true and correct copy of the original record in the custody of the California Secretary of State's office.

SEP 29 2012

Date: _____

DEBRA BOWEN, Secretary of State

Exhibit B to Dr. Giang Declaration

# BYLAWS
## OF
## LOMA LINDA—INLAND EMPIRE CONSORTIUM FOR HEALTHCARE EDUCATION

*a California Nonprofit Religious Corporation*

## ARTICLE I.  NAME

The name of this corporation is LOMA LINDA—INLAND EMPIRE CONSORTIUM FOR HEALTHCARE EDUCATION (hereinafter "LLIECHE").

## ARTICLE II.  PRINCIPAL OFFICE

The principal office for the transaction of the activities and affairs of the corporation (principal office) is located at 11175 Campus Street, Loma Linda, CA 92354, in San Bernardino County, California. The Board of Directors ("Board") may change the principal office from one location to another. The Board may at any time establish branch or subordinate offices at any place or places where the corporation is qualified to conduct its activities.

## ARTICLE III.  PURPOSES, RELATIONSHIPS, RESERVED POWERS AND LIMITATIONS

**Section 1. General Purpose.**

    1.1.  LLIECHE is a religious corporation organized pursuant to the Non-Profit Religious Corporation Law of the State of California to continue the healing and teaching ministry of Jesus Christ.

    1.2.  This corporation is not organized for the private gain of any person. It is organized under the Nonprofit Religious Corporation Law of the State of California for charitable purposes.  This corporation is organized exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986 or the corresponding provision of any future United States internal revenue law.  Notwithstanding any other provision of these Bylaws, this corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the purposes of this corporation, and the corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under section 501(c) (3) of the Internal Revenue Code of 1986 or the corresponding provision of any future United States internal revenue law, or (b) by a corporation, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code of 1986 or the corresponding provision of any future United States internal revenue law.

Exhibit B to Dr. Giang Declaration

**Section 2. <u>Specific Purposes.</u>** LLIECHE's purpose, in alignment with the specific purposes of Loma Linda University Health ("LLUH") and Social Action Community Health System ("SACHS"), is to continue the teaching and healing ministry of Jesus Christ through:

2.1. Supporting Graduate Medical and Dental Education with necessary education, financial and human resources;

2.2 Maintaining an ethical, professional and educational environment in which curricular requirements and applicable requirements for scholarly activity and the general competencies can be met;

2.3 Providing leadership, organizational structure and resources to allow substantial compliance with Institutional Requirements of the Accreditation Council on Graduate Medical Education and to enable the programs which are accredited through the Accreditatation Council for Graduate Medical Education to achieve substantial compliance with program requirements;

2.4 Serving the healthcare needs of underserved patient populations (including under-represented minorities and other high risk populations) both in the present through healthcare services and in the future as the medical and dental residents continue to serve these populations after graduating.

2.5 Assessing the quality of Graduate Medical Education programs, the performance of residents and using results of outcome assessment for program improvement as essential components of this commitment; and

2.6 Providing excellent, Christ-centered Graduate Medical Education to allow its resident physicians to develop both their professional and personal lives.

**Section 3. <u>Reserved Powers</u>**

3.1. <u>Powers Reserved to LLUH, SACHS, LLUMC and LLU Boards of Trustees Requiring a Super-Majority Vote</u>. The powers reserved by LLUH, SACHS, LLUMC and LLU as Members, which may only be exercised by the LLUH, SACHS, LLUMC and LLU Boards upon the affirmative vote of two-thirds of the Trustees/Directors present and voting at any regular or special meeting of the respective Boards at which a quorum is present are to:

3.1.1. Approve or ratify all changes to the Articles of Incorporation and Bylaws of LLIECHE.

3.1.2. Remove from office the entire Board of LLIECHE with or without cause.

3.1.3. Approve any significant change in the corporate purposes of LLIECHE.

3.2. <u>Powers Reserved to LLUH, SACHS, LLUMC and LLU Boards</u>. The powers reserved by LLUH, SACHS, LLUMC and LLU as Members, which shall only be exercised by the LLUH, SACHS, LLUMC and LLU Boards upon the affirmative vote of a majority of the Members present and voting at any regular or special meeting of the Board at which a quorum is present, are to:

3.2.1. Appoint the Board for LLIECHE as set forth in Article V. Section 1 below.

3.2.2. Require LLIECHE to have a policy for borrowing funds that is congruent with the LLUH Board-approved policy on borrowing.

3.2.3. Approve any merger, consolidation, dissolution or sale of LLIECHE.

3.2.4. Approve any exceptions to the policy for the borrowing of funds by LLIECHE.

3.2.5. Approve the strategic plan of LLIECHE.

Exhibit B to Dr. Giang Declaration

3.2.6. Approve major construction projects of LLIECHE.

3.2.7. Approve corporations subsidiary or affiliated to LLIECHE including accountable care organizations.

3.2.8. Accept the annual audited financial statements of LLIECHE.

3.2.9. Approve the annual operating and capital budgets of LLIECHE.

3.2.10. Require LLIECHE to establish contracting guidelines.

3.2.11. Approve the business development plans of LLIECHE.

3.2.12. Approve recommendations from LLIECHE and its subsidiaries for new institutional alliances, joint ventures and similar arrangements outside the ordinary course of business.

3.2.13. Require LLIECHE to have a compliance program.

**Section 4: <u>Limitations.</u>**

4.1. Nothing in these Bylaws is intended, nor shall be construed, to diminish the authority of the LLIECHE Board of Directors over its own strategic, operational and management issues as required by California law, accrediting bodies, and/or financing documents.

4.2. A Member of the corporation wishing to reimburse another Member for contracted professional or administrative services shall contract and make payment only with the Member providing services and not with any employees or departments of a Member.

4.3. No substantial part of the activities of this corporation shall consist of lobbying or propaganda, or otherwise attempting to influence legislation, except as provided in section 501(h) of the Internal Revenue Code of 1986, and this corporation shall not participate in or intervene in (including publishing or distributing statements) any political campaign on behalf of any candidate for public office except as provided in section 501(h) of the Internal Revenue Code of 1986.

4.4. All corporate property is irrevocably dedicated to the purposes set forth in Section 1 above. No part of the net earnings of this corporation shall inure to the benefit of any of its directors, trustees, officers, private shareholders or membership, or to individuals.


### ARTICLE IV.  MEMBERSHIP OF THE CORPORATION

**Section 1.   <u>Corporate Membership</u>**. The Corporate Membership (the "Membership") of LLIECHE pursuant to Section 9310 of the California Nonprofit Religious Corporation Law shall be LLUH, SACHS, LLUMC and LLU, acting by and through their Boards of Trustees/Directors. The Membership of the Corporate Members may not be assigned, transferred or encumbered in any manner whatsoever, either voluntarily or involuntarily.  Unless otherwise specified herein, all questions shall be determined by a majority of the Member Boards of Trustees (See Article III, Section 4).

**Section 2.   <u>Membership Meeting</u>**.

2.3. <u>Action by Written Consent of the Members</u>.  Any action required or permitted to be taken by the Members under law or these Bylaws may be taken without a meeting if

all the Members individually or collectively consent in writing to the action. Written consents must be filed with the minutes of the proceedings of the Member. Action by written consent has the same force and effect as a unanimous vote of the Members.

2.4. <u>Matters that Must be Specified in the Notice for a Meeting or Action of the Members</u>.  The following matters must be specified in the Notice for a Members' Meeting or Action if they are to be considered at the meeting or by action by written consent.

    2.4.1. Adopting, amending or repealing the Bylaws.

    2.4.2. Removing Directors without cause.

    2.4.3. Disposal of corporate assets.

    2.4.4. Amending of Articles of Incorporation

    2.4.5. Adopting or amending a merger agreement.

    2.4.6. The voluntary windup and dissolution of the Corporation.

2.5. <u>Unanimity and Meet and Confer</u>.  The approval of matters within the reserved powers require the unanimous consent of the Members.  If the Members cannot unanimously agree on an action required of them, they shall meet and confer in person or by representatives appointed for that purpose with the purpose of reaching agreement before submitting the action for another vote of the Members.  If the Members cannot reach agreement after their conference and another vote, the action shall be deemed denied.

2.6 <u>Notice of Meetings</u>.

    2.6.1. <u>Notice</u>.  Notices of the time, place, and agenda of each regular and special meeting of the Members not fixed by an express provision of the Bylaws shall be given to each member of the Boards of the Members not less than twenty-four (24) hours before the date of the meeting if given personally or by telephone or electronic mail, and if given by first-class mail, not less than ten (10) days before the date of the meeting.

    2.6.2. <u>Waiver of Notice</u>.  The transactions of any meeting of the Members, however called and noticed and wherever held, shall be as valid as though enacted at a meeting duly held after regular call and notice if a quorum of the Members' Boards are present, and if either before or after the meeting, each member of the Board not present signs a written waiver of notice or a consent to hold the meeting or approval of the minutes of the meeting.  All the waivers and consents or approvals shall be filed with the corporate records or be made a part of the minutes of the meeting.

**Section 3.  <u>Liability of Member</u>**.  There shall be no membership fees, dues, or assessments. The Member of LLIECHE shall not be liable to LLIECHE creditors for any indebtedness or liability.  Any or all creditors of LLIECHE shall look only to the assets of LLIECHE for payment.

## ARTICLE V.  BOARD OF DIRECTORS

**Section 1.  <u>Qualification of Directors</u>.**

Exhibit B to Dr. Giang Declaration

1.1. <u>Overall Qualifications.</u> All Directors of the corporation must be committed to the furtherance of health care delivery and the advancement of medical education in the communities served by the corporation, and must be willing to devote the necessary time and energy for self-education, corporate functions and other actions necessary to fulfill this commitment. Directors have a fiduciary duty to the corporation, and shall make all decisions in a manner that is in the best interests of the corporation and the community. Directors shall not advocate or act in the best interest of any person or group unless it also serves the best interest of the corporation.

**Section 2. Number of Directors.** The Board shall be composed of at least four (4) and no more than nine (9) persons. The LLIECHE Board shall be appointed by the Members at the first regular meeting of the Members following the Members' quinquennial membership meeting and shall include at least the following:

2.1. <u>LLUH – One (1) Director</u>.  The President of LLUH shall ordinarily serve as a Director.

2.2. <u>SACHS – One (1) Director</u>.  The President of SACHS shall ordinarily serve as a Director.

2.3. <u>LLUMC – One (1) Director</u>.  The Chief Executive Officer of LLUMC shall ordinarily serve as a Director.

2.4 <u>LLU – One (1) Director</u>.  The Dean of the LLU School of Medicine shall ordinarily serve as a Director.

**Section 3. Officers of the Board.**

3.1. The President of LLUH shall ordinarily be the Chair of the LLIECHE Board and shall:

- Preside at meetings of the LLIECHE Board.
- Cause to be called regular and special meetings of the Board in accordance with these Bylaws.
- See that all actions of the Members and all actions and policies of the LLIECHE Board are carried into effect through the CEO.
- Invite additional persons as advisors to attend meetings of the LLIECHE Board and its committees.
- Stay informed on the work of the various committees and faculties, and on activities of LLIECHE.
- Perform such other duties as the LLIECHE Board may delegate.

3.2. The Vice Chair of the Board of Directors ordinarily shall be the President of SACHS. The Vice Chair shall preside in the absence of the Chair at the meetings of the Board.

