EXHIBIT P

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 31

In the Matter of:

Loma Linda Inland Empire     Case No.     31-RC-312064
Consortium for Healthcare
Education d/b/a Loma Linda
University Health Education
Consortium,

                    Employer.
and

Union of American Physicians
and Dentists,

                    Petitioner.

_____

_____

Place: Los Angeles, California (Via Zoom Videoconference)

Dates: March 14, 2023

Pages: 138 through 316

Volume: 2

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

EXHIBIT P

EXHIBIT P

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 31**

In the Matter of:

LOMA LINDA INLAND EMPIRE
CONSORTIUM FOR HEALTHCARE           Case No.     31-RC-312064
EDUCATION D/B/A LOMA LINDA
UNIVERSITY HEALTH EDUCATION
CONSORTIUM,

     Employer,
 and

UNION OF AMERICAN PHYSICIANS
AND DENTISTS,

     PETITIONER.

The above-entitled matter came on for hearing via Zoom
videoconference, pursuant to notice, before **KRISTIN SCOTT**,
Hearing Officer, at the National Labor Relations Board, Region
31, 11500 West Olympic Boulevard, Suite 600, Los Angeles,
California 90064, on **Tuesday, March 14, 2023, 8:59 a.m.**

EXHIBIT P

EXHIBIT P

- - - - - - - - - - - - - - -

1                    **A P P E A R A N C E S**

2   **On behalf of the Employer:**

**CHRISTIAN ROWLEY, ESQ.**
SEYFARTH SHAW LLP
560 Mission Street, Suite 3100 San
Francisco, CA 94105
Tel.        (415)544-1001

**JEFFREY A. BERMAN, ESQ.**
SEYFARTH SHAW LLP
2029 Century Park East
Suite 3500
Los Angeles, CA 90067-3021
Tel.        (310)201-1541

**On behalf of the Petitioner:**

**DAVID A. ROSENFELD, ESQ.**
**MICHAELA POSNER, ESQ.** WEINBERG,
ROGER & ROSENFELD 1375 55th
Street
Emeryville, CA 94608
Tel.        (510)715-4218
Tel.        (510)671-4961

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

EXHIBIT P

1       MR. BERMAN: Ask that Employer's 7 be received.

2       HEARING OFFICER SCOTT: And Ms. Posner, any objection?

3       MS. POSNER: No objection.

4       HEARING OFFICER SCOTT: Okay, Employer's 7 is received

5   into evidence.

6   **(Employer Exhibit Number 7 Received into Evidence)**

7       MR. BERMAN: We have nothing further.

8       HEARING OFFICER SCOTT: Okay. For the Petitioner, Ms.

9   Posner, do you have cross for this witness?

10      MS. POSNER:  I do.

11      HEARING OFFICER SCOTT: Okay. Do you need a few minutes

12  to prepare, or are you ready to go?

13      MS. POSNER: No, I'm ready.

14      HEARING OFFICER SCOTT: Okay. You may begin.

15      MS. POSNER: Well, I -- Mr. Berman or Ms. Mora, would you

16  mind ending the screenshare, please?

17      MS. MORA: Sorry.

18      MS. POSNER: That's ~~all right. Thank~~ you.

19                    **CROSS-EXAMINATION**

20  Q   BY MS. POSNER: Good morning, Mr. Knott. I -- if -- if I

21  understand your testimony correctly, the statements and

22  guidelines concerning this -- the church's view on unions, it

23  applies to all church institutions; is that correct?

24  A   It does. It -- all -- all church institutions, and

EXHIBIT P

EXHIBIT P

25      specifically those operated by the general conference of



1   Seventh-day Adventists.

2   Q    Okay. And when it says personal and corporate behavior,

3   that's not limited to just labor unions. That's -- is that

4   correct?

5   A    In what context are you using personal and

6   corporate behavior?

7   Q    Well, let me rephrase, then. In Exhibit 2, it mentions

8   organizational behavior. And I believe you said that unions

9   are a very powerful example of that. But organizational

10  behavior is not limited to labor unions, correct?

11  A    No, it's not limited -- not limited to, no.

12  Q    Okay. And these teachings of the church with respect to

13  labor unions, in addition to applying to all church

14  institutions, it also applies to individual members of the

15  church; is that correct?

