**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Loma Linda—Inland Empire Consortium <br> For Healthcare Education <br> d/b/a <br> Loma Linda University Health <br> Education Consortium <br> 1177 Campus Street <br> Loma Linda, CA 92354 <br><br> Plaintiff <br><br> v. <br><br> National Labor Relations Board <br> 1015 Half Street, SE <br> Washington, D.C. 20003 <br><br> Defendant | Case No. 1:23-cv-00688-CKK |

**DEFENDANT NATIONAL LABOR RELATIONS BOARD'S MOTION TO TRANSFER**
**VENUE PURSUANT TO 28 U.S.C. § 1404(a)**

Defendant National Labor Relations Board, by its undersigned counsel, respectfully files

the instant Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) to the United States

District Court for the Central District of California. For the reasons set forth in the accompanying

statement of points and authorities, which also opposes the Motion for a Preliminary Injunction

filed by Plaintiff Loma Linda University Health Education Consortium ("Consortium"), the

Motion to Transfer Venue should be granted without reaching the merits of the requested

preliminary injunction.

Undersigned counsel conferred with Michael Berkheimer, counsel for the Consortium,

and the Consortium does not consent to the transfer of venue requested herein.

1

WHEREFORE, the National Labor Relations Board respectfully requests that its Motion to Transfer Venue be granted.

Respectfully submitted,

DAWN L. GOLDSTEIN
*Assistant General Counsel*

KEVIN P. FLANAGAN
*Supervisory Attorney*

/s/ David Boehm
DAVID BOEHM
*Trial Attorney*
Bar No. 103755
David.boehm@nlrb.gov
Tel: (202) 273-4202

AARON SAMSEL
*Trial Attorney*

TYLER JAMES WIESE
*Trial Attorney*

National Labor Relations Board
Contempt, Compliance & Special Litigation Branch
1015 Half Street, S.E. - 4th Floor
Washington, DC 20003

Dated:  March 31, 2023

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Loma Linda—Inland Empire Consortium | ) |
| For Healthcare Education | ) |
| d/b/a | ) |
| Loma Linda University Health | ) |
| Education Consortium | ) |
| 1177 Campus Street | ) |
| Loma Linda, CA 92354 | ) |
| | ) |
| Plaintiff | ) |
| | ) |
|  v. | ) Case No. 1:23-cv-00688-CKK |
| | ) |
| National Labor Relations Board | ) |
| 1015 Half Street, S.E. | ) |
| Washington, DC 20003 | ) |
| | ) |
| Defendant | ) |
| | ) |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
NATIONAL LABOR RELATIONS BOARD'S MOTION TO TRANSFER VENUE
PURSUANT TO 28 U.S.C. § 1404(a) AND IN OPPOSITION TO PLAINTIFF LOMA
LINDA UNIVERSITY HEALTH EDUCATION CONSORTIUM'S MOTION FOR A
PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Headings**                                                                                    **Page(s)**

THE STRUCTURE AND FUNCTIONS OF THE NLRB............................................................ 1

FACTUAL BACKGROUND ........................................................................................... 4

ARGUMENT ............................................................................................................. 7

I.   This Case Should Be Transferred to the Central District of California Pursuant to 28 U.S.C. §
     1404(a). ....................................................................................................... 7

     A.   Consistent with past decisions, this Court may transfer the case before deciding anything
          else, including its own subject-matter jurisdiction. ............................................ 8
     B.   Legal standards for motions to transfer venue pursuant to Section 1404(a)..................... 9
     C.   This Court, in its discretion, should transfer the case to the Central District of California.
          ............................................................................................ 10
          1.   Private-interest factors weigh in favor of transfer to the Central District of California.
               ...................................................................................... 11
               a.   The Consortium's choice of forum should be accorded little weight................11
               b.   The Board's preferred choice of forum, the Central District of California, is the
                    more logical, appropriate forum. ...................................................13
               c.   The Consortium's claims arose in the Central District of California and events
                    giving rise to its claims continue to occur there. ...............................14
               d.   Other private-interest factors tip in favor of transfer to the Central District of
                    California...........................................................................15
          2.   Public-interest factors weigh strongly in favor of transfer to the Central District of
               California. ............................................................................ 16
               a.   The local interest in deciding local controversies at home weighs heavily in
                    favor of transfer...................................................................16
               b.   The relative congestion of the courts does not weigh against transfer. ............17
               c.   Both this Court and the Central District of California are qualified to resolve
                    the legal issues presented in this matter. .........................................18
          3.   The Court should transfer this case to the Central District of California "in the
               interest of justice." .................................................................. 18

II.  The Consortium's Motion for a Preliminary Injunction must be denied because it does not
     satisfy the multi-factor test for obtaining such relief. ........................................... 20

     A.   The Consortium's claims have no likelihood of success on the merits. ....................... 21
          1.   District courts generally lack subject-matter jurisdiction to enjoin NLRB
               proceedings. ........................................................................... 21
          2.   The Consortium cannot demonstrate that the Court has subject-matter jurisdiction
               under *Leedom v. Kyne.* ................................................................ 24
               a.   *Kyne* jurisdiction does not extend to the Consortium's RFRA claim................25
               b.   *Kyne* does not supply jurisdiction over the Consortium's First Amendment
                    claim. .............................................................................26

i

      i.    The Consortium cannot show that the Board's continued processing of the representation and unfair-labor-practice cases lacks "colorable support." ... 27

      ii.   Jurisdiction is not available under *Kyne* because the Consortium has a meaningful and adequate opportunity for judicial review of its claims. ....... 31

B.  The Consortium has failed to show that it will suffer irreparable harm. ......................... 32

   1.  Because the Consortium is not facing any threat of civil sanctions or penalties, it is not experiencing irreparable harm. ......................................................................... 33

   2.  The Consortium's participation in the Board's proceedings does not infringe on First Amendment rights and does not constitute irreparable harm. ................................... 34

C.  The balance of equities and public interest weigh strongly against granting the requested relief. ........................................................................................................................... 37

   1.  Delay is harmful and likely prejudicial to the rights of third parties not before the Court. ................................................................................................................... 38

   2.  Congress clearly wanted to extend the NLRA to health care workers in nonprofit settings to improve working conditions and avoid labor unrest. .............................. 39

   3.  State law may not adequately fill the jurisdictional gap the Consortium desires. ...... 40

   4.  The constitutional interests at issue here are not one-sided. ...................................... 42

CONCLUSION..................................................................................................................... 42

# TABLE OF AUTHORITIES

### Cases

*Adorers of the Blood of Christ v. FERC,* 897 F.3d 187 (3d Cir. 2018) ........................................ 26

*Aftab v. Gonzalez,* 597 F. Supp. 2d 76 (D.D.C. 2009) ................................................................. 8

*Am. Fed'n of Labor v. NLRB,* 308 U.S. 401 (1940) .............................................................. 3, 23

*Amerco v. NLRB,* 330 F. Supp. 2d 1083 (D. Ariz. 2004) ............................................................ 31

*AMERCO v. NLRB,* 458 F.3d 883 (9th Cir. 2006) ..................................................................... 22

*Arbaugh v. Y&H Corp.,* 546 U.S. 500 (2006) ............................................................................. 21

*Armco Steel Corp. v. Ordman,* 414 F.2d 259 (6th Cir. 1969) (per curiam) ................................ 29

*Bakery, Confectionery & Tobacco Workers' International Union, Local 6 v. NLRB,* 799 F. Supp. 507 (E.D. Pa. 1992) ................................................................................................................. 28

*Barham v. UBS Fin. Servs.,* 496 F. Supp. 2d 174 (D.D.C. 2007) .......................................... 10, 11

*Bd. of Trustees of Mem'l Hosp. of Fremont County v. NLRB,* 523 F.2d 845 (10th Cir. 1975) .... 24

*Bethany College,* 369 NLRB No. 98 (2020) ................................................................................ 12

*Blue Cross & Blue Shield of Mich. v. NLRB,* 609 F.2d 240 (6th Cir. 1979) ............................... 24

*Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.,* 502 U.S. 32 (1991) ....................................................................................................................................... 31

*Bohon v. FERC,* 37 F.4th 663 (D.C. Cir. 2022) ......................................................................... 28

*Boire v. Greyhound Corp.,* 376 U.S. 473 (1964) .................................................................... 3, 24

*Bokat v. Tidewater Equipment Co.,* 363 F.2d 667 (5th Cir. 1966) ......................................... 22, 23

*Bos. Med. Ctr. Corp.,* 330 NLRB 152 (1999) ............................................................................. 40

*Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235 (1970) ............................................... 21

*Canadian Am. Oil Co. v. NLRB,* 82 F.3d 469 (D.C. Cir. 1996) ............................................... 4, 23

*Carroll Coll., Inc. v. NLRB,* 558 F.3d 568 (D.C. Cir. 2009) ...................................................... 36

*Caulfield v. Hirsch,* 1977 U.S. Dist. LEXIS 15088, No. 76-279, 1977 WL 15572 (E.D. Pa. July 7, 1977) .................................................................................................................................. 28

*Chaplaincy of Full Gospel Churches v. United States Navy,* 697 F.3d 1171 (D.C. Cir. 2012) .... 34

*Charlie Rossi Ford, Inc. v. Price,* 564 F.2d 372 (9th Cir. 1977) (per curiam) ............................ 24

*Christ the King Reg'l High Sch. v. Culvert,* 815 F.2d 219 (2d Cir. 1987) .................................... 17

*City of Boerne v. Flores,* 521 U.S. 507 (1997) .......................................................................... 41

*Davis v. Am. Soc'y of Civil Eng'rs,* 290 F. Supp. 2d 116 (D.D.C. 2003) .................................... 14

*Detroit Newspaper Agency v. NLRB,* 286 F.3d 391 (6th Cir. 2002) ............................................ 31

*Elgin v. Dep't of Treas.,* 567 U.S. 1 (2012) .............................................................................. 26

*Fay v. Douds,* 172 F.2d 720 (2d Cir. 1949) .............................................................................. 28

*FTC v. Cephalon, Inc.,* 551 F. Supp. 2d 21 (D.D.C. 2008) ........................................................ 10

*Goethe House N.Y., German Cultural Ctr. v. NLRB,* 869 F.2d 75 (2d Cir. 1989) ..... 24, 25, 31, 32

*Gold Coast Rest. Corp. v. NLRB,* 995 F.2d 257 (D.C. Cir. 1993) .............................................. 24

*Greater Yellowstone Coalition v. Bosworth,* 180 F. Supp. 2d 124 (D.D.C. 2001) ...................... 11

*Grutka v. Barbour, 549 F.2d 5 (7th Cir. 1977).............................................................. 5, 27, 28

Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947)....................................................................... 16

Hague v. Comm. for Indus. Org., 307 U.S. 496 (1939)............................................................ 42

Hanna Boys Center v. Miller, 853 F.2d 682 (9th Cir. 1988) .................................................. 12

Hartz Mountain Corp. v. Dotson, 727 F.2d 1308 (D.C. Cir. 1984)..................................... 24, 27

Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171 (2012) ............. 28

IAM Loc. Lodge No. 1424 v. NLRB, 362 U.S. 411  (1960) ..................................................... 38

In re Scott, 709 F.2d 717 (D.C. Cir. 1983) (per curiam) .......................................................... 9

Inland Empire Dist. Council v. Millis, 325 U.S. 697 (1945) ..................................................... 2

Jarkesy v. SEC, 803 F.3d 9 (D.C. Cir. 2015)......................................................................... 26

*Lab. Corp. of Am. Holdings v. NLRB, 942 F. Supp. 2d 1 (D.D.C. 2013)......................... passim

League of Women Voters of U.S. v. Newby, 838 F.3d 1 (D.C. Cir. 2016) .................................. 20

*Leedom v. Kyne, 358 U.S. 184 (1958) ...................................................................... 21, 24, 25

Lentz v. Eli Lilly & Co., 464 F. Supp. 2d 35 (D.D.C. 2006)..................................................... 10

Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409 (2d Cir. 1999)............ 30

McCormick v. Hirsch, 460 F. Supp. 1337 (M.D. Pa. 1978) ..................................................... 28

McCulloch v. Libbey-Owens-Ford Glass Co., 403 F.2d 916 (D.C. Cir. 1968) .......................... 24

