EXHIBIT B

JD–14–23
Saint Leo, FL

### UNITED STATES OF AMERICA
### BEFORE THE NATIONAL LABOR RELATIONS BOARD
### DIVISION OF JUDGES

**SAINT LEO UNIVERSITY INCORPORATED**

   **and**                                               **Cases 12-CA-275612, 12-CA-275617,**
                                                            **12-CA-275639, 12-CA-275640,**

**UNITED FACULTY OF SAINT LEO,**              **12-CA-275641, 12-CA-275642,**
**NATIONAL EDUCATION ASSOCIATION**     **12-CA-275644, 12-CA-275645,**
**FLORIDA EDUCATION, AMERICAN**            **12-CA-284360**
**FEDERATION OF TEACHERS, AFL-CIO**

*John W. Plympton* and *Steven Barclay, Esqs.*,
    for the General Counsel.
*Amy M. Gaylord* and *Scott T. Silverman, Esqs.*,
    *(Akerman, LLP)*, for the Respondent.
*Heidi B. Parker, Esq., (Egan, Lev & Siwica,*
    *P.A.)*, for the Charging Party.

### DECISION

#### STATEMENT OF THE CASE

    **IRA SANDRON, Administrative Law Judge**.  This case arises from a consolidated complaint issued on August 11, 2022, based on charges that the Charging Party (the Union) initially filed on April 14, 2021, against the Respondent (the University), relating to full-time faculty that the Union has represented.

    Pursuant to notice, I opened the trial by Zoom on October 26, 2022, and thereafter held an in-person hearing in Tampa, Florida, on November 2–4 and 29–30, and December 1, during which I afforded the parties a full opportunity to be heard, to examine and cross-examine witnesses, and to introduce evidence.

#### ISSUES

    (1) Did the Respondent violate Section 8(a)(5) and (1) when it withdrew recognition on October 23, 2020,[1] and thereafter starting on about December 18, changed

---

[1]    All dates hereinafter occurred in 2020 unless otherwise indicated.

JD–14–23

terms and conditions of employment without the Union's consent; or was the University privileged to do so because (1) it is a religious institution exempt from the Act's provisions under *Bethany College,* 369 NLRB No. 98 (2020), and/or (2) its full-time faculty members are managerial employees excluded from the Act's coverage?

5

At the outset, I will address the position taken by counsel for the General Counsel (the General Counsel), both at trial and in his posthearing brief (GC Br. 66, et. seq.), that the Board should abandon *Bethany College*, the current state of the law regarding the religious institution exemption, and return to its prior standard in *Pacific Lutheran University,* 361 NLRB 1404 (2014) (*Pacific Lutheran*).  I repeat what I stated at trial; that I am bound by the Board's governing decision in *Bethany College* and that arguments that the Board should return to its prior standard must be addressed to the Board.[2]

10

15

I allowed the General Counsel to inquire into areas potentially relevant under *Pacific Lutheran* in order to develop a full record for the Board in the likely event that this decision goes before it, the General Counsel reiterates arguments in support of return to the *Pacific Lutheran* standard, and the Board chooses to revisit the criteria for determining whether an institution qualifies for the religious exemption.  However, this decision will focus only on facts relevant under *Bethany College*.

20

(2) Did the Respondent, since on about October 26, violate Section 8(a)(5) and (1) by bypassing the Union and dealing directly with unit employees by soliciting their input for a new faculty handbook containing revised terms and conditions of employment?

25

(3) Did the Respondent violate Section 8(a)(1) by maintaining unlawful rules since October 8, 2021?

### WITNESSES AND CREDIBILITY

30

The General Counsel called:

(1) Dr. Brian Camp (Camp), former associate professor, Biology and Mathematics Department.

35

(2) Dr. Patrick Crerand (Crerand), former professor, Language Studies and the Arts Department.

(3) Dr. Andrew Gold (Gold), associate professor, Management Department.

(4) Dr. Thomas Humphries (Humphries), associate professor, Philosophy, Theology, and Religion Department.

---

[2] The same holds true for the General Counsel's argument (GC Br. at 95, et. seq.) that the Board should abandon the current standard for evaluating facially neutral work rules set out in *Boeing Co.*, 365 NLRB No. 154 (2017), and return to the standard in *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004).  In *Stericycle, Inc.*, 371 NLRB No. 48 (2022), the Board invited briefs addressing whether the Board should continue to adhere to the *Boeing Co.* standard.

EXHIBIT B

JD–14–23

    (5) Dr. Christopher Miller (Miller), professor, Natural Sciences Department.

    (6) Dr. Stephen Okey (Okey), associate professor, Philosophy, Theology, and Religion Department.

    (7) Dr. Valerie Wright (Wright), Union president and professor, Elementary Education Department.

    (8) As a 611(c) witness, Dr. Mary Spoto (Spoto), vice president of academic affairs (VPAA).

The Respondent called:

    (1) Spoto.

    (2) Father Randall Meissen (Meissen), former chaplain and director of University Ministry.

Many salient facts are undisputed, and credibility resolution is generally not pivotal. Suffice to say, witnesses appeared candid and to answer questions as best as they could, realizing that many events occurred years ago and/or over a period of years.

As to the discrepancies between the General Counsel's witnesses and Spoto on the issue of the managerial role of full-time faculty, I credit their consistent testimony over hers. In doing so, I take into account the following precepts.

Firstly, "[T]he testimony of current employees which contradicts statements of their supervisors is likely to be particularly reliable because these witnesses are testifying adversely to their pecuniary interest." *Flexsteel Industries*, 316 NLRB 745, 745 (1995), enfd. mem. 83 F.3d 419 (5th Cir. 1996).