**Section 4. Powers of Directors.**

Subject to the limitation of the Articles of Incorporation, other sections of the Bylaws including those relating to reserve powers of the Members, and of applicable State law, all corporate powers of LLIECHE shall be exercised by or under the authority of the Board and all the business and affairs of LLIECHE shall be controlled by the Board.  Without limiting the general powers, the Board shall have the power:

4.1. To establish the philosophies, goals, objectives and policies of LLIECHE

4.2. To appoint and remove the LLIECHE Corporate officers; prescribe such powers and duties for them as are consistent with law, the Articles of Incorporation and the Bylaws; fix their compensation and require from them security for faithful service (Security may include, but is not necessarily limited to, bonding for officers and employees, execution of conflict of interest statements, etc.)

4.3. To provide financial oversight to the corporation in accordance with the powers reserved to the Corporate Members (Article III, Section 3):
- To approve the annual operating and capital budgets
- To receive and approve the annual audited report
- To approve financial policies
- To approve borrowing of money and incurring of indebtedness for the purposes of LLIECHE, and for those purposes to cause to be executed and delivered, in the corporate name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations or other evidences of debt and security
- To authorize the disbursement of funds by the designated officer
- To authorize the acquisition and disposition of real property

4.4. To formulate, revise and maintain appropriate policies, in harmony with the mission, values and objectives of LLIECHE and LLUH, and as required by law or proposed by accrediting agencies.  Further, to periodically evaluate the effectiveness of these policies and make changes to maintain harmony.  Further, to approve the policies and procedures of LLIECHE.

4.5. To appoint committees of the Board, as may be authorized in these Bylaws or as the Board deems necessary and to define the responsibilities of such committees. Further, to invite additional persons or counselors to attend meetings of the Board and or its committees.

4.6. To ensure appropriate fulfillment of the fiduciary responsibilities of the Directors:
- Adopting conflict of interest guidelines applicable to members of the Board and corporate officers.
- Providing appropriate resources to assist individual Directors in understanding and fulfilling their responsibilities as Directors.
- To establish a method and policy for evaluating the Board of Directors' own performance.

4.7. Adopt and use a corporate seal, and alter the form of the seal.

4.8. To exercise such additional powers as may be provided by law.

**Section 5:  Meetings.**
5.1. Type of Meetings.
    5.1.1. Organization Meetings.  Within sixty (60) days following the quinquennial meeting of the Members, the Board shall hold a regular meeting for the purpose of organization and the transaction of business.  No other notice of such organization meetings  need be given.
    5.1.2. Regular Meetings. The Board shall normally meet three (3) times each calendar year.
    5.1.3. Special Meetings.  Special meetings of the LLIECHE Board for any purpose or purposes may be called at any time by the Chair of the LLIECHE Board and notices sent by his/her authorization.

5.1.4.  Meetings by Telephone.  Directors shall be deemed present at any meeting if a conference telephone or similar communication equipment is arranged by means of which all persons participating in the meeting can communicate with each other.

5.1.5.  Action Without Meeting.  Any action required or permitted to be taken by the Board of Directors may be taken without a meeting, if all members of the Board of Directors individually or collectively consent in writing to that action.  Any action by written consent will have the same force and effect as a unanimous vote of the Board of Directors.  All written consents will be filed with the minutes of the proceedings of the Board of Directors.

"Written" or "in writing" includes facsimile, telegraphic and other electronic communication as authorized by the Corporations Code, including electronic mail and other electronic transmission by the Corporation that satisfies the requirements of Corporations Code section 20.

All the Board members must consent to the use of electronic communications prior to voting by e-mail.  Such consent must be preceded by a clear statement indicating (1) the recipient's right to have the record provided in non-electronic form, (2) whether the consent applies only to that transmission, to specified categories of communications, or to all communications from the Corporation, and (3) the procedures the recipient must use to withdraw consent.

5.2.  Notice of Meetings.

5.2.1.  Notice.  Notices of the time and place of each meeting of the LLIECHE Board not fixed by an express provision of the Bylaws shall be given to each Director not less than twenty-four (24) hours before the date of the meeting if given personally, by telecommunication, or by electronic mail; or if given by first class mail or equivalent, not less than ten (10) days before the date of the meeting, addressed to the Director at the Director's latest address on the records of LLIECHE, or if such address is not shown on records, at LLIECHE's principal place of business.

5.2.2.  Waiver of Notice.  The transaction of any meeting of the Board, however called and noticed and wherever held, shall be as valid as though the meeting had been held after call and notice if a quorum is present and if, either before or after the meetings, each of the Directors not present signed a written waiver or notice of consent to hold the meeting or approval of the minutes of the meeting.  All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

5.3.  Quorum.  Three (3) Directors of the Board, which shall include the Chair or Vice Chair, and shall constitute a quorum for the transaction of business.  If less than a quorum is present at a regular meeting, any resulting action shall be subject to the ratification of the Board at the next meeting in which a quorum is present.

5.4.  Voting of the Board.  Each Director shall have one vote on any question.  No person may vote or act by proxy.  Unless otherwise specified herein, all questions shall be determined by a majority of those Directors present and voting.

Exhibit B to Dr. Giang Declaration

5.5. <u>Place of Meeting</u>. Regular meetings of the Board shall be held at any place within or without the State of California designated from time to time by resolution of the Board. In the absence of this designation, regular meetings shall be held at the principal office of LLIECHE in San Bernardino County, California. Special meetings of the Board may be held either at a place designated or at the principal office.

**Section 6.** **<u>Vacancies on the Board and Director Replacement.</u>**

6.1. A Member whose representative Director is or becomes ineligible or can no longer serve as a Director shall have power to fill the vacancy of the Director on the Board at or between the annual meetings of the Members. A successor Director so elected shall serve until the next scheduled regular meeting of the Members. Should the Member not fill each Board position, such position shall be deemed vacant for purposes of this section.

6.2. A Director may be replaced upon the occurrence of any of the following:

6.2.1. A Director's written resignation addressed to the Secretary of the Corporation with such resignation to become effective upon the Secretary's receipt of such notice unless a date of resignation is otherwise specified in the notice.

6.2.2. The death of a Director.

6.2.3. A Director shall automatically be disqualified from office for failure to: (a) maintain the qualifications required for a Director specified in Sections 1 and 2 of this Article V, or (b) comply with any other provision of these Bylaws.

6.2.4. A Director may be replaced without cause by his or her appointing Member.

**Section 7.** **<u>Standard of Conduct</u>.** Pursuant to Section 9241 of the California Nonprofit Religious Corporation Law, a Director shall perform the duties of a Director including duties as a member of any committee of the Board upon which the Director may serve, in good faith, in a manner such Director believes to be in the best interest of LLIECHE and with such care including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. In performing the duties of a Director, a Director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, prepared or presented by:

7.1. One or more officers or employees of LLUH, SACHS, LLUMC, LLU and LLIECHE whom the Director believes to be reliable and competent in the matters presented;

7.2. Counsel, independent accountants or other persons as to matters which the Director believes to be within such person's professional or expert competence;

7.3. A committee of the Board upon which the Director does not serve, as to matters within its authority, which committee the Director believes to merit confidence.

**Section 8.** **<u>Self-Dealing Transactions</u>.** Except as provided in Section 9243 of the California Nonprofit Religious Corporation Law, the Corporation shall not be party to a transaction in which one or more of its directors has a material financial interest.

**Section 9.** **<u>Interlocking Directors</u>.** No contract or other transaction between LLIECHE and any domestic or foreign corporation, firm or association of which one or more of the Directors are

Exhibit B to Dr. Giang Declaration

Exhibit B to Dr. Giang Declaration

directors or trustees is either void or voidable because such Director or Directors are present at the meeting of the Board or a committee thereof which authorizes, approves or ratifies the contract or transaction, if:

    9.1.  The material facts as to the transaction and as to such Director's other directorship or trusteeship are fully disclosed or known to the Board or committee and the Board or committee authorizes, approves or ratifies the contract or transaction in good faith by a vote sufficient without counting the vote of the common Director or Directors; or

    9.2.  As to contracts or transactions not approved as provided in Section 8 of this Article V, the contract or transaction is just and reasonable as to LLIECHE, taking into account its religious purposes, or is in furtherance of its religious purposes at the time it is authorized, approved or ratified.

This section does not apply to transactions covered by Section 8 of this Article V relating to a Director's personal "material financial interest".

**Section 10.   Compensation.** No member of the LLIECHE Board shall receive any form of compensation, either directly or indirectly, based upon or related in any manner to that member's service on the Board.   Each member of the LLIECHE Board shall be obligated to verify compliance with this section in the Conflict of Interest Statement.

**Section 11.  Conflict of Interest.**   The Board shall adopt and apply a conflict of interest policy and procedure designed to insure that Directors, officers and management undertake their respective responsibilities with an uncompromised duty of loyalty and fidelity consistent with their fiduciary relationship to LLIECHE and that such persons make full disclosure of interests which might result in or have the appearance of a conflict of interest in satisfying their fiduciary obligations. LLIECHE (through Directors, officers or management) shall refrain from considering or consummating any transaction involving any conflict of interest until all relevant and pertinent facts regarding the transaction and the conflict of interest have been disclosed, considered, avoided and/or resolved.   A conflict of interest is considered to exist in those instances where a relationship or interest that an individual has or had might influence his/her actions on a matter  which is or might be contrary to the best interests of LLIECHE.

## ARTICLE VI. COMMITTEES

**Section 1. Appointment and Responsibilities.**   Except as otherwise provided by these Bylaws, the LLIECHE Board may, by resolution, appoint standing or special committees comprised of at least two (2) Directors, the members of which shall serve at the pleasure of the Board.  Any such committee, when a quorum is present and to the extent provided in the resolution of the Board or in the Bylaws, shall have all authority of the Board, except with respect to:

    1.1.  The approval of any action which also requires approval of the Members;

    1.2.  The filling of vacancies on the Board or in any committee which has the authority of the Board;

    1.3.  The amendment or repeal of the Bylaws or the adoption of the new Bylaws;

Exhibit B to Dr. Giang Declaration

1.4.  The amendment or repeal of any resolution of the Board, which by its express terms is not so amendable or repealable; and

1.5.  The appointment of committees of the Board.

**Section 3.  Finance Committee**.  The Board may establish a Finance Committee.  The Finance Committee shall consist of at least two (2) Directors appointed by the Board..  The EVP for Finance, Administration/CFO of LLUH shall be an ex officio member of the Finance Committee and shall ordinarily serve as its Chair.  This committee shall serve as a strategic budgetary and finance planning committee with authority to make recommendations to the Board in the development and implementation of financial policies and decisions for LLIECHE and its subsidiaries.

**Section 4.  Audit Committee.** The LLUH Board Audit Committee shall be the Audit Committee for LLIECHE. The Audit Committee shall have general responsibility for surveillance or internal controls and accounting and audit activities of LLIECHE.

**Section 5.  Bylaws Review Committee.**  The Board may establish a "Bylaws Review Committee". (See Article XVI, Section 2).

**Section 6.  Graduate Medical Education Committee.**  The Board shall establish a "Graduate Medical Education Committee".

**Section 7.  Meetings and Actions**.  Meetings and actions of committees of the LLIECHE Board shall be governed by, held, and taken in accordance with, the provisions of these Bylaws concerning meetings and other Board actions except that the time for regular meetings of such committees and calling of special meetings of such committees may be determined either by Board resolution, or if there is none, by resolution of the committee.  Minutes of each meeting of any committee of the Board shall be kept and filed with the corporate records.  The Board may adopt rules for the governance of any committee that are consistent with these Bylaws, or in the absence of rules adopted by the Board, the committee may adopt such rules.