16  A    The statements of the church in -- are of two kinds. It

17  indicates that church members should not participate in labor

18  unions, but that church institutions must not. That

19  distinction is clear. Individual members, if they choose to

20  participate, may do so. Church institutions may not.

21  Q    Okay. And I want to make sure I -- I have your -- I

22  understand this correctly. When you say that these statements

23  and guidelines apply to all church institutions, you've made

24  clear that it applies to general conference institutions. But

25  it also applies to institutions that are at the congregational,

EXHIBIT P

1   conference, or union conference level, correct?

2   A    This counsel is intended for all church institutions that

3   are in alignment with the general conference working policy. And

4   by definition, all official entities and regional units of the

5   church are to be alignment with general conference working

6   policy.

7   Q    Okay, thank you. And can you explain how gigantic

8   monopolies relate to unions, please?

9   A    The gigantic monopolies are -- are a reference to the

10  entities whose behavior in the 1880s and 90s, seemed to

11  occasion the rise of the labor movement. At Seventh-day

12  Adventist, we're clear in criticizing both those we today

13  describe as the robber barons of that era, the industrialists

14  whose efforts impoverished many and enda -- endangered the

15  health of many. So they criticized both those with industrial

16  power, and they also criticized those who attempted to use

17  collective action to coerce the -- both the public and those

18  wealthy industrialists into certain courses of action.

19  Q    Thank you for that. Now on Employer Exhibit 5, The

20  Dictionary of Jesus in the Gospels, that's not specifically

21  an SDA publication, is it?

22  A    It is -- as I mentioned, it is a publication of

23  InterVarsity Press, an evangelical organization. It gives a

24  broad outline of the ministry and teachings and behavior of

25  Jesus, and -- that Seventh-day Adventist would find acceptable

EXHIBIT P

EXHIBIT P

1    as a descriptor.

2    Q    So that's a -- a multi-denominational Christian

3    publication?

4    A    That one definitely is.

5    Q    Okay. Now on Employer Exhibit 6, the statement of

6    unionization, do you recall the statement that all or almost

7    all employees of Adventist affiliated entities are members of

8    the church?

9    A    I -- I don't have it in front of me anymore, but I -- I

10   believe -- I had read that statement there. And at the time

11   that was written, that was, in fact, a -- an accurate

12   indication of what the circumstances were for most -- well,

13   of -- all -- almost all educational and medical facilities at

14   the time. I am not completely aware of the individual

15   circumstances at any institution at the moment.

16   Q    Okay, that answered my next question. And in Employer

17   Exhibit 6, it also made reference to AHS. Is that a reference

18   to Adventist Health System?

19   A    Yes. Adventist Health System was a precursor of an

20   entity -- a collection of Adventist hospitals in an

21   organization that covered at that time a major section of the

22   eastern portion of the United States and the south.

23   Q    Okay. Are you familiar with a facility by the name of

24   Adventist Health, Lodi Memorial?

EXHIBIT P

EXHIBIT P

25    A    I know of it by name only, yes.



www.escribers.net | 800-257-0885

EXHIBIT P

1    Q    Okay. Are you aware that they have a collective

2    bargaining asso -- relationship with the California Nurses

3    Association?

4    A    I am not aware.

5         MR. BERMAN: Objection. Objection.

6         HEARING OFFICER SCOTT: What's the objection?

7         MR. BERMAN: That misstates the record. That is not the

9    case.

10        MS. POSNER:  I'm sorry, that -- that's fair, that's fair.

11   I will rephrase the question.

12        HEARING OFFICER SCOTT: Okay, thank you. Please.

13   Q    BY MS. POSNER: Are you aware that a -- a union election

14   was recently held at Adventist Health Lodi Memorial where the

15   union -- where California Nurses Association received a

16   majority of votes?

17   A    I am not aware of that outcome.

18   Q    Are you aware that that was a stipulated election, meaning

19   the hospital did not assert a religious objection?