Mesa Power Grp., LLC v. Gov't of Can., 255 F. Supp. 3d 175 (D.D.C. 2017)............................ 9

Minker v. Balt. Ann. Conf. of United Methodist Church, 894 F.2d 1354 (D.C. Cir. 1990).......... 30

Modaressi v. Vedadi, 441 F. Supp. 2d 51 (D.D.C. 2006).......................................................... 13

*Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41 (1938) ..................................... 21, 22, 34

Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel, 437 F.3d 1256 (D.C. Cir. 2006)
...................................................................................................................................... 25

NLRB v. A.J. Tower Co., 329 U.S. 324 (1946) ......................................................................... 2

NLRB v. Catholic Bishop of Chicago, 440 U.S. 490 (1979)................................................. 6, 35

NLRB v. Douglas & Lomason Co., 443 F.2d 291 (8th Cir. 1971).............................................. 33

NLRB v. Hanna Boys Center, 940 F.2d 1295 (9th Cir. 1991) .................................................. 12

NLRB v. IBEW, 308 U.S. 413 (1940).................................................................................... 3

NLRB v. Interstate Dress Carriers, Inc., 610 F.2d 99 (3d Cir. 1979) ......................................... 28

NLRB v. Sears, Roebuck & Co., 421 U.S. 132 (1975)............................................................. 21

Onyeneho v. Allstate Ins. Co., 466 F. Supp. 2d 1 (D.D.C. 2006) ........................................ 18, 19

*Pac. Mar. Ass'n v. NLRB, 905 F. Supp. 2d 55 (D.D.C. 2012) ............................................ 8, 17

Peoples Gas Sys., Inc. v. NLRB, 629 F.2d 35 (D.C. Cir. 1980)................................................. 33

Power Mobility Coal. v. Leavitt, 404 F. Supp. 2d 190 (D.D.C. 2005) .................................. 32, 35

Pursuing Am.'s Greatness v. FEC, 831 F.3d 500 (D.C. Cir. 2016)....................................... 20, 21

Republic Steel Co. v. NLRB, 311 U.S. 7 (1940)..................................................................... 33

Roman Catholic Archbishop v. Bowser, 531 F. Supp. 3d 22 (D.D.C. 2021)................................ 42

S. Jersey Catholic Sch. Teachers Org. v. St. Teresa of the Infant Jesus Church Elem. Sch., 696
A.2d 709 (N.J. 1997)....................................................................................................... 41

Schmid Labs., Inc. v. Hartford Accident & Indem. Co., 654 F. Supp. 734 (D.D.C. 1986)10, 13, 18

Schwarz Partners Packaging, LLC v. NLRB, 12 F. Supp. 3d 73 (D.D.C. 2014)..................... 8, 24

SEC v. Ernst & Young, 775 F. Supp. 411 (D.D.C. 1991) .................................................... 11, 14

SEC v. Savoy Indus., Inc., 587 F.2d 1149 (D.C. Cir. 1978)........................................................ 9

*Senn v. Tile Layers Protective Union*, 301 U.S. 468, 478 (1937)................................................ 42

*Shelton v. Tucker*, 364 U.S. 479 (1960)................................................................................ 42

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011)............................................................... 20

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422 (2007) ............................ 8

*St. Elizabeth Community Hospital v. NLRB,* 708 F.2d 1436 (9th Cir. 1983) ...................... 12

*Starnes v. McGuire*, 512 F.2d 918 (D.C. Cir. 1974) (en banc)............................................. 17

*Thayer/Patricof Educ. Funding, LLC v. Pryor Res. Inc.*, 196 F. Supp. 2d 21 (D.D.C. 2002)...... 10

*Thomas v. Collins*, 323 U.S. 516 (1945)............................................................................... 42

*Thornhill v. Alabama*, 310 U.S. 88 (1940) ........................................................................... 42

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)....................................................... 26

*Trout Unlimited v. U.S. Dep't of Agric.,* 944 F. Supp. 13 (D.D.C. 1996) ...................... 9, 16

*Turner & Newall, PLC v. Canadian Universal Ins. Co.,* 652 F. Supp. 1308 (D.D.C. 1987) . 10, 18

*Ukiah Adventist Hosp.*, 332 NLRB 602 (2000) ................................................................... 42

*United Food & Com. Workers v. NLRB*, 694 F.2d 276 (1982)........................................... 30

*United Food & Com. Workers v. NLRB*, 694 F.2d 276 (D.C. Cir. 1982)........................... 26

*University of Great Falls v. NLRB,* 278 F.2d 1335 (D.C. Cir. 2002) ................................... 6

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ...................................................... 20, 32

**Statutes**

28 U.S.C. § 1292(a)(1)............................................................................................................ 8

28 U.S.C. § 1391(b)(2) ........................................................................................................... 11

28 U.S.C. § 1404(a) ................................................................................................................. 9

29 U.S.C. § 10(f)...................................................................................................................... 3

29 U.S.C. § 104 ...................................................................................................................... 21

29 U.S.C. § 107 ...................................................................................................................... 21

29 U.S.C. § 113 ...................................................................................................................... 21

29 U.S.C. § 151 ................................................................................................................. 37, 39

29 U.S.C. § 152(14) ............................................................................................................... 28

29 U.S.C. § 153(a) ................................................................................................................... 3

29 U.S.C. § 153(b) ................................................................................................................... 2

29 U.S.C. § 153(d) ................................................................................................................... 3

29 U.S.C. § 157 ....................................................................................................................... 1

29 U.S.C. § 158 ....................................................................................................................... 2

29 U.S.C. § 158(a)(1) ............................................................................................................. 6

29 U.S.C. § 158(g) ................................................................................................................. 41

29 U.S.C. § 159 ....................................................................................................................... 1

29 U.S.C. § 159(b) ................................................................................................................... 1

29 U.S.C. § 159(c)(1)...................................................................................................... 1, 2, 29

29 U.S.C. § 159(d) .............................................................................................................. 4, 23

29 U.S.C. § 160(a) ................................................................................................................. 22

29 U.S.C. § 160(c) ............................................................................................................. 3, 22

29 U.S.C. § 160(e) ......................................................................................................... 3, 22, 36

29 U.S.C.§ 160(b) ................................................................................................................... 3

42 U.S.C. § 2000bb-1 ................................................................................................ 26

Cal. Civ. Proc. Code § 527.3 ...................................................................................... 41

Cal. Lab. Code § 1122 ................................................................................................ 41

Cal. Lab. Code § 113 .................................................................................................. 41

Cal. Lab. Code §§ 1115-20 ........................................................................................ 41

Cal. Lab. Code §§ 920-923 ........................................................................................ 41

**Other Authorities**

17 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 111.13[1][a] (3d ed.) ................. 9

*California County has Most Prominent Adventist Community in the U.S.*, ADVENTIST TODAY,
.org/alifornia-county-has-most-prominent-adventist-community-in-the-u-s/ (June 3, 2013)... 17

LEGISLATIVE HISTORY OF THE COVERAGE OF NONPROFIT HOSPITALS UNDER THE NATIONAL
LABOR RELATIONS ACT, 1974, at 93 (1974) ............................................................... 39

*LLU Health Ed Consortium,* https://www.nlrb.gov/case/31-CA-312728 (last visited Mar. 23,
2023)........................................................................................................................... 6

*LLU-Health Ed Consortium,* https://www.nlrb.gov/case/31-RC-312064 (last visited Mar. 23,
2023)........................................................................................................................... 5

*Loma Linda Resident and Fellow Physicians Seek to Form Union*, UNION OF AMERICAN
PHYSICIANS & DENTISTS (Mar. 7, 20203), https://www.uapd.com/2023/03/loma-linda-resident-
and-fellow-physicians-seek-to-form-union/ ............................................................... 39

NLRB, *Regional Offices*, https://www.nlrb.gov/about-nlrb/who-we-are/regional-offices (last
visited Mar. 23, 2023) ................................................................................................. 4

*Representation-Case Procedures*, 79 Fed. Reg. 74,307 (Dec. 15, 2014) ...................... 2

Robert A. Ragazzo, *Transfer & Choice of Federal Law: The Appellate Model,* 93 MICH. LAW
REV. 703 (1995) ......................................................................................................... 8

S. Rep. No. 93-766 (1974) ........................................................................................ 40

Table C-5, U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil
Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending
December 31, 2022, uscourts.gov/statistics/table/c-5/statistical-tables-federal-
judiciary/2022/12/31 (Dec. 31, 2022) ...................................................................... 18

U.S. District Courts—National Judicial Caseload Profile, uscourts.gov/file/63494/download
(Dec. 31, 2022) ......................................................................................................... 18

**Regulations**

29 C.F.R. § 102.15 ..................................................................................................... 3

29 C.F.R. § 102.45 ..................................................................................................... 3

29 C.F.R. § 102.46-47 ................................................................................................ 3

29 C.F.R. § 102.67(c) ................................................................................................. 2

29 C.F.R. § 102.67(d) ................................................................................................. 2

29 C.F.R. § 102.69(b) ................................................................................................. 2

29 C.F.R. § 102.69(c)(1)(i) ......................................................................................... 2

29 C.F.R. § 120.35 ..................................................................................................... 3

As explained below, Defendant National Labor Relations Board's primary position is that this matter should be transferred to the District Court for the Central District of California, where the underlying events and labor dispute giving rise to this case are unfolding. But should this Court find that this District is the appropriate forum, the request of Plaintiff Loma Linda University Health Education Consortium ("Consortium") for a preliminary injunction should be denied chiefly because the Consortium has failed to establish that this Court has subject-matter jurisdiction to enjoin Board proceedings. In support of transferring this case and denying the requested preliminary injunction, the National Labor Relations Board ("Board" or "NLRB"), by its undersigned counsel, respectfully submits this Statement of Points and Authorities.

## THE STRUCTURE AND FUNCTIONS OF THE NLRB

Section 7 of the National Labor Relations Act ("NLRA" or "Act") guarantees employees of most private-sector employers certain rights, including the right "to bargain collectively through representatives of their own choosing . . . and . . . the right to refrain from" doing so.[1] The Board protects these and other rights in two principal fashions.

First, the NLRB protects and effectuates Section 7 rights by conducting union-representation proceedings pursuant to Section 9 of the NLRA.[2] Section 9(c)(1) authorizes the Board to investigate election petitions filed by outside parties to determine whether there is a "question of representation,"[3] in a "unit appropriate for the purposes of collective bargaining."[4] Section 9(c)(1) also empowers the Board to conduct a hearing "if it has reasonable cause to

---

[1] 29 U.S.C. § 157. All sections of the NLRA are codified consecutively beginning at 29 U.S.C. § 151.

[2] Id. § 159.

[3] Id. § 159(c)(1).

[4] Id. § 159(b).

believe that a question of representation affecting commerce exists."[5] By longstanding delegation, the Board's functions in representation cases are carried out in the first instance by NLRB Regional Directors.[6] If the evidence and testimony introduced at the hearing causes the Regional Director to conclude that a question of representation exists, Section 9(c)(1) further requires the NLRB to conduct a representation election by secret ballot.[7] At the conclusion of the election and any post-election proceedings, the Regional Director may issue a certification of representation (indicating that a union has prevailed), or a certification of results (indicating that no union received majority support).[8] At any time up until "10 business days after final disposition of the proceeding," a party dissatisfied with "any action of a Regional Director" may file a request for review of the action with the five-seat Board.[9] By rule, the Board grants such certiorari-like requests "only where compelling reasons exist therefor."[10]

Second, the NLRA deems certain employer and union activity to be "unfair labor practices" (or "ULPs") under Section 8 of the Act.[11] ULP proceedings commence upon the filing

---

[5] Id. 29 U.S.C. § 159(c)(1). As the Supreme Court has remarked, "great latitude concerning procedural details is contemplated" by Section 9. *Inland Empire Dist. Council v. Millis*, 325 U.S. 697, 706 (1945); *accord NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946) ("Congress has entrusted the Board with a wide degree of discretion in establishing the procedure" in Section 9 cases.).

[6] *See* 29 U.S.C. § 153(b).

[7] *Id.* As the Board has explained, "a question of representation cannot arise under the Act[] unless the employees in the unit are employed by an employer covered by the Act." *Representation-Case Procedures*, 79 Fed. Reg. 74,307, 74,398 n.423 (Dec. 15, 2014). Thus, "unless the employer concedes the Board has jurisdiction, evidence must be taken on the Board's statutory jurisdiction to process the petition" during the hearing. *Id.* at 74,399.