Secondly, the testimony of former employees is considered in the context of their having no interest in the outcome of the proceedings and, in the absence of demonstrated bias either for or against the respondent, is also likely to be reliable.

Finally, as the General Counsel points out (GC Br. 51–52), Spoto's testimony regarding whether a course or program can be brought before the curriculum committee for approval without a dean's approval was equivocal and contradicted by her affidavit, and her vague testimony on cross-examination about a student protest against having a Starbucks on campus was suspiciously refreshed when the Respondent's counsel questioned her the following day. Moreover, she was evasive when asked whether job postings must be approved by department chairs.

### FACTS

Based on the entire record, including testimony and my observations of witness demeanor, documents, stipulations, and the thoughtful posttrial briefs that all parties filed, I find as follows.

EXHIBIT B

EXHIBIT B

JD–14–23

The Respondent is a 501(c)(3) not for profit corporation with its principal office and place of business in Saint Leo, Florida, engaged in the business of operating a private nonprofit university.  The Respondent admits that at all times material, it has been an employer engaged in commerce within the meaning of the Act.

5

The University is a member of the American Association of University Professors (AAUP), the Association of Catholic Colleges, and the Association of Benedictine Colleges and Universities.

10

### Organization

The academic organizational structure of the University from bottom to top is: (1) departments headed by chairs (undergraduate) or program directors (graduate);[3] (2) colleges headed by deans; (3) vice-chairs, including the VPAA; and (4) the president, who reports to

15   the board of trustees (the board), which has ultimate authority over the University's operations.  See the University's current bylaws (R. Exh. 51 at 2).

The board is composed of approximately 30 individuals.  The bylaws state that the board shall select one member from the Saint Leo Abbey (currently, Abbot Isaac Camacho)

20   and one from the Benedictine Sisters (currently, Sister Roberta Bailey, the prioress).  They are not subject to the term restrictions applicable to other board members.  In addition, Bishop Gregory Parkes of the Diocese of St. Petersburg sits on the board.  The practice has been for the chair to be Catholic, although the bylaws do not require this.

25   As VPAA, Spoto has responsibility for all academic and academic support entities operating on campus, including four main colleges, the Department of Learning Design, three centers, the registrar's office, and the library.

The total number of students is over 9000; approximately 2000 students attend in-

30   person classes on campus in Saint Leo (university campus), approximately 6000 students attend exclusively online, and the remainder attend in-person classes in approximately 12 satellite campuses in Florida, Georgia, and Texas.

### Relationship with the Union

35

There are approximately 130 full-time faculty based on the main campus, with many teaching both in-person and online classes.

The Union was certified on May 26, 1976, as the exclusive collective-bargaining

40   representative of a unit of all full-time faculty members employed at the university campus, including area coordinators and faculty librarians.[4]  (GC Exh. 36.)  Thereafter, the parties

---

[3]   Hereinafter, both will be referred to as chairs.  Chairs have administrative duties and reduced teaching responsibilities and are therefore not full-time faculty.

[4]   The position of area coordinator no longer exists.

4

JD–14–23

entered into a series of collective-bargaining agreements, the most recent of which was effective by its terms from June 6, 2013, to August 15, 2016 (the CBA).  (Jt. Exh. 1.)   The University's mission statement is the preamble:  "Saint Leo University is a Catholic, liberal arts-based university serving people of all faiths.  Rooted in the 1,500-year-old Benedictine
5      tradition, the University seeks balanced growth in mind, body and spirit for all members of its community. . . ."  Id. at 1.

The parties agreed to maintain the terms of the CBA until negotiation of the terms of a successor agreement (see GC Exh. 37, a memorandum of understanding), and the University
10     did so until October 23, 2020.  Prior to that date, the parties met numerous times for negotiations but never reached full agreement.

On October 23, the board passed a resolution immediately withdrawing recognition of the Union under *Bethany College*, supra, creating a shared governance model, and replacing
15     the existing university senate (senate) with a new "faculty senate."  (GC Exh. 18.)

On the same date, the University announced this decision to the Union and to all faculty through emails from various officials.  (GC Exhs. 38–41.)  One was from Spoto, who announced that under shared governance, a new faculty senate would be created, and a
20     guiding faculty handbook would be issued.  Spoto followed up by calling many meetings for the faculty to  discuss transition to a shared governance model.  See GC Exh. 20, an October 27 email rescheduling the first meeting.  Although bylaws for the new faculty senate have been drafted (without consultation with the Union), they have not yet  received final approval from President Edward Dadez (Dadez), and the faculty senate has not yet met.  The senate
25     continues to operate.

The Respondent admits that starting on October 26, it bypassed the Union and dealt directly with unit employees by soliciting their input for a faculty handbook that changed terms and conditions of employment.
30

### Subsequent Unilateral Changes

On December 18, Spoto announced to the faculty that an attached interim faculty handbook would be in effect until a final handbook was developed.  (GC Exh. 22.)  The
35     interim handbook (GC Exh. 23) outlined new or modified provisions vis-à-vis the CBA, including changes in tenure, workloads, evaluations, and other terms and conditions of employment.  The University announced and later implemented most of the terms of the interim handbook without affording the Union an opportunity to bargain or bargaining to impasse.
40

Before this, there was no handbook for full-time faculty; rather, there was a handbook that covered only nonbargaining unit adjunct faculty and faculty at satellite centers.

In April 2021, the University issued a faculty handbook (handbook) (GC Exh. 33) that
45     superseded the interim handbook but contained substantially the same provisions.  As with the

JD–14–23

interim handbook, there was no prior bargaining with the Union.