### ARTICLE VII.  OFFICERS

**Section 1.  Officers of the Corporation.**  The officers of the corporation shall be the:
A.  Chief Executive Officer
B.  Chief Operating Officer
C.  Chief Financial Officer
D.  Secretary

The corporation may also have, at the Board's discretion, one or more Vice Presidents, one or more Assistant Secretaries, and one or more Assistant Financial Officers.  Any number of offices may be held by the same person, except that neither the Secretary nor the Chief Financial Officer nor the Chief Executive Officer may serve concurrently as the Chair of the Board.

**Section 2.  Appointment and Removal.**
2.1.  The Board shall appoint all officers of LLIECHE to serve at the pleasure of the

LLIECHE Bylaws Final 05-13-15                  10

Board.

2.2. The appointment or reappointment of the Officers by the Board will occur immediately following the quinquennial meeting of the Members.

2.3. Without regard to any rights of an officer, under any contract of employment, an officer, may be removed by the Board at any time with or without cause being necessary or stated.

**Section 3.** **Resignation of Officers.** Any officer may resign at any time by giving written notice to the corporation. The resignation shall take effect as of the date the notice is received or at any later time specified in the notice and, unless otherwise specified in the notice, the resignation need not be accepted to be effective. Any resignation shall be without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party.

**Section 4.** **Chief Executive Officer.** The Chief Executive Officer (CEO) ordinarily shall be the SACHS Chief Medical Officer. The authorities and duties of the CEO, subject to Board control, are to:

- Provide overall leadership and direction to LLIECHE.
- Harmonize the mission, vision and values of LLIECHE with those of SACHS and LLUH.
- Coordinate the strategic planning of LLIECHE for health ministry, education, research, spiritual life and wholeness, diversity, and outreach consistent with the strategic planning of LLUH.
- Represent LLIECHE to the public.
- Foster positive external relations of LLIECHE with SACHS, LLUH, LLU, LLUMC, the LLUFMG, contracting entities, the local community, and governmental entities.
- Fulfill Governance responsibilities by being an ex officio member of all standing committees; directing and obtaining LLIECHE compliance with the functions and reserved powers of the Members (as set forth in Article III, Section 3 of these Bylaws); and having such other powers and duties usually vested in such an officer.

**Section 5.** **Chief Operating Officer.** The Chief Operating Officer (COO) of the corporation ordinarily shall be the LLUMC Executive Director for Graduate Medical Education, and shall be appointed by the CEO subject to the approval of the Board. The responsibilities of the COO, subject to Board control and under the direction of the CEO shall be to:

- Oversee the general administration and operations of LLIECHE and subsidiaries, if any, in line with the Board-approved policies, in compliance with applicable laws and regulations and subject to the authorities and duties of the CEO.
- Carry out all policies and procedures established by the LLIECHE Board.
- Develop and submit to the Board for approval, a plan of organization of personnel and others concerned with the operation of LLIECHE and its subsidiaries, if any. Identify and recommend to the Board potential candidates, for other officer positions, who have the necessary professional qualifications and competencies, who will support the mission of LLUH, SACHS, LLUMC and LLU.
- Implement a strategic plan with specific objectives and actions and present updates to the Board.
- Select, employ, supervise, and discharge employees, and develop and maintain

personnel policies and practices for LLIECHE, in compliance with the relevant laws, accreditation requirements and the policies established by the Board.

- Implement and maintain, in conjunction with the CEO, systematic and effective mechanisms of communications within and between the Board, the administration, the departments/services and the faculty physicians.
- Execute contracts as authorized by the Board, and in accordance with contracting policies of LLIECHE.
- In conjunction with the CEO and CFO, prepare and implement an annual operating, capital and cash flow budget for LLIECHE in accordance with the strategic plan and present this to the Board for approval according to policy.
- Maintain physical properties in a good state of repair and ensure their effective utilization. Oversee the planning of new facilities in collaboration with the CEO and CFO.
- Present to the Board or its committees periodic reports reflecting operations, mission endeavors and other special reports as may be requested.
- Support clinical research and the application of basic research to the care of patients within policies utilizing the research infrastructure of LLUH.
- Facilitate the personal wholeness of the staff and the provision of whole person care for the patients and their families.
- Nurture the success of a diverse staff and create an inclusive environment for the diverse population that is served.
- Participate with the CEO in fostering external relations.
- Participate in local outreach to better the community and respond, in collaboration with the CEO as appropriate, to requests from international locations.
- Coordinate the fulfillment and maintenance of accreditation requirements for LLIECHE and its member organizations.
- Perform such other duties as the CEO may delegate or the Board may authorize.
- Have such other powers and duties as are usually vested in such an officer.

**Section 6. Chief Financial Officer**. The Chief Financial Officer who shall be responsible to the CEO, shall ordinarily also be the Sr. Vice President for Finance of LLUMC. He or she shall:

- Establish and direct the systems of oversight and control essential to maintain LLIECHE's fiscal integrity.
- Assist the CEO in the preparation and administration of the budget for LLIECHE.
- Under the direction of the Audit Committee, facilitate, with the Internal Auditor, the annual financial audit process for LLIECHE.
- Provide oversight of accounting methods and procedures.
- Perform such other duties as the CEO or COO may delegate or the LLIECHE Board may authorize.
- Administer the budget and the day-to-day fiscal operations of LLIECHE and be responsible to the COO for such administration, subject to the oversight and direction of the CFO.
- Receive, keep safely, account for and disburse all funds.
- Manage, maintain and secure the physical plant, facilities and grounds.
- Prepare appropriate reports and analyses.

- Perform such other duties as the COO may delegate.
- Ordinarily serve as the CFO of subsidiary organizations whose sole corporate member is LLIECHE.

**Section 7.** <u>Secretary</u>. The Secretary shall keep a record of the proceedings of the Corporation and shall perform all duties usually incident to the office of Secretary as set forth in the organization and policies approved by the Board and shall perform such other duties as the President may delegate or the Board may authorize. The Secretary shall ordinarily be the Corporate Secretary of LLUH.

**Section 8.** <u>Vice Presidents</u>. There may be Vice Presidents with varying responsibilities appointed by the Board, upon the recommendation of the CEO, with duties as specified by the CEO.

**Section 9.** <u>Officer Conduct.</u> Officers of LLIECHE are prohibited from making or authorizing payments or engaging in activities that would violate the tax-exempt status of LLIECHE. The Internal Auditor shall annually audit the payroll records and expense records of each officer to determine if any such violation has occurred and shall report its findings to the Audit Committee of the LLIECHE Board with a recommendation for appropriate corrective action, if necessary. The General Counsel, Internal Auditor and Corporate Compliance Officer shall provide annual education to the LLIECHE officers on the requirements for their conduct in compliance with the requirements for the tax-exempt status of LLIECHE.

## ARTICLE VIII.  SUBSIDIARY CORPORATIONS

From time to time LLIECHE may establish subsidiary corporations (see Article III, Section 4.2.7). The authority of the subsidiary corporation Board will be specified in the Articles of Incorporation and Bylaws by the LLIECHE Board at the time of the subsidiary's incorporation. Any subsequent changes to the subsidiary corporation Articles and Bylaws will require approval of the LLIECHE Board and the Members. LLIECHE may also, subject to the reserve powers of the Members, participate in one or more accountable care organizations.

## ARTICLE IX.  QUALITY OF PROFESSIONAL SERVICES

The Board of Directors delegates to the officers of LLIECHE the responsibility of maintaining quality and availability of professional services, including ensuring continuous programmatic accreditation as applicable.

## ARTICLE X.  ADDITIONAL POWERS AND LEGAL INSTRUMENTS

**Section 1.** <u>Additional Powers.</u>  In addition to the powers and duties hereinabove specifically granted to the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, and Secretary, each, upon the authorization of LLIECHE Board shall have the power on behalf of LLIECHE to execute all deeds, conveyances, mortgages, contracts, promissory notes, and other

instruments of similar character and import; provided, however, that such documents shall also be signed by the Secretary.  In addition, the LLIECHE Board may delegate authority to other officers or subordinate officers to execute on behalf of LLIECHE, either alone or in conjunction with others, such instruments as it may designate.

No contracts or agreements executed by any officer of LLIECHE, which are not within the authority specifically granted to him or her by the LLIECHE Board, shall be valid without previous authorization of or subsequent ratification by the LLIECHE Board. Election or appointment to any office shall not constitute a contract of employment.

**Section 2.  Legal Documents.**  The Board shall adopt a policy which shall specify in detail the officers who are authorized for execution of various legal documents.  The CEO  or his/her designee shall maintain a master file of all legal instruments of LLIECHE, including minutes, deeds, mortgages, contracts and insurance policies.  Duplicate files may be maintained by the CEO and General Counsel.  Legal document files shall at all times be available for review of any individual director of LLIECHE at all reasonable business hours, providing that originals of such legal documents be retained permanently in the official files of LLIECHE and not removed from the premises of the corporate offices.

**Section 3.  Securities.**  The Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Secretary or such other officers as the Board may select for that purpose are authorized to vote, represent and exercise on behalf of LLIECHE all rights incident to any and all voting securities of any other Corporation or Corporations standing in the name of LLIECHE.  The authority granted by these Bylaws to officers to vote or represent LLIECHE arising from any voting securities held by LLIECHE and any other Corporation or Corporations may be exercised by the officers in person or by any person authorized to do so by proxy or power of attorney duly executed by the officers.

## ARTICLE XI. INDEMNIFICATION

**Section 1. Advancement of Expenses.**  The CEO of the corporation may, in his or her sole discretion, authorize the corporation to advance to a corporate agent any amount equal to or less than the expenses incurred by the agent in defending himself or herself against any threatened or pending action or proceeding brought against the agent in connection with the agent's actions or omissions on behalf of the corporation.  Such advances shall be memorialized in a written agreement between the agent and the corporation.  The Board must approve any advance made to the CEO under this section, prior to such advance being paid to the CEO.

**Section 2.  Indemnification Upon Successful Defense.**  If an agent of the corporation is successful on the merits in defense of any proceeding, claim or other contested matter brought against the agent in connection with the agent's actions or omissions in relation to the corporation, the corporation shall indemnify the agent against his or her actual and reasonable expenses incurred in defending himself or herself against such proceeding or claim.

**Section 3. Indemnification Upon Unsuccessful Defense.**

Exhibit B to Dr. Giang Declaration

3.1     Mandatory Indemnification. To the maximum extent permitted by law, the corporation shall indemnify each of its present and former (i) Directors, (ii) Officers, (iii) persons who are or were regularly invited for six (6) consecutive months or more to attend and participate at Board meetings or Board committee meetings, and (iv) persons identified in a duly approved Board resolution as qualifying for this mandatory indemnification (each of whom is an "indemnitee") against expenses (collectively, "Payments") actually and reasonably incurred by such indemnitee in connection with defending himself or herself against an action or proceeding.  An employee of the corporation may be an indemnitee if he/she meets one or more of the definitions of indemnitee set forth above.  Notwithstanding the above, mandatory indemnification shall be given to a potential indemnitee only if all of the following apply:

   3.1.1.   The potential indemnitee was not a Director, Officer or other person who was removed from one or more of their positions with this corporation;

   3.1.2.   The action or proceeding against the indemnitee is based on or relates to an action or inaction taken by the indemnitee on behalf of the corporation;

   3.1.3.   The action or proceeding against the indemnitee is based on an action or inaction that was within the scope of the indemnitee's role or relationship with the corporation;

   3.1.4.   The Board of Directors (excluding vacancies and Directors who have a conflict   of interest) has made all findings required by California Nonprofit Religious Corporation Law (the indemnitee shall not be eligible to receive this mandatory   indemnification if such findings are not made by the Board); and

   3.1.5.   The potential indemnitee has not procured for himself/herself any illegal profit, remuneration or advantage, as determined by the Board in its sole discretion. If a person does not qualify for this mandatory indemnification, such person might still receive discretionary indemnification as outlined below.