20        MR. BERMAN: Objection, relevance. It's not relevant. As -

21   - as Ms. Posner has told us many times, the only thing that's

22   relevant here is LLUHEC. Now -- now we're dealing with a

23   hospital that is not part of the Loma Linda group. We're

24   dealing with a hospital that is not a general conference

25

EXHIBIT P

institution. And we're dealing with a witness that currently

has no knowledge of this.



www.escribers.net | 800-257-0885

93251298v.2

EXHIBIT P

EXHIBIT P

1       HEARING OFFICER SCOTT: Okay.

2       MS. POSNER: Madam Hearing Officer, can I --

3       HEARING OFFICER SCOTT: Briefly, yes.

4       MS. POSNER: Mr. Knott testified that the policies in the

5    guidelines, and the beliefs that he went over on direct, apply

6    to all church institutions, not just general conference

7    institutions. And while I am not going to pry into the truth

8    or reasoning behind the beliefs of the church, I am permitted

9    to -- to investigate whether those beliefs are sincerely held.

10   And the presence of a collective bargaining relationship and

11   union elections, and stipulated union elections at other

12   Adventist facilities is highly relevant.

13      HEARING OFFICER SCOTT: Okay, thank you. Thank you for

14   that. I'm prepared to make my ruling.

15      MR. BERMAN: Can I make a --

16      HEARING OFFICER SCOTT: No. I'm -- I'm prepared to make

17   my ruling at this time. I am going to overrule the objection

18   because it -- it does go to the earlier testimony about the

19   applicability of the Employer's Exhibits that have been

20   introduced. However, I am going to stress that we not --

21   that -- that it just be very limited to the -- the questioning

22   to the witness' knowledge of this situation, okay? So the

23   objection is overruled.

24      Ms. Posner, you can ask the question again. Mr. Knott,

EXHIBIT P

EXHIBIT P

25    you may answer.



www.escribers.net | 800-257-0885

EXHIBIT P

EXHIBIT P

1    Q    BY MS. POSNER: Mr. Knott, are you aware that Adventist

2    Health -- that the election that took place at Adventist Health

3    was pursuant to a stipulated election agreement where the

4    facility did not assert a religious exemption under the

5    National Labor Relations Act?

6    A    No, I am not.

7    Q    Okay. Are you familiar with an institution called

8    Adventist Health Ukiah Valley?

9    A    I have heard of it.

10   Q    Okay. Are you aware that that facility has a collective

11   bargaining relationship with the California Nurses Association?

12        MR. BERMAN: Objection. That misstates the records and

13   misstates the facts. There is no relationship between Ukiah

14   and any labor organization.

15        HEARING OFFICER SCOTT: Okay.

16        MS. POSNER: That's fine. I can -- I can -- I can

17   rephrase the question.

18        HEARING OFFICER SCOTT: Okay. Please rephrase the

19   question.

20        MS. POSNER: You know what, no, it's fine, I'll move on.

21   Q    BY MS. POSNER: Are -- are you fam -- Mr. -- Mr. Knott,

22   are you familiar with an institution called Rideout Memorial

23   Hospital?

24   A    I'm sorry, the name again?

EXHIBIT P

EXHIBIT P

25    Q    Rideout Memorial Hospital.



www.escribers.net | 800-257-0885

EXHIBIT P

1    A    I don't recognize that name.

2    Q    Okay. What about the Fremont Medical Center?

3    A    I have heard of it only.

4    Q    Okay. Are you aware that that facility has a collective

5    bargaining relationship with the California Nurses Association?

6    A    I am not aware of that.

7    Q    Okay. Have you heard of the Rideout Cancer Center?

8    A    I have not.

9    Q    Okay. Have you heard of Adventist Health Mendocino Coast?

10   A    I have heard of the institution.

11   Q    Okay. Are you aware that institution has a collective

12   bargaining agreement with Local 8 of the United Food and

13   Commercial Workers?

14   A    I am not aware of that.

15       MS. POSNER: Okay, no further questions.

16       HEARING OFFICER SCOTT: Okay.

17       MR. BERMAN: We have nothing further.

18       HEARING OFFICER SCOTT: Mr. Berman -- I'm -- I'm sorry,

19   Mr. Berman, you have nothing further?

20       MR. BERMAN: No, we don't.

21       HEARING OFFICER SCOTT: Okay. I just want to go back

22   and -- and just clarify for the record a couple pieces.

23       Can you please share the Employer's 1, 2, 3, 4, 5, 6, 7,

24   again?

25       MS. MORA: I'm sorry, share them on the screen?

EXHIBIT P

EXHIBIT P

1        MS. POSNER: No.

2        HEARING OFFICER SCOTT: Okay, no objection. Employer 14

3    is received into evidence.