[8] 29 C.F.R. § 102.69(b), 29 C.F.R. § 102.69(c)(1)(i), *as amended by* 88 Fed. Reg. 14,908, 14,912 (Mar. 10, 2023).

[9] 29 C.F.R. § 102.67(c), *as amended by* 88 Fed. Reg. at 14,912.

[10] 29 C.F.R. § 102.67(d).

[11] 29 U.S.C. § 158.

of a charge by any person.[12] Under Section 3(d) of the Act, the General Counsel has "final

authority, on behalf of the Board, in respect of the investigation of charges and issuance of

[administrative] complaints . . . , and in respect of the prosecution of such complaints before the

Board."[13] On behalf of the General Counsel, the Regional Director for the office where a charge

is filed conducts an investigation with the assistance of staff.[14] If the Regional Director

determines that a charge has merit, an administrative complaint issues and an adversarial hearing

is held before an administrative law judge, who thereafter issues a decision and recommended

order.[15] That decision, in turn, is appealable to the five-seat Board, which acts as an adjudicatory

body.[16] The Board's decision and order constitutes the final agency determination.[17] It is only

that "final order of the Board" that is reviewable in an appropriate federal court of appeals

pursuant to Section 10(e) and (f) of the NLRA.[18]

      Unlike ULP cases, it is settled that representation cases under Section 9 are not subject to

direct appellate review.[19] This is so because such proceedings culminate in "certifications,"

which are not "final order[s] of the Board" subject to judicial review under Section 10(e) and (f)

the NLRA.[20] Instead, the Act provides an indirect method for judicial review of Section 9

representation proceedings. Specifically, Section 9(d) provides that when a certification has

---

[12] *Id.* § 160(b).

[13] *Id.* § 153(d).

[14] *Id.* ; 29 C.F.R. § 102.15.

[15] 29 C.F.R. § 120.35, 102.45.

[16] 29 U.S.C. § 153(a).

[17] 29 U.S.C. § 160(c); 29 C.F.R. § 102.46-47.

[18] 29 U.S.C. § 160(e), (f).

[19] *See Boire v. Greyhound Corp.*, 376 U.S. 473, 476-77, 481 (1964); *NLRB v. IBEW*, 308 U.S. 413, 414-15 (1940); *Am. Fed'n of Labor v. NLRB (AFL)*, 308 U.S. 401, 409, 411 (1940).

[20] *See AFL*, 308 U.S. at 409.

become the basis for a subsequent unfair-labor-practice order, and that order is before an appropriate court of appeals under Section 10(e) or (f), the certification itself is also open to review.[21]

## FACTUAL BACKGROUND

On February 13, 2023, the Union of American Physicians & Dentists, American Federation of State, County & Municipal Employees, AFL-CIO ("Union") filed a petition with NLRB Region 31 in Los Angeles,[22] seeking to be certified as the exclusive collective-bargaining representative of a unit of employees of the Consortium. The petitioned-for bargaining unit (as modified by stipulation of the parties) includes all residents and fellows enrolled at one of the Consortium's residency or fellowship programs and assigned to one of the locations that participate in that program.[23] That same day, the Regional Director for NLRB Region 31 ("Regional Director") docketed the petition as Case 31-RC-312064. The Regional Director's docketing letters solicited the parties' position statements and provided them notice that a representation hearing would take place on March 6, if the parties failed to reach an election agreement before then.

On February 27, the Consortium filed a motion with the Regional Director to bifurcate the question of the NLRB's jurisdiction over the Consortium based on purported First Amendment concerns and to stay litigation of all other issues in the representation proceedings.

---

[21] 29 U.S.C. § 159(d); *see Canadian Am. Oil Co. v. NLRB*, 82 F.3d 469, 471 n.1 (D.C. Cir. 1996).

[22] In addition to Region 31, the NLRB also maintains a separate Regional office in Los Angeles, Region 21; each region serves a separate area in Southern California. *See* NLRB, *Regional Offices*, https://www.nlrb.gov/about-nlrb/who-we-are/regional-offices.

[23] The parties stipulated to this description of the bargaining unit in Board Exhibit 2 at the outset of the representation hearing.  Bd. Mot. Ex. 1 at 3.

The Consortium also filed a motion with the Regional Director that day to continue the hearing from March 6 to March 13, 2023. The following day, on February 28, the Regional Director issued an order summarily denying the Consortium's motion to bifurcate and stay, but granting the Consortium's request to reschedule the hearing to March 13. Thereafter, on March 2, the Consortium filed with the Board an interlocutory request for expedited discretionary review and reversal of the Regional Director's denial of the Consortium's motion to bifurcate. On March 13, a three-member panel of the Board issued a two-sentence order denying the Consortium's request on the ground that it "raise[d] no substantial issues warranting review."[24]

Also on March 13, Region 31 convened the representation hearing as scheduled. On the first day of this hearing, the Consortium renewed its motion to adjourn the proceeding, noting that it was filing the instant action in this Court.[25] The Regional Director denied this motion on the record later that day, relying on the Seventh Circuit's decision in *Grutka v. Barbour*,[26] the need to develop an evidentiary record regarding the Consortium's First Amendment challenges, and the general rule that district courts lack jurisdiction to enjoin Board proceedings.[27] The hearing continued on consecutive weekdays from March 13 to March 24, and stands adjourned until April 4, 2023.

Meanwhile, shortly after filing the election petition, the Union filed an unfair-labor-practice charge with the Board's Region 31 office against the Consortium. In its charge, the Union alleges that the Consortium violated Section 8(a)(1) of the Act when it "announced that it

---

[24] The relevant docket entries for the Board's representation case proceeding can be found at *LLU-Health Ed Consortium,* https://www.nlrb.gov/case/31-RC-312064 (last visited Mar. 23, 2023).

[25] Representation Hearing Tr., Excerpts at 5-6 (Tr. 9-10) (attached as Bd. Mot. Ex. 3).

[26] 549 F.2d 5 (7th Cir. 1977).

[27] Bd. Mot. Ex. 3 at 42-43.

could not make any improvements in working conditions," presumably due to the pending election petition.[28] This charge was docketed by Region 31 as Case 31-CA-312728 and is currently being investigated by Board agents under the supervision of the Regional Director for Region 31.[29]

After the representation proceeding had already commenced, the Consortium filed its Complaint for Declaratory and Injunctive Relief against the Board in this Court on March 14, 2023.[30] Relying on the First Amendment and the Religious Freedom Restoration Act ("RFRA"), the Complaint requests that the Court immediately dismiss the representation and unfair-labor-practice cases, and issue a preliminary and permanent injunction prohibiting the Board from further processing those cases.[31] One week later, after the representation-case hearing had reached its seventh day, the Consortium filed a Motion for a Preliminary Injunction with this Court.[32] Both the Complaint and the Motion for a Preliminary Injunction rely heavily on the D.C. Circuit's decision in *University of Great Falls v. NLRB*,[33] which determined that the Board lacked jurisdiction over a religious university's labor relations with its faculty.[34]

---

[28] Bd. Mot. Ex. 2. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]." 29 U.S.C. § 158(a)(1).

[29] The relevant docket entries for the unfair-labor-practice proceeding can be found at *LLU Health Ed Consortium,* https://www.nlrb.gov/case/31-CA-312728 (last visited Mar. 23, 2023).

[30] Compl., ECF No. 1.

[31] Compl. ¶ 1.

[32] Pl.'s Mot. Prelim. Inj., ECF No. 6.

[33] 278 F.2d 1335 (D.C. Cir. 2002).

[34] *See* Compl. ¶¶ 25-28, 30, 32 (referencing the *Great Falls* decision six times); Statement of P. & A. 8-11 (self-applying the jurisdictional test enunciated in *Great Falls*), ECF No. 6-1. An antecedent, *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), also figures prominently.

**ARGUMENT**

**I.  This Case Should Be Transferred to the Central District of California Pursuant to 28 U.S.C. § 1404(a).**

The Consortium has filed a Complaint for Declaratory and Injunctive Relief in this Court, even though virtually all relevant events in this dispute have occurred, and are continuing to occur, in and around Loma Linda, California. The union organizing campaign, representation-case proceedings, and unfair-labor-practice investigation are all taking place in California, as would any Board-ordered union-representation election involving the Consortium. The labor dispute that led to these administrative proceedings is a matter of acute local interest, particularly given the involvement of persons providing health care services at regional hospitals. Further, the arguments contained in both the Complaint and the Motion for a Preliminary Injunction support the inference that the Consortium filed in this Court rather than one located in California to receive the benefit of potentially favorable D.C. Circuit precedent and to avoid certain unfavorable Ninth Circuit precedent.

When confronted with similar circumstances—an out-of-jurisdiction employer with a strong incentive to forum shop seeking expedited relief from this Court to stop NLRB proceedings—this Court (by Judge Walton) immediately transferred the case to a more appropriate district pursuant to 28 U.S.C. § 1404(a).[35] In the interest of justice, and as further explained below, the same result should follow here, and this case should be transferred to the Central District of California.

---

[35] *Lab. Corp. of Am. Holdings v. NLRB,* 942 F. Supp. 2d 1, 5 (D.D.C. 2013).

**A. Consistent with past decisions, this Court may transfer the case before deciding anything else, including its own subject-matter jurisdiction.**

Courts possess discretion to determine the appropriate venue as a threshold issue, without needing to first assess jurisdiction or the underlying merits of the matter.[36] Consistent with this principle, different judges of this Court have granted motions to transfer at the Board's request prior to determining other threshold or merits issues.[37] These decisions effectuate the commonsense notion that sometimes "[a]djudicative efficiency favors resolving the venue issue before addressing whether subject matter jurisdiction exists."[38]

Deciding the venue issue prior to determining the jurisdictional and merits arguments also avoids potential procedural complications. For example, if this Court were to consider the preliminary injunction first, any order granting or denying that request would be appealable to the D.C. Circuit.[39] However, if the case were then later transferred to California, any final orders or interlocutory appeals would be heard by the Ninth Circuit—creating the potential for conflicting orders and complicating the litigation in this case. Additionally, reaching the merits of the Consortium's Motion for a Preliminary Injunction prior to transferring to the appropriate

---

[36] *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007).

[37] *See, e.g., Lab. Corp. of Am. Holdings,* 942 F. Supp. 2d at 1 (transferring to the District of New Jersey); *Pac. Mar. Ass'n v. NLRB,* 905 F. Supp. 2d 55, 58–59 (D.D.C. 2012) (Howell, J.) (transferring to the District of Oregon), and cases cited therein; *cf. Schwarz Partners Packaging, LLC v. NLRB,* 12 F. Supp. 3d 73, 88 (D.D.C. 2014) (Howell, J.) (denying motion to transfer as moot and dismissing matter).

[38] *Aftab v. Gonzalez,* 597 F. Supp. 2d 76, 79 (D.D.C. 2009); *see also* Robert A. Ragazzo, *Transfer & Choice of Federal Law: The Appellate Model,* 93 MICH. LAW REV. 703, 746 n.265 (1995) (citing 1B JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 0.404[4.-2] (2d ed. 1994)) ("Because a permanent transfer has the effect of changing the federal law applicable to the case, district courts should make transfer decisions as early in the proceedings as practicable.") As explained below, deciding the motion to transfer first is even more appropriate here given the Consortium's attempt to forum shop and thereby derive an anticipated benefit from "the federal law applicable to this case." *Ragazzo, supra,* at 746 n.265.

[39] *See* 28 U.S.C. § 1292(a)(1).

venue would likely engender ancillary disputes concerning the impact of the transferor court's antecedent rulings on future proceedings.[40] Preventing these potential outcomes serves as further reason to decide the venue question as an initial matter prior to reaching the other issues presented in this case.

### B. Legal standards for motions to transfer venue pursuant to Section 1404(a)

Section 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."[41] In adjudicating a motion to transfer under Section 1404(a), a court must make a "factually analytical, case-by-case determination of convenience and fairness."[42] Even where venue is proper in the originating court, a district court nonetheless has discretion to order a transfer.[43] The NLRB acknowledges that, as the movant, it "bears the burden of establishing that transfer is proper."[44]

A district court will usually grant a motion to transfer where 1) the movant has established that the action could have been brought in the proposed transferee district and 2) the

---

[40] *See, e.g.*, *Mesa Power Grp., LLC v. Gov't of Can.*, 255 F. Supp. 3d 175, 181 (D.D.C. 2017) ("[I]f the transferor court already decided an issue (based on its own interpretation of the law) [then] the 'law of the case' governs that issue even in the transferee court.").