Wright testified to the following differences between the handbooks and the CBA:

5

(1) The CBA had no evaluation section or article.  The handbook has such a section.
(2) With the CBA, the Union negotiated salary increases for all faculty by category.  In the handbook, increases are determined person-by-person, based on their evaluations.
(3) The CBA allowed up to 20 hours of outside employment.  The handbook has a maximum of 10 hours without approval.

10

(4) Under the CBA, full-time faculty were given preference for teaching alternative format courses (on-line).  They have no such preference in the handbook.
(5) The CBA required that tenure committee deliberations be recorded and saved for 7 years (although Wright testified that, in practice, deans have the discretion whether to record).  The handbook requires only a written memorandum be saved for 2 years.

15

(6) Under the CBA, denial of promotion and tenure could be grieved.  Under the handbook, only the process, not the decision, can be grieved.
(7) The CBA had a 5-year limit on use of visiting faculty members (who are hired on an annual basis and not on a tenure track).  The handbook changes the definition of visiting faculty and has no duration limitation.  According to Wright, this can lead to less stability in a department and the fear that tenured faculty could be replaced with visiting faculty, who lack job security.

20

(8) The CBA defined the academic year as 9 calendar months beginning by August 9 and ending no later than May 8.  The handbook sets out no specific number of months or specific dates.  According to Wright, this negatively affects planning for vacations.

25

(9) Overload is the term for more than the normal workload.  The CBA provided that a faculty member was allowed to teach one overload, two with the chair's permission, and three with the dean's permission.  The handbook requires approval from the chair and dean to teach even one overload class.

30

(10) The academic freedom statement in the handbook was changed from the CBA and eliminated mention of AAUP principles.

35

## The University's Religious Affiliation

Benedictine monks established the University in 1889.  (R. Exh. 1.)  The St. Leo Benedictine Abbey, which includes a monastery church and the monks' residences and offices, is located near the middle of the campus and is not physically demarcated.  The residences of the Benedictine Sisters are located just off campus, and a cemetery for deceased monks and Sisters is located at the edge of campus.  There is also a student chapel (St. Jude).  St. Francis Hall, the administration building, is named after St. Francis of Assisi; the clock tower for the student activities building has a Benedictine cross; there are two statues of Mary on campus; and at least many classrooms have crucifixes at or near their doors.

40

45

6

EXHIBIT B

The Policy Manual Governance and Administration, February 2008 (Jt. Exh. 2), applies to all employees regardless of their locations.  It contains the mission statement in the CBA's preamble, set out above (at 38).

5      The values statements (ibid at 38–39) list the Benedictine values of excellence, community, respect, personal development, responsible stewardship, and integrity.  Religious references are:  (1) under community, "[D]evelop[ing] hospitable Christian learning communities. . . ."; (2) respect starts with, "Animated by the spirit of Jesus Christ. . . ."; and responsible stewardship starts with, "Our creator blesses us. . . . ."  The college seal is a cross

10  based on the cross of Saint Benedict.  (Id. at 32–33.)

Numerous videos taken from the University website were shown during the course of the trial.  They are replete with repeated references to the University's identity as Catholic/Benedictine.  For example, General Counsel Exhibit 12, screenshots from the

15  University's public website on October 23, 2020, contains the following:

    (1) A Catholic identity statement (at 3–4):  "Saint Leo University is a community rooted in the Catholic faith and in the spirit of our Benedictine founders.  As a Catholic institution of higher learning, Saint Leo University supports what *Ex*

20         *Corde Ecclesiae*[5] terms the four essential characteristics of a Catholic University."

    (2) Living Our Catholic Faith (at 6):  "Opportunities abound at our University campus for faith and spirituality in action.  University Ministry Programs[6] include eucharistic adoration, Sunday and weekday Mass and confession," and Voice of

25         Christ—student choir and band; Imago Dei–pro-life group; Rite of Christian Initiation for Adults; and Peer Ministry–students selected and trained to serve as spiritual partners for their campus peers.

See also, e.g., General Counsel Exhibit 10, a printout from the University's old

30  website, which references the University's Catholic identity and its core values based on the Rule of St. Benedictine.  The  core values are posted in various places on campus, including many classrooms and the student resident hall.

Meissen, who was chaplain until November 1, 2022, was in charge of the ministry

35  programs, including all those described above.  Many of the University's webpages describe these programs and/or show photographs taken of  ministry events, frequently in religious settings.

Confession is regularly scheduled twice a week and by appointment.  Meissen also

40  organized other events, including having three speakers a semester talk on faith-related subjects.  See Respondent Exhibit 140, a printout of the October 2022 PowerPoint

---

     [5]   A document promulgated by Pope John Paul II speaking to the nature of a Catholic university.  (GC Exh.44.)

     [6]   Also called campus ministry (ministry).

EXHIBIT B

EXHIBIT B

JD–14–23

presentation that he made to the board's student affairs subcommittee, showing ministry activities during the year.  See also Respondent Exhibit 18, a ministry schedule of Mass, Confession, and Adoration & Praise and Worship, created early in the fall semester 2021 and distributed throughout the campus.  See also, e.g., Respondent Exhibit 43, a summer
5      orientation for new students, setting out ministry activities (at 3–5).

For certain special religious occasions (Special Mass of the Holy Spirit, Feast of St. Leo, and Patron Feast Day), class schedules are modified so that no classes are held at those particular times.  Meissen testified that such observances were held in the Abbey church, the
10     student chapel, or the gymnasium, with an average number of 200 students in attendance (others participated online).  The ministry has also held welcoming events for incoming students who wish to attend, as well as organized recreational and community service trips with a faith-based component.