3.2     Discretionary Indemnification. To the maximum extent permitted by law, the Board of Directors may, in its sole discretion, by a majority vote (excluding vacancies and Directors with a conflict of interest), indemnify an agent (including former Directors who were removed by the Board of Directors, employees and/or agents identified by the Board as acting on behalf of the corporation and not entitled to mandatory indemnification) (each of which is a "recipient") against any or all of the expenses, judgments, fines, settlements and/or other amounts actually and reasonably incurred by such recipient in connection with an action or proceeding against the recipient, subject to the following:

   3.2.1.   The action or proceeding against the recipient must be based on or relate to an action or inaction taken by the recipient on behalf of the corporation and within the scope of the recipient's role or relationship with the corporation.

   3.2.2.   An employee of the corporation may be a recipient if he/she meets one or more of the definitions of recipient set forth above.

   3.2.3.   The Board of Directors (excluding vacancies and Directors who have a conflict   of interest) must have made all findings required by California

Exhibit B to Dr. Giang Declaration

Exhibit B to Dr. Giang Declaration

Nonprofit Religious Corporation Law (the recipient shall not be eligible to receive this discretionary indemnification if such findings are not made).

3.2.4.   Indemnification is not available if the recipient is found to have procured for himself/herself illegal profit, remuneration or advantage.

For purposes of this Article, an "agent" shall have the meaning established in California Nonprofit Corporation Law applicable to this corporation.

## ARTICLE XII.  AUDITOR

The books of LLIECHE shall be audited annually by an independent firm of certified public accountants as the Board may direct.

## ARTICLE  XIII.  INSURANCE

The corporation shall have the right to purchase and maintain insurance to the fullest extent permitted by law on behalf of its officers, directors, employees, and other agents, against any liability asserted against or incurred by any officer, director, employee, or agent in such capacity or arising out of the officer's, director's, employee's, or agent's status as such.

## ARTICLE XIV. CONSTRUCTION AND DEFINITIONS

Unless the context requires otherwise, the general provisions, rules of construction and definitions in the California Nonprofit Corporation Law shall govern the construction of these bylaws.  Without limiting the generality of the preceding sentence, the masculine gender includes the feminine and neuter, the singular includes the plural, the plural includes the singular, and the term "person" includes both a legal entity and a natural person.

## ARTICLE  XV.  DISSOLUTION

On the winding up and dissolution of this corporation, after paying or adequately providing for the debts, obligations, and liabilities of the corporation, the remaining assets of this corporation shall be distributed to an organization (or organizations) organized and operated exclusively for charitable purposes selected by the Board, which has established its tax-exempt status under section 501(c)(3) of the internal Revenue Code of 1986 (or the corresponding provision of any future United States internal revenue law). The recipient organization shall be LLUH, if LLUH meets the qualification described in this paragraph.

## ARTICLE  XVI.  AMENDMENT TO ARTICLES AND BYLAWS

**Section 1:   Amendment of Articles and Bylaws**.  The Articles of Incorporation and these Bylaws may be amended by an affirmative vote of the Members, when the proposed amendment

Exhibit B to Dr. Giang Declaration

does not conflict with federal or state laws.  When it is proposed to change the Bylaws at any meetings of the Members, notice shall be given to that effect in the call for the meeting. All amendments and approvals shall be filed with the corporate records or be made a part of the minutes of the meeting.

**Section 2:** **Bylaws Review Committee**.  The Board may establish a "Bylaws Review Committee."  (See Article VI, Section 5.) The purpose of this Committee shall be to review, evaluate and make recommendations for revisions to the LLIECHE Board on a periodic basis. This review process shall take place at a minimum of once every five (5) years.  The Board shall consider and act upon such recommendations from the Bylaws Review Committee before forwarding this to the Members for consideration and enactment.

**Section 3. Inspection.**  These Bylaws, and all amendments thereto, shall be recorded in a minute book which shall be kept by the Secretary of LLIECHE at the principal office of LLIECHE and may be inspected at any time during regular office hours by any Director or officer of LLIECHE or its members.

Exhibit B to Dr. Giang Declaration

Exhibit B to Dr. Giang Declaration

### CERTIFICATION OF
### LOMA LINDA—INLAND EMPIRE CONSORTIUM
### FOR HEALTHCARE EDUCATION

I, Brian S. Bull, Secretary of Loma Linda—Inland Empire Consortium for Healthcare Education, hereby certify that the attached bylaws of Loma Linda—Inland Empire Consortium for Healthcare Education, a California nonprofit religious corporation, were approved by the membership of same corporation at a duly held meeting on May 19, 2015 and that the same is the entire document and is true and correct.

**IN WITNESS WHEREOF,** I execute this certificate effective as of the
6 July _____, 2015.


Brian S. Bull, Corporate Secretary

Exhibit B to Dr. Giang Declaration

Exhibit C to Dr. Giang Declaration

**LOMA LINDA UNIVERSITY HEALTH**

# JOB DESCRIPTION

**Mission and Values Statement "How We Live"**

**Our mission is to continue the teaching and healing ministry of Jesus Christ. Our core values are compassion, excellence, humility, integrity, justice, teamwork and wholeness.**

**Job Code:** I02101
**Job Title:** Resident 1
**FLSA:** Exempt
**Revised Date:** 02/07/2020

**Job Summary**

Resident Physician (hereinafter "Resident") entails provisions of patient care commensurate with level of advancement and competence. Abides by the policies, rules, and procedures of Medical Center and its Affiliated Institutions, specific Graduate Medical Education (GME) Program, and Graduate Medical Committee (GMEC). Adheres to Accreditation Council for Graduate Medical Education institutional and program requirement. Complies with established ethical behaviors and practices. Provides medical care and learns under the direction and supervision of appropriate attending physicians and faculty members. Performs assigned duties in appropriate and timely manner. Advises on-call colleagues of the status of patient on the assigned service. Assures assigned patients received appropriate and continuous care. Participates in institutional programs and activities. Performs other duties as needed.

**Job Duties - "What We Do"**
**Essential Duties**

- Abides by Medical Center policies and procedures, the policies and procedures of the Affiliated Institutions to which Resident may rotate or be assigned, the policies and procedures of the specific Graduate Medical Education (GME) Program, the Graduate Medical Education Committee's (GMEC) rules, regulations, policies and procedures, and adhere to Accreditation Council for Graduate Medical Education institutional and program requirements.

- Complies with established ethical behavior and practices.

- Performs the duties assigned to Resident to the best of his/her skill and ability under the general direction of the Graduate Medical Education Committee (GMEC) and the specific direction of members of the Medical Staff.

- Participates in safe, effective, and compassionate patient care under supervision, commensurate with their level of advancement and responsibility.

- Takes responsibility for the care of all patients on the service and see new patients promptly and leave orders.

- Takes continuous responsibility for patients and not necessarily limited to any scheduled hours within the guidelines of the Graduate Medical Education Committee (GMEC).

- Develops a personal program of self-study and professional growth with guidance from the teaching staff.

Exhibit C to Dr. Giang Declaration

- Participates fully in educational activities and, as required, develop an understanding of the ethical, socio-economic and medical/legal issues that affect graduate medical education and of how to apply cost containment measures in the provision of patient care.

- Participates in institutional programs and activities involving the medical staff and adhere to established practices, procedures, and policies of the institution.

- Participates in the evaluation of the Graduate Medical Education (GME) Program and its faculty.

- Refrains from accepting fees from any patient for services rendered at LLUMC or its Affiliate Institutions.

## Job Specifications
## Knowledge, Skills and Abilities (KSA)

- Resident must be capable of learning; responding to and improving with constructive feedback; and demonstrating increasing competence so that by the end of training, Resident will be competent to independently practice the specialty. Initially, Resident must be able to practice medicine safely under supervision, perform a complete history and physical examination, effectively document in the electronic health record, write orders on behalf of the Medical Staff, and obtain consents for procedures on behalf of medical staff members. Able to read, write legibly, speak in English (and Spanish preferred) with professional quality; use computer and software programs necessary to the position; troubleshoot and calibrate patient care equipment. Able to relate and communicate positively, effectively, and professionally with others; be assertive and consistent in following and/or enforcing policies; work calmly and respond courteously when under pressure; lead, supervise, teach, and collaborate; accept direction. Able to communicate effectively in English in person, in writing, and on the telephone; think critically; work with indirect supervision; perform basic math functions; manage multiple assignments effectively; work well under pressure; problem solve; organize and prioritize workload; recall information with accuracy; pay close attention to detail. Able to distinguish colors and smells as necessary for patient care; hear sufficiently for general conversation in person and on the telephone; identify and distinguish various sounds associated with the work place/patient care; see adequately to read computer screens, medical records, and written documents necessary to position; discern temperature variances through touch.

## Education and Experience

- Graduate of a medical school accepted by the Medical Board of California or the Osteopathic Medical Board of California required.

## Licensure(s) and Certification(s)

- Basic Life Support Certification Required. Permission of or licensure by the Medical Board of California or the Osteopathic Medical Board of California to participate in graduate medical education required.

## Age Specific Criteria

- Age specific criteria pertinent to this position are contained and described within the department's Performance Standards. Additional criteria may be listed in separate documents by the department.

## Exposure to Hazards

- Hazardous materials pertinent to this position are described in the department's Safety Data Sheets (SDS) information outlined on One Portal.

## Physical Demands

Exhibit C to Dr. Giang Declaration

Exhibit C to Dr. Giang Declaration

Physical Demand Description. The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions. Please refer to Department addendum for physical requirements by specialties. ACTIVITIES: Occasionally requires kneeling, reaching above shoulder level, reaching below waist, climbing and crawling. Frequently requires walking, sitting, squatting, reaching at shoulder level, reaching above waist, bending waist, twisting waist, balancing, bending neck, and using foot controls. Continuously requires standing, turning neck. HAND FUNCTIONS: Continuously requires pinching, simple grasping, firm grasping and fine manipulation. ENVIRONMENTAL DEMANDS: Occasionally exposed to outdoor weather conditions, gas, extreme heat and cold, humid, steam, chemotherapy, radiation, animals, insects and hazardous materials. Frequently works indoors, exposed to heights, dust, fumes, excessive noise, wet, hostility and working on uneven ground, and vibrations. Continuously exposed to pathogens, latex, medications, sharps. VISION REQUIREMENTS: Specific vision abilities may be required including close vision, distance vision, peripheral vision, depth perception and ability to adjust focus. DRIVING: Not applicable. LIFTING AND CARRYING: Continuously lifts up to 10 lbs, occasionally lifts up to 50 lbs and occasionally lifts over 50 lbs. Continuously carries up to 10 lbs, occasionally carries up to 50 lbs and occasionally carries over 50 lbs. The type of objects lifted or carried are as follows: medical equipment, patients, records, paperwork, medical and office supplies. PUSH AND PULL (PATIENT CARE AND NON-PATIENT CARE ACTIVITIES): Frequently uses maximum force when performing patient care and non-patient care activities. The types of objects that are pushed or pulled are as follows: computer workstations, patient transport various methods, carts, office and medical equipment and machines, lifting devices. In emergency situations, will need to blanket drag patient 50 plus feet using proper body mechanics and patient safety.