4    **(Employer Exhibit Number 14 Received into Evidence)**

5        MR. BERMAN: We have no further questions.

6        HEARING OFFICER SCOTT: Ms. Posner, do you have cross?

7        MS. POSNER:   I do.

8        HEARING OFFICER SCOTT: Okay. Are you ready to begin? Do

9    you need a minute?

10       MS. POSNER: I think I'm ready.

11       HEARING OFFICER SCOTT: Okay.

12                        **CROSS-EXAMINATION**

13   Q    BY MS. POSNER: Pastor Roberts, how long has it been since

14   you've worked directly with residents?

15   A    Well, that's a little bit of an artificial question

16   because I do interact with them regularly now. I'm not in a

17   supervisorial role in any sense, and I don't work as a chaplain

18   right now. But throughout my entire career, I've worked with

19   them in one form or another.

20   Q    So how long has its been since you've been on the floor of

21   the medical center rounding with the res -- with residents?

22   A    Well, again, some of that happens even now as my capacity

23   as what I do both as a pastor and as VP. But not in terms of

24   regularly, daily or weekly rounds that happens. The last time

EXHIBIT P

EXHIBIT P

25     I was consistently involved in that -- not the last time I was



www.escribers.net | 800-257-0885

EXHIBIT P

217

1   directly involved, but the last time I was consistently

2   involved -- would've been when I was a chaplain. I left

3   chaplaincy in the mid -- almost the mid-nineties.

4   Q    Now, earlier, do you recall testifying at the medical

5   center there's a chaplain for every unit? Do you have that

6   right?

7   A    Yes. Now, let me just explain that. There are chaplains

8   on every unit, but chaplains will be assigned multiple units.

9   In another words, there's a chaplain --

10  Q    Does every unit have an assigned chaplain?

11  A    Yes.

12  Q    Okay. And chaplains cannot force patients to talk with

13  them, correct?

14  A    Correct.

15  Q    Now, with respect to these -- let's see. I'm trying --

16  I'm trying to remember. The lecture series. Is that what you

17  were referring to as grand rounding when speakers would come

18  in?

19  A    That is one of the contexts in which that happens, yes.

20  Q    Okay. That's not mandatory for residents and fellows,

21  correct?

22  A    I don't believe it typically is. That's -- I'm not 100

23  percent certain of that though.

24  Q    Okay. And I want to go ahead and talk about Employer

25  Exhibit 14 for a moment. You were asked to go through a

EXHIBIT P                                P-19

EXHIBIT P

1    couple. Can you identify what mission priority five is off the

2    top of your head?

3    A    It has to do with diversity, equity and inclusion.

4    Q    Okay. And can you just describe why that's a mission

5    priority?

6    A    Because of our conviction that scripture teaches us that

7    every person is created by God, and every person is of value

8    to God. And that one of the core themes of scripture is

9    expressed in Micah 6:8 -- that what God expects of us is to do

10   justice, to love mercy, and to walk humbly with our God. And

11   so based on that, we believe it is a central part of what we

12   do as -- as a spiritual faith-based institution.

13   Q    So is it fair to say that that's a reflection

14   and commitment to tolerance and nondiscrimination?

15   A    Yeah, I'd say --

16       MR. BERMAN: Ask to what nondiscrimination means?

17       HEARING OFFICER SCOTT: I'm sorry. What was the

18   objection?

19       MR. BERMAN: In terms of nondiscrimination is big.

20   There's all sorts of discrimination. I don't know what she's

21   talking about.

22       HEARING OFFICER SCOTT: Ms. Posner, can you please

23   rephrase the question?

24       MS. POSNER: Well, the witness answered it. So I think he

25   understood the question, but.

EXHIBIT P

EXHIBIT P

1     HEARING OFFICER SCOTT: But there was an objection, so I

2    am going to sustain the objection and ask that you rephrase the

3    question.

4          MS. POSNER: Okay.

5    Q     BY MS. POSNER: Pastor Roberts, would you agree that

6    Mission Priority 5 is essentially a way of reflecting tolerance

7    and a commitment to not discriminate based on race, or gender,

8    or religion, but essentially, to treat all people, whoever they

9    may be, with compassion?

10         MR. BERMAN: Objection. Compound.

11         HEARING OFFICER SCOTT: The objection's overruled and the

12    witness can answer the question.