[41] 28 U.S.C. § 1404(a).

[42] *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1154 (D.C. Cir. 1978) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)); *see also* 17 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 111.13[1][a] (3d ed.) (explaining that a motion to transfer under Section 1404(a) "lies within the broad discretion of the district court" and "requires the court to make a 'flexible and individualized analysis,' and to 'weigh in the balance a number of case-specific factors' to determine whether the proposed transferee district would be a more convenient forum for the litigation" (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988))).

[43] *See In re Scott*, 709 F.2d 717, 720 (D.C. Cir. 1983) (per curiam).

[44] *Trout Unlimited v. U.S. Dep't of Agric.,* 944 F. Supp. 13, 16 (D.D.C. 1996).

"balance of convenience of the parties and witnesses and the interest of justice" favor transfer.[45]
In exercising its broad discretion, and as part of the balancing analysis, the court must weigh a
number of "private and public-interest factors."[46] The private-interest factors include: (1) the
plaintiff's choice of forum; (2) the defendant's preferred choice of forum; (3) where the claim
arose; (4) convenience of the parties; (5) convenience of the witnesses, but only to the extent that
witnesses may be unavailable for trial in one of the locations; and (6) ease of access to sources of
proof. The public-interest factors include: "(1) the transferee court's familiarity with the
governing law; (2) the relative congestion of the courts of the transferor and potential transferee;
and (3) the local interest in deciding local controversies at home."[47]

Further, in weighing whether the "interest of justice" favor transfer, courts consider
whether the plaintiff has engaged in forum shopping.[48] This Court has recognized that because
the transfer provisions were in part intended to prevent forum shopping, it is against the interest
of justice "to encourage, or even allow, a plaintiff to select one district exclusively or primarily
to obtain or avoid specific precedents."[49]

### C.  This Court, in its discretion, should transfer the case to the Central District of California.

The Court should find cause to transfer this matter to the Central District of California.
The first requirement for a transfer is met here–that is, the Consortium could have brought this

---

[45] *Thayer/Patricof Educ. Funding, LLC v. Pryor Res. Inc.*, 196 F. Supp. 2d 21, 31 (D.D.C. 2002)
(internal quotation mark omitted) (quoting *Armco Steel Co. v. CSX Corp.*, 790 F. Supp. 311, 323
(D.D.C. 1991)); *see Lentz v. Eli Lilly & Co.*, 464 F. Supp. 2d 35, 36 (D.D.C. 2006).

[46] *Barham v. UBS Fin. Servs.*, 496 F. Supp. 2d 174, 178 (D.D.C. 2007).

[47] *Id.* at 178, 179; *see also FTC v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 25 (D.D.C. 2008).

[48] *See Turner & Newall, PLC v. Canadian Universal Ins. Co.,* 652 F. Supp. 1308, 1312 (D.D.C.
1987) (explaining that Section 1404(a) is designed to "prevent forum shopping").

[49] *Schmid Labs., Inc. v. Hartford Accident & Indem. Co.,* 654 F. Supp. 734, 737 (D.D.C. 1986).

action in the Central District of California. The claims in the Consortium's Complaint involve

questions of federal law (assuming there is jurisdiction to hear them, a point which the NLRB

contests), and nearly all of the operative events giving rise to this action arose and are continuing

to take place within the Central District of California.[50]

The second requirement is also met here—balancing the private- and public-interest

factors, along with the interest of justice, make it clear that transfer is appropriate.[51] Accordingly,

as shown below, the Court should find that the Board has satisfied its burden to show that the

factors favor a transfer.

    1.   Private-interest factors weigh in favor of transfer to the Central District of California.

        a.   The Consortium's choice of forum should be accorded little weight.

While a plaintiff's choice of forum is ordinarily afforded deference by courts, it is

afforded "substantially less deference,"[52] where the plaintiff's choice of forum has "no

meaningful ties to the controversy and no particular interest in the parties or subject matter."[53]

Indeed, a defendant's burden in a motion to transfer "decreases when the plaintiff's choice of

forum has no meaningful nexus to the controversy and the parties."[54]

Notwithstanding that nearly all the events giving rise to the disputes in Cases 31-RC-

312064 and 31-CA-312728 occurred in California, the Consortium filed its Complaint and its

---

[50] Under Section 1391(b)(2), venue is appropriate in a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is subject of the action is situated." 28 U.S.C. § 1391(b)(2). Venue would thus be appropriate in the Central District of California.

[51] *See SEC v. Ernst & Young*, 775 F. Supp. 411, 414 (D.D.C. 1991).

[52] *Barham*, 496 F. Supp. at 178.

[53] *Greater Yellowstone Coalition v. Bosworth*, 180 F. Supp. 2d 124, 128 (D.D.C. 2001) (quoting *Chung v. Chrysler Corp.*, 903 F. Supp. 160, 165 (D.D.C. 1995)).

[54] *Id.*

Motion for a Preliminary Injunction in the District of Columbia. Notably, the Consortium specifically relies on the D.C. Circuit's ruling in *University of Great Falls*, which establishes a three-part test for applying the NLRA to faculty in religious schools, in support of its assertion that the NLRB's processing of the pending representation and ULP cases conflicts with the First Amendment.[55] Indeed, the Consortium's D.C. forum choice and direct reliance on this ruling to obtain its desired relief suggest that the Consortium has chosen this Court for the purpose of forum shopping in the district where it believes it has advantageous precedent.[56]

Further supporting an inference of forum shopping here is the existence of precedent within the Consortium's home circuit that is arguably unfavorable to its position. The Ninth Circuit, within which the Consortium resides and operates, has limited the scope of the religious exemption the Consortium has raised. Thus, in *St. Elizabeth Community Hospital v. NLRB*[57] and *NLRB v. Hanna Boys Center*,[58] the Ninth Circuit held that the NLRA applies to religious health care institutions and to non-faculty workers in religious schools, respectively. In addition, in *Hanna Boys Center v. Miller*,[59] the Ninth Circuit made clear that district courts lack jurisdiction

---

[55] *See* Compl. ¶¶ 25-28, 30, 32; Statement P. & A. 8-11.

[56] While the Board endorsed the *Great Falls* test in *Bethany College*, it made clear that the test applies only to its "jurisdiction over the *faculty* of an *educational institution*." 369 NLRB No. 98 (2020) (emphasis added). The Consortium claims that its residents and fellows are teachers (or students, or both), *see* Statement P. & A. 11-14, and apparently sees no meaningful difference between itself, on the one hand, and schools or universities, on the other, but these are hardly self-evident propositions. That is why each issue has been subject to serious evidentiary disputes at the underlying representation hearing. *See infra* p. 35.

[57] 708 F.2d 1436, 1440 (9th Cir. 1983) (rejecting Religion Clauses challenge involving a bargaining unit of "maintenance and service employees" at a hospital owned and operated by a religious order).

[58] 940 F.2d 1295, 1305 (9th Cir. 1991) (same, as to a bargaining unit of "lay non-faculty employees" at a church-owned residential school).

[59] 853 F.2d 682 (9th Cir. 1988).

to preclude the NLRB from tallying ballots cast in a representation election, notwithstanding the existence of unresolved Religion Clause objections.

Additionally, given that there is *virtually no other connection* to the District of Columbia other than the fact that the Board's "headquarters" is here,[60] the evidence of improper forum shopping is strong. The Board's summary rejection of the Consortium's interlocutory appeal in the representation case[61] adds little to the forum-transfer analysis because, as Judge Walton of this Court has observed, "mere involvement on the part of federal agencies, or some federal officials who are located in Washington, D.C. is not determinative of whether the plaintiff's choice of forum in the District of Columbia receives deference."[62] Weighing this singular connection against the fact that all other operative events have occurred, are occurring, or will occur in California and that California, not the District of Columbia, is the Consortium's home forum, the Consortium's choice should be given little deference.[63]

      b.    The Board's preferred choice of forum, the Central District of California, is the more logical, appropriate forum.

"Venue statutes serve 'the purpose of protecting a defendant from the inconvenience of having to defend an action in a trial court that is . . . remote . . . from where the acts underlying the controversy occurred.'"[64] The Board requests a transfer of venue to the Central District of

---

[60] Compl. ¶ 6.

[61] *See* Compl. ¶ 16.

[62] *Lab. Corp.*, 942 F. Supp. 2d at 4 (cleaned up).

[63] *Schmid Labs.,* 654 F. Supp. at 737 ("While choice of an advantageous forum alone might not warrant a transfer, . . . when such forum shopping is considered with the other factors in this case, *i.e.,* the complete lack of nexus with the District of Columbia and the relatively more convenient forum available in [another district], it is clear that this case should be transferred to that district.").

[64] *Modaressi v. Vedadi*, 441 F. Supp. 2d 51, 53 (D.D.C. 2006) (quoting *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1576 (Fed. Cir. 1990)).

California because the acts underlying the labor dispute occurred in that district, and the various claims arising out of the dispute are already being investigated or litigated in that district.

The Board's choice of forum, the Central District of California, is the true locus of the dispute. The Board's preference to transfer this action to California is logical, given that the entire factfinding and administrative processes underlying this dispute are occurring in that district. Litigation in California is also practical, as it makes sense to entertain an action where the dispute is actually occurring and affecting local interests. Moreover, California is also the more appropriate forum to decide this case, considering that, as stated, the Consortium's choice of forum and framing of its Complaint strongly suggests a "forum shopping" motive.

      c.   The Consortium's claims arose in the Central District of California and events giving rise to its claims continue to occur there.

Judges of this Court have held that claims "arise" for purposes of Section 1404(a) where most of the significant events giving rise to the claims occurred.[65] Here, nearly all ties in this case are to California. The dispute arises out of the Union's filing of an election petition and an unfair-labor-practice charge in one of the NLRB's two regional offices in Los Angeles, California. The election petition seeks NLRB certification as the collective-bargaining representative of a group of the Consortium's employees, all of whom work for a residency program based in Loma Linda, California.[66] Moreover, the Board agents who have investigated the Union's election petition and who are conducting the pre-election hearing are all on staff at the NLRB's Region 31 office in Los Angeles.

---

[65] *See, e.g.*, *Davis v. Am. Soc'y of Civil Eng'rs*, 290 F. Supp. 2d 116, 123 (D.D.C. 2003) (concluding that the case did not "arise" in this district where "only one of the many potential events giving rise to this action . . . occurred in the District of Columbia"); *Ernst & Young,* 775 F. Supp. at 417.

[66] Compl. ¶ 8.

Following this hearing, the Regional Director may decide to direct a secret-ballot election, or she may instead dismiss the petition for lack of jurisdiction or for any other reason supported by the record. Whatever the decision may be, it will issue from the Board's Region 31 office in Los Angeles. And if an election is ordered and takes place, that election would occur in California, as would the parties' related electioneering activity to persuade voters to choose or reject union representation. Meanwhile, the Board's administrative investigation of the unfair-labor-practice charge is being conducted by agents from the Region 31 office in Los Angeles, and any decision to litigate or dismiss this charge will emanate from this office. That the Consortium is seeking to preliminarily enjoin all of these actions from occurring in California only heightens the local interest in deciding the dispute in that forum.

Conversely, the *sole* connection to the current venue is that the Board, which issued a two-sentence, summary denial of the Consortium's interlocutory request for discretionary review in the representation case, is headquartered in Washington, D.C. Since almost all of the operative events have taken place or will eventually take place in California, the third private-interest factor weighs heavily in favor of transfer.

      d.   Other private-interest factors tip in favor of transfer to the Central District of California.

The next two considerations, convenience of the parties and convenience of the witnesses, weigh in favor of transfer. The Consortium is located within the geographical boundaries of the Central District of California, and the Board maintains two offices there. It is not clear why this Court is a convenient forum for the Consortium; indeed, it is not clear that the District of Columbia is a convenient forum even for the Consortium's counsel, many of whom

intend to appear pro hac vice.[67] And should testimony be required in this matter, many if not all of the relevant witnesses who can testify about the Consortium's operations, the working conditions of employees in the proposed bargaining unit, and any other potential evidence regarding the First Amendment and RFRA issues raised by the Consortium's Complaint are located in California.