15     Ministry staff say prayers at campus events, some professors start their classes with a prayer, and the senate opens with a prayer.  On new student weekends, at the start of the school term, Meissen opened with a prayer.  When Dr. Jeffrey Senese was publicly sworn in as president, he took the Catholic Oath of Fidelity and gave the Catholic Profession of Faith.[7]

20     The University offers a Catholic Promise Award (see R. Exhs. 46, 47) to students who meet its requirements, one of which is graduating from a Catholic high school.  A general education requirement is to take three classes (nine credits) in religion.

The General Counsel's witnesses who testified about the circumstances around their
25     being hired were aware of the University's Catholic identify either before they applied for employment or during the interview process.

Participation by faculty and students in Campus Ministry and other religious activities is voluntary.  No faculty or students have been disciplined for not attending such functions.
30     Neither faculty nor staff are required to read *Ex Corde Eccleciae* or the Rule of St. Benedictine.

**Faculty's Managerial Role**

35     Faculty do not set the overall University general admissions standards, establish graduation standards, establish tuition and fees, determine the size of the student body, create the budget, decide the distribution of financial aid, or decide the renewal of contracts for instructors.

40     They play no role in the selection of deans and chairs.  The dean determines the department chair and may change the chair from semester to semester without prior notice to the department faculty.  In this regard, in a 2022 Zoom meeting, in response to a question,

---

[7]      Dadez, who assumed the presidency in the summer of 2022, has not yet had a swearing-in ceremony.

EXHIBIT B

JD–14–23

Dean Susan Kinsella stated that it would be inappropriate for faculty to choose their chairs or to rotate in that position.

### College/Department Structuring

5

The University has established new colleges without faculty approval, such as the College of Health Professions and the school of "CARDS" (computing artificial intelligence, robotics, and data science).

10    The faculty does not decide the composition of a college or the college in which a course will be taught.  For examples, the faculty was not consulted before (1) the Biology and Mathematics Department was split in October 2020, with Mathematics going to a new college as a separate department, and Biology being made its own department; and (2) the recent decisions to transfer a computer class from the College of Business, in which it historically
15    was taught, to the Center for Alternative Pathways; and to remove Philosophy from the Philosophy, Theology, and Religion Department.

The same holds true for the establishment or reconstitution of degree programs.  Thus, in approximately 2022, the administration made decisions to have the B.A. in Religion
20    removed from in-person on campus to online only, and to establish a new degree, B.A. in Religious Studies, to be taught on campus.  These were not faculty proposals, and the faculty played no role in the decisions.  Spoto testified that the dean made the decision to make the B.A. Religion solely online and that the idea and decision to establish the new B.A. in Religious Studies came from the administration.

25

Camp suggested developing bachelor's and master's in science degrees to his chair, Siamack Bondari, who never acted on his proposals.  He testified that in the past, if the chair said yes and the dean said no, or if the chair said no, a faculty proposal for a new degree program went no further.

30

### Class Schedules

Under the CBA, the course load is eight courses, four in the Fall and four in the Spring, but it has been common for faculty to teach 10–12 over the year, including summer
35    and overloads.

The chair makes the decision whether a class will be taught on campus or online in a given semester.  Faculty can express their preferences, but the chair has the final word.  One semester, Camp requested an online course as an overload, but Bondari responded that it had
40    to be online.  Similarly, if Camp or another faculty asked to teach a particular course the following semester, Bondari might say no.  Camp further testified that Bondari put the needs of adjunct professors over faculty scheduling requests and that it was difficult for Camp to get his classes scheduled at the times he wanted.  Humphries requested to teach two classes a couple of years ago, but Chair Randall Woodard told him not to pursue the subject.

45

JD–14–23

### *University Senate and its Committees*

The senate and its committees are governed by the senate's constitution (GC Exh. 34) and bylaws (GC Exh. 35).  It is composed of faculty, administrators, and administrative staff,
5   as are its approximately 13 committees.   The faculty members of the committees are voted on by their peers and usually can serve two consecutive fixed terms, with the opportunity to return after a hiatus.  Only the faculty members are voting members; the others are ex officio and do not have votes.  Any recommendations of the senate committees that have a budgetary impact require the administration's approval.
10

Gold, who has not been  a union member or supporter because he does not feel that the Union has acted in the best interests of the faculty, was president of the senate from Fall 2018—January 2022.  He could recall no instances where the University implemented any of the senate's committees' recommendations.  As an example, he cited the technology
15   committee's recommendations that were ignored.

Over a number of years, many changes were made without input from the faculty senate or otherwise from the faculty, including the closing of centers.  The senate did not vote on the new handbook.
20

Senate committees listed in the bylaws include:

(1)  Academic Standards and Policy

25   These committees (graduate and undergraduate)  primarily handles cases involving alleged student academic dishonesty.  They make determinations of sanctions, up to expulsion.  A student can appeal a decision to Spoto, who has the final say and can decide to reduce the penalty.

30   (2)  Catholic Identity

Okey served on the committee for 4 years starting in Fall 2018 and was chair the last year.  Father Michael Cooper (Cooper) was the chair for the first 3 years, Okey for the fourth.  The committee recommended a number of measures to enhance the Catholic identify on
35   campus, such as renaming generic street names after saints.  None of their recommendations were implemented.[8]

(3)  Program and Curriculum

40   There are separate undergraduate and graduate curriculum committees, which operate substantially similarly.

---

[8]  See R. Exh. 76 at 7, committee meeting notes of January 8, 2019, wherein there is a notation from Cooper that the president did not have time to look at their proposals.

EXHIBIT B

JD–14–23

Wright has served on both undergraduate and graduate curriculum committees and is currently in her fourth year in a row on the latter.  Department chairs have never served on those committees.