**End of report**

Exhibit C to Dr. Giang Declaration

Exhibit D to Dr. Giang Declaration

LOMA LINDA UNIVERSITY HEALTH
**EDUCATION CONSORTIUM**

**LOMA LINDA INLAND EMPIRE CONSORTIUM FOR HEALTHCARE EDUCATION**
**(dba LOMA LINDA UNIVERSITY HEALTH EDUCATION CONSORTIUM)**
**GRADUATE MEDICAL EDUCATION TRAINING AGREEMENT**

THIS AGREEMENT made and executed at Loma Linda, California, as of **May 2, 2022**, by and between LOMA LINDA UNIVERSITY HEALTH EDUCATION CONSORTIUM (hereinafter "the Consortium"), a not-for-profit religious corporation owned and operated by the Seventh-day Adventist Church, whose principal place of business is 11234 Anderson Street, Westerly Bldg. Suite 'C', Loma Linda, California 92354, AND **Jane Smith Doe, MD** Resident/Fellow Physician (hereinafter "Resident"). The Consortium and Resident agree that Resident meets the qualifications for resident eligibility outlined in the Accreditation Council for Graduate Medical Education (ACGME) Common Program Requirements. In addition, the Consortium and the Resident agree:

1. **CONSORTIUM SPONSORSHIP.** The Consortium sponsors a Graduate Medical Education Training Program in **Cardiology** (hereinafter the "GME Program"). The GME Program may be performed entirely within the facilities owned and operated by Loma Linda University Medical Center or the GME Program may utilize facilities owned and operated by other entities (hereinafter "Affiliated Institutions"), as the GME Program Director deems appropriate for purposes of education and training. The Consortium sponsorship of this GME Program is guided by the regulations of the Medical Board of California (hereinafter "MBC") or the relevant board established by the State of California and by the standards of the relevant accrediting body for the program.

2. **MISSION STATEMENT.** The Consortium is committed to its mission to continue the healing ministry of Jesus Christ, "To Make Man Whole" in a setting of advancing medical science and to provide a stimulating clinical and research environment for the education of physicians, nurses, and other health professionals. Such commitment is embodied in the CONSORTIUM's Agreements.

3. **REQUIREMENTS.** Resident certifies that he/she is a graduate of a Medical School approved by the Liaison Council on Medical Education ("LCME") or that he/she has met the requirements established by the MBC for unrestricted participation in a graduate medical education program in the State of California. Resident must pass a background investigation, which includes criminal, Federal, OIG and DMV driver's record, conducted through Human Resource Management and must pass a urine drug screening test and pre-employment physical examination prior to commencing of training. This AGREEMENT shall be null and void unless all credentials and requirements have been met by the time of the effective date of this AGREEMENT.

4. **DURATION of APPOINTMENT.** The Consortium has offered and the Resident has accepted appointment to a position as a Resident in the GME Program at the **PGY-3** level of training. This appointment shall be for a period beginning **7/1/2022** and ending **6/30/2023**. The appointment period may be extended by mutual consent of Resident and the Consortium.

5. **FINANCIAL SUPPORT.** The Consortium agrees to pay the Resident a rate of **$41,234.56** per appointment period.

6. **AGREEMENT DATES.** This agreement applies only for the dates indicated in Paragraph 4 above, subject to the termination clauses contained in paragraphs **29 and 30** and does not imply any type of a guarantee of a position as a Resident for any subsequent year(s) of education and training regardless of the total length of the GME Program to which Resident was appointed.

7. **CONDITIONS FOR REAPPOINTMENT.** Appointment to an additional year of the GME Program, if any, is accomplished by affirmative recommendation from the specific residency Program Director and concurrence of the Graduate Medical Education Committee (hereinafter "GMEC"). It is the Resident's responsibility to clarify with the Program Director whether the GME Program intends to offer an appointment to Resident for any additional year(s) of Graduate Medical Education training.

8. **NON-RENEWAL OF APPOINTMENT.** If a decision is made not to renew the Agreement, Resident must be provided with a written notice of intent not to renew the Agreement no later than four months prior to the end of the current Agreement. However, if the primary reason(s) for the nonrenewal occurs within the four months prior to the end of the Agreement, Resident must be provided with as much written notice of the intent not to renew or of the intent to renew but not to promote to the next level of training as the circumstances reasonably allow prior to the end of the agreement. Resident may implement the GMEC Resident Grievance Policy and Procedure if such notice of intent not to renew the Agreement is received.

Exhibit D to Dr. Giang Declaration

9. **RESIDENT'S RESPONSIBILITIES.** Resident must discharge the duties and responsibilities as hereinafter provided as a Resident in the GME Program. The Resident may be assigned additional duties and responsibilities by the Program Director in the GME Program. The duties and responsibilities begin with the first day of this AGREEMENT and must be carried out at Loma Linda University Medical Center and/or Affiliated Institutions which have been approved to participate in the GME Program, as directed.

10. **GENERAL OBLIGATIONS.** Resident must abide by the Consortium policies and procedures, the policies and procedures of the Affiliated Institutions to which Resident may rotate or be assigned, the policies and procedures of the specific GME Program, and the GMEC's rules, regulations, policies and procedures. The GMEC's rules, regulations, policies and procedures are found on the Loma Linda University Health One Portal or the Consortium's GME website. In making this commitment, the Resident understands and agrees that these education and training activities and responsibilities must be carried out in accordance with and subject to the standards of conduct and ethics which are not in conflict with the ethics, principles and philosophy of the Seventh-day Adventist Church.

11. **RESIDENT'S GENERAL OBLIGATIONS.** The position of Resident entails provision of care commensurate with Resident's level of advancement and competence, under the general supervision of appropriately privileged attending Medical Staff members. The Resident expressly agrees to faithfully perform the duties assigned to the best of his/her skill and ability under the general direction of the GMEC and the specific direction of members of the Medical Staff. The Resident acknowledges, understands, and agrees that he/she:

(A) Will participate in providing safe, effective and compassionate patient care;
(B) Will develop an understanding of the ethical, socio-economic and medical/legal issues that affect graduate medical education and of how to apply cost containment measures in the provision of patient care;
(C) Will participate in the educational activities of the GME Program and, as appropriate, assume responsibility for teaching and training students and other residents, as directed, and participate in institutional orientation, educational programs, and other activities involving the Medical Staff, as appropriate;
(D) Participate in the evaluation of the GME Program and its faculty as requested;
(E) Adhere to ACGME institutional and program requirements;
(F) Participate in Medical Staff committees to which Resident may be appointed or invited;
(G) Maintain valid (unexpired) AHA certification in Basic Life Support (BLS) or Advanced Cardiac Life Support (ACLS). All life support education must be approved by the American Heart Association and include a skills test to demonstrate competency to an in-person American Heart Association instructor. Failure to renew in a timely manner will result in suspension from the training program;
(H) Live within a driving distance from LLUMC as specified by their Program. Residents who are required to be on duty overnight must reside within 30 miles driving distance of LLUMC;
(I) Adhere to the clinical and educational work hour policies of the CONSORTIUM (GMEC-12), the training program and comply with any applicable ACGME requirements. Rotations shall be established by the Program Director, where assigned, and may include weekend requirements and on-call responsibility; the responsibility for patients is continuous and not necessarily limited to any scheduled hours;
(J) He/She shall wear proper medical attire as established by the rules, regulations and policies of the Consortium, the Affiliated Institution (as assigned), the GMEC, the Director of Graduate Medical Education, and/or the Program Director. Refer to the Consortium policy GMEC-I-20, which is included on the Loma Linda University Health One Portal webpage.
(K) He/She will refrain from accepting fees from any patient for services rendered at LLUMC or its Affiliate Institutions;
(L) The Consortium and/or the Affiliated Institution shall have the right to the exclusive services of Resident during all scheduled hours, including weekend and on-call responsibilities, as determined by the Program Director. Residents must agree to devote full time to the course of training and will not participate in any outside activities that will interfere with training hours or violate clinical and educational work hour restrictions;
(M) Moonlighting: Residents are not required to engage in moonlighting; refer to policy GMEC-26 on LLUH One Portal;
(N) He/She is required to and will complete all medical records accurately, timely, and in accordance with policies of the GMEC and of the respective institutions participating in the GME Program. FAILURE TO COMPLY WITH THIS REQUIREMENT REGARDING MEDICAL RECORD COMPLETION MAY RESULT IN DISCIPLINARY ACTION INCLUDING SUSPENSION FROM THE GME PROGRAM WITHOUT PAY, AND/OR TERMINATION FROM THE GME PROGRAM at the sole and absolute discretion of the GMEC and/or the GME Director;
(O) He/She must obtain and maintain a current State of California Medical, Dental or Postgraduate Training License within the time frame required by the Consortium and the applicable professional licensing boards of the State of California as outlined in policy GMEC-18, refer to LLUH One Portal. Failure to apply for, obtain, and maintain a California Medical License or California Postgraduate Training License as required by the CONSORTIUM's GME Office and applicable professional licensing board shall result in **TERMINATION FROM THE GME PROGRAM.** This action is based upon state law; therefore, it is not grievable under the GMEC Resident Grievance Policy and Procedure.

12. **USMLE/COMLEX.** Resident acknowledges, understands, and agrees that:

(A) Residents are required to take and pass USMLE Step 3 or COMLEX-USA Level 3 by the end of the 12th month of Residency training. CONSORTIUM allows two days off with pay to take USMLE/COMLEX-USA Level 3 for the first time.
(B) PGY-2 Residents (US Grads) entering a Consortium training program are required to have successfully passed USMLE Step 3 or COMLEX-USA Level 3 prior to their Consortium start date.

Exhibit D to Dr. Giang Declaration

Exhibit D to Dr. Giang Declaration

(C) PGY-2 Residents (IMG Grads) entering a Consortium training program are required to take and pass USMLE Step 3 or COMLEX-USA Level 3 by the end of their PGY-2 year. Failure to do so will result in NONRENEWAL OF THE TRAINING AGREEMENT.

13. **MEDICAL LICENSE.** Resident acknowledges, understands, and agrees that:

(A) Mere acceptance and/or completion of the GME Program does not in any way guarantee that Resident will receive a license of any kind from any source;
(B) It is his/her sole responsibility to comply with all CONSORTIUM and applicable professional training board licensure requirements; and,
(C) The Consortium is under no obligation whatsoever to assist Resident in obtaining a license of any kind from any source. The Consortium is willing; however, to supply documentation concerning training in the Consortium sponsored GME Programs provided such request is submitted in writing in advance to the GME Office.
(D) Resident agrees to provide GME Office with any necessary information to allow the GME Office to assist with the license application as required.
(E) Refer to policy GMEC-18 on LLUH One Portal for California Medical License requirements.

14. **PROVISION OF MEDICAL LICENSE AND DEA REGISTRATION.** Resident understands, acknowledges and agrees that he/she must provide a copy of the initial California Medical License to the GME Office no later than ten (10) days after receipt of the California Medical License. Moreover, if the Resident is required by his/her residency program to obtain a Drug Enforcement Administration (hereinafter "DEA") Registration, he/she must similarly provide a copy of the Registration and an opportunity to verify the authenticity of the copy by observing the original.

15. **DRUG-FREE WORKSITE.** Resident's signature affixed to this AGREEMENT certifies that Resident shall not engage in the unlawful manufacture, distribution, dispensation, possession, sale or use of controlled substances, as described in policy GMEC-I-58, while performing services under this AGREEMENT. It is the Resident's responsibility to read, understand and abide by policy GMEC-I-58, refer to LLUH One Portal.

16. **RESIDENT IMPAIRMENT.** Any Resident who believes he/she may be impaired by physical or mental illness, substance abuse or any other impairment should, as a matter of professionalism, seek the assistance of the Resident Well-Being Committee. A Resident who is determined to be impaired during the GME program will be subject to policy GMEC-23, refer to LLUH One Portal. The Consortium is obligated under certain circumstances to report impairment that affects patient safety to the applicable professional training board (e.g. Medical Board of California, Osteopathic Medical Board of California, or Dental Board of California).