13         THE WITNESS: I'm sorry. Could you repeat it?

14         MS. POSNER: Sure.

15    Q     BY MS. POSNER: Wouldn't you agree that Mission Priority 5

16    is simply a commitment to tolerance and nondiscrimination of

17    the basis race or sex, and treating people equally, regardless

18    of who they may be?

19    A     Certainly that is the commitment in terms of our care of

20    patients. We want to treat every patient in the way that God

21    would have us do and that is undergirded by love for -- for

22    people.

23    Q     So by singling out that it applies to patients, does this

24    then not apply among colleagues?

EXHIBIT P

EXHIBIT P

25    A    No. Certainly, we would want to treat everyone with



www.escribers.net | 800-257-0885

EXHIBIT P

1    respect. That doesn't mean that Loma Linda University Health

2    would necessarily agree with or endorse every belief or idea

3    that others might have.

4    Q    But in the vein of tolerance, there is no requirement that

5    residents or fellows practice Seventh-day Adventism, correct?

6    A    Well, yes. There is -- there is a -- clearly a commitment

7    that people would not -- meaning residents, or I suppose for

8    that matter, anyone else -- would not practice their

9    profession, would not, as students, conduct themselves in ways

10   that are contrary to the core principles of our institution.

11   Q    But they're not -- residents themselves are not required

12   to attend the Seventh-day Adventist church, are they?

13   A    No. They're not required to attend church.

14   Q    And they're not required to show up to a particular

15   Seventh-day Adventist religious ceremony, such as a wedding or

16   a funeral?

17   A    Well, I mean, we don't require anyone to show up at a

18   wedding or a funeral.

19   Q    And so if a resident practices a faith other than

20   Seventh-day Adventism, they're not required to convert to

21   Seventh-day Adventism in order to -- to participate in a LLUHEC

22   residency, correct.

23   A    I'm sorry. Something came in there and broke your voice

24   up. Do you mind repeating that again?

EXHIBIT P

EXHIBIT P

```
25    Q    Not in the least. If a resident practices a faith other
```



www.escribers.net | 800-257-0885

EXHIBIT P

1    than Seventh-day Adventism, they're not required to convert

2    to Seventh-day Adventism in order to participate in a LLUHEC

3    residence, correct?

4    A    That's correct.

5    Q    And medical students are required to sign a -- I don't

6    want to call it a morality contract, but it is a contract where

7    medical students agree to refrain from certain conduct,

8    including premarital sex, correct?

9    A    I believe so. It's been quite a while since I read that,

10   so I can't say with specificity that it includes premarital

11   sex, but there is a statement along those lines, yes.

12   Q    Okay. But residents and fellows are not similarly

13   required to sign that same agreement, correct?

14   A    I don't know.

15   Q    Okay.

16   A    I don't know.

17   Q    Now, I want to make sure I understand this correctly: The

18   Loma Linda University Medical Center operates from sundown

19   Friday to sundown Saturday, correct?

20   A    Yes.

21   Q    Okay. And can you identify how many patients participate

22   in spiritual rounding?

23   A    Are you meaning how many -- how many patients would

24   feel that their spiritual needs are addressed? I'm not sure

25   I understand the question.

EXHIBIT P

EXHIBIT P

1  Q    Well, you testified that residents and fellows and faculty

2  members do spiritual rounding with patients.

3  A    I see.

4  Q    So how many patients participate in spiritual rounding?

5  A    Well, there's no way I can know the number. I can tell you

6  the intent is that the spiritual realities would be a clear

7  part of any and every patient's experience --

8  Q    So do you have any quantitative measure for -- for how

9  frequently spiritual rounding occurs at the medical center?

10  How many patients?

11  A    We do have some measures and I am sorry; I don't have

12  those here. And I'm happy to try to get that information for

13  you, but we do have some measures regarding what happens with

14  patients and -- and some of these kinds of realities. I don't

15  know what those are off the top of my head.

16  Q    Okay. And the Loma Linda University Medical Center treats

17  patients regardless of their religious affiliation, correct?

18  A    Correct.

19       MR. BERMAN: Objection. Relevance. There's -- there's a

20  Supreme Court law that this kind of questioning has nothing to

21  do with anything. Whether somebody -- whether a religious

22  institution hires nonchurch members or provides services to

23  nonchurch members is -- according to at least two Supreme Court

24  cases -- not a relevant factor.