The final private-interest factor—ease of access to the sources of proof also weighs, at least potentially, in favor of transfer. Although the pleadings and related Board decisions in this case are available and accessible in electronic form, should the need arise for witnesses to be consulted and for other documentary evidence to be used, those persons and evidence would likely be physically located in California. As such, other private-interest factors favor transfer here.

    2.  Public-interest factors weigh strongly in favor of transfer to the Central District of California.

        a.  The local interest in deciding local controversies at home weighs heavily in favor of transfer.

Of the three public interest factors, the first—the local interest in deciding local controversies at home—weighs heavily in favor of transfer. There is a compelling interest in having local disputes and all related issues "resolved in the locale where they arise."[68] Consistent with this general principle, judges of this Court have recognized a "strong local interest" in

---

[67] *See* Pl.'s Mot. Prelim. Inj. 4.

[68] *Trout Unlimited,* 944 F. Supp. at 19; *see also Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) ("There is a local interest in having localized controversies decided at home.").

having union election controversies decided by the court "where the affected employees are located."[69] Here, that court sits in the Central District of California.

These local interests are only heightened by the fact that this matter involves persons who provide essential medical services at major regional medical centers. Additionally, the Consortium's position that the Board lacks authority to regulate its labor relations necessarily implicates the question of whether the resulting jurisdictional gap is filled by California state law.[70] Moreover, since the Consortium's Complaint concerns the exercise of religious beliefs by adherents to the Seventh-day Adventist faith, it stands to reason that the Central District of California, which encompasses a county with "the most prominent Seventh-day Adventist presence of any county in the nation," would have a particularly strong interest in the outcome of this case.[71] Based on these facts, this Court should find that transfer is supported by a profound local interest in having this matter resolved in the Central District of California.

   b. The relative congestion of the courts does not weigh against transfer.

The relative congestion of the transferee and transferor courts should not be a concern here, and this factor should be given little, if any, weight. While "congestion alone is not sufficient reason for transfer, relative docket congestion and potential speed of resolution is an appropriate factor to be considered" by district courts in the motion-to-transfer analysis.[72] To the

---

[69] *Lab Corp. of Am. Holdings.*, 942 F. Supp. 2d at 4; *see also Pac. Mar. Ass'n,* 905 F. Supp. at 61 (transferring case to Oregon, the "true locus of this dispute," based in part on location of work, conduct at issue, and Board's administrative processes).

[70] *E.g., Christ the King Reg'l High Sch. v. Culvert,* 815 F.2d 219, 222 (2d Cir. 1987) ("Indeed, it is clear that if the NLRA does not exert jurisdiction in a given area, the states can supplement the NLRA with state legislation.").

[71] *California County Has Most Prominent Adventist Community in the U.S.*, ADVENTIST TODAY, https://atoday.org/california-county-has-most-prominent-adventist-community-in-the-u-s/ (June 3, 2013).

[72] *Starnes v. McGuire*, 512 F.2d 918, 932 (D.C. Cir. 1974) (en banc).

extent the comparative congestion is relevant here, it is neutral. The latest statistics reporting median case-processing times and pending cases per judgeship show that the two districts are comparable.[73]

     c. Both this Court and the Central District of California are qualified to resolve the legal issues presented in this matter.

Similarly, the final public-interest factor—the courts' familiarity with the governing laws—has little bearing here. This action primarily involves a claim of improper agency action, grounded in federal law and the Constitution. The District Court for the Central District of California is not a disadvantage to this Court in hearing and resolving such claims.

    3. The Court should transfer this case to the Central District of California "in the interest of justice."

The final factor of Section 1404(a), "the interest of justice," weighs in favor of transfer, in light of the Consortium's forum shopping in this Court.[74] This Court should not condone the Consortium's deliberate selection of this forum to obtain a perceived benefit from the application

---

[73] *See* Table C-5, U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending December 31, 2022, https://www.uscourts.gov/statistics/table/c-5/statistical-tables-federal-judiciary/2022/12/31 (Dec. 31, 2022) (noting that median disposition time in civil cases for the Central District of California is 4.7 months compared to 5 months in the District of Columbia); U.S. District Courts—National Judicial Caseload Profile, 2, 68, https://www.uscourts.gov/file/63494/download (Dec. 31, 2022) (showing that the Central District of California has 482 pending cases per judgeship versus 401 for the District of Columbia).

[74] *See Onyeneho v. Allstate Ins. Co.,* 466 F. Supp. 2d 1, 5 (D.D.C. 2006) ("To the extent that plaintiffs are engaging in forum shopping, it weighs in favor of transfer to a more appropriate forum."); *Turner & Newall,* 652 F. Supp. at 1312 (considering whether "transfer is warranted in the interest of justice because [plaintiff] engaged in forum shopping" by filing in this Court "simply to benefit from [the D.C.] Circuit's ruling" in another case); *accord Schmid Labs.,* 654 F. Supp. at 736.

of certain precedents,[75] while avoiding a forum with perhaps less favorable precedent but much stronger connections to the underlying dispute.[76]

Additionally, transferring this matter to California at this time should cause little, if any, prejudice to the Consortium's interests. The representation-case hearing is nearing its conclusion as of the date of this submission.[77] After the proceeding concludes, the Regional Director will require time—likely several weeks, given the length of the representation hearing—to draft a decision and potential direction of election. Additionally, the investigation of the ULP charge is in its nascent stages and will also take significant time to process. Should this Court find cause to transfer this matter, the Consortium will therefore have ample opportunity to renew its preliminary injunction motion with the transferee court in advance of any major developments.

In sum, after weighing all the private- and public-interest factors for and against transfer, this Court should conclude that the Board has established that any presumption in favor of this forum is substantially outweighed by the greater interests of fairness and justice that would be served by transferring this case to the Central District of California. The Court should further decide this issue without reaching subject-matter jurisdiction or the merits of the Consortium's Motion for a Preliminary Injunction, both of which are addressed below.

---

[75] *See* Compl. ¶¶ 25-28, 30, 32.

[76] *See supra* p. 12-13; *see Lab. Corp. of Am. Holdings*, 942 F. Supp. 2d at 5 (citing the plaintiff's "forum shopping" as a reason to transfer a lawsuit seeking to enjoin an NLRB representation case); *see also Onyeneho,* 466 F. Supp. 2d at 5 (granting transfer where court was "indeed concerned about the possibility of forum shopping here" based on the argument "that plaintiffs have chosen this forum simply to avoid disadvantageous precedent in the Fourth Circuit").

[77] Having chosen to wait until the seventh day of the hearing to seek preliminary injunctive relief and having decided not to request a temporary restraining order, the Consortium has undercut any possible claim that it is unduly prejudiced by the hearing continuing to completion.

## II.  The Consortium's Motion for a Preliminary Injunction must be denied because it does not satisfy the multi-factor test for obtaining such relief.

"A preliminary injunction is an extraordinary remedy never awarded as of right."[78] To secure a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[79] The public interest and balance of equities factors merge when, as here, the government is a party "because the government's interest *is* the public interest."[80]

Before the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, courts in this circuit applied a "sliding-scale" approach to the preliminary injunction analysis under which "a strong showing on one factor could make up for a weaker showing on another."[81] Since *Winter*, the D.C. Circuit has hinted on several occasions that "a likelihood of success is an independent, free-standing requirement for a preliminary injunction,"[82] but it "has not yet needed to decide the issue."[83] In any event, "[i]n First Amendment cases, the likelihood of success will

---

[78] *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).

[79] *Id.* at 20.

[80] *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

[81] *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).

[82] *Id.* at 393 (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009)).

[83] *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).

often be the determinative factor."[84] Under either approach, the Consortium is not entitled to a preliminary injunction here."[85]

## A. The Consortium's claims have no likelihood of success on the merits.

This Court's lack of subject-matter jurisdiction over this case precludes any possibility of the Consortium succeeding on the merits.[86] In both unfair-labor-practice and union-representation cases under the NLRA, the Supreme Court has long recognized that Congress intentionally prevented judicial interference with, or review of, non-final NLRB actions. Nor can the Consortium meet the exceedingly high standard to establish subject-matter jurisdiction over non-final action under the sole exception to this general rule enunciated in *Leedom v. Kyne*.[87]

### 1. District courts generally lack subject-matter jurisdiction to enjoin NLRB proceedings.

Since the Supreme Court's seminal decision over eighty years ago in *Myers v. Bethlehem Shipbuilding Corp.*, it has been established that Congress did not grant federal district courts jurisdiction over administrative unfair-labor-practice proceedings.[88] Rather, Congress provided

---

[84] *Pursuing Am.'s Greatness*, 831 F.3d at 511.

[85] Notably, absent some other on point statutory basis such as the NLRA, Congress chose to withhold both preliminary and permanent injunctive powers from federal courts in labor disputes. *See Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 253 (1970). This includes "any controversy concerning terms or conditions of employment, or concerning the association *or representation* of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment." 29 U.S.C. § 113 (emphasis added). This limitation applies "regardless of whether or not the disputants stand in the proximate relation of employer and employee." *Id.*; *see generally* 29 U.S.C. §§ 104, 107 (the "Norris-LaGuardia Act").

[86] If the party initiating a federal suit does not meet the burden of establishing subject-matter jurisdiction, a federal court must dismiss the suit in its entirety without reaching the merits. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

[87] 358 U.S. 184 (1958).

[88] 303 U.S. 41, 48, 51 (1938); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138, 155 (1975).

exclusive jurisdiction initially to the NLRB to administer the ULP provisions of the NLRA.[89]

Congress made the Board's adjudication of such cases subject to judicial review and

enforcement *only* upon the issuance of a final Board order at the conclusion of an unfair-labor-

practice proceeding, and then *only* in a United States court of appeals.[90] *Myers* determined that

this avenue for circuit court review of final Board orders affords parties like the Consortium "an

adequate opportunity to secure judicial protection against possible illegal action on the part of the

Board."[91] This is so because Board orders are not self-enforcing, and "until the Board's order has

been affirmed by the appropriate . . . Court of Appeals, no penalty accrues for disobeying it."[92]

Indeed, the *Myers* Court emphasized the comprehensive nature of appellate court review

available at the conclusion of NLRB unfair-labor-practice cases: "*all questions of the jurisdiction

of the Board* and the regularity of its proceedings, *all questions of constitutional right or

statutory authority* are open to examination by the court."[93]

  The Fifth Circuit's decision in *Bokat v. Tidewater Equipment Co.* illustrates how these

principles impact requests to enjoin pending NLRB proceedings.[94] In *Bokat*, an employer

petitioned the Board to sever a consolidated hearing of two unfair-labor-practice cases, one of

which was related to a representation issue. When the Board declined to sever the charges, the

---

[89] *See* 29 U.S.C. § 160(a), (c); *Myers*, 303 U.S. at 50.

[90] *See* 29 U.S.C. § 160(e), (f); *Myers*, 303 U.S. at 48, 51; *AMERCO v. NLRB*, 458 F.3d 883, 888 (9th Cir. 2006) (district court lacked jurisdiction to enjoin ULP case upon claim that the employer was being denied due process because review was available through the court of appeals upon entry of a final Board order).

[91] *Myers*, 303 U.S. at 48.

[92] *Id.*

[93] *Id.* at 49 (emphasis added) (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 47 (1937)).

[94] 363 F.2d 667 (5th Cir. 1966).

employer sought and received an injunction in federal district court prohibiting the Board's consolidation of the matters based on an alleged violation of the employer's right to due process. On appeal, the Fifth Circuit reversed the district court, explaining "we are of the clear view that the District Court should have dismissed this case without looking further than *Myers*."[95] The court of appeals held that "[c]onsolidation of the charges against [the] [e]mployer . . . for a joint hearing is a matter inevitably committed to the wide discretion of the Board in its control of unfair labor practice hearings."[96] In addition, the Fifth Circuit emphasized that the remedy for any due-process violation was circuit court review of a final Board order, "not the over-the-shoulder supervision of District Courts who, for that matter, have a very very minor role to play in this statutory structure."[97]

Likewise, district courts lack jurisdiction over the NLRB's representation proceedings. In *American Federation of Labor v. NLRB* ("*AFL*"), the Supreme Court held that union-representation and election matters are not reviewable in absence of a final agency decision.[98] Only circuit courts may review actions, orders, or decisions arising from a representation case, and only when a certification later serves as the basis of an unfair-labor-practice finding, such as when an employer refuses to bargain.[99] Accordingly, courts within and outside the this Circuit have repeatedly and consistently dismissed lawsuits like this one in which an employer seeks

---

[95] *Bokat*, 363 F.2d at 671.