5        The graduate curriculum committee is composed of seven voting faculty members, 2 from each college and the librarian, and administrative support staff.  They are appointed by the senate, the dean or VPAA, or are administrative staff.  The committee meets once or twice a month and evaluates proposals for changed or updated courses or new programs, majors, minors, or specializations.  They review a submissions form (GC Exh. 9) and use a master
10      syllabus checklist (GC Exh. 31).

Page 3 of the submissions form states that  the dean's signed and dated approval is necessary for the proposal to be eligible to advance to the curriculum committee.  Spoto confirmed that such approval is required.  Faculty must adhere to the master syllabi, which
15      Spoto testified were created by then VPAA Maribeth Durst.

If everything is properly checked off, the committee will approve the proposal.  A proposal has never been rejected because of content.  The committees have final say over proposals, unless they are for new programs, which must go to the board's Academic Affairs
20      Subcommittee and then to the full board for approval.

### *Other Committees*

(A)     Promotion and Tenure Committee

25

The committee reviews the faculty member's portfolio and makes a recommendation for promotion and/or tenure to the chair, who writes a letter of support if he or she agrees. The matter then goes up the chain to the dean, VPAA, president, and the board.  In approximately 2016–2018, the president rejected the committee's recommendation, and the
30      faculty member filed a grievance.

Spoto testified that there have been occasions when she or the president did not accept the recommendation of the committee, and other times when the president recommended
35      someone to the board whom the committee did not recommend.

(B)     Hiring Committees

The University utilizes faculty hiring committees to interview new faculty applicants. They use interview panel guides, developed by Human Resources, which set out the factors to
40      use to rate candidates (see, e.g., GC Exh. 46).  A hiring committee makes recommendations to the dean, who makes the final hiring decisions.  It is undisputed that a chair or dean does not always accept those recommendations.

Spoto was evasive when asked whether job postings have to be approved by the
45      department chair, but her testimony clearly implied a yes answer: "Generally, the department

11

EXHIBIT B

JD–14–23

chair and the dean would—would work on—you know on ultimately, the final wording of a positing."[9]

> (C)      Search Committees

5

Either a faculty member asks to be on a department's search committee, or the chair asks him or her to serve.  The committee makes recommendations to the chair.  If the chair accepts the recommendations, he or she presents them to the dean.  If the dean agrees, the recommendations go to Spoto.  Either Spoto or one of her associates interviews the finalists, 10  and she makes the final decision.  Occasionally, the dean or Spoto disagree with committee recommendations.

### Alleged Unlawful Rules

15      The Respondent admits that since on about October 8, 2021, it has maintained the following rules in its policy manual:

> (a) Use of University Name, Seal, and Logo:

20      Members of the University community, either individually or collectively, shall not officially use the name, seal or logo of Saint Leo University in any activity outside of the regular work of the University. Violation of this rule is regarded as sufficient cause for dismissal or expulsion. Saint Leo University's name, seal, and logo are the exclusive property of the University and, 25      consequently, may not be used in connection with goods or services offered by any outside organization without the prior permission of the Vice President for University Advancement.

> (b)      Types of Confidential Information

30      Confidential  information  includes,  but  is  not  limited  to  information concerning:

. . . . .

35      2.  Current, former and prospective employees (employment, pay, health, insurance data, and other personnel information).

3.  Current former and prospective faculty, and adjunct faculty 40      (employment, pay, health, insurance data, and other personal information).

. . . .

---

[9]   369 Tr. 235.

12

**JD–14–23**

     (c)     Media Contacts

5               Employees may not comment on University business to representatives of the press (radio, television, or print media) without authorization from the University Communications Office. Inquiries from campus or other media must be referred to the University Communications Office.

**ANALYSIS AND CONCLUSIONS**

10

**Respondent as an Exempt Religious Institution**

     Both the Board and the courts have wrestled with the difficult task of achieving the proper balance between protecting employee rights under the Act and ensuring the religious
15    freedom accorded religious institutions under the First Amendment.

     In *Pacific Lutheran*, supra, the Board held that a religious institution is not exempt from the Board's jurisdiction unless it meets the threshold requirement that it holds itself out as providing a religious educational environment and then that it holds out the faculty
20    members as performing a religious function, i.e., they perform a specific role in creating or maintaining the university's religious educational environment.

     In *Bethany College,* supra, the Board overruled that aspect of *Pacific Lutheran* and adopted the D.C. Circuit's three-pronged standard announced in *University of Great Falls v.*
25    *NLRB*, 278 F.3d 1335 (D.C. Cir. 2002).  The Board found that the D.C. Circuit correctly interpreted the Supreme Court's holding in *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490 (1979).  The Board held:

30         [I]n determining whether to assert jurisdiction over the faculty of an educational institution claiming exemption under the principles set forth in *Catholic Bishop*, we will inquire only whether the institution (a) holds itself out to the public as a religious institution, (b) is nonprofit, and (c) is religiously affiliated.  (slip op. at 1) (footnotes omitted)

35   The Board also cited *Duquesne University of the Holy Spirit v. NLRB*, 947 F.3d 824 (D.C. Cir. 2020), rehearing denied en banc, 975 F.3d 13 (D.C. Cir. 2020).  Therein, the court held that the Board lacked jurisdiction because "Duquesne is a non-profit school affiliated with the Catholic Church and the Spiritan religious order, and Duquesne holds itself out as providing a religious educational environmental by publicly identifying itself as a Catholic institution
40    guided by Catholic principles, providing regular Catholic religious services on campus, and encouraging students to participated in religious groups, lectures, and projects." (Ibid at 833) (footnote omitted).

     Clearly, the Respondent meets the *Bethany College* criteria for religious exemption
45    from the Act's coverage:  it is nonprofit; religiously affiliated; and in many and highly visible

13

EXHIBIT B

ways, both on campus and on online, regularly holds itself out to the public and to students as a religious institution guided by Catholic principles.  As in *Duquesne University*, above, numerous Catholic religious services and projects take place on campus, and students are encouraged to participate in them.