17. **NON-DISCRIMINATION AND ANTI-SEXUAL HARASSMENT.** Resident's signature affixed to this AGREEMENT certifies that Resident will review, does understand and does agree to abide by the Consortium's policies on anti-discrimination and sexual harassment. It is Resident's responsibility to read, understand and abide by both policy GMEC-I-68 "Equal Employment Opportunity" and policy GMEC-I-39, "Non-Discrimination and Anti-Harassment", refer to LLUH One Portal.

18. **VIOLENCE IN THE WORKPLACE.** The CONSORTIUM embraces a **ZERO TOLERANCE** policy for workplace violence. Acts, comments or threats of physical contact and/or violence, including intimidation, harassment and/or coercion, whether of a joking nature or otherwise, which involve or affect CONSORTIUM or any of its staff, employees or visitors, or which occur on LLUMC property or on any Affiliate Institution's property, will not be tolerated. It is the responsibility of Resident to read, understand, and abide by LLUMC's Policy I-71, "Violence in the Workplace", refer to LLUH One Portal.

19. **INTELLECTUAL PROPERTY.**

(A) Resident agrees that all inventions, ideas, concepts, improvements, developments, innovations and works of authorship, whether patentable, copyrightable or not ("Intellectual Property"), made, developed, written or conceived by Resident in the course and scope of Resident's appointment with the CONSORTIUM shall be and remain the sole and exclusive property of the CONSORTIUM or its assignees, as shall the media in which all such Intellectual Property is fixed, including, without limitation, notes, drafts, computer diskettes or tapes and the like. Accordingly, to the extent the CONSORTIUM does not already own all rights by operation of law, and subject to Section 2870 of the California Labor Code (Article 3.5), Resident hereby assigns irrevocably and agrees to assign and also agrees promptly to disclose in writing to the CONSORTIUM, all rights, of whatever type, throughout the world, for as long as such rights shall endure, all Intellectual Property made, conceived or developed by Resident in the course and scope of Resident's appointment with the CONSORTIUM, whether or not made, conceived or developed during regular working hours. To the extent permitted by law, such Intellectual Property shall conclusively be presumed to have been made, conceived or developed in the course and scope of Resident's appointment with the CONSORTIUM and shall be and remain the sole and exclusive property of the CONSORTIUM or its assignees.

Exhibit D to Dr. Giang Declaration

(B) To the extent any third party has any ownership, copyright and/or patent interests in Intellectual Property made, developed, written, conceived or perfected by Resident in the course and scope of Resident's appointment with the CONSORTIUM, Resident agrees to disclose in writing any and all such interests in existence as of the date of execution of this Agreement.

(C) Resident, by signing this Agreement, does not waive any rights under Section 2870 of the California Labor Code Article 3.5.

(D) Resident agrees that, both during and after Resident's appointment, without charge to the CONSORTIUM, Resident will, at the CONSORTIUM's request and expense, assist the CONSORTIUM and/or its assignees in every proper and reasonable way to obtain, preserve, defend and vest, in it or them, title to patent, copyrights or other intellectual property rights on the Intellectual Property in all countries, including but not limited to executing all necessary or desirable documents, such as applications for patents, copyrights or trademarks, and assignments thereof.  If the CONSORTIUM is unwilling to pursue title to patent, copyrights or other intellectual property rights, the right to pursue those protections will revert to the Resident.

20. **CONSORTIUM'S GENERAL OBLIGATIONS.**  CONSORTIUM agrees to the best of its ability to:

(A) Provide a suitable environment for Graduate Medical Educational experience(s), as determined in the CONSORTIUM's sole and absolute discretion;

(B) Provide and maintain an accredited or otherwise recognized GME Program in the specialty in which Resident is appointed.  However, this AGREEMENT may be terminated or suspended by the CONSORTIUM at any time in the event any cause beyond the CONSORTIUM's control, as determined at the sole and absolute discretion of the CONSORTIUM, renders it impracticable for whatever reason, for the CONSORTIUM to continue with the GME Program. This AGREEMENT may also be terminated in the event of termination of the GME Program or in the case of financial exigency as determined by the CONSORTIUM.  In such an instance, the CONSORTIUM shall endeavor to use its best efforts to assist the Resident in obtaining comparable alternative training.  In addition, the CONSORTIUM will inform the Resident in the event of any adverse accreditation action taken by the ACGME within a reasonable period of time after the CONSORTIUM is notified an action has been taken; and,

(C) Allow the Resident to engage in any professional activities at the CONSORTIUM or its Affiliated Institutions for which he/she is qualified as may be approved by the Program Director and the GMEC.

21. **RESIDENT BENEFITS.**  The CONSORTIUM agrees to provide benefits, meals, and leaves of absence as found on ATTACHMENT B ("Resident Physician Benefits").

22. **PROFESSIONAL LIABILITY COVERAGE.**  The CONSORTIUM agrees to provide professional and general liability coverage for the authorized activities of Resident under this AGREEMENT.  It is specifically understood and agreed that this coverage **SHALL NOT APPLY** to any unauthorized activity.  The professional and general liability coverage is an occurrence plan, thus eliminating the need for "tail coverage".  Coverage includes protection against awards from claims reported or filed after completion of the program if the alleged actions are within the scope of the residency program.

23. **PERFORMANCE EVALUATION.**  Since the position of Resident involves a combination of supervised, progressively more complex and independent patient evaluation and management functions and formal educational activities, the competence, knowledge, skills, and professional growth of the Resident is evaluated on at least a semi-annual basis.  An unsatisfactory evaluation can result in required remedial activities, temporary suspension from duties, or termination from the GME Program.  The GME Program maintains a confidential record of the evaluations. The GME Program will provide periodic written evaluation(s) of Resident's performance to the GME Office pursuant to GMEC policy and procedure, to be made a part of Resident's permanent academic record.  The Resident may request copies of the academic evaluations from the GME Office during normal business hours with 10 days written notice.

24. **REBUTTAL.**  The Resident has the option of rebutting and/or disputing any evaluation(s) in the permanent academic record with which the Resident disagrees.  Disputes may be dealt with through the GMEC Resident Grievance Policy and Procedure, refer to LLUH One Portal.

25. **PROGRAM TRANSFER.**  Transferring from one CONSORTIUM sponsored GME Program to another CONSORTIUM sponsored GME Program during an appointment period covered by this AGREEMENT is prohibited unless:

(A) Resident requests in writing to his/her Program Director to be released, and;

(B) The request for release is approved in writing by his/her Program Director, and;

(C) The request for release is approved by the GMEC.  The GMEC, in its sole and absolute discretion, shall determine if there is to be a release from this AGREEMENT.  If a release is approved, it is understood that such release shall not take place unless and until there is satisfactory completion of all current obligations and responsibilities of the current GME Program by Resident and such completion is affirmed in writing by the Program Director.

Exhibit D to Dr. Giang Declaration

26. **COMPLAINTS/DIFFERENCES.** All complaints or differences arising with regard to the services provided hereunder, or the interpretation of the terms of this AGREEMENT, and the Attachments hereto, shall be reviewed, investigated and acted upon by the GMEC and the CONSORTIUM Administration in accordance with such procedures as they shall establish from time to time.

27. **RESIDENCY COMPLETION EXIT PROCEDURES.** On or before the date of completion of residency, or upon termination, resignation, or non-renewal of the Agreement: 1) all CONSORTIUM property issued to the Resident during the GME Program must be returned to the GME Office; 2) Resident must complete all incomplete or delinquent medical records; and 3) Resident must personally check out with the GME Office PRIOR to departing from the GME Program.

28. **CERTIFICATE OF COMPLETION.** Resident shall be awarded a Certificate of Completion if the required number of years of training in a GME Program has been successfully completed, as applicable. Awarding of a Certificate of Completion is contingent upon the relevant periods of appointment having been completed to the satisfaction of the faculty of the GME Program, the Program Director, and the GMEC. Awarding of such Certificate of Completion will be conditioned upon Resident having, on or before the date of termination of this AGREEMENT, returned all CONSORTIUM property delivered to him/her, completed all patient and other records for which he/she is responsible, and settled all his/her obligations with the GME Program, the GME Office, the CONSORTIUM, and any of its Affiliated Institutions, as appropriate, including those obligations identified in paragraph 27.

29. **THIRTY-DAY TERMINATION.** Except as provided in Paragraph 20(B) above, either party may terminate this AGREEMENT prior to its expiration date with thirty (30) days prior written notice. If the CONSORTIUM terminates this AGREEMENT, pay in lieu of thirty (30) days' notice, or any combination of notice and pay, may be utilized at the discretion of the Director of Graduate Medical Education. If such termination takes place at the request of the Resident, it is understood and agreed that the CONSORTIUM must be provided with an opportunity for an "exit interview" with the Resident to discuss any comments, differences of opinions, dissatisfactions, or complaints of the Resident. If such termination occurs at the direction of the CONSORTIUM, the Resident retains the right to utilize the GME Grievance Policy and Procedure.

30. **SUSPENSION/TERMINATION.** This AGREEMENT with Resident may be suspended or terminated by the Program Director, the Director of Graduate Medical Education, the GMEC, or the CONSORTIUM Administration at any time if: 1) it is discovered that material facts presented by Resident at the time of application or re-application are misleading or not true, or 2) Resident's actions and responsibilities are carried out in conflict with the ethics, principles, and/or philosophy of the medical profession as defined by the CONSORTIUM, or 3) Resident's actions and responsibilities are carried out in conflict with the ethics, principles, and/or philosophy of the Seventh-day Adventist Church, or 4) the welfare of any patient may be placed in jeopardy due to any one or more of the following conditions:

(A) Gross act not commensurate with good medical practice;
(B) Disciplinary action imposed by the Medical Board of California;
(C) Resident's conviction or plea of guilty or nolo contendere to a felony or misdemeanor or any crime involving moral turpitude, including but not limited to substance use or abuse;
(D) Failure to satisfactorily meet the standards of the GME Program or to make reasonable progress towards satisfaction of those standards;
(E) Conduct not commensurate with good moral standards including, but not limited to, unprofessional conduct;
(F) When it is believed Resident's capacity is diminished by use of drugs or alcohol;
(G) When responsible faculty, in conjunction with the Program Director, and/or the Director of Graduate Medical Education or his/her designee, or the CONSORTIUM Administration, believes that the Resident's effective capacity has been seriously diminished by emotional, mental or physical factors;
(H) Failure to fulfill residency/fellowship responsibilities;
(I) Failure to keep charts, records and reports accurate, up to date, and signed at all times;
(J) Failure to maintain valid Basic Life Support (BLS) certification at all times.

31. **GRIEVANCE PROCEDURES AND DUE PROCESS.** In the event the Resident is suspended or terminated for any reason, or for non-promotion of a resident to the next level of training or other actions that could significantly threaten a resident's intended career development or if any dispute arises concerning Resident's eligibility to receive a Certificate of Completion of Graduate Medical Education (hereinafter "Certificate"), the Resident may exercise any and all due process rights in accordance with the GMEC Resident Grievance Policy and Procedure established by the GMEC and the CONSORTIUM Administration. **THE GMEC RESIDENT GRIEVANCE POLICY AND PROCEDURE MUST BE UTILIZED IF THE RESIDENT WISHES TO CHALLENGE THE DECISION REGARDING SUSPENSION, TERMINATION OR ELIGIBILITY TO RECEIVE THE CERTIFICATE, AND IS A PRE-CONDITION TO SEEKING JUDICIAL RELIEF.** The GMEC Resident Grievance Policy and Procedure GMEC-20 is available on LLUH One Portal. Additional copies may be obtained from the GME Office.