25       HEARING OFFICER SCOTT: Okay. Thank you for that. The

EXHIBIT P

EXHIBIT P

1    objection is overruled. The witness can answer.

2        THE WITNESS: So the question was, again, whether or not

3    Loam Linda treats people who are not Seventh-day Adventists?

4    Was that the question?

5        MS. POSNER: Yes.

6        THE WITNESS: Yes.

7        MS. POSNER: Okay.

8    Q    BY MS. POSNER: Do you know, approximately, what

9    percentage of patients treated at Loma Linda in any given year

10   are Seventh-day Adventists?

11       MR. BERMAN: Same objection.

12       HEARING OFFICER SCOTT: Okay. That one I am going to

13   sustain.

14       Unless, Ms. Posner, can you explain the relevance of the

15   patients' religion?

16       MS. POSNER: Well, there's this argument that this

17   spiritual rounding is a religious element and furthers the

18   Seventh-day Adventist philosophy, and I'm trying to get at how

19   patient-oriented it is so that if prayer is offered, it's the

20   prayer of the patient. That at the end of the day, it comes

21   down to the patient. That Seventh-day Adventist ideals are not

22   being forced onto a patient. That if a patient is of another

23   faith, they're not forced to adhere to a faith that's not their

24   own.

EXHIBIT P

EXHIBIT P

25          HEARING OFFICER SCOTT: Okay. I think there are ways to



www.escribers.net | 800-257-0885

EXHIBIT P

1    probably get to that without specifically discussing the

2    percentage of the patients' faith, so the objection is

3    sustained. Would you please rephrase the question?

4        MS. POSNER: Sure.

5    Q   BY MS. POSNER: If a patient identifies as a faith other

6    than Seventh-day Adventist --

7        MS. POSNER: Hang on. Let me rephrase that.

8        Sorry. That sounded like a message being sent over IM

9    message.

10       THE WITNESS: Yes. I'm supposed to be in another meeting

11   and I just said I'm still testifying. I sent two words:

12   "still going".

13       HEARING OFFICER SCOTT: Okay. Just a reminder that you

14   should not be communicating with anyone else while you're

15   testifying.

16       THE WITNESS: Okay.

17       HEARING OFFICER SCOTT: It's unique because we're via

18   Zoom, but if we were in the hearing room, you would be on the

19   stand without any material in front of you.

20       THE WITNESS: Yeah. I'm sorry. I didn't know how long

21   this was going to be and so I just didn't want people sitting

22   waiting. My apologies.

23   Q   BY MS. POSNER: Residents are not forced to lead a prayer,

24   correct?

EXHIBIT P

25   A   Nobody is forced to lead a prayer, including residents.



EXHIBIT P

EXHIBIT P

1   Q    And so am I correct in understanding there's nothing

2   stopping a resident from voluntarily practicing their faith and

3   saying a prayer, correct?

4   A    Well, are you -- are you talking about a Christian

5   resident? Or I'm just trying to get a hold of your question.

6   What would come to me as an answer would be to say that we not

7   only don't stop someone from -- from doing that, it's core to

8   what we are as a Christian Seventh-day Adventist institution.

9   Q    And are those prayers still welcome if they are of

10  a non-Christian faith?

11  A    We seek to be very respectful of people, whatever

12  faiths they come from.

13  Q    Okay. Now earlier, you testified about prayers being

14  conducted in the beginning of meetings. Are residents required

15  to remain in the room for the prayer?

16  A    I'm not aware of any written -- I was just trying to think

17  that through -- I'm not aware of any written requirement that

18  you have to stay in the room for the prayer.

19  Q    And they're not required to participate in the

20  prayer, correct?

21  A    I -- I suppose not. I mean -- you mean, as in leading the

22  prayer or bowing their head? Let me make sure I understand what

23  you're asking.

24  Q    Well, if a resident doesn't want to participate in the

25  prayer, doesn't want to bow their head, they're not required to

EXHIBIT P

EXHIBIT P

1    bow their head or say "amen", correct?

2    A    Correct.

3    Q    If a patient identifies an interest in spiritual care, but

4    identifies that they are of a non-Christian faith, which faith

5    will govern the spiritual care for that patient?

6    A    We -- our chaplain's department will do all we can to put

7    them in touch with the appropriate person from their faith

8    tradition.

9    Q    Now, at these meetings that you attended with fellows and

10   residents that were opened with prayer, can you recall what

11   types of meetings these were or what the subject was?