[96] *Id.* at 673.

[97] Id.

[98] *AFL*, 308 U.S. at 409-11.

[99] 29 U.S.C. § 159(d); *see Canadian Am. Oil Co.*, 82 F.3d at 471 n.1.

premature judicial review of an NLRB representation case.[100] Therefore, "as a general rule, Board orders emanating from representation proceedings are not directly reviewable in court."[101]

"Congress adopted this policy because it wished to avoid delays involved in direct judicial review—delays which ultimately could frustrate employees' bargaining rights before the employees had an opportunity to exercise them."[102] The indirect review process protects this important interest and still "makes full provision for judicial review of the underlying certification order."[103]

2. The Consortium cannot demonstrate that the Court has subject-matter jurisdiction under *Leedom v. Kyne.*

The cases following the principles of *Myers* and *AFL* over the last several decades "are legion."[104] Nevertheless, "the Supreme Court has established one important and extremely narrow exception to the general rule that Board representation orders are not subject to direct judicial review."[105] In *Leedom v. Kyne*, the Supreme Court held that district courts may exercise jurisdiction under 28 U.S.C. § 1337 "to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act,"[106] but only "'[i]f the absence

---

[100] *See, e.g.*, *Goethe House N.Y., German Cultural Ctr. v. NLRB*, 869 F.2d 75, 80 (2d Cir. 1989); *Blue Cross & Blue Shield of Mich. v. NLRB*, 609 F.2d 240, 240-41, 243-44 (6th Cir. 1979); *Charlie Rossi Ford, Inc. v. Price*, 564 F.2d 372, 373 (9th Cir. 1977) (per curiam); *Bd. of Trustees of Mem'l Hosp. of Fremont County v. NLRB*, 523 F.2d 845, 846 (10th Cir. 1975); *McCulloch v. Libbey-Owens-Ford Glass Co.*, 403 F.2d 916, 917-18 (D.C. Cir. 1968); *Schwarz Partners Packaging, LLC v. NLRB*, 12 F. Supp. 3d 73, 83-88 (D.D.C. 2014).

[101] *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1310 (D.C. Cir. 1984).

[102] *Gold Coast Rest. Corp. v. NLRB*, 995 F.2d 257, 267 (D.C. Cir. 1993).

[103] *Boire*, 376 U.S. at 477.

[104] *Hartz Mountain*, 727 F.2d at 1310.

[105] *Id.* at 1311.

[106] 358 U.S. at 188.

of jurisdiction of the federal courts [would] mean[] a sacrifice or obliteration of a right which Congress has created.'"[107]

"Thus, in order to justify the exercise of [*Kyne*] jurisdiction, a plaintiff must show, first, that the agency has acted 'in excess of its delegated powers and contrary to a specific prohibition' which 'is clear and mandatory,' and, second, that barring review by the district court 'would wholly deprive [the party] of a meaningful and adequate means of vindicating its statutory rights.'"[108] The Consortium cannot make the required showing as to either its RFRA claim or its First Amendment claim.

    a.   *Kyne* jurisdiction does not extend to the Consortium's RFRA claim.

As stated, *Kyne* jurisdiction requires NLRB action that is "contrary to a specific prohibition in the Act."[109] This easily disposes of the Consortium's RFRA claim as a basis for this Court to exercise jurisdiction. In *Goethe House New York, German Cultural Center v. NLRB*, an employer claimed that the district court had *Kyne* jurisdiction to correct the Board's alleged violation of the Foreign Sovereign Immunities Act.[110] "Under *Kyne*, however, a district court does not have jurisdiction to review a Board order in a representation proceeding whenever that order may violate any statute; the district court has jurisdiction only when the order violates a specific prohibition of the NLRA."[111] By this same reasoning, *Kyne* does not provide a basis for this Court to consider the Consortium's RFRA claim.

---

[107] *Id.* at 190 (quoting *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 300 (1943)).

[108] *Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006) (citation omitted).

[109] *Kyne,* 358 U.S. at 188.

[110] 869 F.2d at 78.

[111] *Id.*

Moreover, it is beyond cavil that Congress may require parties to present their arguments to an administrative agency prior to judicial review.[112] This is true of claims (even ones that may be raised as defenses) rooted in the Constitution or laws other than the agency's organic statute.[113] Here, RFRA explicitly provides that it may be invoked as "claim *or defense* in a judicial proceeding."[114] And because the instant claims are the "vehicle by which" the Consortium seeks to undo the Board's decision to go forward with its inquiry in this case, they must be considered within the relevant statutory scheme by the Board and, if necessary, a court of appeals.[115]

     b.  *Kyne* does not supply jurisdiction over the Consortium's First Amendment claim.

Cases interpreting and applying *Kyne* have also suggested that the doctrine may extend to "strong and clear" showings that the Board has acted in a manner that infringes the constitutional rights of unions.[116] However, to the Board's knowledge, no case in this circuit has extended this principle to protect an alleged infringement of an employer's constitutional rights. In any event, as explained below, the Consortium has not made the required "strong and clear" showing here.

---

[112] *Elgin v. Dep't of Treasury*, 567 U.S. 1, 19 (2012).

[113] *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 214-15 (1994) (although Mine Safety and Health Commission had "no particular expertise" in construing statutes other than the Mine Act, procedure requiring the Commission to consider challenges based on another statute was appropriate since agency resources could be "brought to bear on" the problem); *see Jarkesy v. SEC*, 803 F.3d 9, 18 (D.C. Cir. 2015) (constitutional claims have no "talismanic significance" and do not preclude requiring the challenge to go through the administrative route so long as a court can eventually pass upon the challenge); *Adorers of the Blood of Christ v. FERC*, 897 F.3d 187, 195 (3d Cir. 2018) (district court RFRA challenge to agency order related to pipeline under National Gas Act was precluded by statutory scheme requiring administrative exhaustion and court of appeals review).

[114] 42 U.S.C. § 2000bb-1 (emphasis added).

[115] *See Elgin*, 567 U.S. at 22.

[116] *United Food & Com. Workers, Loc. 400 v. NLRB*, 694 F.2d 276, 279 (D.C. Cir. 1982).

i.   The Consortium cannot show that the Board's continued processing of the
representation and unfair-labor-practice cases lacks "colorable support."

Because *Kyne* jurisdiction can exist only if the Board's actions clearly violate the NLRA

or the Constitution, the D.C. Circuit has explained that a plaintiff cannot establish jurisdiction

under *Kyne* if the NLRB's position enjoys "any colorable support."[117] Here, the NLRB's

decision to continue processing the representation and ULP cases easily clears that low bar.[118]

The evidence of colorable support begins with the Seventh Circuit's rejection of

arguments in a similar posture to those made here by the Consortium in *Grutka v. Barbour*.[119] In

*Grutka*, an Indiana Catholic bishop raised a religious liberty challenge to the counting of ballots

in an NLRB election and the continued processing of an unfair-labor-practice charge involving

parochial school lay-teachers, like the ones eventually exempted from Board jurisdiction in

*Catholic Bishop*.[120] The district court below had enjoined the counting of the ballots and the

unfair-labor-practice proceeding pending the circuit court's resolution of the applicability of the

NLRA in *Catholic Bishop*.[121] On appeal, the Seventh Circuit reversed, finding *Kyne* jurisdiction

was unavailable where the action "does not seek review of agency action bottomed on the plain

wording of a statute which is alleged to be facially unconstitutional."[122] Because questions of

intrusion on religious exercise must be "intelligently assessed against a developed factual

---

[117] *Hartz Mountain*, 727 F.2d at 1313.

[118] The Consortium does not claim that the NLRB has violated a provision of the NLRA, *see* Statement P. & A. 35-36, nor could it credibly do so given the Board's broad discretion over representation-case procedures, *see supra* n. 5, and the General Counsel's final authority over the disposition of unfair-labor-practice charges, *see supra* p. 3.

[119] 549 F.2d 5 (7th Cir. 1977).

[120] *Id.* at 7.

[121] *Id.*

[122] *Id.* at 9.

background" and "developing a factual record in labor disputes is a task peculiarly within the competence of the Board" the court recognized the importance of "permitting the exhaustion doctrine to run its normal course."[123] Here, each of the Consortium's claims involve an as-applied rather than facial challenge. There is therefore no justification for departing from the NLRA's statutory exhaustion requirement.[124]

The Consortium relies heavily on two out-of-circuit Pennsylvania district court cases, *McCormick v. Hirsch*,[125] and *Caulfield v. Hirsch*,[126] which disagreed with the holding in *Grutka*. The viability of this line of cases has subsequently been called into question within the Third Circuit.[127] And unlike this case, *McCormick* and *Caulfield* did not involve contested statutory questions such as whether the employer was a health care institution, or whether the employees were even teachers. Like *Catholic Bishop* itself, both cases involved unionization of lay-teachers in parochial schools. Here, the Consortium has asserted that it is an educational institution (rather than a "health care institution" as defined by Section 2(14) of the NLRA)[128] and that its residents

---

[123] *Id.*; *see also Bohon v. FERC*, 37 F.4th 663, 666 (D.C. Cir. 2022) (constitutional claims hold no "talismanic significance" excusing parties from exhaustion principles.

[124] The Consortium further suggests in passing that the ministerial exception to jurisdiction precludes processing of the Board's administrative proceedings. *See* Statement P. & A. 1 n.1. This claim, too, requires development of an evidentiary record regarding the duties and responsibilities of the residents and fellows in the proposed unit, *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 193-94, 196 (2012), and any dispute can be resolved as part of, or upon exhaustion of, the Board's administrative proceedings.

[125] 460 F. Supp. 1337 (M.D. Pa. 1978).

[126] 1977 U.S. Dist. LEXIS 15088, No. 76-279, 1977 WL 15572 (E.D. Pa. July 7, 1977).

[127] In *Bakery, Confectionery & Tobacco Workers' International Union, Local 6 v. NLRB*, 799 F. Supp. 507, 511 (E.D. Pa. 1992), the court refused to follow *McCormick*, noting that *Fay v. Douds*, 172 F.2d 720 (2d Cir. 1949), the doctrinal basis for both *McCormick* and *Caulfield*, had since been rejected by the Third Circuit in *NLRB v. Interstate Dress Carriers, Inc.*, 610 F.2d 99, 107 (3d Cir. 1979).

[128] 29 U.S.C. § 152(14).

and fellows should be treated like the faculty in *Catholic Bishop* and *Great Falls*. But these assertions are disputed by the Union, and it is far from cleaCar that the Consortium's position precludes the Board from conducting an inquiry that Congress assigned exclusively to it rather than district courts. To the contrary, Congress has made clear that the NLRB "shall investigate" representation petitions and it "shall provide for an appropriate hearing" if there is "reasonable cause to believe that a question of representation affecting commerce exists."[129]

Court decisions supporting the NLRB's actions—even those which may be at odds with the law of the circuit—also demonstrate "colorable support" that is sufficient to defeat an invocation of *Kyne* jurisdiction.[130] *Hanna Boys Center v. Miller*, *Hanna Boys Center v. NLRB*, and *St. Elizabeth*, discussed above,[131] show that the NLRB's decision to continue processing Cases 31-RC-312064 and 31-CA-312728, notwithstanding the Consortium's objections, is at least "colorable." And while the arguments presented by the Consortium concerning the NLRB's jurisdiction must be considered in the first instance by the Board, a D.C. Circuit decision upholding the application of the NLRA to another Adventist-run facility also provides "colorable support" for the NLRB to continue its inquiries here. In *Cap Santa Vue, Inc. v. NLRB*,[132] the D.C. Circuit considered and rejected an Adventist convalescent home's religious objection to an NLRB order requiring it to bargain with a union.

---

[129] 29 U.S.C. § 159(c)(1).