5

The *Bethany College* standards do not entail determining what degree of affiliation or religious participation by faculty and students is necessary for an exemption; there is no requirement that a university mandates that faculty or students be Catholic or participate in religious activities.  Nor do the standards provide for judging whether the degree of the
10   Respondent's Catholic/Benedictine nature is outweighed by its secular nature.  Put another way,  nothing in the appropriate analysis places the burden on the Respondent to demonstrate an overwhelming religious presence in order to qualify for an exemption.  Moreover, the parties' long bargaining history, cited by the General Counsel (GC Br. 65) for the proposition that the Respondent for decades saw no infringement on its First Amendment rights, is not a
15   relevant factor.

I therefore conclude that the Respondent is exempt from the Board's jurisdiction as a religious institution.

20                                   **Faculty Managerial Status**

In *University of Great Falls v. NLRB*, 278 F. 1335, 1347 (DC Cir. 2002), the court stated, "[B]ecause we have concluded that the University is not within the jurisdiction of the Board under the NLRA [as an exempt religious institution], we need not consider the
25   University's alternative claim that the Board's determination of the bargaining unit was erroneous."  The university averred that the faculty were not employees within the meaning of the Act, but rather managers under *NLRB v. Yeshiva University*, 444 U.S. 672 (1980).  See also *Carroll College, Inc. v. NLRB*, 558 F.3d 568, 575 (DC Cir. 2009).

30   In *Bethany College*, supra, slip op. at 1 fn. 4, the Board adopted this approach and stated, "The managerial status issue will be mooted in any case where a religiously affiliated school is deemed exempt from Board jurisdiction. . . ."

Nevertheless, I will address the issue of managerial status and the other allegations in
35   the complaint in the event that my decision that the University is an exempt religious institution is overturned and the determination made that the Respondent unlawfully withdrew recognition.

While the Act makes no specific mention of "managerial" employees, such employees
40   are excluded from the Act's coverage because their functions and interests are more closely aligned with management than with unit employees.  *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 286 (1974); *International Transportation Service*, 344 NLRB 279, 285 (2005).  As with alleged supervisory status, the party asserting managerial status has the burden of proving it. *Southern Monterey County Hospital*, 348 NLRB 327, 333 (2006); *Union Square Theatre*
45   *Management, Inc.*, 326 NLRB 70, 71 (1998).  In the university context, "[T]he party asserting

JD–14–23

managerial status must demonstrate that faculty actually exercise control or make effective recommendations." *Pacific Lutheran*, supra, at 1427.

5   In *NLRB v. Yeshiva University*, 444 U.S. 672, 683 (1980), the Court cited the general principle that "normally an employer may be excluded as managerial only if he represents management interests by taking or recommending discretionary actions that effectively control or implement employer policy." The Court determined that the faculty in question were managerial:

10   They decide what courses will be offered, when they will be scheduled, and to whom they will be taught. They debate and determine teaching methods, grading policies, and matriculations standards. They effectively decide which students will be admitted, retained, and graduated. On occasion their views have determined the size of the student body, the tuition to be charged, and the location of a school. (Ibid at
15   686) (fn. omitted).

*In Pacific Lutheran*, above at 1420, the Board set out the framework for analyzing whether college or university faculty are managerial: (1) examining the faculty's participation in academic programs, enrollment management, finances, academic policy, and
20   personnel policies and decisions, giving greater weight to the first three areas; and (2) then determining whether in the context of the university's decision making structure and the nature of the faculty employment relationship with the university, the faculty actually control or make effective recommendations over those areas.

25   The decision included a footnote that "[i]n those instances where a committee controls or effectively recommends action in a particular decisionmaking area, the party asserting that the faculty are managers must provide that a majority of the committee or assembly is faculty. If faculty members do not exert majority control, we will not attribute the committee's conduct to the faculty." (Id. at 1421 fn. 36.)
30

In *University of Southern California*, 365 NLRB No. 11 (2016) (*USC*), the Board extended application of this "subgroup majority status rule" to conclude that even if the employer's collegial bodies exercised actual control or effective recommendation over the *Pacific Lutheran* areas of consideration, such control or recommendation could not be
35   attributed to the faculty subgroup in question because they were consistently in the minority on the dozens of faculty committees that comprised the university's shared governance system.

On review, the D.C. Court of Appeals denied enforcement, concluding that the rule
40   was inconsistent with the *Yeshiva* decision. 918 F.3d 126, 127, 136–140 (2019). However, the court further found that other elements of the *Pacific Lutheran* framework, specifically its standard for "effective recommendation" and the division between "primary and secondary" areas of consideration, did not contradict *Yeshiva*. Id. at 140.

JD–14–23

In *Elon University*, 370 NLRB No. 91 (2021), the Board adopted the position of the court in *USC* and modified the *Pacific Lutheran* test.  Thus, the Board eliminated the majority status rule and determined that to establish the managerial status of a subgroup of faculty members, based on their participation in a collegial faculty body, two inquiries must be answered in the affirmative:  (1) "'whether a faculty body exercises effective control' over areas of decision-making. . . , and (2) 'whether, based on the faculty's structure and operations, the petitioning subgroup is included in that managerial faculty body.'"  Slip op. at 1, citing 918 F.3d  at 139.

The Board concluded that the university failed to meet the structural inclusion prong and that the petitioned-for nontenure-track faculty therefore did not possess managerial status.  Accordingly, the Board found it unnecessary to address the effective control prong.