32. **FINAL AND BINDING DECISION.** The final decision reached through the GMEC Resident Grievance Policy and Procedure by the CONSORTIUM Administration shall be final and binding between the parties to this AGREEMENT.

Exhibit D to Dr. Giang Declaration

Exhibit D to Dr. Giang Declaration

33. **ACKNOWLEDGMENT OF GRIEVANCE PROCEDURE.**  In executing this AGREEMENT for Graduate Medical Education Training, Resident specifically acknowledges: 1) having read the provisions of paragraphs 26 through 32; 2) his/her understanding and agreement to be bound by all provisions of this AGREEMENT including all provisions of paragraphs 26 through 32 relating to Grievances and Disputes, and, 3) his/her understanding and agreement to participate in any and all procedures established pursuant to paragraphs 26 through 32, including appearance at any interviews, hearings, and/or other proceedings, whether informal or formal, as described in the GMEC Resident Grievance Policy and Procedure referred to in this AGREEMENT.

34. **GOOD FAITH.**  The CONSORTIUM and Resident further agree that they have entered into this AGREEMENT in good faith and acknowledge their respective ethical and legal obligations to fulfill such AGREEMENT until its expiration date, except in the cases provided for in paragraphs 20(B), 29 and 30, or in circumstances where Resident is unable to do so because of an incapacitating accident or illness.

35. **ASSIGNMENT.**  Nothing in this AGREEMENT shall be construed to permit assignment by Resident of any rights or obligations under this AGREEMENT.  Such assignment is expressly prohibited.

36. **CALIFORNIA LAW.**  The CONSORTIUM is licensed under the laws of the State of California and most, if not all, of the services to be rendered hereunder shall be performed in California.  Accordingly, this AGREEMENT shall be construed and interpreted under and according to the laws of the State of California.

37. **PARTIAL INVALIDITY.**  If any provision or part of a provision in this AGREEMENT is determined by a Court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions will, nevertheless, continue in full force and effect without being impaired or invalidated in any way.

38. **WAIVER OR FAILURE OF A CONDITION.**  Waiver or failure of any condition shall not operate as nor be construed to be a waiver of a subsequent failure of the same or other condition.

39. **COUNTERPARTS.**  This AGREEMENT may be executed in counterparts, each of which shall be deemed an original; the counterparts shall together constitute a single AGREEMENT.

40. **HUMAN SERVICES PROVISION.**  Pursuant to the requirements of the Health and Human Services Department, until the expiration of four (4) years after the performance of services pursuant to this AGREEMENT, the CONSORTIUM and Resident shall make available, upon written request by the Health and Human Services Secretary, or upon request by the Controller General, or any of the duly authorized representatives, this AGREEMENT, any book(s), document(s) and record(s) of the CONSORTIUM and/or Resident that are necessary to certify the nature and extent of costs pursuant to this AGREEMENT.  If the CONSORTIUM or Resident carries out any of the duties of this AGREEMENT through a subcontract with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period with a related organization, such subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of such services pursuant to such subcontract, the related organization shall make available, upon written request by the Health and Human Services Secretary, or upon request by the Controller General, or any of their duly authorized representatives, the subcontract(s), as well as any book(s), document(s), and record(s) of such organization(s) that are necessary to verify the nature and extent of such costs.

41. **MODIFICATION OF AGREEMENT.**  Any modification of this AGREEMENT will be effective only if it is communicated in writing and only if signed by the parties to be changed.

42. **ACKNOWLEDGEMENT.**  Resident acknowledges and understands that he/she is required and responsible for accessing the GMEC Policies on LLUH One Portal.  The Resident's signature certifies that he/she agrees to read and abide by the information contained in the GMEC Policies.

Exhibit D to Dr. Giang Declaration

ATTACHMENT A
"RELEASE AND AUTHORIZATION"

This document is incorporated by reference in the Graduate Medical Education Training Agreement signed by the Resident. In executing this Graduate Medical Education Training Agreement, I specifically acknowledge that I have read, understand and agree to be bound by all of the provisions of the AGREEMENT including the provisions regarding Grievances, Complaints and Termination, (i.e. paragraphs 26, 31 through 33, as well as the actual policies and procedures) as well as to participate in any and all procedures established pursuant to such paragraphs (including but not limited to appearances at any interviews, hearings or other proceedings).

I understand that LOMA LINDA UNIVERSITY HEALTH EDUCATION CONSORTIUM (hereinafter "the CONSORTIUM") has an interest in evaluating materials that are relevant to my completion of the GME Program and fulfillment of my obligations under this AGREEMENT, including materials that are relevant to my professional competence, ethical and moral qualifications, and character. I, therefore, agree that the CONSORTIUM Administration, the GME Director, the Program Director(s), the Graduate Medical Education Committee members, and/or their designated representatives, may:

(1) Consult with medical school deans, administrators, and faculty members of institutions of learning, medical staff members of Loma Linda University Medical Center or Children's Hospital and of other hospitals with which I have been associated, and any other person or entity who may have information which may bear on my professional competence, ethical and moral qualifications and character; and/or,
(2) Inspect and/or copy all records and documents, including academic and disciplinary records, at the Consortium, hospitals, clinics, as well as at universities and colleges which I have attended, and any and all medical and other records in any way related to my professional competence, ethical and moral qualifications, and character, wheresoever located;
(3) Provide data to the ACGME which may include social security numbers and Milestone data. ACGME may share data with the certifying boards in accordance with ACGME requirements. Residents are advised to contact legal@acgme.org with any questions or concerns or to withdraw consent to share this data.

I hereby consent to the release of such information, records and documents for such purposes to the CONSORTIUM and GME Office from any and all individuals and organizations as indicated herein.

I release from any and all liability the CONSORTIUM, CONSORTIUM Administration, the GME Director, the Graduate Medical Education Committee, LLUMC's Medical Staff, any Program Director, and any and all their officers, employees, agents or representatives for their acts, communications, reports, recommendations or disclosures performed in good faith as an incident to any action, inaction, proceeding, review or assessment undertaken in connection with this AGREEMENT. I further release from liability any and all individuals and organizations which provide information, in good faith, to the CONSORTIUM, the CONSORTIUM Administration, the GME Director, the Graduate Medical Education Committee, the GME Office, LLUMC's Medical Staff, any Program Director, and any and all their officers, employees, members, agents or representatives concerning my academic and/or professional performance and competence, ethics, moral qualifications and character, and any other information which may be relevant to any review, evaluation, or other proceeding carried out in connection in any way with this AGREEMENT. In addition to these specific releases, the parties listed in this paragraph shall be entitled, to the fullest extent permitted by law, to absolute immunity from liability arising from any such act, communication, report, recommendation or disclosure.

I FURTHER UNDERSTAND THAT THE CONSORTIUM, CONSORTIUM ADMINISTRATION, ITS GRADUATE MEDICAL EDUCATION COMMITTEE, THE GME DIRECTOR, RESIDENCY PROGRAM DIRECTORS, MEMBERS OF ITS MEDICAL STAFF AND ANY OTHER EMPLOYEES, AGENTS OR REPRESENTATIVES ARE ACCORDED RIGHTS, PRIVILEGES, AND IMMUNITIES WITH RESPECT TO THE RELEASE TO THIRD PARTIES OF INFORMATION EACH MAY HAVE CONCERNING ME UNDER SECTION 805 OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE, SECTIONS 43.7, 43.8 AND 47 OF THE CALIFORNIA CIVIL CODE, AND OTHER APPLICABLE PROVISIONS OF CALIFORNIA AND/OR FEDERAL LAW. I HEREBY CONSENT TO ANY SUCH RELEASE OF INFORMATION WHICH IS MADE OR GIVEN IN A MANNER WHICH IS BELIEVED IN GOOD FAITH TO QUALIFY FOR AND/OR QUALIFIES FOR ANY IMMUNITY(IES) AND/OR PRIVILEGE(S) AFFORDED BY APPLICABLE PROVISIONS OF CALIFORNIA AND/OR FEDERAL LAW.

Exhibit D to Dr. Giang Declaration

Moreover, I specifically consent to the release of any information requested by a third-party payor or auditor of or for a third-party payor relevant to my qualifications and/or any duties performed or not performed by me under this training AGREEMENT as determined solely by the CONSORTIUM.

I further agree that, upon request of the CONSORTIUM and/or its GME Office, I will execute releases in accordance with the tenor, spirit and intent of this AGREEMENT, including paragraphs 26, and 29 through 33, in favor of any individual or organization, subject to such requirements, including those of good faith, as may be applicable under the laws of the State of California and/or the Federal government.

I ACKNOWLEDGE THAT MY SIGNATURE BELOW INDICATES THAT I HAVE READ, UNDERSTAND, AND AGREE TO BE BOUND BY THIS AGREEMENT, THE ATTACHMENT (S) HERETO, AND/OR ALL POLICIES AND PROCEDURES IN PLACE OR DEVELOPED BY THE CONSORTIUM OR ITS AUTHORIZED AFFILIATES TO SUCH AGREEMENT.

---

**Resident Physician**

WHEREAS, LOMA LINDA UNIVERSITY HEALTH EDUCATION CONSORTIUM and Resident have caused this AGREEMENT to be executed as set forth below.  This AGREEMENT is not valid until signed by the designated CONSORTIUM representative.

---

**Program Director**

---

**President/Chief Executive Officer**
LOMA LINDA UNIVERSITY HEALTH EDUCATION CONSORTIUM
A California Not-For-Profit Religious Corporation

Exhibit D to Dr. Giang Declaration

ATTACHMENT B
RESIDENT PHYSICIAN BENEFITS

**BENEFITS: The Consortium agrees to provide the following benefits based upon a twelve-month appointment:**

**HEALTH PLAN COVERAGE:**
Residents are eligible to participate in the LOMA LINDA UNIVERSITY HEALTH Wholeness Health Plan or the LOMA LINDA UNIVERSITY HEALTH Base Health Plan (hereinafter "Plans". These Plans offer coverage for inpatient and outpatient medical services, prescription drugs, optical expenses, counseling, psychological and other support services. To maximize coverage under these Plans, participants must obtain non-emergency services from a contracted "preferred provider". Optional dental coverage is also available. Coverage may also be extended to a Resident's spouse and/or dependent children. To participate in the Plans, the Resident, spouse and/or children must enroll within 30 days of eligibility or during the annual open enrollment period and pay a monthly contribution through payroll deduction.

Coverage is effective on the first day of attendance at Orientation, or on the effective date of the training agreement, providing appropriate enrollment forms have been completed within the first 30 days of hire.

The Plan is a self-insured, employer-sponsored health care benefit plan; it is not an insurance program. To receive any coverage under the plan, the Resident must complete an enrollment form and submit the form on PeoplePortal **within the first 30 days of hire**. Any changes in family or eligibility status (such as change in marital status, new children, unemployed spouse, etc.) must be reported within 30 days of the change in eligibility status.

Medical and dental coverage is limited to the terms and conditions of the Plan Documents. Residents and their families are eligible during the term of Agreement, but coverage may be extended after the termination of the agreement under the terms of COBRA as described in the Plans. Resident will be responsible for co-payments and all hospital or medical expenses beyond that which is paid by the Plan whether the care is at LLUMC or elsewhere. A detailed description of Plan eligibility, enrollment, coverage, limitations, and exclusions are included in the Plan document found on the LLUH web site. Plan document is available from Risk Management and/or GME Office.

**DISABILITY/LIFE INSURANCE:**
A guaranteed issue, group long-term disability plan and term life insurance plan is provided at CONSORTIUM's expense. Details are available from the GME Office.