12   A    Typically, meetings that I am -- would attend with such

13   people would have to do with some aspect of whole person care,

14   spiritual care, possibly end of life care, those kinds of

15   things.

16   Q    And you would agree with me that many hospitals, including

17   nonreligious hospitals, have chaplains, correct?

18   A    I don't know about all hospitals.

19   Q    But Loma Linda is not the only hospital that has

20   chaplains, correct?

21   A    Correct.

22   Q    Are you aware that whole person care exists at

23   non-Seventh-day Adventist healthcare facilities?

24   A    I am aware. I'm aware deeply of the difference between

EXHIBIT P

EXHIBIT P

25    the two.



EXHIBIT P

EXHIBIT P

1   Q    Now earlier, you were saying that you know what -- why

2   residents come to Loma Linda because you've spoken with them.

3   How many residents have you spoken with?

4   A    I had -- I mean, I've been here some 37 years and have

5   been involved with residents and students and physicians

6   throughout all those years. I don't have any idea. Many, many

7   over the years.

8   Q    Do you have any idea what percentage you've spoken to of

9   total residents that have completed a LLUHEC program?

10  A    I don't. I would have no way to evaluate or number that.

11  Q    Okay. Now, you were talking about the Center for Whole

12  Person Care in the School of Religion. Isn't it true that

13  residents are not required to interact with the Center for

14  Whole Person Care?

15  A    I'm not aware of any requirement. I'm trying to just

16  think that through. There may be required attendance by their

17  programs at certain numbers of grand rounds or such things and

18  the Center does sponsor those. So from that perspective, there

19  very well may be. I'm not sure of that. There is not, from

20  the Center itself, that requirement.

21  Q    Now earlier, you were talking about an onboarding process

22  for residents and interns in order for them to understand the

23  Seventh-day Adventist faith and its principles. Do you recall

24  that?

EXHIBIT P

EXHIBIT P

25   A   Yes, ma'am.



www.escribers.net  |  800-257-0885

EXHIBIT P

EXHIBIT P

1  Q    Do all residents and fellow go through that program?

2  A    To my knowledge.

3  Q    So there's no separate onboarding process for

4  non-Seventh-day Adventist fellows and residents?

5  A    Not that I am aware of.

6  Q    Are residents required to instruct patients on scripture?

7  A    No. Not required.

8  Q    Right. They're not required, but if the patient would

9  like that, then it's appropriate, correct?

10 A    I would answer that in two ways. One would be that there

11 is always the need to be sensitive to what the patient desires

12 and what his or her needs are, what their needs may be. At the

13 same time, there are those who are residents who feel it as a

14 part of their Christian practice to share their faith with

15 others and so they would act out of that desire that is deep

16 and long -- deeply historical one in the Christian faith.

17 Q    And when you say that certain providers may feel an

18 obligation to share their faith, that's an individual choice of

19 those providers, correct?

20 A    If it is at their initiative, I would say that would be

21 true.

22 Q    Okay.

23 A    If it is at the --

24      MS. POSNER: Thank you. I have no further questions.

25      MR. BERMAN: He had -- he had his answer cut off.

EXHIBIT P

EXHIBIT P

1        MS. POSNER: He answered the question.

2        HEARING OFFICER SCOTT: He did answer the question. He

3    was --

4        MR. BERMAN: Okay.————————————

5                        **REDIRECT EXAMINATION**

6    Q    BY MR. BERMAN: Pastor Roberts, what else were you about

7    to say?

8    A    I was going to say, if it is at the initiative of the

9    patient, which is often the case -- the patient asking

10   spiritual questions, asking questions about -- about God, or

11   life, or requesting prayer, then I think there is an obligation

12   for a resident to respond in some fashion to that and not to

13   let that just drop.

14   Q    Spirituality is one of the four prongs of the (audio

15   interference) about whole patient care?

16   A    I'm sorry. Can you repeat that?

17   Q    Yeah. Whole patient care has four prongs.    And what are

18   those?

19   A    That's an interesting question because you might get some

20   different answers. Physical, spiritual, mental, and emotional

21   are the ones that I would most quickly answer.

22   Q    Are you aware of at any time a resident or a fellow has

23   ever refused to consider the spiritual needs of the patient?

24   A    Not that I can recall.

EXHIBIT P