[130] *See Armco Steel Corp. v. Ordman*, 414 F.2d 259, 260 (6th Cir. 1969) (per curiam) (affirming denial of injunction of unfair-labor-practice proceeding despite an adverse Sixth Circuit decision on the same legal question where the Fifth Circuit had reached a contrary decision in a different case).

[131] *See supra* pp. 12-13.

[132] 424 F.2d at 890.

If all this "colorable support" weren't enough, the Consortium has not made the required "strong and clear" showing that engaging in the NLRB's statutory procedures will infringe on its religious liberty.[133] In fact, it has failed to even plead any facts supporting this contention. The Consortium has submitted evidence that it has religious objections to union membership and collective bargaining.[134]  But its sole support for its alleged injury based on participating in the NLRB's procedures is not bottomed in any religious doctrine, but from the application of the constitutional avoidance canon in *Catholic Bishop* and its progeny.[135] The NLRB's inquiry into the status of residents and fellows as teachers, students, doctors, or any combination of the three, is a secular question and "the First Amendment does not prevent courts [or the Board] from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters."[136] The Board is not being asked to opine on the validity of the Consortium's religious principles or resolve a question of faith. Because the matter before the Board may well be resolved on "entirely neutral methods of proof" that do not involve delving into spiritual questions, the Board and a reviewing court of appeals may decide the pending administrative cases on the basis of the records developed in each.[137]

---

[133] *United Food & Com. Workers, Loc. 400 v. NLRB*, 694 F.2d at 279.

[134] *See* Decl. of Dr. Giang, ECF No. 6-2, ¶¶ 15-16, and exhibits attached thereto.

[135] Statement P. & A. 36.

[136] *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 431 (2d Cir. 1999).

[137] *Minker v. Balt. Ann. Conf. of United Methodist Church*, 894 F.2d 1354, 1360 (D.C. Cir. 1990). In this case, the D.C. Circuit dismissed statutory discrimination claims brought by a minister, but remanded to the district court to consider his breach of contract claims. *See id.*

    ii.    Jurisdiction is not available under *Kyne* because the Consortium has a meaningful and adequate opportunity for judicial review of its claims.

The Consortium may obtain judicial review of the First Amendment arguments it makes here—and the RFRA claim, too, for that matter—by following the procedure prescribed by the NLRA, just as the employers did in *Catholic Bishop*, *Great Falls*, and many other cases. As the Supreme Court explained in *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*, there can be no "sacrifice or obliteration" of a right under *Kyne* where "a meaningful and adequate opportunity for judicial review" is available.[138] Sections 9(d), 10(e), and 10(f) of the Act, which, together, establish the procedures for indirect judicial review in representation cases and direct review in unfair-labor-practice cases, provide the Consortium with "a meaningful and adequate opportunity for judicial review."[139] "In *Kyne*, by contrast, the plaintiff in the district court was a labor organization. As a labor organization, it did not have the option, available to an employer, to seek indirect judicial review of the Board's action."[140]

In light of this important distinction, the D.C. Circuit has explained that "the *Leedom v. Kyne* remedy was not devised for the benefit of an employer."[141] "Indeed, the District of Columbia Circuit has opined that had the aggrieved party in *Kyne* been an employer and thus able to seek indirect judicial review, the Supreme Court probably would have held that the

---

[138] 502 U.S. 32, 43 (1991); *see Detroit Newspaper Agency v. NLRB*, 286 F.3d 391, 398 (6th Cir. 2002) (noting that the Supreme Court "rested its decision in *MCorp* solely on the basis that *MCorp* had available to it review in the appellate courts, thus making district court jurisdiction improper under *Leedom* [*v. Kyne*]"); *accord AMERCO v. NLRB*, 330 F. Supp. 2d 1083, 1086 (D. Ariz. 2004) (relying on *MCorp* and *Kyne* to deny a request to preliminarily enjoin a Section 10 unfair-labor-practice proceeding because "[t]he availability of appellate review weighs against applying a jurisdictional exception"), *aff'd*, 458 F.3d 883 (9th Cir. 2006).

[139] *MCorp*, 502 U.S. at 43.

[140] *Goethe House*, 869 F.2d at 80.

[141] *Id.* (citing *Atlas Life Ins. Co. v. Leedom*, 284 F.2d 231 (D.C. Cir. 1960)) (emphasis added).

district court lacked jurisdiction over the case."[142] Accordingly, as discussed above,[143] courts within and outside the D.C. Circuit have repeatedly and consistently dismissed lawsuits like this one when filed by putative employers.

**B. The Consortium has failed to show that it will suffer irreparable harm.**

Even assuming that this case is in the appropriate forum and that this Court has jurisdiction to hear the Consortium's claims, the Motion for a Preliminary Injunctive must be denied because the Consortium has not shown a likelihood of immediate or certain irreparable harm. The D.C. Circuit has set a high standard for demonstrating irreparable injury, noting that "proving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual - not theoretical - and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm."[144] At a minimum, a plaintiff must show a likelihood of irreparable harm, and not just a possibility.[145] As the D.C. Circuit has noted, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."[146]

In its Motion for a Preliminary Injunction, the Consortium has alleged two distinct types of harm resulting from the Board proceedings: being forced to choose between following the tenets of its religion or enduring civil sanctions and penalties, and being subjected to proceedings

---

[142] *Id.* (citing *Hartz Mountain*, 727 F.2d at 1312 n.2).

[143] *See supra* note 100.

[144] *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)) (internal quotation marks omitted).

[145] *See Winter*, 555 U.S. at 21-22 (holding that no injunctive relief may be ordered unless a plaintiff "demonstrate[s] that irreparable injury is likely in the absence of an injunction").

[146] *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Va. Petrol. Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

that infringe on its constitutional rights. Neither claim satisfies the high standard for demonstrating irreparable injury.

1.  Because the Consortium is not facing any threat of civil sanctions or penalties, it is not experiencing irreparable harm.

The Consortium claims that the Board representation proceeding is causing irreparable harm to its rights under RFRA because it would be "substantially burden[ed]" by being "force[d]… to choose between violating Church teachings [against recognizing and bargaining with a union] and risking a considerable penalty."[147] The Consortium's alleged fear of penalties and "civil sanctions"[148] is inadequate for three reasons.

First, the Board lacks the authority to sanction or penalize a party. Congress has authorized the Board to issue only cease-and-desist and "affirmative" remedies like backpay in ULP cases.[149] The Board has no power to sanction or penalize a party for violating the Act.[150] Indeed, courts have modified or refused to enforce Board remedial orders if they venture too close to a penalty, *i.e.*, going beyond merely making whole those persons injured by unfair labor practices.[151] Thus, the Consortium's purported fear of facing "civil sanctions" or "penalties" has no basis in law.

---

[147] Statement P. & A. 19.

[148] Compl. ¶¶ 38-39.

[149] *See* 29 U.S.C. § 160. The Board does not exercise its remedial powers in representation cases.

[150] *Loc. 57, Int'l Ladies' Garment Workers' Union v. NLRB*, 374 F.2d 295, 303 (D.C. Cir. 1967) ("[T]he purpose of Board remedies is to rectify the harm done the injured workers, not to provide punitive measures against errant employers."); *see also Republic Steel Co. v. NLRB*, 311 U.S. 7, 10 (1940) ("The Act does not prescribe penalties or fines in vindication of public rights . . . .").

[151] *See e.g. Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 50 (D.C. Cir. 1980) ("[I]n the circumstances of this case, a bargaining order would cross the line from a permissible remedy designed to deter future violations to an impermissible punitive measure."); *NLRB v. Douglas & Lomason Co.*, 443 F.2d 291, 295 (8th Cir. 1971) (changing the language in a notice posting, because "the remedy should not 'smack' of punitive action against the employer").

Second, the prospect of facing any Board-ordered remedies here is neither certain nor immediate, given the early stages of both the representation and ULP proceedings. There is no *imminent* threat that the Consortium will have to choose between disobeying a Board order or adhering to its religious tenets. As the Consortium acknowledges, there are multiple other steps which would have to occur before the Board could issue a reviewable final order in the underlying matters—including the NLRB's consideration and rejection of the very arguments the Consortium presses here. As such, the harm the Consortium fears "may be years away"[152] or may not ever happen.[153]

Finally, because Board orders are not self-enforcing, the Consortium would never have to comply with a final Board order before judicial review occurs. As explained above, any Board remedial order would be subject to judicial review in a court of appeals before compliance becomes mandatory. In that judicial proceeding, the court could review any properly preserved legal challenges to the Board's order, including "questions of the jurisdiction of the Board."[154] This process plainly constitutes meaningful and adequate judicial review. Accordingly, the alleged harm cannot be fairly described as irreparable.

2. The Consortium's participation in the Board's proceedings does not infringe on First Amendment rights and does not constitute irreparable harm.

The Consortium further argues that the Board's proceedings are themselves infringements of its rights under the Free Exercise Clause of the First Amendment.[155] It relies on remarks in *Catholic Bishop* stating that "[i]t is not only the conclusions that may be reached by

---

[152] Statement P. & A. 44.

[153] *See Chaplaincy of Full Gospel Churches v. United States Navy*, 697 F.3d 1171, 1175-76 (D.C. Cir. 2012) (potential future injuries do not support standing for injunctive relief).

[154] *Myers*, 303 U.S. at 49 (quoting *Jones & Laughlin*, 301 U.S. at 47).

[155] Statement P. & A. 36-37.

the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."[156] The Consortium also highlights caselaw involving faculty at religious educational institutions, to argue that any inquiry beyond the three-prong test in *Great Falls* causes irreparable harm.[157]

The Consortium's argument begs the question by assuming as premises issues that are in dispute. The risk of "impinge[ment]" described in *Catholic Bishop* is present when the inquiry involves faculty at a religious school. But the magnitude of that risk in any given case is a function of how closely a fact pattern hews to *Catholic Bishop* and its progeny. Here, the Consortium claims that residents and fellows—holders of graduate medical degrees participating in a "training" program[158]—are students from one perspective, but also teachers from another.[159] Does that make them indistinguishable from faculty? And though the Consortium claims that "the education of residents and fellows" in "Christian medical . . . patient care" is its raison d'être,[160] it also acknowledges that residents and fellows "gain their educational experience" from affiliates "and other health care facilities."[161] Does that mean that the Consortium is equivalent to a religious school? The answers to these questions are not obvious, and so the Consortium's claim that irreparable harm flows from being subject to Board proceedings borders on the "theoretical" rather than the "certain, great and actual."[162]

---

[156] 440 U.S. at 502 (emphasis added)

[157] Statement P. & A. 10-16.

[158] Mot. Prelim. Inj. ¶ 2.

[159] Statement P. & A. 12 n.7.

[160] Id. at 3.

[161] Id. at 2.

[162] *Power Mobility Coal.*, 404 F. Supp. 2d at 204.

Moreover, there are two practical realities that must be considered. First, the representation hearing is nearing completion and will likely close before this Court can decide the Consortium's preliminary injunction motion. Second, the Consortium could choose to limit its participation in NLRB proceedings to nothing more than arguing that the Board's potential exercise of jurisdiction is inconsistent with *Great Falls* and RFRA. Such a choice would be risky because it might forfeit any other merits arguments or defenses that the Consortium may have. But the Consortium assures this Court that the Board lacks jurisdiction over its labor relations, so perhaps the risk is not all that great. Generally, an argument is preserved for court review under the NLRA so long as it is "urged before the Board."[163] The Consortium therefore has an option to avoid the irreparable harm it claims the NLRB's proceedings inflict, while still preserving its jurisdictional arguments for a court of appeals to review.

Finally, to the extent that the pending representation hearing has gone beyond the scope of the *Great Falls* inquiry in exploring the Consortium's religious beliefs and practices, at least a portion of such inquiry has been at the behest of the Consortium's own counsel and witnesses. Over the Union's objections and despite the skepticism of the Board's hearing officer, the Consortium insisted that "to understand how [the Consortium] fits into the Church and to Loma Linda University Health and its relationship to the rest of the Church is important."[164] The Consortium then proceeded to direct its inquiries toward questions of its own religious

---

[163] 29 U.S.C. § 160(e). Indeed, it is questionable whether even this much is required if the Consortium is correct about its status. *See Carroll Coll., Inc. v. NLRB*, 558 F.3d 568, 574 (D.C. Cir. 2009) (permitting a religious college to challenge the Board's jurisdiction on review of a final Board order even though the college "did not raise the *Catholic Bishop* argument before the Board").