To constitute "effective" recommendations, they must almost always be followed by the administration.  *Pacific Lutheran*, above at 421, referencing *Ithaca College*, 261 NLRB 577, 578 (1982) (recommendations were "invariably" followed), and other decisions.  Recommendations are also "effective" if they routinely become operative without independent review by the administration."  Ibid, referencing *Lewis & Clark College,* 300 NLRB 155, 163 (1990).

Here, the role of full-time faculty in the University's decision-making process is clearly either none or very limited.  They do not set the overall general admissions standards, establish graduation standards, establish tuition and fees, determine the size of the student body, create the budget, decide the distribution of financial aid, or decide the renewal of contracts for instructors.

They play no role in deciding the establishment of new colleges or centers, in what colleges departments are placed, implementing new degree programs, the selection of department chairs, the mode of classes, or the scheduling of their classes.

Although the senate, through its committees, makes recommendations, few if any are accepted by the administration, which has the final say.  Witness after witness testified uniformly that the administration regularly ignored senate committee recommendations.  Most noteworthy was the testimony of Gold, who has never supported the Union and had no incentive to testify in its favor.  He could recall no instances where the University implemented any of the senate's committees' recommendations during his tenure as senate president from Fall 2018–January 2022.   Furthermore, the University did not consult with the senate before announcing the shared governance model or issuing the faculty handbooks.

Regarding other committees, it is undisputed that recommendations made by the faculty promotion and tenure committee and the hiring and search committees may or may not be accepted by a dean, Spoto, or the president, who exercise an independent review function.

16

JD–14–23

In sum, in marked contrast to *Yeshiva*, the high degree of control that the administration exercises over all aspects of the University's operations, and the very circumscribed role that full-time faculty play in policymaking, lead to the conclusion that under *Pacific Lutheran* criteria, they are employees rather than managers.

5

The Respondent has therefore not met its burden to show that full-time faculty members control or make effective recommendations over the areas of academic programs, enrollment management, finances, academic policy, and personnel policies and decisions. Accordingly, the Respondent has failed to satisfy the second prong of *Elon University*,

10    making unnecessary an analysis of the structural inclusion prong.

Accordingly, I conclude that full-time faculty are not managerial employees excluded from the Act's protection should the Respondent ultimately not be found a religious institution.

15

## Other 8(a)(5) Allegations

### *Bypass and direct dealing*

20    The Respondent admits that, starting on October 26, it bypassed the Union and dealt directly with full-time faculty in soliciting their input for a new faculty handbook that contained revised terms and conditions of employment.  Therefore, this would be a violation of Section 8(a)(5) and (1) should the Board exercise jurisdiction.

25    ### *Changed terms and conditions of employment*

I will not recite here all the numerous changes that the faculty handbooks made from the CBA, as alleged in paragraphs 11 and 12 of the complaint.  Suffice to say that if the Respondent unlawfully withdrew recognition, such changes constituted violations of Section

30    8(a)(5) and (1).

## Unlawful Rules

35    Since on or about October 8, 2021, the Respondent has maintained three rules in its policy manual that are alleged to violate Section 8(a)(1).

In determining whether the maintenance of a challenged rule is unlawful, the relevant test is set out in *Boeing Co.*, 365 NLRB No. 154 (2017).  Work rules are classified as:

40    Category 1—rules that the Board designates lawful to maintain, either because (a) the rule, when reasonably interpreted, does not prohibit or interfere with the exercise of NLRA rights; or (b) the potential adverse impact on protected rights is outweighed by justifications associated with the rule.  No balancing is required.

17

JD–14–23

Category 2–rules that warrant individualized scrutiny in each case as to whether the rule, when reasonably interpreted, would prohibit or interfere with NLRA rights, and if so, whether any adverse impact on NLRA-protected conduct is outweighed by legitimate justifications.

Category 3—rules that that the Board will designate as unlawful to maintain because they would prohibit or limit NLRA-protected conduct, and the adverse impact on NLRA rights is not outweighed by justifications associated with the rule.

The first prong is whether the rule explicitly restricts activities protected by Section 7, in which case it is unlawful.  If the rule is facially neutral, the inquiry is whether reasonably interpreted, it would potentially interfere with the exercise of Section 7 rights.  This requires an evaluation of (1) the nature and extent of the potential impact on NLRA rights, and (2) legitimate justifications associated with the rule.  Id., slip op. at 3.  The General Counsel has the burden to "prove that a facially neutral rule would in context be interpreted by a reasonable employee . . . to potentially interfere with Section 7 rights."  *LA Specialty Produce Co.*, 368 NLRB No. 93, slip op. at 2 (2019).

*Use of the name, seal, and logo*

The rule states:

Members of the University community, either individually or collectively, shall not officially use the name, seal or logo of Saint Leo University in any activity outside of the regular work of the University. . . . Saint Leo University's name, seal, and logo are the exclusive property of the University and, consequently, may not be used in connection with goods or services offered by any outside organization without . . . prior permission. . . .

As the Board stated in *Schwan's Home Service, Inc.,* 364 NLRB 170, 171 (2016), quoting *Brunswick Corp.*, 282 NLRB 794, 795, "'[A]ny rule that requires employees to secure permission from their employer as a precondition to engaging in protected concerted activity on an employer's free time and in nonwork areas is unlawful.'" (fn. omitted).

Because the rule could impinge on Section 7 rights, I find it to be a category 2 rule.

In *Schwan's Home Service*, ibid, the Board citing *Boch Honda*, 362 NRB No. 83, slip op. at 2 (2015), held that employees would reasonably read the prohibition of using the Respondent's logos "in any manner" to cover protected employee communications.