**RETIREMENT PLAN:** Two plans are offered to residents and fellows:
1. A Multiple Employer Retirement Plan (MERP) where the employer makes annual contributions and employees are vested based on years of service.  All eligible residents/fellows are automatically enrolled in the MERP at the time of hire.
2. A TSA-403(b) where the employee may choose to make salary deferrals.  Residents are eligible to sign up for the TSA on the 1st of the month following the date of hire.  A broad range of investment choices are offered.

**DAYS OFF:**
Residents are to have 4 (four) 24-hour periods (1 day in 7) free of patient care responsibilities each month, averaged over four weeks. During months with legal holidays, i.e. February, May, July, September, and December, Residents will have one additional day off for a total of 5 (five) days off duty. Residents will have a total of 6 (six) days off duty during January and November to account for two legal holidays. Recognized Consortium holidays are paid days off and do not require the use of PTO.

**LEAVE:**
The following leave allowances and provisions based upon a twelve-month appointment are provided. Leave provisions will be prorated for appointments of shorter duration. For purposes of paid time off (vacation, sick, funeral, etc.) a week is considered Monday through Friday; weekends are not included in calculations of leave time off. Refer to policy GMEC-21 for full details concerning leave allowances for medical, parental and caregiver leaves.

**Paid Time Off (PTO):**
PGY-1 through PGY-9 Residents are provided 240 hours or six (6) weeks of paid leave days (30 Monday-Friday days) for each program year. PTO is available for vacation, other personal time off, personal illness or to care for a family member as more fully described in policy GMEC-21. Any unused PTO hours will be cashed out upon termination of the residency training agreement.

Vacation may not be taken and will not be granted during the first or last month of the GME program under this AGREEMENT, subject only to the discretion of the Program Director, the GME Director and/or the Consortium Administration. Approval of vacation scheduling is at the discretion of the Program Director. Arrangements for vacation of more than three consecutive days should be made at least 30 days in advance. Resident/fellow must follow appropriate program procedures for requesting leave as described in policy GMEC-21.

Exhibit D to Dr. Giang Declaration

**Legislated Leaves:**
Refer to policy GMEC-I-69 and GMEC-21 on LLUH One Portal for specific information pertaining to Family & Medical Leave Act "FMLA" (federal), Worker's Compensation (state), California Family Rights Act "CFRA" (state), Pregnancy Disability Act (state).

**Funeral Leave:**
Three (3) regularly scheduled workdays off with pay for funeral leave in the case of a death in the Resident's immediate family as defined in policy GMEC-21, refer to LLUH One Portal.

**Leave of Absence (LOA):**
An LOA request must be made 30 days prior to the requested time off, if possible, and must be approved by the Program Director and Executive Director of GME Office. See policy GMEC- 21 and GMEC-22 on LLUH One Portal.

**Effect of Leave(s) on the Ability to Satisfy the Requirements for Program Completion:**
A leave of absence or other types of leaves may have an effect upon the completion date of the training program. The Program Director, in compliance with the ACGME, State Licensing and Specialty Board requirements, will determine whether leave time must be made up and the training completion date extended. The Resident will be given timely notice of the effect of the leave(s) on the ability to satisfy the requirements for program completion.

**Eligibility for Specialty Board Examinations:**
The resident/fellow should consult with their Residency Program Director for information related to the Resident's eligibility for specialty board examinations.

**On-Call Meal Cards:**
Meal cards (total value of $18) will be provided for Residents who are required to take in-house call for 24 consecutive hours and are unable to leave the medical center during that period.  Meal cards are available from the residency program office associated with the service for the assigned rotation.  Meal cards are not eligible for discounts at the various cafeterias.  An assortment of food items for residents can be found 24 hours a day in the Resident Lounge.

**CAFETERIA PAYROLL DEDUCTION OPTION:**
Residents may elect to enroll in an automatic payroll deduction of cafeteria option for purchases in cafeterias on the LLUH campus (does not include on-call meal tickets).  The payroll deduction process eliminates the need to carry cash and provides a faster transaction time at the cash register.  Payroll deduction and employer provided discounts only apply upon presentation of an activated ID Badge.  Cafeteria Deduction Authorization Forms can be obtained from One Portal>Human Resources>Benefits.

**SCRUBS:**
Scrubs are provided through vending machines located in the Medical Center.  Access to the scrub vending machines is by use of the ID badge; request assistance from the GME Office.

**EMPLOYEE ASSISTANCE PROGRAM:**
The CONSORTIUM provides counseling services through an Employee Assistance Program (hereinafter "EAP"), available for Residents in GME Programs.  Specific details are available from "EAP" or from GME Office.

**HOUSING:**
There is no provision whatsoever for housing accommodations for Resident or Resident's dependents.

Exhibit D to Dr. Giang Declaration

Exhibit E to Dr. Giang Declaration

*General Conference*

# WORKING POLICY

## 2022-2023

Exhibit E to Dr. Giang Declaration

. . . . . . . . . . . . . . . .

# WORKING POLICY

OF THE GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS

2022-2023 Edition

PRINTED IN U.S.A.

PACIFIC PRESS PUBLISHING ASSOCIATION
Nampa, ID 83653-5353

. . . . . . . . . . . . . . . .

Exhibit E to Dr. Giang Declaration

Copyright © 2022 by the General Conference of Seventh-day Adventists. All rights reserved.

Exhibit E to Dr. Giang Declaration

# Introduction

This book contains the Fundamental Beliefs of Seventh-day Adventists and the Constitution and Bylaws of the General Conference of Seventh-day Adventists as adopted by General Conference Sessions, the Mission Statement of the Seventh-day Adventist Church, Total Commitment to God—A Declaration of Spiritual Accountability in the Family of Faith, Roadmap to Mission and the *Working Policy* as adopted by Annual Councils of the General Conference Executive Committee. It is therefore the authoritative voice of the Church in matters relating to the administration of the work of the Seventh-day Adventist denomination in all parts of the world. It is to be adhered to by all denominational organizations. (See General Conference *Working Policy* B 10.)

Up until and including the 1975 edition, the General Conference *Working Policy* was published in bound format and was updated and reprinted periodically, usually every two years. Beginning with the 1977 edition, it was published in loose-leaf format and updated annually by inserts which included the policy revisions voted by the latest Annual Council of the General Conference Executive Committee. The last such inserts contained the policy revisions voted by the 1982 Annual Council and carried the notation "Revised 1982." No inserts were prepared with the revisions made by the 1983 Annual Council. Instead, the 1984 edition of the *Working Policy*, published in bound format, included the policy revisions voted by both the 1983 and 1984 Annual Councils. It was also the first edition to be issued under a new plan to print annual revised editions of the complete *Working Policy* which would include changes made by the latest Annual Council.

This is the 2022-2023 edition of the General Conference *Working Policy*. The date 2022 is used to indicate that it incorporates the changes made by the 61st General Conference Session (2022) and subsequent Annual Councils. Its dual designation as the 2022-2023 edition is used to indicate that for most of the year 2023, it will be the latest edition of the General Conference *Working Policy*.

This edition supersedes all previous editions and shall be adhered to except as it may be amended by subsequent actions of a General Conference Session or an Annual Council of the General Conference Executive Committee.

General Conference of Seventh-day Adventists<br>Executive Committee

as Secretary General of the International Religious Liberty Association. One of the main activities of the association is the conducting of international and regional religious liberty congresses, conferences, and seminars.

Public Affairs and Religious Liberty gives support to the International Religious Liberty Association in publishing the journal *Fides et Libertas* and a newsletter, *IRLA Information*. Public Affairs and Religious Liberty develops, jointly with the various English-speaking divisions, policies for the financial support and circulation of this English language religious liberty journal.

## FL 25 Religious Liberty Litigation

In various countries it may become necessary from time to time to take legal action in defense of the religious liberty rights of church organizations or individuals, including the right of Sabbath observance. However, before resorting to the courts, every effort should be made to settle matters equitably in support of free exercise of religion. Prudence should always prevail when it appears advisable to seek rights or redress through the judicial system, not the least because of the heavy costs that can be incurred and the possible far-reaching consequences of court decisions.

Each division shall establish procedures governing religious liberty litigation.

## FL 30 Relationship of Church Members and Church Institutions to Labor Organizations

**FL 30 05 Biblical Background**—1. a. For more than a century, the Seventh-day Adventist Church has taught its members and instructed administrators of its Church institutions that the Bible clearly instructs that Christ is to be Lord of the life of every church member and Church institution, and that He is to be the ultimate authority to Whom they will submit their decisions and relationships (Acts 2:36; 5:29; Col 3:23, 24). The Church has historically taught that its members and institutions dare not violate their individual or corporate consciences by supporting

organizations, policies, or activities incompatible with the principles set forth in Scripture (Isa 8:12, 13; 2 Cor 6:14-18).

b. The Seventh-day Adventist Church is aware that unjust activities on the part of some employers and the exploitation of employees created a climate for strong labor unions. Exploitation is condemned in Scripture. "Now listen, you rich people, weep and wail because of the misery that is coming on you. . . . Look! The wages you failed to pay the workers who mowed your fields are crying out against you. The cries of the harvesters have reached the ears of the Lord Almighty." (James 5:1, 4 NIV) Jesus made His position clear when He said, "And the King will answer and say unto them, 'Assuredly, I say to you, inasmuch as you did it to one of the least of these My brethren, you did it to Me.'" (Matt 25:40, NKJV) However, Jesus never used confrontational methods such as economic or physical pressure. Labor organizations may appear to have good motives, but Christians cannot unite with those who sometimes follow Christ and only sometimes trust His methods.

**FL 30 10 Historical Position**—1. Based on the biblical principles described in FL 30 05 (and many other sources), the Seventh-day Adventist Church hereby confirms its long-standing teaching that church members should, and institutions must, remain free and independent from organizations which might violate a member's conscience or interfere with the fulfillment of the mission of the Church, through its institutions, as follows:

a. Seventh-day Adventist church members are following the historic teaching of the Church when they refuse to join or financially support labor unions or similar organizations.

b. Seventh-day Adventist institutions are following the historic teaching of the Church when they refuse to recognize labor unions as bargaining units or to enter into contractual negotiations with them or similar organizations. Institutions and administrators on all levels shall seek counsel from their division department of Public Affairs and Religious Liberty and division administration if confronted with requests to recognize a labor union as a bargaining unit or enter into contractual negotiations with such organizations.

2. The Seventh-day Adventist Church does not engage in political or economic activities that seek to destroy labor movements. However, the Church will exercise its lawful right to protect itself and its

**404** / *Public Affairs & Rel. Liberty*        *GC Working Policy 2022-2023*

institutions from involvement with labor unions, just as it endeavors to protect the rights of conscience of members who faithfully practice the teaching of the Church in this regard.

3.  Through sermons, personal counseling, Church publications, and other media, Church and institutional administrators as well as pastors should inform Seventh-day Adventist church members and institutional employees of the Bible principles and the historic teachings on which the Church's position is based.

**FL 30 15 Employee Dispute Resolutions**—Seventh-day Adventist employers and employees are urged to employ the methods of Christ in the workplace and in every place. Disputes should be resolved peacefully in a way that will not create adversarial relationships. Working agreements may provide for the use of neutral and objective third parties in dispute resolution efforts. Employers and employees are to remember that Christ went above and beyond what was required and taught that we should love our enemies (Matt 5:41, 44).

**FL 30 20 Union Membership**—Seventh-day Adventist employees in secular workplaces are to follow the dictates of their consciences in matters of labor union membership. They are to avoid unchristian activities and avoid blanket or blind support of partisan political campaigns. Where union membership is required for employment in a given industry or position, and the member elects to remain in said position, he or she should minimize participation, serve in humanitarian projects, and request that his or her union dues be applied to a charitable organization.