[164] Bd. Mot. Ex. 3 at 16-17 (Tr. 58-59).

philosophy and practice.[165] The Union's counsel (not the Board agent) asked questions related to religious practices of the Consortium's residency program only *after* the Consortium put extensive testimony regarding those very subjects into the record. Thus, the record shows that at least some of the harm the Consortium decries has been self-inflicted.

### C.  The balance of equities and public interest weigh strongly against granting the requested relief.

The remaining two preliminary injunction factors, the balance of equities and public interest, which merge in this case, strongly weigh against the requested relief. First, even if the relief requested is only temporary, the delay could have the practical effect of denying over 800 individual residents and fellows access to the statutory procedures needed to enable them to designate representatives of their choosing and to obtain a remedy for an alleged unfair labor practice under a duly enacted federal statute. Moreover, the NLRB's interest in effectuating congressional policy protecting the rights of employees and securing labor peace is an important part of the public interest. The concrete manifestations of this policy include ensuring "stabilization of competitive wage rates and working conditions" and preventing industrial strife.[166] Specifically here, preventing disruption of healthcare services to members of the

---

[165] *Id.* at 9-12 (Tr. 50-53) (obligation of Loma Linda University institutions to follow Adventist Church doctrine); 13-15 (Tr. 55-57), 35-36 (Tr. 102-03) (medical mission work of Adventist Church); 18-19 (Tr. 69-70) (how Adventist religious philosophy relates to healthcare); 21-21 (Tr. 83-84) (combining spirituality with healthcare practice); 21-24 (Tr. 84-86), 34-35 (Tr. 101-02) (role of religion and spirituality in the residency application process); 23-28 (Tr. 86-91) (role of religion in creating "spiritual care" training modules for residents); 28-32 (Tr. 91-95) (the Consortium's use of "spiritual care" techniques when caring for patients); 33 (Tr. 97) (the Consortium's use of prayer with patients); 41-43 (Tr. 147-49), 44 (Tr. 151), 45-46 (Tr. 154-55), 49-53 (Tr. 164-168)  (Adventist Church's teachings and position with regard to unions); 47-48 (Tr. 159-160) (how the Gospels of Matthew, Mark, Luke, and John relate to the Church's healing ministry); 54-55 (Tr. 184-185) (how the chaplains are involved in providing spiritual care in coordination with the residents visiting patients); 56-57 (Tr. 186-187) (application of Loma Linda Health's spiritual plan to the Consortium).

[166] 29 U.S.C. § 151.

community served by the Consortium's residents and fellows and disruption to the professional development of residents and fellows occasioned by labor strife also cannot be seriously doubted as relevant to these factors. Finally, the Court must consider the practical effect of the relief requested on the purported First Amendment interests of the Consortium, the First Amendment interests of residents and fellows, and the burdens on state and local authorities who may be called upon to police the labor relations between the Consortium, its residents and fellows, and their Union in absence of NLRA jurisdiction.

1. Delay is harmful and likely prejudicial to the rights of third parties not before the Court.

Initially, under the particular facts of this case, delays imposed by the requested relief would be highly prejudicial to these residents and fellows and their ability to effectively make use of the NLRB's statutory procedures. In June of each year, a significant fraction of them will complete their residency or fellowship program and be replaced by recent graduates.[167] Organizing a new bargaining unit is resource intensive and time-consuming affair on the part of both employees and Union representatives. Allowing delays to prevent an election among the current unit just as support has reached a critical mass is not equitable. Nor are delays in ULP cases cost-free. It may do the NLRB little good to obtain eventual reversal or vacatur of an injunction prohibiting the processing of an unfair-labor-practice charge if, in the interim, "records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused."[168]

---

[167] The Consortium's Statement of Position, Board Case No. 31-RC-312064, at 2 (attached as Bd. Mot. Ex. 4).

[168] *IAM Loc. Lodge No. 1424 v. NLRB*, 362 U.S. 411, 419 (1960) (internal quotation mark omitted) (quoting H.R. Rep. No. 80-245, at 40 (1947)).

2.  Congress clearly wanted to extend the NLRA to health care workers in nonprofit
    settings to improve working conditions and avoid labor unrest.

These residents and fellows invoked the protections of the NLRA to secure

improvements in their terms and conditions of work, which also implicate their ability to provide

care for patients in the community.[169] Poor working conditions, including unfavorable pay and

long hours for residents and fellows, figured prominently in Congress's decision to extend the

NLRA's coverage to nonprofit hospitals and other health care institutions nearly fifty years

ago.[170] The overall policies of the NLRA are informed by the fact that rights to bargain and act

together at individual workplaces has an aggregate effect on wages and working conditions in

various industries and sectors of the economy.[171] The requested injunctive relief would deny

access to the NLRB's procedures to the Consortium's residents and fellows. This would

undermine the NLRA's policy by impairing their bargaining power in a labor market that has a

profound effect on the local and national economy, contrary to the public interest.

Labor peace, particularly at health care institutions, is also not an abstract concern. As

Congress found when enacting the NLRA, denial of the "right of employees to organize and the

refusal by some employers to accept the procedure of collective bargaining lead to strikes and

---

[169] *See Loma Linda Resident and Fellow Physicians Seek to Form Union*, UNION OF AMERICAN PHYSICIANS & DENTISTS (Mar. 7, 20203), https://www.uapd.com/2023/03/loma-linda-resident-and-fellow-physicians-seek-to-form-union/.

[170] Senator Alan Cranston, who was the cosponsor and floor manager of the Senate bill that extended the NLRA to nonprofit hospitals, explained that the bill was designed to remedy the "notoriously underpaid" working conditions of the average "intern, resident, or fellow [who] works 70 to 100 hours per week, and earns about $10,000 per year." LEGISLATIVE HISTORY OF THE COVERAGE OF NONPROFIT HOSPITALS UNDER THE NATIONAL LABOR RELATIONS ACT, 1974, at 93 (1974).

[171] 29 U.S.C. § 151.

other forms of industrial strife or unrest."[172] And, significantly here, when extending the

protections of the NLRA to non-profit healthcare institutions in 1974, the legislative record

reflects that the relevant Senate Committee was "impressed with the fact, emphasized by many

witnesses, that the exemption of nonprofit hospitals from the Act had resulted in numerous

instances of recognition strikes and picketing."[173] The Board specifically considered this

problem when it determined that interns, residents, and fellows should be covered by the NLRA:

"employee status will have the beneficial purpose of bringing them within the ambit of the Act,

and providing a mechanism for resolving recognition and other representation issues without

resort to such tactics."[174] A recognitional strike or picketing arising from the ongoing labor

disputes now pending before the Board or future labor disputes would adversely affect the public

interest, and as discussed below, withdrawal of access to NLRB procedures encourages this

outcome.

      3.   State law may not adequately fill the jurisdictional gap the Consortium desires.

      By seeking exemption from the NLRA on the same grounds as the parochial school as

*Catholic Bishop*, the Consortium's position could result in state law filling the jurisdictional

gap.[175] But California has taken a largely hands-off approach to the labor rights of workers in the

---

[172] Id.

[173] S. Rep. No. 93-766, at 3 (1974), *reprinted in* LEGISLATIVE HISTORY OF THE COVERAGE OF NONPROFIT HOSPITALS UNDER THE NATIONAL LABOR RELATIONS ACT, 1974, at 10. The Committee then went on to note that "[c]overage under the Act should completely eliminate the need for any such activity, since the procedures of the Act will be available to resolve organizational and recognition disputes." *Id.*

[174] *Bos. Med. Ctr. Corp.*, 330 NLRB 152, 163 (1999).

[175] Notably, the Supreme Court of New Jersey has found that in the absence of NLRB jurisdiction, parochial schoolteachers possess collective-bargaining rights under state law notwithstanding the Supreme Court's holding in *Catholic Bishop*. *See S. Jersey Catholic Sch. Teachers Org. v. St. Teresa of the Infant Jesus Church Elem. Sch.*, 696 A.2d 709, 714 (N.J.

non-agricultural private sector, leaving such workers free to use self-help measures.[176] By contrast, the NLRA establishes a comprehensive administrative machinery that is designed to peacefully resolve various labor disputes and manifestations of industrial unrest. And with respect to heath care institutions, where residents and fellows receive their training, the NLRA provides a ten-day notice requirement before unions can "engag[e] in any strike, picketing, or other concerted refusal to work."[177]

Preserving NLRB jurisdiction here would thus serve the public interest in two important ways. First, it would forestall the potentially dangerous possibility of largely unregulated labor disputes taking place in a healthcare context. Second, it would avoid saddling state courts or local governments with the administrative burdens of trying to resolve labor disputes they had assumed were subject to federal regulation.

---

1997). And ironically, the immodest relief the Consortium seeks from this Court might afford it less, rather than more, protection for its religious freedom. By casting the subject of its labor relations to California authority rather than the NLRB's jurisdiction, the Consortium would lose whatever benefits RFRA provides. *See City of Boerne v. Flores*, 521 U.S. 507, 511, 534 (1997) (finding that RFRA would impermissibly "curtail [states'] traditional general regulatory power" and impose "substantial costs" on them).

[176] *See* Cal. Lab. Code §§ 920-923 (the "little Norris-LaGuardia Act" generally precluding injunctive relief in labor disputes absent unlawful acts and prohibiting contracts preventing membership in a union); Cal. Civ. Proc. Code § 527.3 (stating policy against interference in labor disputes and enumerating acts not subject to injunctive power of courts). There are a few exceptions to the state's hands-off approach. *See* Cal. Lab. Code §§ 1115-20 (prohibiting jurisdictional strikes, which involve disputes where multiple unions are vying to represent the same group of employees); Cal. Lab. Code § 1122 (providing a cause of action for damages by employer dominated unions); Cal. Lab. Code § 1130 (regulating use of professional strikebreakers).

[177] *See* 29 U.S.C. § 158(g).

4.   The constitutional interests at issue here are not one-sided.

There is undoubtedly a "vital public interest in safeguarding religious freedoms protected by the Constitution and by statutes enacted by Congress."[178] While the Consortium's RFRA and constitutional claims sound in the First Amendment, the fundamental right of employees to organize and designate representatives to deal with their employer also has a significant constitutional dimension.[179] The "conjunction of liberties" protected by the First Amendment "is not peculiar to religious activity and institutions alone."[180] Accordingly, it is difficult to see how the sweeping injunction sought by the Consortium would outweigh demonstrable harm to the interests of the public and other third parties not before the Court.

## CONCLUSION

WHEREFORE, the Board respectfully requests that its Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) be granted. In the alternative, should the Motion to Transfer Venue not be granted, the Board respectfully requests that the Court deny the Consortium's Motion for a Preliminary Injunction.

A proposed order is attached.

---

[178] *Roman Catholic Archbishop v. Bowser*, 531 F. Supp. 3d 22, 47 (D.D.C. 2021).

[179] *See Ukiah Adventist Hosp.*, 332 NLRB 602 (2000) ("The right of employees to self-organization is constitutionally protected; it is a fundamental right implicit in the First Amendment's free assembly language." (citing *Shelton v. Tucker*, 364 U.S. 479, 485-87 (1960), and *Thomas v. Collins*, 323 U.S. 516, 532 (1945))).

[180] *Thomas*, 323 U.S. at 531; *see also Shelton*, 364 U.S. at 485-88; *Senn v. Tile Layers Protective Union*, 301 U.S. 468, 478, 482-83 (1937); *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 513-14 (1939); *Thornhill v. Alabama*, 310 U.S. 88, 102-03 (1940).

Respectfully submitted,

DAWN L. GOLDSTEIN
*Assistant General Counsel*

KEVIN P. FLANAGAN
*Supervisory Attorney*

/s/ David Boehm
DAVID BOEHM
*Trial Attorney*
Bar No. 103755
David.boehm@nlrb.gov
Tel: (202) 273-4202

AARON SAMSEL
*Trial Attorney*

TYLER JAMES WIESE
*Trial Attorney*

National Labor Relations Board
Contempt, Compliance & Special Litigation Branch
1015 Half Street, S.E. - 4th Floor
Washington, DC 20003

Dated: March 31, 2023