The Respondent contends (R. Br. 19) that the provision "clearly applies to use of the University's name, seal, and logo in a manner that would purport to represent the University in an official manner in connection with any outside good[sic] or services" and that employees would reasonably understand the rule to only prohibit communications that purport to speak on the University's behalf.  However, the first sentence speaks of "*any activity*

18

JD–14–23

outside of the regular work of the University" (emphasis added), and the rule does not make it clear that it applies only to employees purporting to represent the University or only to outside goods and services, and not to protected activities under the Act.

5        The Respondent cites (ibid) *Medic Ambulance Service, Inc.*, 370 NLRB No. 65 (2021), which held that a rule limiting the use of the company's name in social media posts was lawful. However, that case is distinguishable. The Board considered the rule in the context of a broad social media policy that directed employees to "[m]ake it clear that the views expressed in social media are yours alone. Do not purport to represent the views of the
10      company in any fashion." The Board concluded that reading the two provisions together, an objectively reasonable employee would understand that the rule was aimed at preventing employees from speaking on the company's behalf rather than prohibiting employees from referring to the respondent by name in a post critical of the respondent's terms and conditions of employment. No such dual-provision situation is present here.

15

         The Respondent has proffered no specific business justifications and has therefore failed to demonstrate a business justification that outweighs the impingement on Section 7 rights. Accordingly, I conclude that maintenance of the rule would violate Section 8(a)(1).

20                          *Disclosure of confidential information*

         The rule provides that Confidential information includes information concerning:

         2.      Current, former and prospective employees (employment, pay, health, insurance
25              data, and other personnel information).

         3.      Current former and prospective faculty, and adjunct faculty (employment, pay,
                 health, insurance data, and other personal information).

30       On its face, the rule identifies pay and health insurance as confidential information that cannot be disclosed. Prohibiting employees from communicating with an outside organization about pay and other terms and conditions of employment is unlawful. See, e.g., *Flex Frac Logistics, LLC,* 358 NLRB 1131, 1131 (2012), enfd. 746 F.3d 205 (5th Cir. 2014); *Hyundai America Shipping Agency, Inc.*, 357 NLRB 860, slip op. at 1 (2011), affd. on point,
35      805 F.3d 309 (D.C. Cir. 2015); *Cintas Corp.*, 344 NLRB 943, 943 (2005).

         Because this rule specifically mentions terms and conditions of employment, I find it to be a category 3 rule.

40       The Respondent cites (R. Br. 20) *Interstate Management Co., LLC*, 369 NLRB No. 84 (2020). That case is distinguishable because therein the Board found lawful a policy that was limited to disclosure of personally identifiable information (PPI) given to the company in confidence by guests, employees, and vendors, and stored by the company in its records and databases. The Board did state, "It is well established that employees have a Section 7 right
45      to use generally known information about coworkers such as names, telephone numbers, and

JD–14–23

other contact information they learn during the normal course of their work for organizing and other protected activities." Id., slip op. at 13.  The policy here is not clearly limited to PPI kept in the company's records and can reasonably be interpreted to cover information about coworkers that can be used for organizing and other protected activities.

5

*Argos Ready Mix, LLC*, 369 No. 26 (2020), which the Respondent also cites (ibid), is similarly distinguishable.  There, the confidentiality agreement "clearly applie[d] only to the Respondent's proprietary business information" and did not "reference employees' wages, contact information, or other terms and conditions of employment that would be generally
10  known or accessible from sources other than 'confidential Company information.'" Id., slip op. at 7 (fn. omitted), 8.

The Respondent has proffered no specific business justifications and has therefore failed to demonstrate a business justification that outweighs the impingement on Section 7
15  rights.  Accordingly, I conclude that maintenance of the rule would violate Section 8(a)(1).

*Media Contacts*

The rule states:
20

Employees may not comment on University business to representatives of the press (radio, television, or print media) without authorization from the University Communications Office. . . .

25  Employees have a right under the Act to publicize labor disputes and thereby seek outside assistance in improving terms and conditions of employment.  See *Eastex, Inc. v. NLRB,* 437 U.S. 565, 565 (1978); *Valley Hospital Medical* Center, Inc., 351 NLRB 1250, 1252 (2007), enfd. sub nom., 358 Fed. Appx. 789 (9th Cir. 2009).

30  Because the rule could impinge on Section 7 rights, I find it to be a category 2 rule.

A media policy that is not limited to communications about confidential or proprietary information, or to circumstances when the employees purport to speak on the employer's behalf, could be reasonably interpreted to restrict Section 7 rights and therefore  is unlawful
35  *Tesla, Inc.,* 370 NLRB No. 101, slip op. at 4 (2021); *Maine Coast Memorial Health*, 369 NLRB No. 51, slip op. at 1 (2020), enfd. 999 F.3d 1 (1st Cir. 2021); *LA Specialty Produce Co.*, above,  slip op. at 1.

In this regard, the Respondent's reliance (R. Br. 21–22 ) on *LA Specialty Produce Co*.
40  is misplaced. There, the Board found that the media contact rule "provides only that when employees are approached by the news media for comment, they cannot speak *on their Respondent's behalf*. . . . "  (Id., slip op. at 16) (emphasis in original).  Here, no such limitation appears on the face of the provision, and there are no other policies that place such a limitation on the rule.  Nor is the rule limited to communications involving confidential or
45  proprietary information.

EXHIBIT B

JD–14–23

The Respondent has proffered no specific business justifications and has therefore failed to demonstrate a business justification that outweighs the impingement on Section 7 rights.  Accordingly, I conclude that maintenance of the rule would violate Section 8(a)(1).

5

#### CONCLUSION

The Respondent is a religious institution exempt from the Act's coverage.

10                                          ORDER

The complaint is dismissed.

Dated, Washington D.C.  February 23, 2023.

15

_____
Ira Sandron
20                     Administrative Law Judge

21

EXHIBIT B