EXHIBIT C

**UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 12**

SAINT LEO UNIVERSITY INCORPORATED

    and

UNITED FACULTY OF SAINT LEO,
NATIONAL EDUCATION ASSOCIATION
FLORIDA EDUCATION ASSOCIATION,
AMERICAN FEDERATION OF TEACHERS,
AFL-CIO

Cases 12-CA-275612, 12-CA-275617,
12-CA-275639, 12-CA-275640,
12-CA-275641, 12-CA-275642,
12-CA-275644, 12-CA-275645,
12-CA-284360

**COUNSEL FOR THE GENERAL COUNSEL'S
BRIEF TO THE ADMINISTRATIVE LAW JUDGE**

**I.**    **Statement of the Case**

On October 23, 2020, Saint Leo University Incorporated (Respondent) announced to its

employees, United Faculty of Saint Leo, AFL-CIO (the Union), and members of the public that it

intended to withdraw recognition from the Union as the exclusive collective-bargaining

representative of bargaining unit employees, despite a relationship between the parties extending

back over 40 years. Respondent followed through on its announcement and has since refused to

recognize the Union as the exclusive collective-bargaining representative of bargaining unit

employees. Most of the remaining allegations at issue in the present case stem from this decision

by Respondent, including derivative allegations of direct dealing with employees, unilateral

changes, and midterm modifications to terms and conditions of employment for bargaining unit

employees.

The issues to be decided in this case include whether the Board has jurisdiction over

Respondent and, if so, did Respondent violate Section 8(a)(1) and (5) of the National Labor

Relations Act (the Act) by communicating to employees its intent to withdraw recognition from

EXHIBIT C

EXHIBIT C

the Union, as the exclusive bargaining representative of Respondent's full-time faculty and librarians at its Saint Leo, Florida campus, and subsequently withdrawing such recognition of the Union, or are its faculty and librarians managerial employees. Further, if Respondent violated the Act by withdrawing recognition, did it also violate the Act by bypassing the union and dealing directly with employees? It must also be decided whether Respondent unilaterally changed bargaining unit terms and conditions of employment and made mid-term modifications to the parties' expired collective-bargaining agreement, which the parties had agreed to maintain while negotiating a successor collective bargaining agreement. Finally, it must be decided whether work rules promulgated and maintained by Respondent regarding use of the university name, seal, and logo; confidential information; and contacting the media are unlawfully over broad. The General Counsel contends that Respondent violated the Act as alleged in the Complaint, as amended at the hearing, and therefore should be held accountable for violating the Act. This case was heard via the videoconferencing platform Zoom for Government on October 26, 2022, and in person in Tampa, Florida, on November 2, 2022, through November 4, 2022, and November 29, 2022, through December 1, 2022, by Administrative Law Judge Ira Sandron (the ALJ).

The original and amended charges were timely filed against, and served upon, Respondent by the Union.[1] [GCX [2] 1(a) through 1(v)]. The Regional Director issued a Consolidated Complaint and Notice of Hearing in this matter on August 11, 2022,[3] and Respondent filed an Answer [GCX

---

[1] For a complete list of the dates of the charges, including the original and amended charges, please refer to paragraph 1 of the Complaint, GCX 1(w), which has been admitted by Respondent in its Answer (GCX 1(bb)).

[2] General Counsel's exhibits are referenced as GCX (number). Joint Exhibits are referenced as JX (number). Respondent's Exhibits are referenced as RX (number). The hearing transcript is referenced as Tr. (page number).

[3] On November 29, 2022, at the hearing, General Counsel orally amended the Consolidated Complaint and Notice of Hearing [GCX 1(w)] by withdrawing the allegations made in paragraphs 10(a)(1), 10(a)(4), 10(a)(7) and 11(a)(4). [Tr. 819, 820].

EXHIBIT C

1(bb)], an Amended Answer [GCX 1(gg)], and a Second Amended Answer [GCX 1(ii)] on August 25, 2022, October 20, 2022, and November 1, 2022, respectively.[4]

In defending its withdrawal of recognition and subsequent actions, Respondent relies on the Board's decision in *Bethany College*, which held that the Board will not assert jurisdiction over educational institutions if the facts show that the college or university provides a religious educational environment to students, is organized as a non-profit, and maintains a religious affiliation.[5] However, Respondent fails to meet the first prong of the *Bethany* test since the facts establish that Respondent does not holds itself out to the wider community, prospective students, and faculty as providing a religious educational environment. Rather, the evidence Respondent offers in an attempt to meet the first prong of the *Bethany* test is in reality only evidence of the *Bethany* test's third prong, involving the establishment of a religious affiliation.

Moreover, even though the evidence clearly shows that the Board has jurisdiction pursuant to the test set forth in *Bethany*, as discussed in detail below, the General Counsel urges that the Board return to the jurisdictional standard articulated in *Pacific Lutheran* with a minor modification.[6] Under *Pacific Lutheran*, the Board will assert jurisdiction over a private college or university unless the institution holds itself out as providing a religious educational environment, and faculty perform a specific role in creating or maintaining the institution's religious educational environment. The modification that the Board should adopt is that it should consider all marketing representations made by an institution to students, faculty, and the community at large in

---

[4] The Answer was also amended orally by Respondent at the hearing on October 26, 2022. Respondent amended its response to paragraph 9 of the Complaint [GSX 1(w)] by admitting that since on or about October 26, 2020, it bypassed the Union and dealt directly with employees in the unit by soliciting input from employees for a new faculty handbook that contained revised terms and condition s for unit employees. [Tr. 8].
[5] *Bethany College*, 369 NLRB No. 98 (June 10, 2020)
[6] *Pacific Lutheran University*, 361 NLRB 1404 (2014)

EXHIBIT C

EXHIBIT C

examining whether the institution consistently holds itself out as providing a religious educational environment.

This brief will further address Respondent's assertion that the bargaining unit employees at issue in this matter are managerial employees excluded from the protections of the Act. In fact, the evidence shows that faculty are not managerial employees as they have no authority to make decisions on behalf of the Respondent in terms of financial matters, the establishment of colleges and schools, the creation of degree programs, admissions standards, disbursement of financial aid, and other hallmark indicia of managerial status. Respondent claims that faculty play a central role in setting the curriculum and the hiring of faculty; however, the evidence adduced at the hearing shows that faculty only ministerially consider curriculum after it is first approved by the administration. The record shows numerous examples of courses and programs that were either requested by faculty and denied by administration, or courses and programs that faculty were requested to establish or revise at the request of department chairs, deans, and other administrators.

Additionally, while the evidence shows that while faculty were asked to sit on search committees for open faculty positions, it is undisputed that final hiring decisions are made exclusively by the deans and the administration. Specifically, the evidence shows that recommendations made by faculty for candidates were regularly ignored by the administration. An inspection of the evidence clearly shows that bargaining unit faculty are not managers; to the contrary, the weight of the evidence establishes that faculty are only given authority to act at the pleasure of the university president and his administration, and there is no evidence that any such authority has been given to faculty over the past several years.

This brief will then examine the unilateral changes and modifications made by Respondent without required notice to or input from the Union. Respondent admits both (1) that it made most

4

EXHIBIT C

of the changes to terms and conditions of employment alleged in Paragraphs 10 and 11 of the Complaint; and (2) that the great majority of those unilateral changes and modifications are mandatory subjects of bargaining.   Accordingly, this brief will review only the unilateral changes and modifications that Respondent has denied making and those which Respondent has admitted but argues are not mandatory subjects of bargaining.

Next, this brief will examine work rules promulgated and maintained by Respondent related to logo usage, confidential information, and media contacts. These rules are unlawful under the standard outlined in *Boeing*;[7] however, the General Counsel argues that the Board should return to the former standard articulated in *Lutheran Heritage*, with a modification, to evaluate facially neutral work rules which gave appropriate weight to both an employee's Section 7 rights and an employer's legitimate business interest in maintaining such rules.[8] Under a return to the *Lutheran Heritage* standard, all the work rules in question in the present case are unlawful as they have a chilling effect over employees' Section 7 rights without Respondent having an appropriate business justification to establish and enforce the rules in question.

Finally, this brief concludes by requesting that the honorable Administrative Law Judge order that Respondent take certain actions that fully remedy the violations of Sections 8(a)(1) and (5) of the Act.

## II.   <u>Statement of Facts</u>

### A.   **General Background and Chronology of Events**

Respondent is a not-for-profit Catholic-founded private liberal arts university that offers associate, bachelor, masters, and doctoral degrees. [RX 26 p. 2; Tr. 11]. The institution was chartered in 1889 when the Florida legislature authorized the Order of Saint Benedict to confer

---

[7] *Boeing Co.*, 365 NLRB No. 154 (2017)
[8] *Lutheran Heritage Village – Livonia*, 343 NLRB 646 (2004)

EXHIBIT C

degrees to students. [RX 1; RX 26 p. 2]. Saint Leo University and the Benedictine abbey responsible for establishing the school are both named for Leo Haid, the abbey's first abbot, principal founder, and first president of Respondent. [RX 26 p. 2]. Respondent is a member of the Association of Catholic Colleges and Universities, membership in which is determined at least in part, with reference to religion. [Tr. 11, 34]. Respondent is also a member of the Association of American Colleges and Universities, which does not have any apparent religious screening process. [Tr. 1019].

In 1969, the Order of Saint Benedict transferred title and control of the University to an independent board of trustees. [RX 26 p. 3].[9] Respondent's Board of Trustees remains the final authority on all matters related to Respondent's operations.[10] [Tr. 45, 390, 531]. No diocese or entity affiliated with the Catholic Church exerts control over Respondent's operations or its Board of Trustees. [Tr. 531]. Approximately thirty individuals make up the Board of Trustees. [Tr. 45, 530]. Currently, only three trustees hold religious titles, including the Bishop for the Diocese of Saint Petersburg, the Abbot of the Saint Leo Monastery, and the Prioress of the Holy Name Monastery. [Tr. 45, 531, 532].

Currently, Respondent has approximately 9,000 enrolled students, including about 2,000 students who attend on-the-ground classes at Respondent's University Campus in Saint Leo, Florida. [Tr. 41]. Approximately 6,000 students attend exclusively via on-line learning, and the remaining students attend "in person" at one of Respondent's dozen or so "centers" located in Florida, Georgia, and Texas. [Tr. 41].

---

[9] The Saint Leo Abbey (the Abbey) sits on Respondent's campus and is not owned by Respondent, thus remaining the property of the Order of Saint Benedict. [Tr. 470, 472, 606, 608]. Faculty do not teach in the Abbey, nor do students attend class in the Abbey. [Tr. 473].

[10] The appointment of Board of Trustee members is not controlled by any religious institution or body. [Tr. 531].

EXHIBIT C

EXHIBIT C

In 1973, the school began to offer distance learning for military members and is now one of the top ten higher education institutions for military servicewomen and men, both at its University Campus and at its education centers on military bases. [GCX 53]. Respondent has also focused on attracting distance-learning students, with most of its enrolled students attending exclusively online. [Tr. 41]. Respondent was one of the first schools to offer online programs when it launched the Center for Online Learning in 1998. [Tr. 53].

Administratively, Respondent maintains four colleges and one school on its University Campus, including, the College of Arts and Sciences, the College of Business, the College of Education and Social Services, the College of Health Professions, and the School for Computing, Artificial Intelligence, Robotics, and Data Sciences. [Tr. 42, 917]. Generally, the approximately 130 full-time faculty in those colleges and school report to a department chair who in turn reports to the college or school's dean or director.[11] [Tr. 42]. The deans report to Dr. Mary Spoto, Respondent's Vice President of Academic Affairs (VPAA). [Tr. 39]. Dr. Spoto has held the VPAA position for about four years. [Tr. 39]. Dr. Spoto reports to University President Dr. Ed Dadez, who assumed the presidency in 2022 and replaced Dr. Jeffrey Senese. [Tr. 44]. Relevant to this matter, Dr. Senese was Respondent's president in 2020, when the majority of the material events transpired. [Tr. 44]. The University President reports to Respondent's Board of Trustees. [Tr. 45]. Faculty are not permitted to freely attend Board of Trustee meetings, nor do they have regular time set aside to meet with trustees. [Tr. 390].

---

[11] Faculty are defined by the April 2021 Faculty Handbook as "full-time members of the University, both tenured and non-tenured, whose primary responsibilities focus on teaching, scholarship, and service as set forth in each faculty member's letter of appointment." [GCX 33 p.7].

EXHIBIT C

EXHIBIT C

The full-time faculty and librarians based at Respondent's University Campus (the Unit) have been represented by the Union since 1976.  [GCX 36; Tr. 451, 691-92, 1108]. All faculty in the Unit teach courses at the Respondent's University Campus, but some also teach classes at Respondent's educational centers and online. [Tr. 58, 689]. Campus-based faculty consistently testified that they teach online courses regularly. [Tr. 689]. Dr. Valerie Wright testified that online students are not required to visit campus and that she has not seen any of her current online students on campus this semester. [Tr. 689].

Respondent and the Union have been parties to a series of collective-bargaining agreements (CBAs) that outline terms and conditions of employment for the Unit. [Tr.125]. The most recent CBA was effective by its terms from 2012 through August 2016. [JX 1, Tr. 126, 693]. Following the expiration of the 2012-2016 contract, the parties agreed to maintain the terms of the expired agreement until a successor contract could be negotiated. [Tr. 7]. The parties' intent to maintain the terms of the expired agreement is undisputed and was memorialized by the parties in a 2019 memorandum of understanding related to wage increases for the Unit. [GCX 37]. Until October 23, 2020, Respondent followed the terms and conditions outlined in the expired CBA. [Tr. 126].

The evidence shows that the parties met for at least eighty-four bargaining sessions between 2016 and 2020 and were making progress toward reaching a successor agreement when Respondent withdrew recognition on October 23, 2020. [RX 84 p. 10, Tr. 126]. Faculty had been notified of the status of negotiations through a series of updates sent by Respondent, and as late as April 2020, Respondent told faculty that it hoped to wrap up negotiations with Union during the spring. [RX 84 p. 10]. By July 2020, the parties had reached tentative agreements on almost all subjects of a successor contract. [Tr. 784]. In June or July 2020, the Union sent a settlement

EXHIBIT C

EXHIBIT C

package to Respondent in an attempt to finalize the CBA. [Tr. 804]. At that time, Respondent told the Union that it would get back to the Union with a response to the Union's offer. [Tr. 804, 805].

### B. Respondent's Website

Respondent maintains a publicly accessible website where it provides information to current and prospective students, faculty, and the public regarding Respondent's academic offerings and extracurricular activities. [GCX 10; GCX 12; RX 19; RX 20; RX 21; RX 22; RX 23; JX 3]. The homepage of the website provides the starting point for numerous subjects of information. [GCX 54; JX 3]. A review of a sitemap of Respondent's entire website reveals thousands of webpages available to the public. [JX 3]. The website's homepage content as of November 8, 2022, includes at least 80 links to subcategories of information, such as "best value in colleges", "best college for veterans," and "flexibility." [GCX 54; JX 3]. Notably, none of the links or text on the homepage mention or reference religion or Catholicism, although there is one link titled "Values-Based Community." [GCX 54]. In contrast, there are several links related to the military, including links about a Navy veteran in Respondent's criminal justice program, a link to an article about SOCOM command (located at an Air Force base in nearby Tampa), a link to information about Respondent's ROTC program, and a link simply titled, "Military and Veterans." [GCX 54]. The homepage displays recent postings on Respondent's social media platform, including postings about Korean pop music, an anime club, and Halloween. [GCX 54]. None of the social media postings reference religion or anything related to Catholicism. [GCX 54]. Likewise, the homepage provides links to episodes of an official Saint Leo University podcast. [GCX 54]. The podcast episodes listed on the homepage concern subjects like ROTC, a sorority, Respondent's wellness center, and an interview with Respondent's basketball coach. [GCX 54]. Again, there is no apparent reference to religion or Catholicism in the titles of the available podcasts listed. [GCX 54].

EXHIBIT C

The "Mission, Values and Identity" page of Respondent's website states:

Saint Leo is an innovative global Catholic liberal arts university that fosters a personal and inclusive community which educates, prepares, and develops students for success, and consists of diverse learners who boldly confront the challenges of our world though service to others. [RX 19 p.1][12]

Respondent's "Catholic Identity statement" is located even deeper in its website; it can be found by clicking on the "Learn More About Our Catholic Roots" link on the "Mission, Values and Identity" page, two clicks off the homepage. [RX 20; JX 3]. As discussed above, the most current Catholic Identity statement was updated on October 7, 2020, just over two weeks before the Board of Trustees voted on October 23, 2020, to withdraw recognition from the Union. [GCX 11; GCX 38; GCX 39; GCX 40; GCX 41; GCX 42]. The revised October 7, 2020, statement, which is still in effect, has significantly more substance that the prior Catholic Identity statement that was in effect until October 7, 2020. [GCX 10, p.4].

After Respondent withdrew recognition from the Union, a new website was created in the spring of 2021 to emphasize the University Ministry. [Tr. 892].[13] The University Ministry is an organization on campus that organizes faith based extra-curricular events; University Ministry events have no connection to student curriculum and include activities such as kayak trips and frisbee tournaments. [Tr. 854]. There is no evidence in the record indicating that participation in University Ministry activities is mandatory or even that a majority of students participate.

---

[12] To access the Respondent's "Mission Values and Identity" page, the website user must click on "Mission and Values" link about half-way down the homepage. [JX 3].

[13] Father Randall Meissen testified he headed Respondent's University Ministry until recently. [Tr. 852].  He testified that he was not a member of faculty when he worked for Respondent. [Tr. 896]. Meissen testified that Respondent's faculty were not required to participate in University Ministry. [Tr. 906]. Father Meissen currently heads the Catholic campus ministry at Florida Tech, a private non-religious research university. His job duties at Florida tech include putting together mass services for students and praying with students which are very similar to some of his work duties when he worked for Respondent. [Tr. 899. 900].

While the website makes numerous references to Respondent's religious diversity and inclusion, there is no mention of students receiving a Catholic or otherwise religious education. [RX 19; RX 20; RX 23]. On the website's "Missions, Values and Identity" page, Respondent touts its inclusiveness, "welcoming students of all faiths." [RX 19 p. 2]. The page even has a Diversity/Inclusion section where it says, among other things, that people from different religious backgrounds are valued and celebrated on campus. [RX 19 p. 3]. Even the Catholic Identity statement claims that Respondent "welcomes and embraces students of all faiths," "welcomes an open and free dialog among persons of differing faith," nurtures relationships "regardless of spiritual backgrounds, and connects students to churches of various denominations". [RX 20 p. 1, 2]. Respondent even provides a designated space on campus where its Muslim students can gather to practice their five daily prayers together. [RX 23 p. 1].

### C.    Respondent's Promotional Videos and Television Commercials

Respondent's website homepage also contains an embedded video. [GCX 54]. A review of the 45-second video highlights Respondent's "accessibility" and its "convenient, affordable and innovative education that prepares students for a rewarding successful career." [GCX 50]. The video also appears to briefly show what could be construed as a religious building and another building with what appears to be a cross on it, but there is no verbal mention of Respondent providing a religious education or any overt reference to religion at all. [GCX 50].

Respondent admits that it has three additional videos available on its website under the "Student Experience" section. [Tr. 225].  The homepage link to the Student Experience section (accessed on the left-hand side menu) includes a three-minute promotional video entitled, "An Introduction to Life as a St. Leo Student", which Respondent admits was still posted as of the date of the hearing. [GCX 51; GCX 54; JX 3; Tr. 220]. The video describes Saint Leo as a place where

students can "find their passion" and "challenge" themselves. [GCX 51]. The video shows the many activities and athletics that are available to students on campus. [GCX 51]. None of the activities shown appear to be religious in nature, although on several occasions, for a brief second, the video shows what appears to be buildings in the background that could be perceived as being religious in nature. [GCX 51]. One student in the video stated that if she had to describe Saint Leo in a single word, it would be "adventure." [GCX 51]. At no point does the video does mention Catholicism, religion, or anything that could be perceived as being associated with religion even once. [GCX 51]. Toward the end of the video, one student sums up her experience at Saint Leo by describing the school as a place to discover where she belongs in the professional world and helps her to understand how to get there. She does not discuss finding that place "as a Catholic" or religious person or otherwise indicate that Respondent's foundation as a Catholic institution influenced her choice to attend, her experience there, or her path forward into the professional world.  [GCX 51].

The second video currently available in the Student Experience section of Respondent's website is untitled but can be found embedded under the heading "The Online Experience: Flexible Innovative Learning." [GCX 52]. For approximately two-and-a-half minutes, the video contains images and flashes short text bubbles communicating when the school was founded and that it was one of the first schools to offer online learning. [GCX 52]. The video shows seals from U.S. News and World Report ranking Respondent as one of the "best colleges" for social mobility and veterans.  [GCX 52].  The video goes on to tout the school as "affordable" and "flexible." [GCX 52]. The video describes Respondent's student body to include students returning to school, professionals in new careers, military personnel and their families, and first-time students. [GCX 52]. The video does not refer to religion at all; further, unlike the other videos, there does

not even appear to be any images of what could be construed as religious buildings on the screen. [GCX 52].

The third video currently available in the "Student Experience" section of Respondent's website, also untitled, is embedded under the heading "The Education Center Experience: Education for Any Lifestyle." [GCX 53]. The video discusses the different options that students have for learning, which include traditional learning at Respondent's University Campus, off-campus in-person education at military bases or Respondent's various centers, and online education. [GCX 53]. The video identifies Saint Leo as Florida's oldest Catholic institution of higher learning and notes that theology is one of the eight master's degrees it offers but does not communicate that students receive a religious education. [GCX 53]. The video mentions that Respondent is dedicated to "core values" but does not identify those values, nor does it tie those values to Benedictine or Catholic values or otherwise connect those values to religion in any way. [GCX 53].   Rather, the promotional video appears to be targeted toward prospective military students and highlights the fact that Respondent has been providing courses to the military since 1973, calling itself the "one of America's largest and most committed providers of higher education to the U.S. military," and is ranked among the "most military friendly institution." [GCX 53].

In addition to the videos currently hosted directly on Respondent's website, there are numerous videos it has posted online through video sharing platforms such as YouTube. [Tr. 58, 71, 78]. Further, the evidence shows that some of Respondent's promotional videos appear on a television commercial database called iSpot TV, indicating that not only were they shared online, but at some point, in the past, they were also broadcast to the public as television commercials. [Tr. 577, 578]. Professor Dr. Thomas Humphries testified that he appeared in several of the

EXHIBIT C

commercials and at least one of them was run in the Tampa Bay television market during the Super Bowl within the past few years. [Tr. 577, 578]. Respondent acknowledges that these videos are currently available online, and, with the exception of one video discussed further below, all the videos were made either directly by Respondent or for Respondent at its behest. [Tr. 77].

These promotional videos and television commercials feature various alumni and students talking about their success through Respondent's online program, the flexibility it affords, and the (secular) career-oriented programs at which Respondent excels. [GCX 2]. The students in the videos are of various backgrounds and ages; for example, someone who waited years to start her education; a mom; a young adult with a busy schedule; and someone pursuing a graduate degree. [GCX 2; GCX 3; GCX 4; GCX 5; GCX 8]. The students highlight the curriculum, affordability, individual advisors, faculty support, and flexibility as advantages of Respondent. [GCX 2; GCX 3; GCX 4; GCX 5; GCX 8]. One commercial showcases a veteran who found a career after his military service ended by meeting with one of Respondent's online enrollment counselors. [GCX 3]. In another video, Respondent describes how its education can fit into family life, and also mentions that Saint Leo is the exclusive educational partner of the local NFL team, the Tampa Bay Buccaneers. [GCX 4]. The commercials point out the founding year of the University, 1889, and the founding year of its online program, 1997. [GCX 5]. There is no mention of Catholic heritage made in these commercials, and nothing is said about providing a religious educational environment. [GCX 2; GCX 3; GCX 4; GCX 5].

There is also a Saint Leo "By Drone" video which gives a birds-eye view of the campus with upbeat instrumental music playing in the background.  As its title suggests, utilizing drone footage taken high above the school, this video showcases Respondent's tennis courts, athletic

14

EXHIBIT C

facilities, and other buildings on campus. [GCX 6]. The video simply plays music throughout; it has no words or other messaging. [GCX 6].

A review of Respondent's other online videos demonstrates that Respondent, at best, inconsistently mentions religion. Although most of the videos show pictures of buildings that may have religious origins or that are currently being used for religious purposes, Respondent makes no representation of a religious *educational* environment. [GCX 2; GCX 3; GCX 4; GCX 5, GCX 6; GCX 7; GCX 8]. For example, a 2019 video titled "Saint Leo University – Campus Tour," emphasizes "the resort-like" nature of the campus, its proximity to beaches and nearby Orlando attractions, free school-sponsored trips to Major League Baseball games, Greek life, and sports programs in a narrative depicting the advantages of attending school on Respondent's campus. [GCX 7]. The video does flash a brief text stating that although Saint Leo is "rooted in … Benedictine tradition," it is now "home to students of all faiths." [GCX 7]. While Respondent's Catholic identity is noted peripherally, by mentioning its roots in Benedictine values, the provision of a religious educational environment is not mentioned once as a reason to attend. [GCX 8]. While this video was produced by  a college review company, Respondent acknowledges that representatives that appear on the video describing campus life are employees of Respondent and that they had the permission of Respondent to appear in the video and speak on behalf of Respondent. [Tr. 74, 75, 76]. Several representatives of Respondent were interviewed during the video, and none mentioned, much less advocated for, students attending Saint Leo because Respondent provides a religious educational environment. [GCX 7].

Likewise, a video from 2015 entitled "Saint Leo University – An Overview" quickly and merely notes the school's Catholic heritage. [GCX 8]. The video then sends a message of inclusivity, explaining its "century-long tradition of welcoming students of all faiths" before

pivoting to focus on reasons to attend Saint Leo, such as education technology, diversity, campus life, sports, Greek life, and facilities. [GCX 8].  It does not mention religious education as a reason for attending.

Respondent offered three videos at the hearing in support of its case. [RX 39, RX 143, RX 144]. The first video is titled "Catholic Identity." [RX 39]. The video is not currently available on Respondent's main website; however, it does appear on the webpage of Respondent's University Ministry website and on YouTube.[14] [Tr. 947]. The video discusses Respondent's "proud Catholic heritage." [RX 39]. The video states that Respondent's focus is not just on education, but on the student. [RX 39]. The video identifies small class sizes and its encouragement of students to "persist" as qualities making Respondent a Catholic institution. [RX 39]. VPAA Spoto admits there is nothing uniquely Catholic about small class sizes. [Tr. 1029]. The video also extolls Respondent's accepting people of all backgrounds.  [RX 39]. The video states that Catholicism can be defined as being "universal, diverse, and all inclusive." [RX 39]. However, VPAA Spoto admits that her alma mater, the University of South Florida, a public institution, is a diverse institution as well. [Tr. 1030].

Two of the main speakers in the Catholic Identity video, Father Kyle Smith and Abbot Isaac Camacho, are not involved in the formal education of students and they do not impart religious education as part of Respondent's curriculum. [RX 39; Tr. 896]. Rather, they are associated with University Ministry and the Saint Leo Abbey, respectively. [RX 39; Tr. 896]

The other videos offered by Respondent were made for current students and not the public in general. [Tr. 942]. One video was made in the Fall of 2022 and is a welcome message to enrolled

---

[14] The university ministry website was not launched until Spring of 2021, which is after the Respondent withdrew recognition of the Union. [Tr. 891].  It can be found at https://ministry.saintleo.edu/

EXHIBIT C

EXHIBIT C

students from Respondent's new president, Dr. Ed Dadez. [RX 143; Tr. 940]. Respondent represents that the video is available on YouTube but admits that it is not meant to be a promotional video. [Tr. 942]. In the one-minute video, Dr. Dadez mentions his appreciation for "Catholic values," but states that his "priority" centers on helping students achieve personal and professional success. [RX 143]. The last video introduced by Respondent is a video explaining the activities coordinated by the University Ministry group and lists the various religious services and activities on campus. [RX 144]. Neither faculty nor students are required to attend such activities. No members of the faculty speak in the University Ministry video. [RX 144].

### D.    Living Learning Communities

Respondent provides on-campus living arrangements for its University Campus students. Respondent provides those students with the opportunity to participate in "living learning communities," intended to give students the opportunity to have an all-inclusive living experience with a group that share similar goals and successes. [GCX 43]. In addition to having the choice of living together, students in these communities may also take a class together. The communities include groups interested in academic excellence, leadership and service, honors, and "prayer and mindfulness."[15] However, despite the name, students are not required to live in any of the living learning communities. [Tr. 555]

The prayer and mindfulness community is open to all students, regardless of personal beliefs, who are seeking "individual growth through different expressions of prayer and meditation." [GCX 43]. Participants in that community are given the option to commit themselves to one of several "religious" practices every week, including "unplugging from electronic devices

---

[15] The prayer and mindfulness community is the last community listed on the page of Respondent's website describing the living learning communities. [GCX 43].

17

EXHIBIT C

for 10 minutes twice a week" or "abstaining from a select food once a week." [GCX 43]. As with the option to live within the community, engaging in these practices is completely voluntary for those who have chosen the "prayer and mindfulness" community. Dr. Thomas Humphries has served and continues to serve as the faculty mentor for the prayer and mindfulness living learning community. [Tr. 553]. Dr. Humphries testified without contradiction that of the approximately 1,500 students who live on campus, only twelve students currently live in the prayer and mindfulness community. [Tr. 554]. In some years that number has been as low as seven or eight students. [Tr. 554]. In Dr. Humphries' tenure as its faculty mentor, there has never been a waiting list for students to join the prayer and mindfulness community. [Tr. 556]. Nor has anyone been rejected from joining the community. [Tr. 557].

E.     **Respondent's Financial Investments and Business Dealings**

Respondent contends that it follows a Catholic values approach when it comes to financial investments made by the University and deciding with whom Respondent will do business. [Tr. 922, 923]. While VPAA Spoto testified that she believes this policy is documented in Respondent's bylaws, Respondent failed to offer documentary evidence to support her assertion. [Tr. 922]. Dr. Spoto testified that final approval for all University business dealings is at the discretion of Respondent's president. [Tr. 925]. Again, no documentary evidence is in the record to support such a policy.[16] Dr. Stephen Okey credibly testified that just prior to the COVID-19 pandemic, there was a controversy when Respondent announced its intention to start using Starbucks coffee on campus. [Tr. 1131, 1132]. Dr. Okey testified that some students and faculty were bothered by this decision because Starbucks matches its employees' donations to Planned Parenthood, a provider of abortions, a medical procedure opposed by the Catholic Church.

---

[16] Notably, there is no evidence on the record that faculty have any say in the development of any investment and business dealings policies.

EXHIBIT C

[Tr. 1132].  Despite concerns raised by students and faculty, Respondent nonetheless allowed Starbucks coffee to be served on campus. [Tr. 1133].

    **F.**    **Job Postings and Interviews**

Respondent creates job listings which are posted both internally and externally. [Tr. 106]. Respondent admits that the job postings, marked as General Counsel Exhibits 14(a) through (h), are what is conveyed to potential applicants. [Tr. 105].  There is some evidence that Respondent's job postings will occasionally identify Respondent as a Catholic institution; however, Respondent more consistently holds itself out in these documents as a "Great College to Work," one of the "Best Value Schools," and "Best Colleges for Veterans." [GCX 14(a) p. 1; GCX 14(b) p. 1; GCX 14(c) p. 1; GCX 14(d) p. 1; GCX 14(f) p. 1]. Job postings consistently state that "faculty members must be committed to the educational mission and core values of Saint Leo University, which includes a demonstrated commitment to excellence, community, and responsible stewardship in education and engagement" – notably, the postings do not list any requirement to foster a religious educational environment; personal adherence to, or teaching of, principles of Catholic doctrine; or any other topic directly implicating religion. [GCX 14(a) p. 1; GCX 14(b) p. 1; GCX 14(c) p. 1; GCX 14(d) p. 2; GCX 14(f) p. 2]. It appears that applicants for all professor jobs are asked to provide a teaching philosophy statement or values statement explaining how the applicant's teaching philosophy and practices fit Respondent's Mission Statement and Values of Saint Leo.[17] [GCX 14(a) p. 3; GCX (b) p. 3; GCX(c) p. 3; GCX 14(d) p. 4; GCX14(e) p. 4; GCX 14(f) p. 4]. There is no evidence that job postings indicate that Respondent's core values are Catholic or

---

[17] Notably, instructional librarians, who are in the bargaining unit, seemingly are not required to provide a teaching philosophy statement or values statement. [GCX 14(g)].

EXHIBIT C

EXHIBIT C

Benedictine. Respondent admits that at least some job listings do not mention core values at all. [Tr. 1042].

The faculty members who appeared at the hearing consistently testified that there was no mention of religion during their interview process. [Tr. 305, 306, 396, 455, 536, 742]. In fact, Dr. Brian Camp testified that he knew that Saint Leo had a "Catholic tradition," so he was specifically interested in what the experience would be like compared to his previous experience at large public institutions. [Tr. 306]. Dr. Camp testified that he brought up the subject during his interview, asking whether it would be an "issue" for him to teach with Respondent as he was not Catholic. [Tr. 306, 344]. Dr. Camp credibly testified that he was told that him not being Catholic was "not a problem" and that Respondent had other faculty who were not Catholic. [Tr. 306].

G.     **Catholic Promise Scholarships, Religious Buildings, and Religious Services**

Respondent offered evidence that it has provided something called "Catholic Promise" scholarship awards to students who graduated from Catholic high schools. [Tr. 961]. Dr. Thomas Humphries stated that it was something that had been offered in the past, and clarified that it was not a scholarship, but rather a tuition remission, or a "discount" offered to attend. [Tr. 591]. Dr. Humphries explained that the only two criteria to be eligible for the "scholarship" were a minimum GPA and graduation from a Catholic high school. [Tr. 590]. The Catholic Promise scholarship was awarded by Respondent's Admissions department; if a student met the criteria according to their application for enrollment at St. Leo, the tuition discount was automatically awarded by someone in Admissions, a contact of Dr. Humphries. [Tr. 591]. There was no separate scholarship application involved to review the quality of a candidate or confirm that the student themself was in fact Catholic. [Tr 591]. Dr. Spoto testified that she "believed" the Catholic Promise scholarship was still being awarded. [Tr. 1035]

EXHIBIT C

EXHIBIT C

There is no record evidence showing how many of the tuition discounts have been awarded. [Tr. 591]. Dr. Humphries testified that he was asked to help strategize with Admissions on how to recruit students for the "award." [Tr. 591, 592]. A plan was devised, but never enacted. [Tr. 591, 592]. Dr. Humphries offered to travel to local Catholic high schools to recruit for the scholarship, but his request was denied by his dean. [Tr. 593]. Soon thereafter, Dr, Humphries' contact in the Admissions office left the university and the program "fizzled out." [Tr. 593]. Dr. Humphries' unrebutted testimony is that in fact, in August or September 2022, he approached his dean about reviving the Catholic Promise program – but he was told by his dean that he should not do so. [Tr. 594].

While Respondent's campus has religious buildings used for religious services [Tr. 361], the faculty credibly testified that they have also personally attended or taught at public colleges and universities that had religious buildings and services on campus. [Tr. 347, 352, 465, 466]. Dr. Patrick Crerand testified that when he was a student at the Ohio State University, a public institution, religious services were held at a location called "The Newman Center" on campus. [Tr. 465, 466]. Further, Dr. Crerand testified that when he taught at Bowling Green State University, another public institution, the non-denominational Prout Chapel was in the "middle of campus." [Tr. 466]. Dr. Crerand also testified that at the University of Louisiana – Lafayette, a public institution, the Our Lady of Wisdom church is on campus. [Tr. 466]. Dr. Brian Camp testified that Virginia Tech, a public institution where he previously worked, has a chapel in the middle of campus for prayers and religious services. [Tr. 352]. Dr. Camp testified that when he was teaching at Louisiana Tech, another public institution, he was at an event where the president of the institution led faculty in prayer. [Tr. 347]. Respondent admits that the University of South Florida, a public institution in Tampa, Florida, has a chapel, a Catholic student ministry, and holds

mass services on campus. [Tr. 1085]. A Respondent witness, Father Randall Meissen, also admitted that he organizes masses at the "Catholic chapel" at Florida Tech, a private non-religious university.

Respondent provided some evidence that faculty were invited to a "meet the abbot" event at the Saint Leo Abbey for a day of reflection earlier in 2022. However, Dr. Spoto admitted that the event was planned and coordinated by the abbot, who is neither an employee of Respondent nor a member of its faculty. [Tr. 896, 962, 1036]. Dr. Spoto herself did not attend the event. [Tr. 922]. As noted above, the Saint Leo Abbey is not owned or operated by Respondent (and vice versa). [Tr. 470, 472, 606, 608]. Faculty testified that they had never been invited to the abbey for an event. [Tr. 485, 486]. There is no evidence to establish that the "meet the abbot" event has been held at other times prior to 2022, i.e., until after the withdrawal of recognition. [Tr. 1036].

### H.    Core Curriculum

Respondent's core curriculum includes requirements that all students complete two classes in religion and one philosophy class. [Tr. 570]. Dr. Humphries testified that he developed the courses which satisfy the religion classes requirement, and that they also meet a "critical thinking" requirement needed for the overall general curriculum. [Tr. 583, 584]. To wit, students enrolled in the religion classes are expected to critically engage with the text, as opposed to simply accepting it as truth. [Tr. 584]. Respondent's website describes its core religion and philosophy classes in the following way:

> And no matter what major you choose, all Saint Leo students take three electives in religion and philosophy. We've got tons of options. Spend one semester exploring the Gospels of Matthew, Mark, Luke and John. Next, open yourself to Eastern religions like Hinduism, Buddhism and Taoism, or get hands-on in a youth ministry class. You may even find yourself investigating "the mystery of existence" via *The Matrix* and *Bladerunner* in Philosophy 101. Popcorn optional.[18]

---

[18] GCX 23 p. 1

EXHIBIT C

I.      **Facts Related to the Faculty's Role in Maintaining a Religious Educational Environment or Performing a Religious Function**

Faculty are not required to pray with students, attend religious services on campus, or include elements of religious teachings in their classes. [Tr. 191, 383, 400]. When religion is discussed in a class, it is presented and treated in philosophical, not theological, terms. [Tr. 401]. When a prayer is offered at a campus event, faculty are not required to participate. [Tr. 383]. Faculty are not required to take an Oath of Fidelity to the Catholic faith. [Tr. 398, 540, 541]. An Oath of Fidelity is a formal oath made to a designated religious superior that one will remain faithful to the teachings of the Catholic Church. [Tr. 540]. Faculty do not report their classroom activities to anyone with a religious title. [Tr. 321, 547].

According to Dr. Humphries, Respondent maintains six core values: integrity, excellence, community, personal development, responsible stewardship, and respect. [Tr. 549]. Respondent argues that its core values have a Benediction origin, but the record is without any explanation as to what makes these values inherently religious in nature.  Accordingly, faculty members testified that they do not attribute the core values to anything religious. [Tr. 413, 549]. One faculty considered the core values to be "the guiding principles of our business" and said the values "didn't feel very religious;" rather, they are "good tenets to follow."  [Tr. 313]. While each class requires highlighting one core value in its master syllabus, faculty are not required to read the core value and its definition to students. [Tr. 319, 548]. Faculty are not required to tie a core value to a religious application at any time during their instruction. [Tr. 314, 548].  Furthermore, there is no evidence that there is anything given to students and faculty indicating that Respondent's core values are derived from Benedictine values. [Tr. 259].

EXHIBIT C

EXHIBIT C

Neither appointment letters nor reappointment letters issued to faculty indicate that they are expected to maintain a religious educational environment, impart a religious education, or perform a religious function as part of their job duties. [GCX 15; GCX 16, GCX 45; Tr. 115, 455].[19] Faculty testified consistently that they receive no training at orientation regarding religion or their role in maintain a religious educational environment. [Tr. 397, 421, 422, 743]. There is nothing in either the expired CBA or the new handbook even suggesting that faculty perform any religious functions or take any action to maintain a religious educational environment. [Tr. 745]. Respondent admits that faculty do not receive training regarding faculty's role in maintaining a religious educational environment in the classroom.[20] [Tr. 191]. Faculty have not received training to incorporate Catholic social teaching or Catholic intellectual tradition into their classes or to tie their lessons to Benedictine or Catholic values as such, beyond the aforementioned six values Respondent has adopted as its own values. [Tr. 744]. Faculty are not even required to read any materials related to religion or Catholicism. [Tr. 549].

Similarly, faculty job descriptions in effect during the previous two years (since the withdrawal of recognition) contain no duties associated with maintaining a religious educational environment, imparting a religious education, or performing a religious function. [GCX 13(a) through (h), RX 64]. Faculty classroom and online evaluation forms completed by the administration and their peers contain no mention of religion, nor do they rate faculty's role in maintaining a religious educational environment, imparting a religious education, or performing a religious function. [GCX 25; GCX 26]. The evaluation forms for faculty that are completed by

---

[19] Respondent admits that the appointment letters in the record are typical of appointment letters issued. [Tr. 115].

[20] Faculty have also received no training in maintaining a religious educational environment for online courses.  [Tr. 462, 752].

EXHIBIT C

EXHIBIT C

students likewise do not rate these subjects. [GCX 27]. The faculty members who appeared at the hearing consistently testified that they had never received any comments on any evaluation forms from an observer related to religion or maintaining a religious educational environment. [Tr. 405].

Faculty are required to complete an "annual plan" each year. [GCX 28; Tr. 171, 172]. The annual plan is provided by the administration and is intended to help faculty prepare for their annual review by outlining areas regarding teaching, scholarly growth, and service. [GCX 28; Tr. 172]. There is no reference to religion on the form, much less any mention of maintaining a religious educational environment, imparting a religious education, or performing a religious function as a goal for faculty. [GSX 28; Tr. 172].

Respondent provides faculty with a Statement of Expected Pedagogy. [Tr. 175, 228]. The Statement document is issued by the VPAA and is applicable to all of Respondent's faculty, in all departments, and in all colleges and schools. [Tr. 175]. The Statement outlines how faculty are expected to teach while working for Respondent, such as by making sure that course assignments and discussions require critical thinking, core values, and decision-making on the part of students. [GCX 29 p. 2]. The detailed document does not mention religion in any form, nor does it mention anything about Respondent expecting faculty to maintain a religious educational environment or impart a religious education to students. [GCX 29].

The faculty who appeared at the hearing consistently testified that they have taught the same classes at public institutions that they teach or have taught at Saint Leo, without modifying the syllabus or teaching method with an eye towards Respondent's Catholic foundation or Benedictine values. [Tr 316, 317, 465]. For example, Dr. Patrick Crerand credibly testified that he taught the same composition class at the University of Louisiana-Lafayette, a public institution, as he taught for Respondent; he testified there is no difference in the way he taught the class to

EXHIBIT C

students at the two institutions. [Tr. 464, 465]. Dr. Brian Camp testified that he taught several classes, such as calculus and differential algebra, for Respondent that he also taught at public institutions. [Tr. 316-317]. Dr. Camp explained that other than accounting for a difference in class sizes, the manner in which he taught algebra for Respondent was no different than how he taught algebra at Oregon State University, a public institution. [Tr. 316].

**J.      Academic Freedom**

The parties' expired CBA contained an academic freedom provision. [JX 1, p. 15]. The provision acknowledged that Respondent is a Catholic institution that recognizes the teachings of the Catholic Church as morally binding. [JX 1, p. 15]. However, the academic freedom provision went on to state that Respondent does not require faculty to practice or profess the Catholic faith as personally binding, only that faculty members must "act professionally, respect, understand and support the institution's missions and values." [JX 1, p. 15]. The CBA explicitly stated that Respondent stands committed to the academic freedom principles of the 1940 American Association of University Professors (AAUP) statement and the AAUP guidelines on the subject. [JX 1, p. 15]. The rest of the provision essentially quotes and paraphrases the 1940 AAUP Statement. [JX 1, pp. 15, 16; GCX, 30 p. 2]. The 1940 AAUP Statement was adopted by the Association of American Colleges and Universities, its successor entity, of which Respondent is a member. [GCX 30, pp. 1, 2; Tr. 1019].

The 1940 AAUP Statement guidelines mandate that when it comes to academic freedom, "limitations of academic freedom because of religious or other aims of the institution should be clearly stated in writing at the time of [faculty] appointment." [GCX 30, p. 2]. Respondent admits that the faculty appointment and reappointment letters in the record do not inform the recipients that their academic freedoms are inhibited in any way by taking a teaching position with

EXHIBIT C

EXHIBIT C

Respondent. [GCX 15; GCX 16, GCX 45, Tr. 115, 116]. Furthermore, Professors Miller, Crerand and Wright all testified that there was nothing in their appointment and reappointment letters that indicated their academic freedom was curtailed by taking a position with Respondent. [Tr. 396, 457, 750].

The new December 2020 faculty handbook also contains an academic freedom statement. [GCX 23; GCX 33; Tr. 188]. The 2020 academic freedom statement was unilaterally revised and implemented after Respondent withdrew recognition from the Union and without the Union's approval. [Tr. 707]. The revised statement keeps much of the same language as the academic freedom statement in the expired CBA but goes on to state that the academic freedoms enumerated in the statement are "not absolute and cannot be used to justify statements or actions that demonstrate misconduct, incompetence, violate professional responsibilities and conduct policy, or undermines the Catholic identity of the University." [JX1 p.11]. The new academic freedom statement says that it is "inappropriate [for faculty] in the classroom to serve as advocates for positions that are contrary to the doctrine of the Catholic Church or outside the boundaries of their discipline or course content."[21] [JX1 p.11].

There is no evidence that Respondent has enforced the new 2020 policy by disciplining faculty for statements made in class or for the materials that faculty have used in class which are inconsistent with Catholic beliefs. [Tr. 191]. Dr. Valerie Wright testified that she has no fear of being disciplined for expressing her opinions in class. [Tr. 751]. Dr. Patrick Crerand testified that he taught from *The Handmaid's Tale*, a novel by Margaret Atwood, as it appeared on the syllabi for both classes that he developed, and classes developed by others.  [Tr. 458, 459]. The relatively

---

[21] As previously noted, Respondent employs faculty who are not Catholic. [Tr. 307]. Faculty report that no training is given to employees to identify Catholic beliefs and values. [Tr. 307, 308].

EXHIBIT C

well-known anti-religious novel discusses forced pregnancy and advocates for access to abortion, which is inconsistent with Catholic beliefs. [Tr. 458, 473]. However, Dr. Crerand's unrebutted testimony is that nothing was ever said to him about teaching the text, even though Respondent affirmatively had knowledge that it was being used since the title appeared on the class syllabus. [Tr. 459]. Dr. Crerand further testified that existentialism was discussed, along with philosophy, when the class engaged in a discussion of Friedrich Nietzsche's argument against the existence of God. [Tr. 460]. Dr. Crerand admitted that he advocated Nietzsche's position in class. [Tr. 461]. Professor of Natural Science Dr. Christopher Miller testified that he tells his classes that God is not discussed in science, because you cannot prove the existence of God using the scientific method. [Tr. 400].

In addition to professors discussing and using teaching materials which are inconsistent with Catholic beliefs, there is clear, uncontroverted evidence that students often bring up subjects or positions in class that are inconsistent with Catholic beliefs, without penalty or admonition. [Tr. 459, 550]. Dr. Patrick Crerand testified that he has had students who requested to write papers in support of abortion. [Tr. 458]. Dr. Thomas Humphries, who teaches religion and theology, credibly testified that students in his classes have advocated for atheism, abortion, contraception, and take a "surprising" (to a Catholic) "pro-violence" position on some issues. [Tr. 551]. Faculty have not received instruction that they should maintain a religious educational environment when students advocate in class for positions inconsistent with Catholic beliefs, nor are they given any training or teaching aids on how they would do so. [Tr. 461, 550].

### K.     Faculty's Role in Making Managerial Decisions

There is no dispute that faculty do not play a role in establishing either admissions or graduation standards for Respondent's students. [Tr. 235]. Further, Respondent admits that faculty are not involved in setting tuition and fees, or in determining the size of the student body.

[Tr. 235]. Historically, the administration has unilaterally made the decision to open new colleges and schools without input from faculty. [Tr. 196]. Faculty do not make financial decisions for Respondent, and they have no role in the distribution of financial aid to its students. [Tr. 236, 287]. It is further undisputed that faculty play no role in decisions as to whether to renew the contracts of nontenure-track faculty. [Tr. 236].

Additionally, faculty do not have any input in determining in which "college" or "school" their academic departments are placed. [Tr. 299, 300] For example, Dr. Brian Camp testified that in the fall of 2020, the math department faculty were not consulted before Respondent communicated to them that it had decided to split the biology and math departments, move the math department from the College of Arts and Sciences, and move Biology to the School of Computing, Artificial Intelligence, Robotics, and Data Sciences. [Tr. 299, 300, 392]. Similarly, Dr Thomas Humphries testified that about three years ago, the Department of Philosophy, Theology, and Religion faculty were not consulted before Philosophy faculty were severed from the Department and sent to the Department of Interdisciplinary Studies. [ Tr. 573].

Likewise, there is no evidence that faculty have any input in whether a certain course is offered online or in person during any given semester. [Tr. 565] Further, faculty credibly testified that other than giving feedback to their dean, they play no role in creating the course schedule. [Tr. 325]. Dr. Brian Camp testified that he requested to teach an online class for his "overload," or extra class. [Tr. 326]. Dr. Camp was told by his supervisor (the department chair) that if he wanted an extra class it would have to be in person; in essence, Dr. Camp's request to teach an online class was denied. [Tr. 326]. Dr. Camp also made a request to teach certain classes in a semester, but his request was denied by his department chair. [Tr. 327]. Dr. Camp also testified that requests to

teach a class on Mondays, Wednesdays, and Fridays, rather than on Tuesdays and Thursdays, were "almost never" granted. [Tr. 374].

In an effort to establish that faculty members are managers, Respondent offered the example of certain full-time faculty acting as directors of certain programs, thereby purportedly performing managerial tasks. [Tr. 286]. Specifically, Dr. Spoto identified the director of the Honors program as performing managerial duties when the director overhauled the Honors program. [Tr. 286]. However. Dr. Spoto later conceded that the Honors program director was asked by the administration to overhaul the Honors program, and did not undertake on their own initiative. [Tr. 292].

### L.      The Promotion and Tenure Process

Promotion and tenure have traditionally been the path for career advancement for Respondent's full-time faculty. [Tr. 236].  Respondent admits that the promotion and tenure process is of value to faculty because it gives faculty security to pursue topics in class without "fear or concern." [Tr. 236]. Further, it provides stability, and in the case of promotion, it has a monetary benefit. [Tr. 237].

A tenure-track faculty member applies for promotion and tenure by putting together a portfolio containing evidence of the candidate's excellence in teaching, service, and professional development. [Tr. 406]. The promotion or tenure candidate's portfolio then comes before the promotion and tenure committee for consideration and a recommendation. [Tr. 406]. Under the expired collective-bargaining agreement, the promotion and tenure committee consisted of five full-time faculty, but the new employee handbook expanded the committee to seven members. [Tr. 238]. While the tenure and promotion committee is made up entirely of full-time faculty members, chosen in part by the faculty, the committee only makes a *recommendation* to the

president of the university. [Tr. 238, 406]. The president then decides whether to accept the committee's recommendation and advance it to Respondent's Board of Trustees for final approval. [Tr. 238, 407].

The committee's recommendation is not a "rubber stamp," as there is evidence that the president has refused to follow the recommendation of the committee; specifically, a former president refused the promotion and tenure committee's recommendation to grant promotion to Dr. Michael Novak. [Tr. 407]. Respondent not only admits that have there been occasions when Respondent's president refused to accept the committee's recommendation to grant tenure or promotion to a faculty candidate, but also that there have been occasions when the committee has recommended against a candidate, and the president nonetheless *has* recommended that candidate to Respondent's board of trustees. [Tr. 239, 240].

## M.    Hiring Search Committees

Faculty are routinely assigned, asked, or volunteer to serve on search committees for instructor and faculty hires. [Tr. 107, 409]. The hiring search committee will review applications, interview job finalists, and make a recommendation about whether to hire an applicant. [Tr. 107, 976]. On occasion, the hiring committee will be given interview panel guides that come from the college or Respondent's Human Resources department. [Tr. 107, GCX 46]. Interview panels do not ascertain an applicant's ability to perform a religious function or impart a religious education; in fact, the panels do not mention religion at all. [Tr. 108, GCX 46]. Hiring committee members are not instructed to ask questions about an applicant's religion, their ability to perform a religious function, or an applicant's ability to impart a religious education. [Tr. 113]. In fact, at least in the College of Business, interviewers are specifically instructed to avoid the subject of religion. [GCX 46].

EXHIBIT C

EXHIBIT C

Hiring committees have no authority to hire applicants directly. [Tr. 409]. The hiring committee makes a recommendation to the department chair, who makes a recommendation to the dean of the college. [Tr. 758]. The dean then makes a recommendation to the vice-president of academic affairs. [Tr. 758]. The VPAA makes a final determination regarding who to hire. [Tr. 709, 977]. VPAA Spoto admitted that the administration has hired applicants who were not recommended by the hiring committee. [Tr. 112]

For example, Dr. Christopher Miller testified without contradiction that several years ago, a biology professor position was filled by Dr. Cheryl Kozina (née Clausen), despite the hiring committee's recommendation that a different applicant named Joaquin (last name unknown) be hired. [Tr. 409, 410]. Dr. Valerie Wright testified without contradiction that Dr. Shelly Whitworth was hired for a 'middle-grades" position in the education department even though Dr. Whitworth was not recommended by the hiring committee on which Dr. Wright had served. [Tr. 757]. Dr. Wright also testified that a different hiring committee on which she had served selected a "gentleman" as the committee's recommendation, but the VPAA declined to follow the committee's recommendation and hired a female named Kim Higdon instead. [Tr. 759]. Dr. Wright further testified that there were instances when she had served on a hiring committee, and the committee would make a recommendation, but nobody was hired. [Tr. 758, 759]. Dr. Wright's uncontroverted testimony is that the hiring committee was not consulted before the decision not to hire anybody was made. [Tr. 759].

The evidence shows that faculty involvement in the hiring of department chairs and deans is rare. [Tr. 328]. Although Dr. Christopher Miller testified that he had served on an "general faculty search committee" for a department chair position that resulted in the hiring of Dr. Tom Arnold, several other professors credibly testified that they had no role in the hiring of department

32

EXHIBIT C

EXHIBIT C

chairs and deans despite numerous such vacancies over the years. [Tr. 328, 329]. Faculty have requested that the chair position be rotated among department faculty, but those requests have been denied by Respondent. [Tr. 561]. The evidence reveals that after department chairs and deans are hired, faculty play no meaningful role in evaluating the performance of department chairs and deans. [Tr. 329, 412].

### N.     The University Senate and its Committees

Respondent has historically used a University Senate which provides a "forum and conduit to enhance communication and build understanding that between University leadership and the University community as a whole." [GCX 34 p. 1]. The University Senate includes faculty, a few adjuncts, and "some staff." [Tr. 981]. The Constitution of the University Senate states that the Senate is to coordinate, monitor, and recommend policy in "policy, administrative and Student Affairs" of the university, but the full and final authority to make such changes resides with the president of the university, and ultimately with the Board of Trustees. [GCX 34 p. 1]. The only authorities expressly granted to the Senate by its Constitution are the creation of the by-laws of the Senate and any matter referred to the Senate by the university president. [GCX 34 p. 3]. Respondent admitted that any policies passed by the University Senate that require funding must be approved by administration before they can be implemented [Tr. 197]. Although the faculty had been told that the relationship between the administration and the university faculty would be collaborative in nature, the University Senate was not consulted when the administration made significant changes to academics and to the nature of the university, such as the closing of educational centers located around the country. [Tr. 1100].

The University Senate is organized by standing committees, made of faculty who are assigned to committees as voting members by the University Senate president. [GCX 34]. Not all

33

EXHIBIT C

EXHIBIT C

faculty members serve on University Senate committees. [Tr. 197].  However, Dr. Spoto testified that faculty are "expected" to participate on committees as part of their promotion and tenure process. [Tr. 983]. Standing committees of the University Senate include the undergraduate curriculum committee, graduate curriculum committee, undergraduate academic standards committee, graduate academic standards committee, planning and budget review committee, assessment and research committee, technology advisory committee, collaborative community committee, library committee, environmental advisory committee, and Catholic identity advisory committee. [GCX 34 pp. 2, 3].

Dr. Andrew Gold served as president of the University Senate from August 2018 through January 2022. [Tr. 1092, 1103]. Dr. Gold testified without contradiction that while policy recommendations are regularly made by the Senate's committees, he is not aware of a single recommendation made by the Senate over the past several years that was enacted by Respondent. [Tr. 1097].  Dr. Gold offered specific examples of recommendations made by committees of the University Senate that were ignored by the administration.  The technology committee recommended that Respondent simplify its portal entry and feedback forms regarding Respondent's redesigned website; Respondent did not do so. [Tr. 1103, 1104]. Further, the environmental advisory committee's recommendation to start a robust recycling program on campus has not been implemented by administration. [Tr. 1104]. Respondent's administration also failed to act on recommendations made by the Catholic identity committee that were intended to strengthen Respondent's Catholic identity.  [Tr. 1104].

The undergraduate and graduate curriculum committees are responsible for reviewing and approving new and revised curriculum. [GCX 34 p. 2; GCX 35 p. 10]. The term "curriculum"

EXHIBIT C

includes both individual courses and degree programs.[22] [Tr. 192]. Curriculum committees are made up of voting and non-voting members. [GCX 35 p. 10, 11]. There are seven voting members on each respective curriculum committee. [GCX 35 p. 10, 11]. Four of the seven voting members are appointed by deans or the library director; the other three voting positions are appointed by the University Senate. [GCX 35 p. 10, 11]. The committees also include non-voting members who are appointed by the administration. [GCX 35 p. 10, 11; Tr. 218]. For example, the undergraduate curriculum committee will include seven representatives appointed by the vice president of campus enrollment management, vice president of marketing, associate vice president of learning design, vice president of academic affairs, senior vice president, assistant vice president of accreditation, and the registrar.[23] [GCX 35 p. 10, 11]. The graduate curriculum committee has a similar make up, with one additional non-voting member and slight changes to the appointed positions, irrelevant to the instant matter. [GCX 35 p. 15].

Only full-time faculty may bring curriculum proposals before the curriculum committees. [GCX 9 p. 1]. Again, faculty are defined by the April 2021 Faculty Handbook as full-time members of the University both tenured and non-tenured, whose primary responsibilities focus on teaching, scholarship, and service as set forth in each faculty member's letter of appointment. [GCX 33 p. 7].[24]   However, Respondent admits that there are times that a department chair or dean has requested faculty to create or develop a course or program. [Tr. 192, 193]. In fact, the record contains specific examples where faculty were requested or assigned to create or revise courses

---

[22] New degree programs must be approved by the Board of Trustees after the program is approved by the curriculum committee.

[23] The Vice President of Academic Affairs, Dr. Spoto, testified that she oversees the library, deans, learning design, and the registrar. [Tr. 42, 43].

[24] Department chairs are defined as an individual who manages an academic department within the University and may also have a teaching assignment. [GCX 33, P. 8].

EXHIBIT C

and programs by department chairs, deans, or the administration. [Tr. 568, 571]. Department chairs have also sought to co-develop classes with faculty after a curriculum proposal has been initiated by a member of faculty. [Tr. 568].

When faculty, department chairs, deans, or the administration want to develop a course or program, the proposal is discussed within the relevant department and a recommendation is made by the department chair. [Tr. 195]. Next, the proposal goes to the college the department is located in for the approval of its dean. [Tr. 195]. The submission form to the curriculum committee requires approval from the dean of the school or college involved in the proposed curriculum. [GCX 9 p. 3, Tr 211, 323, 324]. The curriculum committee cannot consider a proposal without the dean's approval. [Tr. 210]. In other words, nothing gets to the faculty members on the curriculum committees without first being approved by the administration. [Tr. 210].

Additionally, in the case of new programs, Respondent admits that before a new program proposal can move forward to the department and college discussion stages, it must be assessed by the administration for demand and marketability to determine whether it is a "good move." [Tr. 294]. Sometimes decisions about whether to create, move or eliminate a program are made without any input from faculty. [Tr. 1005-1007]. For example, the administration made the unilateral decision – without the input of the University Senate or its undergraduate curriculum committee – to discontinue the Bachelor of Arts in Religion on campus; further, the administration solely decided, again without the input of faculty, that it would be replaced by a Bachelor of Arts in Religious Studies. [Tr. 1005]. While faculty played a role in developing the courses for the new Religious Studies program, Respondent admits that faculty did not have input in the decision to implement a religious studies program in the first place. [Tr. 1007]. Likewise, Dr. Stephen Okey

EXHIBIT C

testified that he only proposed a doctorate in theology program to the graduate curriculum committee because it was requested of him by his dean and the VPAA. [Tr.1110].

The record also contains examples where faculty have requested permission to develop a course or program but have been denied by their department chair, dean, or the administration. For example, Dr. Brian Camp testified that in 2014 or 2015, he suggested to his department chair several times that he would like to develop a Bachelor of Science in mathematics and a graduate degree in mathematics.[25] [Tr. 321, 322]. Dr. Camp stated that others in his department supported his suggestions, however his department chair instructed him not to pursue it further. [Tr. 322, 323]. Dr. Thomas Humphries credibly testified that he asked to develop a class regarding the writings of Thomas Merton and another class called "Reading While Black," but both requests were denied by his department chair. [Tr. 566]. There is no procedure for faculty to circumvent the dean's requisite approval to have curriculum implemented, and no way to reach the dean without the approval of the faculty member's department chair. [Tr. 210].

If departmental and college/school approval is obtained, the curriculum committees then consider a course submission package completed by the proposer, which includes a master syllabus "checklist." [GCX 9; GCX 31; Tr. 1173]. Items to be completed in the submission package include a justification for the proposal, rationale for the level assigned to the course, its impact on the university, and other essential items. [GCX 9]. As noted, the submission form also requires written approval from the dean of the school involved in the proposed curriculum. [GCX 9 p. 3, Tr. 211, 323, 324].

---

[25] Dr. Spoto testified that it was common for faculty to verbalize their ideas to department chairs. [Tr. 291].

EXHIBIT C

EXHIBIT C

The master syllabus checklist was created by Respondent's former VPAA and has been in use for years. [Tr. 1173, 1174]. Both curriculum committees are required to use the checklist and must not deviate from its criteria or create their own standards. [Tr. 179]. The checklist outlines essential information that must be completed for approval, including but not limited to required texts, which of Respondent's six core values will be emphasized by the course, learning outcomes, methods of assessment, class content, and accrediting and professional standards to be covered. [GCX 31]. The faculty member that develops the master syllabus selects the core value they want to highlight. [Tr. 311]. The checklist does not mention religion.  [Tr.180].

Dr. Valerie Wright, who has served on both curriculum committees for about 10 years, credibly testified that the committees look at the quality of a proposal using the checklist as a guideline. [Tr. 1072]. While there is evidence that a curriculum committee has rejected a proposal in the past, the rejection was based solely on the proposal not meeting the technical requirements of the checklist. [Tr. 1177]. The curriculum committee does not reject proposals because the committee disagrees with the subject matter or substantive content of a proposal. [Tr. 1174, 1175]. Dr. Wright testified that if the everything on the submission package and checklist provided by the VPAA is complete, the committee approves the proposal.[26] [Tr. 1174].  Moreover, submissions to the curriculum committee that do not meet the checklist criteria are not rejected by the committee; rather, the proposer is asked to revise and resubmit. [Tr. 213, 218].

There is evidence that Respondent's administration has overridden the "deliberations" of the curriculum committees. [Tr. 1176]. For example, Dr. Wright described an instance two years ago where the committee rejected a submission because it encompassed changes for ten different

---

[26] Dr. Spoto testified that there have been times when a proposal has met all the criteria on the checklist and has been rejected by the curriculum committee, but she was not able to provide a specific example. [Tr. 214, 215].

EXHIBIT C

EXHIBIT C

courses. [Tr. 1176]. Per the checklist, each course's changes should have had their own submission form. [Tr. 1176]. Dr. Wright testified without contradiction that after the committee rejected the proposal, the VPAA told the committee to accept the proposal, which they then did. [Tr. 1176]. On a different occasion, the committee rejected a doctorate in education proposal because it did not specify the courses to be taught, a requirement for a program proposal; however, the former VPAA unilaterally approved the program the following summer without the specific courses for the degree having been added to the proposal. [Tr. 1181].

Further, there is evidence that the non-voting members of curriculum committees (those appointed by the administration) exert influence on the determinations of the committees. Dr. Wright testified that she made a submission several years ago for a reading foundations course for the College of Arts and Sciences. [Tr. 1186]. Dr. Wright learned from the chair of the curriculum committee that her proposal was rejected because the registrar, a non-voting committee member appointed by the administration, requested that the proposal not be approved. [GCX 56; Tr. 1186].

Likewise, the undergraduate and graduate academic standards and policy committees, which set the standards for educational and academic conduct, do not have final authority on academic misconduct. [GCX 34, p. 2]. The committees, made up of full-time faculty, are tasked with investigating and adjudicating allegations of academic cheating against students. [Tr. 986]. Full-time faculty make up the voting members of the committees. [Tr. 986]. The committees also have non-voting members, such as the registrar, that represent the administration. [Tr. 1167]. Some voting members of the committees are appointed by the University Senate, while others are appointed by administrators. [Tr. 1074, 1166]. Dr. Patrick Crerand credibly testified that he was appointed to the undergraduate committee by then-dean Dr. Mary Spoto, and he was instructed by Dr. Spoto to be "tough." [Tr. 1166]. Dr. Crerand served on the undergraduate academic standards

EXHIBIT C

committee from 2009 to 2012, chairing it for the last two years of his time on the committee. [Tr. 1166]. Although decisions and sanctions are handed down to students directly from the committee, students have the right to appeal a committee's decision to the vice-president of academic affairs for a final decision. [Tr. 1077]. Moreover, according to Dr. Crerand, in addition to handling academic dishonesty cases, the undergraduate academic standards committees have been assigned other tasks by the administration, including revising the academic honor code. [Tr. 1167]. Dr. Crerand testified that these extra projects were always assigned by the administration, not initiated by the committee itself. [Tr. 1167].

As noted above, the University Senate also has a standing Catholic identity committee, although it has only been in existence for about the past five years. [Tr. 1112]. Dr. Stephen Okey served as chair of the standing committee for two years before rotating off the committee at the conclusion of the spring semester in 2022. [Tr. 1111]. Dr. Michael Cooper was the prior chair of the Catholic identity committee. [Tr. 1112]. Dr. Okey credibly testified that during Dr. Cooper's term as chair, the committee brought several recommendations to the administration to enhance Respondent's Catholic identity, including naming on-campus streets after saints, refurbishing the glass in a chapel on campus to make it more apparent that it was a religious building, and erecting a religious statue on campus. [Tr. 1113]. However, none of the committee's suggestions were implemented by Respondent's administration. [Tr. 1113, 1125]. When the Catholic identity committee met with Respondent's president to discuss its suggestions, the president was more interested in sharing a draft of a revised Catholic Identity Statement with the committee. [Tr. 1120]. The committee made suggestions related to the revised statement, but none of the committee's recommended changes were accepted by Respondent. [Tr. 1122]. Dr. Okey testified without

contradiction that the Catholic identity committee never presented proposals related to Catholic education. [Tr. 1145, 1146].

In 2021 and 2022, during the time that Dr. Okey chaired the Catholic identity committee, the committee presented three goals of the committee to then-President Senese. [Tr. 1123]. The first goal was to complete a survey of employees regarding the religious identity of Respondent's employees. [Tr. 1123]. The second goal of the committee was to educate new employees during the onboarding process about Respondent's Catholic identity and traditions. [Tr. 1124]. The third goal of the committee was to improve communication of Respondent's Catholic identity, such as using Respondent's communication platforms to highlight Catholicism-related topics, such as a "saint of the week" or reminders about the weekly mass schedule. [Tr. 1124]. While the survey of employees has been completed, nothing has been done with the results and the other two committee goals have not been implemented. [Tr. 1127, 1128].

### O. Respondent Updates its Catholic Identity Statement

On October 7, 2020, Respondent sent an "update" in the form of an email to all faculty, staff, and students announcing that Respondent, in an effort to strengthen its commitment to Catholic education, had crafted a revised comprehensive Catholic identity statement. [GCX 11]. The revised lengthy Catholic identity statement beefed up Respondent's prior four-sentence version. [GCX 10 p. 4].

The revised statement, among other things, highlighted Respondent's purported commitment to *Ex Corde Ecclesiae*. [GCX 12 p. 3]. While Respondent claims it had previously adopted *Ex Corde Ecclesiae,* there is no evidence to suggest that the purported adoption was memorialized in writing prior to its inclusion in Respondent's October 7, 2020, revised Catholic identity statement. [Tr. 92, 271, 272]. *Ex Corde Ecclesiae* is a doctrine written by Pope John

Paul II which outlines the principles and duties of a Catholic university. [Tr. 87, 92, 574]. *Ex Corde Ecclesiae* requires that a majority of a Catholic university's faculty be Catholic. [GCX 44, p. 17; Tr. 576]. However, Respondent admits that applicants are not asked to identify their religion during any phase of the hiring process. [Tr. 113, 396]. Respondent further admits that applicants have never been rejected because they are not Catholic. [Tr. 113]. Respondent concedes that it does not know the percentage of its faculty that are Catholic – even though it completed a survey of its employees' religious identity within the last two years, as described above. [Tr. 113, 1127-1128].

   *Ex Corde Ecclesiae* also obligates a Catholic university to require a *man datum* of those who teach theology. [GCX 44 p. 17; Tr. 576, 577]. A *man datum* is a promise and an affirmation from a theologian to a bishop declaring that what the theologian teaches will knowingly be in line with the doctrinal teachings of the Catholic Church. [Tr. 536]. Respondent employs theology faculty who do not possess a *man datum* without requiring them to obtain one as a condition of initial or ongoing employment. [Tr. 536, 537, 660]. In contrast, Ave Maria University, University of Dallas, and Christendom College are examples of Catholic institutions that require faculty to have a *man datum* as a condition of employment. [Tr. 538, 539].

   **P.    Respondent's Board of Trustees Votes to Withdraw Recognition from the Union**

   On October 23, 2020, before a final agreement on a successor CBA could be reached, Respondent's Board of Trustees met and voted to withdraw recognition from the Union as the exclusive bargaining representative of the Unit. [GCX 18]. In its resolution memorializing the vote, the Board of Trustees cited the National Labor Relations Board's June 2022 decision in *Bethany College* to justify its decision to no longer recognize the Union. [GCX 18, p. 1]. Furthermore, on that same date, the Board of Trustees authorized the President to oversee the

development of a faculty handbook to replace the expired CBA and authorized the administration

to develop a model of shared governance to replace the existing University Senate. [27] [GCX 18,

p. 1].

At the same meeting, the Board of Trustees also voted to implement the communication

plan found in the resolution materials; the communication plan and resolution materials included

a scheme for implementing the Board of Trustees' decision to withdraw recognition from the

Union. [GCX 18, p. 3; GCX 19]. For example, the resolution materials highlighted key messages

that Respondent wanted to convey regarding its decision.   [GCX 19, p. 2]. Those messages

included relaying that the decision was made in the spirit of helping innovation and a desire to be

"more nimble and responsive" and "more agile in the fast-moving world of higher education."

[GCX 19 p. 2].  The communication plan included talking points for Respondent's officials which

highlight the aforementioned reasons for its decision; letters that would be sent out to faculty, staff,

and the community from various Respondent officials; news releases; and planned social media

posts announcing the withdrawal of recognition. [GCX 19 pp. 6 through 20]. Nowhere in the

communication plan or resolution materials is there any explanation of how recognizing the Union

infringed on Respondent's First Amendment rights as a religious institution or how withdrawing

recognition would strengthen Respondent's Catholic identity. [GCX 19].[28]

The Union learned about Respondent's decision to withdraw recognition on October 23,

2020. [Tr. 704]. Prior to that date, the Union had no knowledge Respondent was contemplating

withdrawing recognition. [Tr. 704]. The Union was notified of the Board of Trustees' decision in

---

[27] The University Senate is discussed in more detail later this Brief.
[28] Dr. Spoto admits there was no discussion at meetings regarding Respondent's freedom of
religion rights being infringed upon because of Respondent obligation to recognize the Union. [Tr.
139, 140].

EXHIBIT C

an email from Respondent's former general counsel Kelly De Hill to Union President Valerie Wright and Union representative Graham Picklesimer. [GCX 38; Tr. 696]. The email from De Hill cited the NLRB's decision in *Bethany College* as the basis for the Board of Trustees concluding that the NLRB did not have jurisdiction over Respondent. [GCX 38]. In her email, De Hill mentioned that it was in the best interest of Respondent to foster "an exceptional religious educational environment for students" but did not explain how its decision to withdraw recognition would accomplish that. [GCX 38].

That same day, faculty received emails from the chairman of the Board of Trustees, Respondent's then-President Senese, and VPAA Spoto, announcing the Board of Trustees' decision.[29] [GCX 39; GCX 40; GCX 41]. Those emails highlighted the talking points directed in Respondent's communication plan, citing "flexibility," being "nimble," the ability to "pivot swiftly," and "be[ing] more agile" as the reason for the Board's decision. [GCX 39; GCX 40; GCX 41].

Additionally, in her letter to faculty, VPAA Dr. Spoto explained that the decision made by the Board of Trustees was also made in order to "hold true" to Respondent's Benedictine Catholic core values – but VPAA Spoto did not explain how this action furthered that objective. [GCX 40]. VPAA Spoto's email also announced that Respondent would be creating a new "shared governance," under which a new faculty handbook would be created. [GCX 40 p. 1]. To date, a new shared governance model has not been implemented. [Tr. 1083].

---

[29] Dewey Mitchell is no longer the chair of the Board of Trustees. Dr. Senese was replaced as university president after the 2021-2022 academic year by Dr. Ed Dadez. VPAA Dr. Mary Spoto remains in her role.

EXHIBIT C

EXHIBIT C

**Q. Respondent Meets with Faculty to Discuss Creation of New Faculty Handbook**

On October 28, 2020, VPAA Spoto met with faculty and explained that she would be setting up a transition team that included full-time faculty to craft and review a new employee handbook to replace the expired CBA. [Tr. 154]. The transition team ultimately offered comments on handbook provisions related to terms and conditions of employment. [Tr. 155]. Respondent admits it sought the input of faculty regarding the handbook without giving the Union the opportunity to bargain over handbook provisions. [Tr. 155, 157].[30]

On December 18, 2020, VPAA Spoto sent an email to faculty. [GCX 22; Tr.156]. A copy of an interim handbook was attached. [GCX 22; GCX 23, Tr. 156, 157]. The interim handbook indicated on its face that it would be effective on January 15, 2021. [GCX 23]. The VPAA's email highlighted new and modified provisions in the handbook that were different than what appeared in the expired collective bargaining agreement. [GCX 22; Tr.157]. Those highlighted changes included, but were not limited to, changes to the Tenure and Promotion Committee, faculty workload, overload, summer assignments, sabbaticals, and furloughs.[31] [GCX 22].

In April 2021, Respondent issued a final version of the handbook which was substantially similar to the interim version that it had drafted and promulgated in December 2020. [Tr. 183, 706; GCX 33]. As before, Respondent did not seek the input of the Union before distributing the April 2021 final version. [Tr. 707]. The final version of the handbook was approved by the Board

---

[30] Respondent admits that it bypassed the union and dealt directly with employees [Tr. 9].; however, as discussed further below, Respondent avers that it did not violate the Act because the Board does not have jurisdiction over Respondent because it is a religious institution and faculty are managers.

[31] The letter highlighted numerous other changes; however, for the purposes of this brief those will not be discussed because Respondent has admitted to those changes and/or modifications in its Second Amended Answer. [GCX 1(ii)]. The admitted unilateral changes are paragraphs 10(a)(i) through (vi), 11(a)(i) through (iii), 11(a)(v) through (viii), 11(a)(xii), 11(a)(xiv) through (xxi), 11(a)(xxiii) through (xxvi), and 11(a)(xxviii) and (xxix) of the Complaint. [GCX 1(w)].

EXHIBIT C

of Trustees but was not presented to the faculty to be voted upon; rather, it was simply implemented by Respondent. [Tr. 707]. The April 2021 version of the handbook remains in effect at present. [Tr. 184].

### R.    Unilateral Changes and Mid-Term Contract Modifications

Both the interim and final versions of the faculty handbook contained numerous unilateral changes and mid-term contract modifications. For example, the interim handbook tied salaries to evaluations, [GCX 23, p. 32], and the final version of the handbook contains the same provision. [GCX 33, p. 33]. In contrast, the expired collective bargaining agreement did not contain language permitting evaluations to impact salaries. [JX 1, Tr. 710]. This unilateral change impacts unit employees because now, salary increases are individually determined based on the results of subjective evaluations instead of the objective criteria established by the expired CBA. [Tr. 710].

Under the expired contract, faculty were allowed to work up to 20 hours of outside employment per week. [JX 1, p. 20]. The interim and final versions of the handbook state that faculty may not engage in outside employment for more than 10 hours per week without approval from the administration. [GCX 23, p. 29, 30; GCX 33 p.  39].

The expired CBA did not have any provisions discussing furloughs, but the interim and final version of the handbook unilaterally impose a furlough policy. [GCX 23 p. 51, 52; GCX 33 p. 63; JX 1; Tr. 155, 157, 707].

The expired CBA included an arbitration provision that Respondent unilaterally rescinded. [JX 1 p. 31]. The interim and final versions of the handbook include a revised grievance procedure that eliminates the ability of faculty to grieve matters such as denial of tenure and promotion. [GCX,p.58-60; GCX 33, p. 57-61].

The expired agreement gave preference to full-time faculty (over non-unit part-time, adjunct, or visiting faculty) to teach alternate format classes. [JX 1, p. 23]. One faculty member, Dr. Valarie Wright testified that alternate formats are any classes that are not taught "on the ground" at the University Campus; alternate formats include online courses as well as in-person evening and weekend courses. [Tr. 715, 716]. Dr. Wright testified this is of importance to full time campus-based faculty because classes are not taught on campus in the summer, so if campus-based faculty want to teach during the summer, they need to teach an alternative format class. [Tr. 716]. In contrast to the expired CBA, the interim and final versions of the handbook do not include a preference for full-time faculty to teach summer assignments. [GCX 23, p. 27; GCX 33, p. 37].

The expired collective bargaining agreement required the electronic recording of the deliberations of the promotion and tenure committee and specified that such recordings be kept for seven years. [JX 1, p. 40]. Neither the interim nor final versions of the handbook call for the electronic recording of deliberations, nor retention of such recordings even if made. [Tr. 719]. This change impacts faculty because a faculty member would need this information if they wanted to file a grievance over a denial of promotion or tenure – if such grievances were still permitted. [Tr. 723, 724].

Finally, the definitions of several key terms changed in the interim and final handbooks from those previously in use in the expired agreement.[32]  The definition of "visiting faculty" changed from including a five-year limit on how long an individual could continue as visiting faculty and now includes no limit.  [JX 1, p. 8; GCX 23, p. 3; GCX 33, p. 7]. This impacts faculty as the removal of the time limit on visiting faculty could result in the loss of tenure opportunities

---

[32] Each definitional change is pled as its own unilateral change and/or mid-term contract modification in the Complaint.  [GCX 1(w)].

EXHIBIT C

because Respondent could classify an instructor as visiting faculty in perpetuity, something they were not permitted to do before.[33] [Tr. 727].  Likewise, limitations on the definition of "academic year" previously included in the expired CBA were removed from the interim and final handbooks. [JX 1, p. 11; GCX 23, p. 5; GCX 33, p. 9]. Specifically, under the expired agreement, specific dates were assigned to the academic year and the overall academic year was limited to nine (9) months.  [JX 1, p. 11; GCX 23, p. 5; GCX 33 p. 9]. Faculty are materially impacted by this change as they are unable to plan for summer – a time when no in-person classes have typically been offered on Respondent's campus, but for which faculty must now commit to being available. [Tr. 731].

The interim and final handbook introduced a definition for "faculty academic year" which was absent from the expired collective agreement. [GCX 23, p. 5; GCX 33, p. 10; Tr.731]. This new provision sets out the dates that faculty are required to be at work or available for work. [GCX 23, p. 5; GCX 33 p. 10]. Similar to the change in the definition of "academic year," the addition of the term "faculty academic year" impacts faculty because the uncertainty of what constitutes a faculty academic year makes it difficult for faculty to create personal schedules, including summer vacations. [Tr. 732].

S.    Policy Manual Rules

Respondent has promulgated and maintains an Employee Policy Manual which is accessible to employee online. [Tr. 81]. The current version of the Employee Policy Manual has been in effect since February 2008. [Tr. 84]. The Employee Policy Manual includes, among other

---

[33] Under the terms of the expired CBA, therefore, non-unit visiting faculty would automatically become part of the bargaining unit if they worked full-time for five or more years, and gain access to the rights and privileges afforded to unit employees by the CBA.

things, work rules related to use of Respondent's name seal and logo [Tr. 82], confidential information [Tr. 83], and media contact. [Tr. 84.]

Respondent's "University Name, Seal and Logo Policy" prohibits employees from using Respondent's logo in any activity outside the scope of the employee's regular work. [JX 2, p. 189]. The policy manual states that violation of the rule is "regarded as sufficient cause for dismissal or expulsion." [JX 2, p. 189].

Respondent's "Confidential Information" rule prohibits the disclosure of confidential information and defines such information to include pay and insurance information of current, former, and prospective employees, faculty, and adjunct employees. [JX 2, p. 254]. Confidential information also includes information regarding "university business." [JX 2, p.254]. The policy states that violating Respondent's confidential information rule may result in "legal penalties." [JX 2, p. 254].

Finally, Respondent maintains a "Media Contact Policy" that prohibits employees from commenting on university business to representatives of the media without authorization from Respondent. [JX 2, p. 255]. Further, this rule mandates that all inquiries from the press must be referred to Respondent's University communications office. [JX 2, p. 255].

The Respondent admits that the aforementioned rules are still in effect and are applicable to all employees of Respondent, regardless of the employee's work location. [Tr. 82-84.]

## III.   <u>Argument</u>

### A.      **Credibility of Witnesses**

In the present case, the administrative law judge must sift through facts related to whether Respondent holds itself out to the students, faculty, and the community as offering a religious educational environment, and facts related to whether Respondent's faculty act as managerial

employees. When the trier of fact is faced with contradicting evidence presented through the General Counsel's witnesses and Respondent's primary witness, VPAA Dr. Mary Spoto, the General Counsel's witnesses should be credited over Dr. Spoto. Dr. Spoto's testimony is not credible as it did not hold up under cross-examination; was generally broad, without evidentiary support or specific examples; she selectively recalled self-serving information, and her testimony at the hearing conflicted with her sworn affidavit previously provided to the Region during the investigation of this matter.

The record reflects that Dr. Spoto frequently made general assertions which did not hold up to scrutiny under cross-examination. For example, Dr. Spoto testified on direct that Respondent's bylaws require that Respondent's president be Catholic. [Tr. 955]. When Dr. Spoto was confronted with the requirements for the University president as stated in the bylaws, she could not identify where the bylaws state the president must be Catholic. [Tr. 1021]. Further, Dr. Spoto testified there was "no change" to the tenure and promotion committee's procedures after Respondent withdrew recognition from the Union. [Tr. 1014, 1015]. However, on cross-examination, Dr. Spoto had to admit that currently, the president appoints a member to that committee every year, while prior to the unilaterally modified tenure and promotion committee procedures in the wake of the withdrawal of recognition, the president had only made those committee appointments every other year. [Tr. 1050-1055].

The record also reflects Dr. Spoto making bare assertions and sweeping generalizations without providing specific examples or evidence to support her statements. For example, Dr. Spoto testified that Respondent has a policy that requires it to only make financial investments and have business dealings with companies that uphold Catholic values. [Tr. 922, 923]. Not only was no document presented to substantiate the existence of such a policy, but under cross-examination

EXHIBIT C

EXHIBIT C

and through rebuttal witnesses, it was demonstrated that Respondent selected a coffee provider that matches employee contributions to "pro-choice" organizations, in opposition to the "Catholic" value of opposing abortion access. [Tr. 1023, 1024, 1209- 1214]. Likewise, Dr. Spoto testified that Respondent grants "Catholic Promise" scholarships to student who graduate from Catholic high schools. [Tr. 961]. However, when pressed as to whether Catholic Promise scholarships were currently being granted to students, Dr. Spoto indicated uncertainty. [Tr.1035]. Respondent provided no evidence to establish that the Catholic Promise scholarship program is still active, nor any information showing how many scholarships had been awarded to students. In contrast, Dr. Thomas Humphries credibly testified that even though the award is still listed on Respondent's website, the program had "fizzled out." [Tr. 593]. In fact, when Dr. Humphries reached out to his dean and inquired if he should follow up to reactivate the award, he was told, "No." [Tr. 594].

Furthermore, Dr. Spoto conveniently recalled facts when they were self-serving. For example, Dr. Spoto was asked on cross-examination about the campus Starbucks controversy, described above. [Tr. 1023]. At the time, Dr. Spoto admitted that she "vaguely" remembered the controversy involving "some students" concerned about Starbucks because of a position by the coffee provider that "students did not believe was in sync with Catholic teachings." [Tr. 1023, 1024]. However, Dr. Spoto claimed she could not recall the subject of the controversy. [Tr. 1024]. Yet, when subsequently questioned by Respondent the following day, Dr. Spoto revealed that after she provided her aforementioned cross-examination testimony, she discussed her testimony with another administrator and changed her account of events: instead of "some students" having been concerned, it was only "one student" objecting to having a business association with Starbucks on campus. [Tr. 1210]. Suddenly, Dr. Spoto was able to recall various details about the Starbucks controversy from her "own personal knowledge," including the identity of the pro-choice

EXHIBIT C

organization Starbucks had donated to and details about conversations between the Respondent's president and various religious officials. [Tr. 1211. 1212]. Dr. Spoto could even recall the names of other major Catholic universities who serve Starbucks on campus. [Tr. 1212]. A day after Dr. Spoto had only a hazy recollection of events, she miraculously recalled that Starbucks was chosen because they use ethically sourced products, are environmentally friendly, and engage in community work. [Tr. 1213, 1214].

At trial, Dr. Spoto gave testimony that was inconsistent with the sworn affidavit she provided during the investigation of the underlying charges. Initially, at trial, Dr. Spoto testified that even if a dean did not approve a course or program, it nevertheless could be brought before the curriculum committee for approval. [Tr. 194, 207]. Dr. Spoto then doubled down, saying that it was possible that when a piece of curriculum is not approved by a dean that it could still be approved for the course catalog by the committee. [Tr. 194]. When asked to provide a specific example, she could not do so. [Tr.194]. Then, Dr. Spoto was effectively impeached when she was confronted with her affidavit, wherein she swore that a proposed course or program could not be advanced without the support of the relevant dean. [Tr. 210]. In the end, Dr. Spoto was forced to admit that her testimony that the committee had approved curriculum without the approval of a dean was not accurate.   [Tr. 210].

It must be noted that Respondent did not call a single member of faculty to testify in support of either of its core positions in this case – that Respondent holds itself out as an institution that maintains a religious educational environment issue, and that its faculty perform managerial duties sufficient to disqualify them from the protection of the Act. In contrast, the General Counsel provided numerous witnesses whose testimony should be fully credited. Even Professor Andrew Gold, who stated that he opposed the Union and had worked with Respondent's former president

EXHIBIT C

in an attempt to decertify and otherwise undermine the Union, gave testimony that was consistent

with all the other witnesses of the General Counsel. [Tr. 1095]. Furthermore, the General

Counsel's witnesses gave testimony that was supported by documentary evidence and/or with

specific examples. Accordingly, the testimony of the General Counsel's witnesses should be

credited over the testimony of Dr. Spoto.

> **B.  When viewed comprehensively to evaluate the means and audience to which Respondent holds itself out, Respondent does not meet the first prong of the *Bethany College* test requiring it to show that it holds itself out as a religious institution, providing a religious educational environment.**

Pursuant to the Board's holding in *Bethany College*, 369 NLRB No. 98 (2020), a university

employer is exempt from NLRB jurisdiction if it "(a) holds itself out to the public as a religious

institution, providing a religious educational environment (b) is nonprofit, and (c) is religiously

affiliated."[34] The Board adopted the three-pronged inquiry from the D.C. Circuit's 2002 decision

in *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002), the only circuit to articulate

this standard. Here, as discussed further below, Respondent clearly satisfies the second prong and

almost certainly meets the third prong of the test.  However, given how it holds itself out to

prospective students and the community at large, including its website and in promotional videos

and television commercials, as well as how it holds itself out to prospective administrators and

faculty through its job postings, Respondent does not meet the first prong of the *Bethany College*

test.

The Board has traveled a long and winding road in establishing criteria to determine if a

university should be exempted from Board jurisdiction because of its status as a religious

---

[34] The D.C. Circuit recently upheld this standard in *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 832 (2020), and noted that whether the school holds itself out as a "religious institution" is a similar inquiry as to whether it holds itself out as providing a "religious educational environment."

EXHIBIT C

EXHIBIT C

institution.  In *Catholic Bishop of Chicago*, 440 U.S. 490 (1979), the Supreme Court concluded that there is "significant risk that the First Amendment will be infringed" if the Board had jurisdiction over church-operated schools and their teachers with a "substantial religious character." *Id* at 501-503. This risk exists even when teachers are teaching purely secular material. *Id.* As such, the Supreme Court declined to permit the Board to exercise jurisdiction over church-operated schools with a "substantial religious character."

Then, in *University of Great Falls*, the Board determined that the university did not have a "substantial religious character," as outlined in *Catholic Bishop*, because the "propagation of a religious faith is not the primary purpose," and instead its functions were "primarily secular." 278 F.3d at 1338, 1340 (quoting *University of Great Falls*, 331 NLRB 1663, 1665 (2000)). On review, the D.C. Circuit rejected the Board's criteria, and instead adopted a three-pronged analysis under which it concluded that the Board could not exercise jurisdiction over the university. *Univ. of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002).  The test adopted by the D.C. Circuit Court of Appeals is whether the institution: (a) "holds itself out to students, faculty, and community as providing a religious educational environment"; (b) is "organized as a nonprofit"; and (c) is "affiliated with, or owned, operated, or controlled, directly or indirectly, by a recognized religious organization, or with an entity, membership of which is determined, at least in part, with reference to religion." *Id.* The Court reasoned that this would allow the Board to determine jurisdiction without wading through religious doctrine or motive, while still ensuring that it is a bona fide religious institution. *Id* at 1334 – 1335.

In *Pacific Lutheran University,* 361 NLRB 1404 (2014), the Board adopted a two-prong test to determine whether the Board will exercise jurisdiction over a religious institution of higher learning. The test created by the Board incorporated the first prong of the D.C. Circuit's *Great*

EXHIBIT C

*Falls* test, wherein an employer must demonstrate that it "holds itself out to students, faculty, and community as providing a religious educational environment." *Id* at 1409. An analysis of that factor would include a review of the employer's "… handbooks, mission statements, corporate documents, course catalogs and documents published on a school's website. Press releases or other public statements by … officials could also be relevant. A university's contemporary presentation of itself is likely to be more probative than its founding documents and historical tradition." *Id.* at 1409. The Board noted that relying on these types of documents avoided the intrusive inquiry *Catholic Bishop* prohibited, as the employer freely provides this information to its students and the public.  *Id* at 1410.

To meet the second prong of the test set forth by the Board in *Pacific Lutheran*, an employer must demonstrate that its faculty members perform a specific role in creating or maintaining the school's religious educational environment. *Id* at 1409. The Board held that the focus should be on the faculty members themselves – the employees to be granted or denied the protections of the Act – rather than on the nature of the university as a whole. *Id* at 1410. The Board went on to explain that it would extend a "holding out" principle wherein it would examine the university's "communications to current or potential students and faculty members and the community at large," to determine if the faculty member's role was to create or maintain the religious purpose or mission." *Id* at 1411. This requirement allows the Board to dismiss claims from self-purported religious institutions which are made "solely in an attempt to avoid the Board's jurisdiction." *Id* at 1410.  The Board cautioned that it would, "err on the side of being over-inclusive and not excluding universities because they are not 'religious enough.'" *Id* at 1410.   The Board further reasoned that general statements that faculty support the school's mission would be inadequate. *Id.* The Board explained that:

>Appropriate evidence to assess this requirement could include, but would not be limited to, job descriptions, employment contracts, faculty handbooks, statements to accrediting bodies, and statements to prospective and current faculty and students. We will not seek to look behind these documents to determine what specific role petitioned-for faculty actually play in fulfilling the religious mission of a school or to inspect the university's actual practice with respect to faculty members. Nor will we examine the specific actions of any individual teacher. Rather, we rely on the institution's own statements about whether its teachers are obligated to perform a religious function, without questioning the institution's good faith or otherwise second-guessing those statements. If the evidence shows that faculty members are required to serve a religious function, such as integrating the institution's religious teachings into coursework, serving as religious advisors to students, propagating religious tenets, or engaging in religious indoctrination or religious training, we will decline jurisdiction. Likewise, if the college or university holds itself out as requiring its faculty to conform to its religious doctrine or to particular religious tenets or beliefs in a manner that is specifically linked to their duties as a faculty member, we will decline jurisdiction.

*Id*. at 1409.

The Board included the public "holding out" elements as a market check to dissuade institutions from claiming to be religious in order to escape the Board's jurisdiction. *Id.* at 1412. The Board reasoned that an employer would not falsely hold itself out as providing a religious educational environment because it could lose the business of individuals who did not want to attend a religious school.[35] *Ibid*.

The *Pacific Lutheran* test remained in effect under existing Board law (appropriate despite the D.C. Circuit's rejection and adoption of the *Great Falls* test) until June 2020, when the Board issued its decision in *Bethany College.* 369 NLRB No. 98 (2020). In *Bethany College*, the ALJ applied the *Pacific Lutheran University* test, and determined that the Board had jurisdiction. *Id.,* slip. op. at 1. In exceptions to the Board, the General Counsel argued for the Board to adopt the test set forth by the D.C. Circuit in *University of Great Falls*. The Board agreed with the D.C.

---

[35] Not only does a university run the risk of lost students, but some faculty may not be willing to work at an institution that holds itself out as providing a religious educational environment.

EXHIBIT C

Circuit that an inquiry into a teacher's roles in performing the religious education environment "impermissibly present[s] a significant risk that the protections set forth in the Religion Clauses of the First Amendment of the Constitution would be infringed." *Id* slip. op. at 3. The *Bethany College* Board adopted the D.C. Circuit's three-prong test outlined in *University of Great Falls*. *Ibid.*

As a threshold matter, it is undisputed that Respondent meets the second prong of the *Bethany College* test, which states that the institution seeking exemption from the Act's definition of an "employer" must be established as a non-profit. Regarding the third prong of the test, that relating to the institution having a religious affiliation, it appears that Respondent meets this prong. Adopting in part the First Circuit's split-decision in *Universidad Central de Bayamon v. NLRB*, 793 F.2d 383, 399-400 (1st Cir. 1985) (3-3 decision) (Breyer, J., denying enforcement), the D.C. Circuit explained in *Great Falls* that a college can satisfy the third prong through an affiliation with, or through ownership, operation, or control—whether directly or indirectly—by a recognized religious organization. *Great Falls*, 278 F.3d at 1343. The organization's membership should be determined, at least in part, with reference to religion. *Id.* In *Bayamon*, then-Judge Breyer, writing for the half of the court that would deny Board jurisdiction, highlighted that the Dominican Order founded, controlled, and financed the majority of Bayamon's operations as a college and continued to control the administrative functions through the president and Board of Trustees. 793 F.2d at 399-400 (Breyer, J.).

Here, Respondent is not owned or controlled by a religious order or church, but rather only has its origins with Benedictine monks. There is no evidence that the monks or any other Catholic diocese have operational or exercised predominant administrative control over the school since the 1960s. The D.C. Circuit and the Board have both acknowledged that the breadth and limitations

EXHIBIT C

EXHIBIT C

of the third prong have not been fully explained, as the cases before them have clearly established ownership, control, or some other official tie between the school and religious entity. *See Bethany College*, 369 NLRB No. 98 (2020), slip op. at 6, fn. 10; *accord Great Falls*, 278 F.3d at 1343-44 ("…we need not determine whether we reach the full expanse of the third step here."); *but compare Carroll College, Inc. v. NLRB*, 558 F.3d 568, 573-74 (D.C. Cir. 2009) (The college was affiliated with the Presbyterian Church through its Articles of Incorporation, but the Regional Director had determined that, because "the Church does not sponsor the college, does not own its campus, and does not have any right of ultimate control over it," the third prong of *Bethany College* was not met. The Circuit Court criticized the analysis as "too much" because the third prong is satisfied through "affiliation alone").

However, despite a lack of religious ownership or control, Respondent is arguably affiliated with a religious organization. Respondent was established by Benedictine monks and has maintained a relationship with Saint Leo's Abbey, even if only insofar as it encourages students to visit the abbey located on its campus. Respondent is also affiliated with the Holy Name Monastery, a Benedictine convent in the same order as the Abbey. Moreover, Respondent is a member of the Association of Catholic Colleges and Universities.

The crux of this analysis then turns on whether Respondent meets the first prong of the test first articulated in *Great Falls* and much later, adopted by the *Bethany College* Board.  The answer is a clear "no." Specifically, as articulated in *Great Falls,* Respondent cannot show that it "holds itself out to students, faculty, and [the] community as providing a religious educational environment." 278 F.3d at 1343, quoting *Bayoman*, 793 F.2d at 400).

Respondent argues that the school's Catholic identity can be found in its mission statement, its religious themed architecture and art, the presence of monks at Saint Leo's Abbey on campus,

EXHIBIT C

and the membership of the local archbishop, abbot and prioress on Respondent's Board of Trustees (a body of 30 members total). While these facts demonstrate Respondent's Catholic identity and heritage, this should not be conflated with holding itself out as providing a religious educational environment. The two are different. The evidence the Respondent provides of its Catholic heritage, at most, goes to demonstrating its Catholic affiliation. This is a separate prong of the *Bethany College* test, and this *affiliation* does not demonstrate that the school is providing a Catholic religious educational environment *in the classroom*, the locus of concern when attempting to determine if the Act should apply to faculty.  Additionally, these aspects do not fully represent how the school is publicly marketed or administered, which is a truer representation of how it is "holding itself out" to prospective and current students, faculty, and the community-at-large. While the more significant evidence in *Great Falls* is public documents and statements, such as the mission statement and course catalog, the inquiry does not end there.[36]

In this case, the more significant factor is Respondent's public marketing of the institution, which is the evidence that the *Great Falls* court notes is most salient. More specifically, the D.C. Circuit expressed in *Great Falls* that whether a school can demonstrate that it holds itself out as providing a religious educational environment is an especially important and useful "market check." 273 F.3d at 1344.

Respondent's website is one of its most visible avenues that it uses to interact with and represent itself to students and the community. Respondent's website does not inform or even suggest that Respondent provides a religious-based education. For example, Respondent's Mission

---

[36] Notably, in 2002, when the D.C. Circuit decided *Great Falls*, the Internet was still far from the ubiquitous (and generally primary) information source it has become with the advent of high-speed internet, smart phones, and social media sites.  These innovations permit more real-time updates to online content by the communicators, i.e., Respondent, in parallel with the enhanced ability of the receivers, i.e., students, faculty, and the community, to access that content.

Statement on its website does not announce that education will be religiously oriented. [RX 19, p. 1]. The Mission Statement does not provide that a Catholic educational philosophy is employed in the classroom or more generally on campus. Nor does it explain how, if at all, faculty are required to be guided by the teachings of the "Doctors of the Church," as they were in the Mission Statement promulgated by the university in another case, *Bayoman*.[37] Rather, the Mission Statement itself is secular in its aim to prepare students for success and mentions the University's inclusivity and diversity. [RX 19 p. 1]. The word "Catholic" is used in reference to Respondent's heritage. Compare *Universidad Central de Bayamon v. NLRB*, 793 F.2d 383, 400 (1st Cir. 1985) (noting that the university referred to its religious mission 13 times in 34 pages).

While it is true that Respondent offered evidence highlighting additional sections from its website that explain the Respondent's Catholic tradition, most significantly its recently beefed-up Catholic Identity statement, the website also contains numerous statements regarding inclusivity and open dialog among people of differing faiths. Further, Respondent's maintenance of a "Catholic Identity Statement" and use of other language on its website regarding "values" and "identity" does not explain how these values and identity translate into providing a religious educational environment to students; rather, this information at best merely further articulates its Catholic identity, i.e., affiliation. Notably, the revised Catholic Identity Statement was introduced just two weeks before Respondent's withdrawal of recognition.

Further, Respondent introduced approximately five webpages from its current website that discuss religion. [RX 19, RX 20, RX 21, RX 22, RX 23]. The pages offered are a tiny fraction of the overall content of the website and are buried amongst thousands of pages of non-religious

---

[37] *Universidad Central de Bayamon v. NLRB*, 793 F.2d 383, 400 (1st Cir. 1985) (equally divided en banc decision) (Breyer, J., denying enforcement)

EXHIBIT C

EXHIBIT C

content. [JX 3]. Specifically, a close examination of Respondent's homepage reveals *no* mention of religion at all, while other, secular topics are abundant. [GCX 54].

While Respondent avers that its core values are religious in nature, there is no evidence to show that Respondent communicates to students and faculty how its values are Catholic or Benedictine in nature. There is no evidence that prospective students and faculty are educated about the origin of Respondent's values; for example, neither faculty nor students are required to read the Rules of Saint Benedict, a foundational document for the Order that founded the university. In fact, in instances when faculty job applicants are asked to write a values statement to be considered for hire, there is no evidence that shows that faculty are told those values have a Catholic or Benedictine origin. Likewise, while Respondent's core values appear on course syllabi, there is absolutely no requirement that the values be tied to religion at all in their instruction or even in their mere implication in the course. While some faculty members admitted to copying Respondent's definitions of core values on the website to their master syllabi, other testified that they created their own definitions for those terms.

Respondent seems to believe that its campus ministry is evidence that it holds itself out as offering a religious educational environment. The campus ministry is an extra-curricular activity organization and there is no evidence that student participation is required. [Tr. 854, 855]. Moreover, only a small fraction of students attended the regular mass services organized by the extra-curricular group. [Tr. 399]. Further, it is undisputed that the Chaplain that heads the University Ministry is not a part of faculty. [Tr. 896]. The evidence also shows that the Respondent's University Ministry website was not launched until the Spring of 2021, long after Respondent withdrew recognition. [Tr. 892]. The presence of a ministry on campus is not unique to Respondent, as similar ministries may be found on the campuses of many other non-religious

EXHIBIT C

institutions. [Tr. 898]. Thus, the mere maintenance of a University Ministry program on campus does not establish that students are taught in a religious educational environment and does not signal to students that they will receive their education in a religious educational environment.

Respondent's television commercials and promotional videos, perhaps viewed by millions, are Respondent's most public way of holding itself out to the prospective students, faculty, and the community at large.[38]  This type of marketing has been in place for several years, allowing it to have a great influence on how prospective students likely view the education they expect to receive from Respondent.  These commercials and promotional videos make no representations that would suggest that Respondent is providing a religious educational environment and make virtually no mention of religion at all.  [GCX 2, GCX 3, GCX 4, GCX 5, GCX 6, GCX 7, GCX 8, GCX, 50, GCX 51, GCX 52, GCX 53]. In its videos and commercials, Respondent extols its decades long experience providing flexible on-line learning but makes no mention of religiosity generally, or that it provides a religious educational environment specifically.  [GCX 2, GCX 3, GCX 4, GCX 5, GCX 6, GCX 7, GCX 8, GCX, 50, GCX 51, GCX 52, GCX 53]. The representations made by Respondent in its commercials and videos are a significant factor in analyzing how it holds itself out to the public for purposes of the *Bethany* legal test.  [GCX 2, GCX 3, GCX 4, GCX 5, GCX 8, GCX, 50, GCX 51, GCX 52, GCX 53]. These commercials and promotional videos focus on alumni and students praising the flexibility of online education, and the (secular) career-oriented programs offered by the University. [GCX 2, GCX 3, GCX 4, GCX 5, GCX 8, GCX, 50, GCX 51, GCX 52, GCX 53]. The speakers highlight Respondent's curriculum, affordability, individual advisors, faculty support, and flexibility. [GCX 2, GCX 3,

---

[38] Dr. Humphries credibly testified that he appeared in television commercial which was aired during the Super Bowl in the Tampa Bay television market.

EXHIBIT C

GCX 4, GCX 5, GCX 8, GCX, 50, GCX 51, GCX 52, GCX 53].  Thus, the vast majority of the marketing of the university via commercials and videos is devoid of religious content and make no suggestion that Respondent provides a religious educational environment. [GCX 2, GCX 3, GCX 4, GCX 5, GCX 8, GCX, 50, GCX 51, GCX 52, GCX 53]. This outward-facing introduction and representation of the school – consciously chosen by Respondent as it tries to attract students in the competitive higher education market – therefore fails to establish that Respondent meets the first prong of the *Bethany College* test.

Meanwhile, though Respondent's October 2020 revised "Catholic Identity" statement asserts its commitment to *Ex Corde Ecclesiae,* a standard for Catholic institutions of higher education promulgated decades ago by Pope John Paul II, the record evidence reveals that Respondent is not actually following the tenets of that doctrine. [GCX 44 p. 17; Tr. 113, 536, 537, 576]. The Catholic Identity statement is not even on Respondent's home page and can only be found by going about three pages into the website. [JX 3]. In these circumstances, Respondent cannot demonstrate that in its commercials, videos, and website, it is holding itself out to the public as providing a religious educational environment – at best, it is only providing information about the religious life options available to people who are actively seeking out information about a Catholic experience on campus in the first place, as they could at any other university that supports the religious life of its so-inclined students.

Further, in administration and faculty job postings as well as in its recruitment efforts, Respondent holds itself out to prospective faculty members and employees, the individuals who will most impact students' education experience, in a *non-religious* manner. [GCX 14(a) p. 1; GCX 14(b) p. 1; GCX 14(c) p. 1; GCX 14(d) p. 1; GCX 14(f) p. 1]. Respondent does not notify prospective faculty and staff they will be required to teach in a religious educational environment.

[Tr. 305, 306, 344, 396, 455, 536, 742]. No such notice is given to prospective faculty or staff because Respondent does not require that its teachers provide a religious educational environment. [GCX 29]. Accordingly, both classroom evaluations and faculty members' annuals plans are completely silent about religion. [GCX 25, GCX 26, GCX 27, GCX 28]. Faculty are not required to pray in class or attend religious services on campus. [Tr. 191, 383, 400]. Even faculty who teach theology are not required to obtain a *man datum*, (the commitment to teach in line with the tenets of Catholic faith), as other Catholic institutions require, and the instruction is framed in philosophical, rather than religious, terms. In this regard, it is telling that Respondent changed the name of its undergraduate department where theology courses are taught from "Department of Religion" to "Department of Religious Studies." [Tr. 536, 537, 538, 539, 660]. Faculty are not required to make an oath of fidelity to any religious institution or body. [Tr. 398, 540, 541]. Faculty are not even required to read any materials related to religion or Catholicism. [Tr. 549]. In short, there is nothing to tip off faculty that they are employed in a religious *educational* environment. At most they would understand that they teach at a school with a Catholic *affiliation*.

The faculty appointment letters further support the conclusion that Respondent's faculty are not expected to teach in a religious educational environment. Respondent is a member of the Association of American Colleges and Universities which has adopted and supports the 1940 AAUP Statement on academic freedom. [GCX 30; Tr. 1019]. Both the former academic freedom statement in the collective-bargaining agreement and the academic freedom statement that appears in Respondent's current faculty handbook quote generously from the 1940 Statement. [JX 1 pp. 15, 16; GCX 30 p. 2]. While not explicitly set forth in the collectively bargained academic freedom statement or the unilaterally implemented statement found in the faculty handbook, the 1940 AAUP Statement requires that faculty be notified explicitly in their appointment letters if their

EXHIBIT C

academic freedom is limited. [GCX 30 p. 2]. The evidence is clear that no such provision has appeared in *any* appointment letter issued to faculty at any time before or after Respondent withdrew recognition from the Union; thus, faculty would have no reason to believe that there would be any limit on academic freedom and that they would be teaching in a religious educational environment. [GCX 15; GCX 16, GCX 45, Tr. 115, 116]. In fact, there is no evidence that any faculty member's academic freedom has ever been limited because of any asserted religious imperative of Respondent. [Tr. 191, 458, 459].

It must be noted that the faculty here had been represented by the Union for more than four decades prior to Respondent's withdrawal of recognition in October 2020, and there is not a scintilla of evidence that shows any violation of Respondent's First Amendment rights occurring in that period because of entanglement with employees' rights to collective bargaining under the National Labor Relations Act. [GCX 36; Tr. 139, 140]. Thus, this case is distinguishable from prior cases where an institution has claimed religious exemption because, unlike the prior cases, where there is no bargaining history and courts have been left to speculate that religious entanglement that *might* violate the First Amendment *could* occur, here, over four decades of bargaining history demonstrates that any concern over First Amendment entanglement is not merely speculative, but completely specious. Respondent should be treated no differently than the thousands of hospitals, nursing homes, hospice providers and others that have some religious identity and affiliation, but despite this identity and affiliation also manage to bargain with their union-represented employees while incurring no First Amendment concerns. Indeed, Respondent should be treated no differently than itself in the prior four decades.

In sum, considering Respondent's public commercials targeted to wide audiences via television and the internet, coupled with its website and videos posted on that site, it job postings

EXHIBIT C

and recruitment efforts, it is apparent that Respondent does not hold itself out to the public as a religious institution providing a religious educational environment, and thus does not meet the first prong of the *Bethany College* test. Additionally, the history of collective bargaining demonstrates that any First Amendment concerns are specious. Thus, Board should assert jurisdiction over Respondent under extant law.

    **C.**    **The Board should return to the *Pacific Lutheran* test and, under prong one, examine the totality of evidence as to show how institutions of higher education hold themselves out prospective students, faculty, and the larger community.**

As the D.C. Circuit emphasized in *Great Falls*, how a school markets itself "to the public" is the critical inquiry in determining if a school is a *bona fide* institution warranting exemption from the jurisdiction of the Act. See *Great Falls*, 278 F.3d at 1344. The appellate court specifically noted that such "public representations serve as a market check" such that the market's responses to such representations will act as a check on institutions that falsely identify themselves as providing a religious educational environment merely to obtain exemption from the NLRA. *Id*. Simply put, only an institution of higher education truly offering a religious education environment will market itself as such, as schools know that while this attribute will attract some, it will dissuade others (and risks dissuading, perhaps, more than it will attract). Although the D.C. Circuit considered the school's course catalogue, mission statement, student bulletin, and other public documents, that court did not explicitly limit the "holding out" inquiry to those aspects alone. *Id.* at 1345. There was no mention of marketing, ads, commercials to the public or social media specified under this "public holding out" prong in the decision, perhaps because this information did not exist at that time, as it does here now for Respondent as well as others institutions of higher learning with which it competes to attract a diverse and inclusive student body.

For the Board and federal courts to obtain a full picture of whether an institution of higher learning is holding itself out as providing a religious educational environment, it must look at all

EXHIBIT C

possible marketing representations, including representations made to prospective students, faculty, and the community at large. This would include, but not be limited to, its website content, commercials, online videos, print-media and online articles about the school, materials sent in hard copy and electronically to prospective students, as well as faculty and administrative job postings and materials sent to prospective faculty, such as their engagement letters. Examining the totality of these materials should, as anticipated in *Great Falls*, give a truer picture of whether a school is holding itself out as providing "a religious education environment" or not – a truer picture than merely the mission statement alone. If a school, such as Respondent, takes an inconsistent approach in how it markets itself regarding its purported religious educational environment, such inconsistencies must be held against the institution as such ambiguities directly undermine the "religious educational environment" claimed.  Thus, the Board should return to the test it set forth in *Pacific Lutheran*, and modify it to expressly consider all possible marketing representations when determining how an institution of higher learning holds itself out and whether its faculty should be deprived the protections of the Act on a religious exemption basis.

> D.  **The *Bethany College* test is erroneously founded in *Catholic Bishop* and a return to *Pacific Lutheran* is not unconstitutional; the Board should return to the *Pacific Lutheran* standard.**

The *Bethany College* test is erroneously founded upon the faulty reasoning in *Catholic Bishop*. While the D.C. Circuit has rejected the Board's *Pacific Lutheran* test in *Duquesne University of the Holy Spirit v. NLRB*, 947 F.3d 824 (D.C. Cir. 2020) (*Duquesne I*), and the Board subsequently adopted the D.C. Circuit's *Great Falls* test in *Bethany College* in light of *Duquesne*, the Board should nonetheless return to the *Pacific Lutheran* standard. The General Counsel respectfully disagrees with the circuit court's decision in *Duquesne I* and notes that D.C. Circuit Judge Pillard has called for reconsideration of the *Great Falls* test. *See Duquesne Univ. of the*

EXHIBIT C

EXHIBIT C

*Holy Spirit v. NLRB*, 975 F.3d 13, 14-19 (D.C. Cir. 2020) (*Duquesne II*) (Pillard, J., concurring in denial of rehearing en banc for other reasons).

The *Bethany College* test, having been adopted from the D.C. Circuit's analysis in *Great Falls*, proceeds from a flawed interpretation of Supreme Court precedent regarding First Amendment religious freedoms. The fundamental case of *NLRB v. Catholic Bishop* highlighted the risk of government entanglement in religious affairs if the Board were permitted to exercise jurisdiction over faculty at two Catholic *high schools*. The Supreme Court has never applied its *Catholic Bishop* decision to institutions of higher education. *Duquesne II,* 975 F.3d at 16 (Pillard, J., concurring). And, in fact, as Judge Pillard recently pointed out, the D.C. Circuit is the *only* appellate court to have done so in a majority opinion. *Id.* Crucially, the *Catholic Bishop* decision was made in the context of parochial high schools, in which teachers participated in the school's mission of religious propagation to its students and where "[r]eligious authority necessarily pervades the school system." *NLRB v. Catholic Bishop*, 440 U.S. 490, 501-03 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 617 (1971).[39]

However, there are "generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools," explained the Supreme Court in *Tilton v. Richardson*, 403 U.S. 672, 685 (1971)*.* Most institutions of higher education simply do not "operate to indoctrinate" as parochial schools do. In higher education, there is substantially less risk of government entanglement because nationally-accredited undergraduate programs "limit the opportunities for sectarian influence by virtue of their own internal disciplines," and faculty are afforded more academic freedom. *Id.* at 686. This

---

[39] The Supreme Court referred to its earlier *Lemon* decision as the foundation for its concern regarding excessive government entanglement in church-operated parochial schools.

EXHIBIT C

EXHIBIT C

strong Supreme Court precedent suggests that the different contexts in which parochial schools and higher education institutions exist necessitate different constitutional analyses regarding religious freedom. *Allen v. Morton*, 495 F.2d 65, 71 (D.C. Cir. 1973) (noting that the Supreme Court has explained there is "a very real distinction between the degree of permeation that exists in parochial elementary and secondary schools as compared to Church-related institutions of higher learning"). Thus, the *GreatFalls*/*Bethany College* jurisdictional test mistakenly extends *Catholic Bishop*'s holding – readily applicable to lower-level parochial schools – to colleges and universities – and enshrines a faulty assumption: that the effective point of being a religiously-affiliated school at any education level is to provide a religious education environment. Yet this precise assumption has already been soundly rejected by the highest court in this nation. *Tilton v. Richardson*, 403 U.S. at 685-686.

The timing is ripe for a revisitation of this issue. Recently, D.C. Circuit Judge Pillard, in her *Duquesne I* dissent, and then concurrence on the denial of rehearing on other grounds, welcomed an opportunity to examine the jurisdictional standard. See *Duquesne II*, 975 F.3d at 15 (Pillard, J. concurring); *see also Bayamon*, 793 F.2d at 401 (Breyer, J.) ("Whether this kind of institution of higher education falls within the strictures of *Catholic Bishop* is, in our view, an important, likely recurring, question that calls for Supreme Court guidance"). As Pillard explained, the D.C. Circuit's caselaw extending *Catholic Bishop* to the higher education context is "unmoored and increasingly untenable" and should be revisited when the issue is raised by parties. See *Duquesne I*, 947 F.3d at 846 (Pillard, J., dissenting), 849; *Duquesne II.*, 975 F.3d at 15 (Pillard, J., concurring). She pointed out that "no court has understood *Catholic Bishop* to exempt all staff of any religious institution or school from the NLRA," and listed cases where the Board retained jurisdiction over religiously affiliated institutions. See *Duquesne I.*, 947 F.3d at 846 (Pillard, J.,

EXHIBIT C

dissenting). In support of the Board's *Pacific Lutheran* standard, Judge Pillard asserted that the test, in focusing on whether the school "holds out" its faculty as performing religious roles or duties, actually "went beyond what the First Amendment requires" to avoid entanglement issues. *Duquesne II.*, 975 F.3d at 14 (Pillard, J., concurring).

Moreover, other circuit court decisions have interpreted *Catholic Bishop* to not preclude an examination of the role of employees in a religious institution's purpose or mission.[40]   In determining Board jurisdiction, the circuit courts have often looked at whether the employees carried out religious programming. While such decisions were in the context of non-school institutions or organizations, a deferential review of employee functions in the higher education setting under *Pacific Lutheran* is in line with general circuit court analysis and in keeping with *Catholic Bishop*'s original outcome, shielding parochial schools at the elementary and secondary level from government entanglement. Indeed, as stated by one circuit court:

> By articulating some religious affiliation and mission, no matter how little effect it might have on the social programs' functions or operations, providers of care could easily avoid the Board's jurisdiction even though the work settings involved would be suitable for collective bargaining. Nothing in *Catholic Bishop* suggests that such

---

[40] *Volunteers of Am., L.A. v. NLRB*, 777 F.2d 1386, 1390 (9th Cir. 1985) (finding that the employer's alcohol treatment centers are "expressive of a religious philosophy but are carried out in a secular fashion," and that "[r]egardless of how the VOA views its religious mission, that view is not imposed upon the employees"); *NLRB v. Salvation Army of Mass. Dorchester Day Care Ctr.*, 763 F.2d 1, 6 (1st Cir. 1985) (allowing Board jurisdiction over day care employees because "[a]lthough the teachers are aware of the religious purpose of the Salvation Army, there is not that intertwining of religious doctrine and secular teaching which created the risks present in *Catholic Bishop*"); *Volunteers of Am.-Minnesota-Bar None Boys Ranch v. NLRB*, 752 F.2d 345, 348-49 (8th Cir. 1985), *cert. denied*, 472 U.S. 1028 (1985) (differentiating the Ranch from the parochial school in *Catholic Bishop* because "its employees perform essentially secular functions" and were not "mandated to propagate sectarian doctrines," eliminating a risk of entanglement); *Denver Post of the Nat'l Society of the Volunteers of Am. v. NLRB*, 732 F.2d 769, 772 (10th Cir. 1984) (that the employer's social programs were not infused with religious philosophy and that the employees were a "far cry from that of the parochial schoolteachers in *Catholic Bishop*," in part because employees testified that religious beliefs did not have a part in their work, that they were not told about the employer's religious mission upon hire, and that they were unaware of the religious mission until the contemporaneous labor dispute) .

a result is desirable or was sought by Congress in enacting the National Labor Relations Act.

*Salvation Army of Mass. Dorchester Day Care Ctr.,* 763 F.2d 1, 7 (1st Cir. 1985).

Recent Supreme Court decisions regarding the ministerial exception under employment antidiscrimination laws also "call into question the reasoning that underlies *Great Falls* and *Carroll College.*" *Duquesne II*, 975 F.3d at 17 (Pillard, J., concurring). In this regard, the Supreme Court has permitted courts to look beyond the face of faculty's job descriptions in determining their "ministerial" status for purposes of workplace discrimination suits under laws other than the Act. In such cases, the "ministerial exception" prevents government intrusion in the free exercise of religion by allowing a religious institution general autonomy over its employment relationship with only certain key employees – those serving in an inherent religious capacity. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2069 (2020).[41] If those employees provide "vital religious duties," then the discrimination claim will fail. *Id.* at 2066.

The employee-focused inquiry used with approval in *Our Lady of Guadalupe School* is similar to *Pacific Lutheran*'s emphasis on looking at the actual duties of employees in the bargaining unit, rather than at the religious identity of the employer as a whole, but goes further than the Board attempted to in *Pacific Lutheran*. In *Our Lady of Guadalupe School*, the Supreme Court upheld the ministerial exception and clarified that "[w]hat matters, at bottom, is what an employee does." *Id.* at 2064, 2069. Thus, courts (and the Board) have effective permission to look beyond the representations or titles given by the employer to an employee and look at their actual

---

[41] See also *see Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 188 (2012) ("[w]hen a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow.")

EXHIBIT C

performance before accepting the ministerial defense. *Id.* at 2063-64 ("[s]imply giving an employee the title of 'minister' is not enough to justify the exception").[42]

The *Pacific Lutheran* test crafted by the Board is *less* intrusive and presents *less* danger of the government entanglement with religious affairs than the ministerial defense as it was tested in *Our Lady of Guadalupe,* since it limits the Board and the courts to considering only how the employee is "held out" to the public and students, i.e., through the publicly available documents on its website and other documents generally made available to students and faculty. *Pacific Lutheran Univ.*, 361 NLRB at 1409. Thus, *Pacific Lutheran* focuses on the individual employees at issue, just as the ministerial exception does, but in doing so, is substantially more deferential to First Amendment religious freedoms. Further, Judge Pillard has correctly noted that the D.C. Circuit cases "seem to hold *any* inquiry behind a religious school's public representations to be necessarily out of bounds." *Duquesne II*, 975 F.3d at 17 (Pillard, J., concurring).[43] D.C. Circuit court precedent has refused to allow the Board to look behind a school's public representations as to its religiosity overall and as to the religious role of its faculty in order to avoid First Amendment violations, which is contrary to the Supreme Court's approach permitting a review of actual faculty duties.

Under *Pacific Lutheran*, a school need not disavow all secular aims and goals to be able to claim religious exemption. Rather, the "holding out" inquiry in the second prong suggests that the

---

[42] . Even before *Morrissey-Berru*, when dealing with religious exemption status under Title VII, courts have weighed the factual considerations, including "[a]ll significant religious and secular characteristics…to determine whether the corporation's purpose and character are primarily religious." *EEOC v. Townley Eng. & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir. 1988), *cert. denied*, 489 U.S. 1077 (1989); *see also EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980), *cert. denied.* 453 U.S. 912 (1981).

[43] *Duquesne I* was a subpoena enforcement case; the Board was seeking documents from the university on this very point.

EXHIBIT C

higher education institution claiming exemption from the Act has the onus to publicly draw a clear connection between its potentially generic or secular values and the religious role of the faculty to its religious mission. Despite the D.C. Circuit's concern with language in the Board's *Pacific Lutheran* decision,[44] the expectation that faculty advance or comply with secular norms, such as "diversity and academic freedom," does not necessarily dictate that faculty do not play religious roles. *Pacific Lutheran Univ.*, 361 NLRB at 1411-12 & n. 16.  However, employees and applicants must be made aware of how their job duties are intertwined with the connection. This is similar to the Board's requirement in *Pacific Lutheran* that "general or aspirational statements" of the employer be supported with evidence linking those claims to faculty's actual job functions, such that "a reasonable prospective applicant [for a faculty position] would conclude that performance of their faculty responsibilities would require furtherance of the college or university's religious mission." *Id.* at 1412 (emphasis added).

A return to *Pacific Lutheran* would adequately address and protect First Amendment religious freedoms. Supreme Court precedent does not dictate that the *Bethany College* test is the appropriate test for religious exemption for higher education institutions. Rather, the precedent allows for the *Pacific Lutheran* test in a similar manner that it allows for the "ministerial exception" under antidiscrimination statutes. There is no good rationale for denying faculty NLRA protections when they are not even held out as performing religious functions. The Board's "holding out"

---

[44] "This commitment to academic freedom does not become 'any less religious' simply because secular schools share the same commitment, nor because it advances the school's religious mission in an 'open-minded' manner as opposed to 'hard-nosed proselytizing.' [Citation omitted.] Yet rather than accepting at face value that academic freedom serves a religious function, the Board sees academic freedom as the opposite: a sign that 'religion has no bearing on faculty members' job duties.' [Citation omitted.] The Board may not 'second-guess' or 'minimize the legitimacy of the beliefs expressed by a religious entity' in this way." *Duquesne Univ.*, 947 F.3d at 836 (quoting *Great Falls*, 278 F.3d at 1346).

EXHIBIT C

analysis is even more deferential than the religious exemption outlined in *Our Lady of Guadalupe School*.

E.      **Under a return to *Pacific Lutheran*, neither prong of the *Pacific Lutheran* test can be satisfied, thus the Board may exercise jurisdiction over Respondent.**

Under *Pacific Lutheran,* the Board would decline jurisdiction over the faculty at an institution of higher education if the school could show, first, that it held "itself out as providing a religious educational environment," and, second, that it held out its faculty as "performing a specific role in creating or maintaining the university's religious educational environment." *Id.* at 1404. Regarding the second prong, the Board specifically stated that a school must hold out the faculty it claims as exempt from the Act "as performing a *specific religious function.*" *Pacific Lutheran Univ.*, 361 NLRB at 1411 (emphasis original).  "Requiring faculty members to comply with norms shared by both a religion and by wider society does not support a finding that faculty members are held out as performing any specific religious role." *Id*. at 1411-1412.  The faculty duties at the institution seeking the exemption must extend beyond those "that they would be expected to fill at virtually all universities." *Id.* at 1412.

Respondent cannot meet the first prong of the *Pacific Lutheran* test for the same reasons that it cannot meet the related first prong of *Bethany College*. Respondent's website, television commercials, and promotional videos publicly "hold out" Respondent as a virtually secular institution of higher learning, with only passing references – in only some of these materials – to its foundation by the Benedictine Order. These representations should be given great weight in a comprehensive first prong analysis, along with lack of evidence generally that the school holds out the faculty as contributing to a religious educational environment. As for the second prong, a review of faculty and administrative job postings, appointment letters, evaluations and annual plans indicate that faculty do not provide a religious educational environment in the classroom.

EXHIBIT C

[GCX 14(a) –(h), GCX 15, GCX 16, GCX 25, GCX 26, GCX 27, GCX 28]. While some job postings generically state that applicants must be "committed to the educational mission and core values" [GCX 14(a) – (h)], the Board noted in *Pacific Lutheran* that "[g]eneralized statements the faculty members are expected to, for example, support the goals or mission of the university are not alone sufficient." *Id.* As discussed above, there must be a publicly drawn connection between religious values and secular goals.

Furthermore, the second prong of *Pacific Lutheran* is not satisfied as Respondent's faculty are not held out as performing specific religious functions, nor in fact even expected to perform religious functions. [JX 1; GCX 16; GCX 17; GCX 23; GCX 33]. While it is true that the April 2021 Faculty Handbook states that "[w]hile it is appropriate for Faculty to educate students by engaging in discussions of controversial matters that are relevant to their disciplines, it is not appropriate in the classroom to serve as advocates for positions that are contrary to the doctrine of the Catholic Church . . ." [GCX 23, p.7; GCX 33, p. 11], the Handbook does not place any affirmative religious duty on the faculty's roles in the classroom or as student advisors,[45] does not dictate discipline or termination for contradicting Catholic doctrine,[46] and further does not link a general aspiration that faculty "respect, understand, and support the University's educational

---

[45] *Compare to Pacific Lutheran Univ.*, 361 NLRB at 1412: "If the evidence shows that faculty members are required to serve a religious function, such as integrating the institution's religious teachings into coursework, serving as religious advisors to students, propagating religious tenets, or engaging in religious indoctrination or religious training, we will decline jurisdiction."

[46] *Compare to Pacific Lutheran Univ.*, 361 NLRB at 1413, n. 19: "We will decline jurisdiction so long as the university's public representations make it clear that faculty members are subject to employment-related decisions that are based on religious considerations. For example, if faculty members are subject to dismissal for teaching a doctrine at odds with the religious faith of the institution, our new test would lead the Board to decline jurisdiction over disputes about those dismissals so long as the university's public representations indicated that faculty members were expected to comply with (or at least not openly contravene) certain tenets of a religion as a term and condition of employment." Here, the Handbook does not state that the teaching of contrary doctrine will lead to dismissal or other discipline.

EXHIBIT C

EXHIBIT C

mission and values, which are founded and based on Roman Catholic belief and tradition" to their specific job duties.[47] [GCX 23 p. 7; GCX 33 p. 11.] Professors credibly testified that, contrary to the aspirational statements in the Faculty Handbook, they have not been told they may not say something in class that is contradictory to Catholic teaching or values, even after teaching texts that offer marked contrasts to Catholic viewpoints.  Nor have they otherwise been directed to – or how to – perform a religious function in their classroom. [Tr. 191, 397, 421, 422, 743, 751].

Furthermore, the Board in *Pacific Lutheran* specifically noted that evidence in this regard would include not only faculty handbooks but job descriptions, and statements of prospective and current faculty. *See* 361 NLRB at 1412. Here, the job descriptions included in faculty appointment and reappointment letters do not contain duties relating to a religious educational environment or performance of any religious function [GCX 15; GCX 16; GCX 45; Tr. 115, 455], and faculty orientation never mentioned a duty to ensure the education environment is religious. [Tr. 397, 421, 422, 743]. Faculty training does not include religious functions—neither an explanation of how Benedictine tradition would/should influence classroom teaching, nor instruction on a moral or religious obligation for professors on campus. [Tr. 191, 461, 462, 550, 744, 752].  Thus, Respondent fails to meet the second prong of *Pacific Lutheran*. Accordingly. the Board should exert jurisdiction over Respondent, pursuant to a return to the *Pacific Lutheran* standard.

### F.     Respondent's faculty are not managerial employees.

Under *Pacific Lutheran*, 361 NLRB 1404 (2014), in determining whether university faculty are managerial employees, the Board considers the faculty's participation in five areas of

---

[47] Compare to *Pacific Lutheran Univ.*, 361 NLRB at 1412: "Likewise, if the college or university holds itself out as requiring its faculty to conform to its religious doctrine or to particular tenets or beliefs in a manner that is specifically linked to their duties as a faculty member, we will decline jurisdiction. However, general or aspirational statements, without specificity as to how the requirement affects actual job functions, will not suffice."

EXHIBIT C

EXHIBIT C

decision-making: academic programs, enrollment management policies, finances, academic policies, and personnel policies and decisions. *Id.* at 1417. The Board gives greater weight to the first three "primary" areas of consideration "as they affect the [u]niversity as a whole," and less weight to the "secondary, i.e., less important" areas. *Id.* at 1417, 1420. The Board conducts this examination "in the context of the university's [decision-making] structure and administrative hierarchy, as well as the nature of the employment relationship of the faculty in issue." *Id.* at 1417. Finally, the party asserting managerial status "must demonstrate that faculty actually exercise control or make effective recommendations" over these primary and secondary areas of consideration. *Id.* at 1421.

The Board's holding in *Pacific Lutheran* regarding the managerial status of faculty members is rooted the Supreme Court's holding in *NLRB v. Yeshiva University*, 444 U.S. 672, 100 S. Ct. 856, 63 L. Ed. 2d 115 (1980). The Court found that full-time faculty members at Yeshiva University constituted managerial employees. In reaching that conclusion, the Supreme Court observed, that managerial employees are those who "'formulate and effectuate management policies by expressing and making operative the decisions of their employer.'" *Id,* at 682 (quoting *NLRB v. Bell Aerospace Co*., 416 U.S. 267, 288, 94 S. Ct. 1757, 40 L. Ed. 2d 134 (1974)). "[N]ormally an employee may be excluded as managerial only if he represents management interests by taking or recommending discretionary actions that effectively control or implement employer policy." *Id,* at 683. The Court determined that the faculty members at Yeshiva "exercise[d] authority which in any other context unquestionably would be managerial" by deciding what courses would be offered, when they would be taught, and who would be teaching them; which students would be admitted, retained, and graduated; and what teaching standards would be applied." *Id.*, at 686. By virtue of these activities, the faculty "determine[d] within each

EXHIBIT C

EXHIBIT C

school the product to be produced, the terms upon which it [would] be offered, and the customers who [would] be served." *Id.* Accordingly, the Court reasoned that finding the faculty members to be managerial would "ensure that employees who exercise discretionary authority on behalf of the employer will not divide their loyalty between employer and union." *Id.* at 687-688..

"The problem of divided loyalty is particularly acute for a university like Yeshiva," the Court explained, "which depends on the professional judgment of its faculty to formulate and apply crucial policies constrained only by necessarily general institutional goals." *Id.* at 689. In this regard, the Court took great pains to emphasize the system of "shared authority" at Yeshiva and similarly structured colleges and universities. As the Court observed, this "shared authority" does not fit squarely with the Act, which "was intended to accommodate the type of management-employee relations that prevail in the pyramidal hierarchies of private industry." *Id.* at 680. In contrast to industrial decision-making, this shared authority system "is divided between a central administration and one or more collegial bodies." *Id.* This model works in the academic world because the faculty and institution ultimately share the same interest: the "policy" of "academic excellence and institutional distinction." Id. at 688. Academic excellence benefits the university as an institution because "[t]he 'business' of a university is education, and its vitality ultimately must depend on academic policies that largely are formulated and generally are implemented by faculty governance decisions"; simultaneously, the faculty can "enhance their own standing and fulfill their professional mission by ensuring that the university's objectives are met." *Id.* Thus, a shared authority system naturally aligns the interests of the faculty with the interests of management. And, since "traditional systems of collegiality and tenure insulate the professor from some of the sanctions applied to an industrial manager who fails to adhere to company policy," "[t]he large

EXHIBIT C

measure of independence enjoyed by faculty members can only increase the danger that divided loyalty will lead to those harms that the Board traditionally has sought to prevent." *Id.* at 689-690.

The Supreme Court cautioned, however, that it was "not suggesting an application of the managerial exclusion that would sweep all professionals outside the Act in derogation of Congress's expressed intent to protect them," and that "[o]nly if an employee's activities fall outside the scope of the duties routinely performed by similarly situated professionals will he be found aligned with management." *Id.* at 690. For example, "[i]t is plain . . . that professors may not be excluded [from the protections of the Act] merely because they determine the content of their own courses, evaluate their own students, and supervise their own research." *Id.* at 690 fn. 31. The Court further commented that "it may be" that rational lines can be drawn between faculty groups (such as tenured and untenured faculty members) "depending upon how a faculty is structured and operates," although it did not express an opinion on such questions because the petitioned-for unit in *Yeshiva* was too broad to implicate them. *Id.*

After several decades of applying *Yeshiva* on a case-by-case basis, the Board in *Pacific Lutheran* set forth the framework for analyzing whether faculty members at a college or university are managerial. As discussed above, faculty will be found to be managerial employees under the *Pacific Lutheran* standard if they exercise actual control over or make effective recommendations regarding the primary and secondary areas of consideration. 361 NLRB at 1421. The Board clarified that a finding of actual control or effective recommendation requires "specific evidence or testimony regarding the nature and number of faculty decisions or recommendations in a particular decision-making area, and the subsequent review of those decisions or recommendations, if any, by the university administration prior to implementation, rather than mere conclusory assertions that decisions or recommendations are generally followed." *Id.* Thus,

effective recommendations are those that "must almost always be followed by the administration," such that they "routinely become operative without independent review by the administration." *Id.* Moreover, the Board observed that its inquiry into actual control and effective recommendation must consider "both the structure of university decision-making and where the faculty at issue fit within that structure, including the nature of the employment relationship held by such faculty (e.g., tenured vs. tenure eligible vs. nontenure eligible; regular vs. contingent)." *Id*. at 1421-1422.

In *Elon University*, 370 NLRB No. 91 (2021), the Board adopted the framework set forth by the D.C. Circuit in *University of Southern California v. NLRB*, 918 F.3d 126 (D.C. 2019) (*USC*), and refined the test set forth in *Pacific Lutheran* to more closely adhere to the Supreme Court's decision in *Yeshiva*.  370 NLRB No. 91, at 9.  Under this test, the Board will analyze "whether a faculty body exercises effective control" over the *Pacific Lutheran* areas of consideration, and, "if so, whether . . . the petitioning subgroup is included in that managerial faculty body." *Elon University*, 370 NLRB No. 91, at 9 quoting 918 F.3d at 139. In Elon, the Board explained that the second prong of the test "naturally incorporates a number of the *Pacific Lutheran* factors, including "the structure of university decision-making and where the faculty at issue fit within that structure, including the nature of the employment relationship held by such faculty (e.g., tenured vs. tenure eligible vs. nontenure eligible; regular vs. contingent)." Id. at 9. Here, all of the full-time faculty members are part of the bargaining unit and there are no subgroups involved. Thus, it is not necessary to reach the second prong of the test set forth in *Elon*.

The Board applied its refined *Pacific Lutheran* analysis in *Elon Univ.*, 370 NLRB No. 91 (2021), to determine whether nontenure-track faculty members are managerial employees eligible to participate in the university's faculty groups vested with decision making authorities. In *Elon*,

EXHIBIT C

there is extensive evidence that tenured-track faculty participate in meaningful shared governance affecting policy decisions of the institution. In *Elon*, faculty sat on committees that determine courses of study, requirements for admission, standards for performance. *Id.* In addition, two members of the Elon faculty sat on the strategic planning and budget committee with four administrators to determine tuition rates, salaries, and the distribution of revenue to the different schools and programs. *Id.* Elon has a nineteen-member Academic Counsel that made recommendations regarding the overall educational programs. *Id*. The Counsel maintained the faculty handbook and wrote and enforced the institutions statement of professional standards. Elon had fourteen standing committees that reviewed and recommended changes to specific academic areas, including academic standing, technology, admissions, athletics, curriculum, core curriculum, faculty research and development, global education, graduate council, library, post-probationary faculty development, promotion and tenure, religious and spiritual life, and student life. *Id.* In addition, individual schools and departments also had their own committees on which faculty participated. *Id.* For example, the School of Education had a curriculum resource advisory committee which oversaw how allotted funding was spent in the library. *Id.*

Besides committees and working groups, Elon held three faculty meetings per semester at which faculty members could vote on specific agenda items, such as changes to the faculty handbook's midsemester grading policy after it was approved by the Advisory Council. *Id.* Similarly, the faculty approved changes proposed by the post probationary period development review committee, designed to provide enhanced opportunities for sabbaticals for faculty. *Id.* Faculty also voted on the creation of new majors and new minors. *Id.* All full-time faculty were allowed to vote in these meetings. *Id.*

EXHIBIT C

EXHIBIT C

Respondent has failed to meet its burden of showing that its full-time faculty members are managerial employees. The present case is distinguishable from *Elon*. Unlike *Elon*, where faculty played a role in the three primary indicia of managerial status - academic programs, enrollment management policies, and finances, - Respondent admits that its faculty play no role in the institution's admission standards and finances. [Tr. 235, 236, 287]. Furthermore, Respondent's faculty play no role in determining tuition. [Tr. 235]. Respondent shut down educational centers without the input of faculty, and it admits opening the College of Health Professions and School of CARDS without consulting faculty. [Tr. 236, 1100].

In regard to faculty's role in making meaningful decisions regarding academic programs, the evidence clearly establishes that Respondent's administration dominate the curriculum approval process and faculty's role is basically ministerial in nature. While Respondent argues that faculty control all aspects of the curriculum, the facts tell a different story. According to the curriculum committee's submission package, only full-time faculty are authorized to propose curriculum before the committee, however Respondent admits, and the record shows, that it is common for department chairs, deans, and the administration to ask faculty to propose courses or programs. [Tr. 192, 193, 568, 571]. For example, administration asked faculty to propose the doctorate in theology degree. [Tr. 1110]. In like manner, the administration unilaterally made the decision to stop offering the Bachelor of Arts in Religion on campus, and likewise unilaterally made the decision to replace it with Bachelor of Arts in Religious Studies. [Tr. 1005, 1007]. The reverse is also true: there is evidence that the administration denied faculty requests to develop degree programs such the Bachelor of Science in Mathematics and the Master of Mathematics. [Tr. 321, 322]. Respondent admits that degree programs are not sent to the curriculum committee until they are vetted by the administration for demand and marketability. [Tr. 294].

EXHIBIT C

EXHIBIT C

The make-up of the curriculum committee is heavily influenced by administration as the bylaws show that a majority of the voting members are appointed by the administration. [GCX 35, pp. 10, 11, 15; Tr. 218]. The proposals that are reviewed by the committees are vetted by the administration prior to being considered by the committee. [Tr. 294]. No proposal comes before the committee without approval of the dean and administration. [GCX 9; Tr. 210]. There is no mechanism for the committee to consider submissions not approved by the administration. [Tr. 210].

Even when a curriculum committee votes to "approve" a course, it is simply following the criteria on a checklist prepared and provided by academic affairs. [Tr. 179, 1173, 1174]. It is undisputed that the committee cannot deviate from the list and create their own criteria for approval. [Tr. 179]. When a submission meets all the criteria on the checklist, the proposed course is approved. [Tr. 1174]. There is not a shred of evidence on the record to show that the curriculum committee has ever used discretion to deny a submission when the checklist is complete. [Tr. 1174, 1175]. Thus, at most, faculty committee members perform a ministerial function.

Even when a curriculum committee has used its ministerial discretion to reject a proposal because it did not meet standards established by administration, there are examples of the administration overriding the will of the committee. The evidence shows that within the past two years, the VPAA instructed the curriculum committee to approve changes even though the changes were not submitted on one form rather than on individual forms properly. [Tr. 1176]. Further, there is unrebutted testimony that after the curriculum committee rejected a doctorate in education program because the submission did not include information regarding program courses, the former VPAA unilaterally approved the program over the summer when faculty were away. [Tr. 1181]. There is even evidence that non-voting administration appointees have exercised

83

EXHIBIT C

EXHIBIT C

influence over the committee leading to the rejection of some proposals. [GCX 56; Tr. 1186]. In short, the evidence clearly shows that faculty do not control the curriculum for Respondent.

Faculty play no role in creating schedules for departments and colleges. [Tr. 325, 326, 327]. The department chairs, dean and administration make the choice as to whether a class will be taught online or "on the ground" in a given semester. [Tr. 565]. Faculty have no say when departments are broken apart or sent to other colleges or schools. [Tr. 299, 300, 392, 573].

Unlike *Elon,* where standing committees made recommendations which were voted on by the faculty, the record in the present case is absent of any evidence showing that recommendations by the University Senate committee have been implemented by Respondent. The University Senate president credibly testified that over the past four years he could not recall a single committee recommendation that was enacted by Respondent. [Tr. 1097]. Notably, Respondent did not rebut this fact. On the other hand, the University Senate president provided numerous examples of recommendations from the environment, technology and catholic identity committees which were ignored by the administration. [Tr. 1103, 1104]. An examination of the University Senate's bylaws show that the body is only empowered to create its own bylaws and complete whatever task is assigned by Respondent's president. [GCX 34, p. 3]. There is no evidence that over the past several years Respondent's president has tasked the University Senate with any responsibilities.

Regarding the secondary indicia of managerial status – academic policies and personnel policies and decisions – Respondent's case is less than convincing that full-time faculty play a meaningful role as decision makers in these categories. With the exception of academic policies related to the graduate and undergraduate academic standards committees, there is no evidence that faculty play any role in this secondary category. Although decisions and sanctions are handed down to students directly from the committee, students have the right to appeal a committee's

EXHIBIT C

EXHIBIT C

decision to the vice-president of academic affairs for a final decision. [Tr. 1077]. Faculty credibly testified that even the tasks performed by the academic standards committees, such as revising the honor code, are assigned by administration. [Tr. 1167].

In regard to personnel and policy decisions, the record clearly shows that ultimate power rests with administration. Respondent admits that faculty play no role in the decision to renew contracts for nontenure track faculty. [Tr. 236]. While faculty often sit on search committees, the record contains several examples when either the dean or the administration ignored the recommendation and hired a different candidate, or nobody at all. [Tr. 409, 410, 757, 758, 759]. Faculty have requested to choose their own department chairs or have the chair rotate among department members; those requests have been denied by Respondent. [Tr. 561].

It is undisputed that the promotion and tenure committee only makes recommendations for promotion and tenure; the final decision on whether to recommend that the Board of Trustees grant promotion or tenure lies with the president. [Tr. 238, 407]. Respondent admits that there have been occasions when Respondent's president has refused to follow the committee's advice to recommend that the Board of Trustees approve a promotion or grant tenure [Tr. 239, 407]; likewise, Respondent admits there are occasions when the president has recommended that the Board of Trustees approve a promotion or grant of tenure to a candidate even if the committee has recommended against promotion or tenure [Tr. 239, 240].

Regarding personnel policies, the evidence shows that the VPAA created a transition team to give feedback on a new faculty handbook. [Tr. 154].  The policy manual was promulgated and implemented without a vote from the faculty at large or even the University Senate. [Tr. 1100]. The handbook made numerous unilateral changes and modifications from the expired CBA, including provisions related to terms and conditions of employment, including teaching loads,

EXHIBIT C

EXHIBIT C

promotion and tenure, and the grievance procedure. [JX 1; GCX 23; GCX 33]. In sum, faculty exert very little influence over Respondent's personnel policies and decisions.

It must be noted that it is undisputed that all faculty do not participate in committee work, so even if it was determined that certain faculty members have taken on managerial duties, which they have not, the other remaining faculty are not acting as managerial employees and they should be protected by the Act. [Tr. 197].

In conclusion, the evidence is clear that Respondent's full-time faculty are not managerial employees when their role in decision making is analyzed under Pacific Lutheran. There is no dispute that faculty play no role in two-thirds of the primary indicia outlined by *Pacific Lutheran*. Regarding academic programs, the evidence shows that while faculty may have the appearance of playing a meaningful role in the establishment of those programs, a closer look shows that the administration dominates the process from beginning to end. The University Senate committees are empty vessels as there is strong evidence that none of the committees' numerous recommendations have been implemented by Respondent. Further, when examining faculty's role in the secondary indicia of managerial status, the evidence shows that Respondent routinely ignore faculty recommendations regarding hiring and promotion and tenure. Work rules and handbooks are promulgated without meaningful faculty input. In sum, Respondent has failed to meet its burden to establish that full time faculty are managerial employees.

## G. Respondent violated Sections 8(a)(1) and (5) of the Act by, respectively, announcing to employees its decision to withdraw recognition from the Union and then withdrawing recognition of the Union.

Section 8(a)(5) of the Act makes it an unfair labor practice for employers "to refuse to bargain collectively with the representatives of [their] employees, subject to the provisions of Section 9(a)" – i.e., the representative selected by the majority of the employees in an appropriate unit.. Once selected, the labor organization representing an appropriate unit of employees enjoys

EXHIBIT C

a presumption of continued majority support unless and until the employer successfully rebuts that presumption.  See, e.g., *United States Stamping Co.*, 5 NLRB 172, 182 (1938); *Ray Brooks v. NLRB*, 348 U.S. 96 (1954); *Auciello Iron Works v. NLRB*, 517 U.S. 781, 786 (1996).

The question of support for the Union has not been raised as an affirmative defense by Respondent or otherwise litigated at the hearing. Thus, the Union continues to enjoy a presumption of majority support; if the Board has jurisdiction over Respondent, then its withdrawal of recognition from the Union is a prima facie violation of the Act. In fact, Respondent does not assert that the Union lost majority support, but rather it contends that its status as a religious institution exempts it from jurisdiction of the Act, and by extension the Board. However, as argued above, Respondent has failed to establish that it is a bona fide religious institution for purposes of jurisdictional exemption pursuant to extant Board law under *Bethany College.* Moreover, there is absolutely no evidence establishing that the Union had lost majority status on October 23, 2020, when Respondent finalized communicated its decision that it was withdrawing recognition from the Union.

It is settled law that coercive statements made to employees by Respondent's supervisors, managers, and representatives that have a tendency to chill union activities violate Section 8(a)(1) of the Act. The Board engages in an objective inquiry into whether the disputed statement or conduct would reasonably tend to coerce or interfere with employee rights. *Sprain Brook Manor Nursing Home*, 351 NLRB 1190, 1204 (2007); *Miller Electric Pump & Plumbing*, 334 NLRB 824, 825 (2001); *Rossmore House*, 269 NLRB 1176, enfd. 760 F.2d 1006 (9th Cir. 1985). The Board has noted that the context in which such statements are made can supply meaning to expressions that, considered in isolation, may be ambiguous or misleading. .  See, e.g., *Debbie Reynolds Hotel*, 332 NLRB 466, 475 (2000). Such communications made by Respondent's president, VPAA, and

the chair of Respondent's Board of Trustees to employees as well as the public at large clearly undermine the Union's role in collective bargaining and sends a chilling message to the bargaining unit employees (and any non-unit employees on campus who may have an interest in organizing for the first time).

Accordingly, because the Board, as discussed above, retains jurisdiction over Respondent, the Administrative Law Judge must find that Respondent violated Sections 8(a)(1) and (5) of the Act by both unlawfully withdrawing recognition and communicating that decision to employees as alleged in the Complaint.

**H.    Respondent violated Section 8(a)(5) of the Act by implementing unilateral changes to terms and conditions of employment and modifying the terms of the parties' collective bargaining agreement.**

Respondent violated Section 8(a)(5) of the Act by making unilateral changes to employees' terms and conditions of employment and modifying mid-contract the terms of the parties' collective-bargaining agreement without the Union's consent.[48] As a threshold matter, it is well settled that wages, hours, benefits and other terms and conditions of work are mandatory subjects of bargaining. *NLRB v. Katz*, 369 US 736 (1962) (aspects of wages are a mandatory subject of bargaining).

Economic decisions that turn on labor costs, such as furloughs and layoffs, are generally found to be mandatory subjects of bargaining. *Lapeer Foundry & Machine, Inc.* 289 NLRB 952-

_____

[48]In addition to admitting that most of the alleged unilateral changes are unlawful if the Board has jurisdiction in this matter,  Respondent has not asserted that its unilateral actions were permitted under the "contract coverage" or "sound arguable basis" standards and the unilateral changes at issue here do not implicate the Board's decisions in *MV Transportation*, 368 NLRB No. 68 (2019) or *Bath Ironworks*, 345 NLRB 499, 501-02 (2005), *enforced sub nom., Bath Marine Draftsmen's Ass'n v. NLRB*, 475 F.3d 14 (1st Cir. 2007).   The General Counsel has urged that the Board overrule both of those cases and adopt a universal "clear and unmistakable" standard when an employer contends that its unilateral actions were permitted under the terms of the contract.

EXHIBIT C

EXHIBIT C

955 1988; *Sullivan Motor Delivery Inc.,* 301 NLRB No. 37 ALJD Slip op. p. 9-10 (1991); *Storer Cable TV of Texas* 295 NLRB No. 39 Slip op. p. 4-9 (1989). Evaluations have the potential to affect the wage rate an employee might receive and therefore are also a mandatory subject of bargaining, requiring negotiating any changes. *Weyerhaeuser NR Co.*, 366 NLRB No. 169 (2018), citing *Saginaw Control & Engineering*, 339 NLRB 541 (2003). Further, the Board has held that Employees' work schedules are a mandatory subject of bargaining. See, e.g., *Green Apple Supermarket of Jamaica, Inc.*, 366 NLRB No. 124, slip op. at 22-23 (2018); *Indiana Hospital*, 315 NLRB 647, 655-657 (1994). Changes in work assignments is a mandatory subject of bargaining. *Sacramento Union*, 258 NLRB 1074, 1075-76 (1981) (change in manner in which work was assigned). However, not every unilateral change that affects terms and conditions of employment triggers the duty to bargain. Rather, the Board asks "whether the changes had a *material, substantial, and significant impact* on the employees' terms and conditions of employment." *Toledo Blade Co.*, 343 NLRB 385, 387 (2004) (emphasis added).

An employer may not unilaterally institute changes regarding mandatory subjects of bargaining before reaching a good faith impasse in bargaining. Unilateral actions by an employer that modify terms or conditions of employment constitute a per se violation of Section 8(a)(5) of the Act. Such actions also allow for an inference of subjective bad faith. *NLRB v. Katz,* 369 U.S. 736 (1962).

Section 8(d) of the Act imposes an additional requirement when a collective-bargaining agreement is in effect and an employer seeks to "modify" terms and conditions of employment "contained in" the agreement. In that instance, the employer must do more than just afford a union notice and opportunity to bargain over the change – the employer must first obtain the union's consent before implementing the change. *Oak Cliff-Golman Baking Co.*, 207 NLRB 1063 (1973),

EXHIBIT C

*enfd.* 505 F.2 1302 (5th Cir. 1974), *cert. denied* 423 U.S. 826 (1975); *Dearborn County Club*, 298 NLRB 915, 920 (1990) ("It is well settled law that a modification of a clear and unambiguous term of contract of fixed duration, regardless of economic motivation, must be obtained pursuant to a positive affirmance by the employees' bargaining agent, otherwise the requirements of Section 8(d) of the Act are not met and a violation of Section 8(a)(5) results.

Here, Respondent made numerous unilateral changes and mid-contract modifications; most of which they admit.[49] The evidence clearly shows that after withdrawing recognition from the Union, Respondent, for the first time, started tying salary increases to evaluations, reduced the number of hours that employees could take outside employment, eliminated the preference fulltime faculty enjoyed for teaching alternate format, including summer assignments, established a furlough policy, and changed the grievance procedure, including unilaterally rescinding the ability to arbitrate grievances. Respondent also unilaterally made changes to the make-up of the promotion and tenure committee, eliminated the requirement that deliberations of the promotion and tenure committee be recorded, and changed the requirements that those recordings and records be preserved for seven years. Respondent unilaterally modified the definition of visiting faculty, academic year, and introduced a definition for academic faculty year.  All of these changes relate to pay and other core terms and conditions of employment; therefore, they are all mandatory subjects of bargaining. These changes were made without the input of faculty and without

---

[49] Respondent admits that it made the unilateral changes as alleged in paragraphs 10(a)(i) through 10(a)(vi) of the Complaint and essentially admits it made unilateral changes to the "language" in the terms and conditions of employment as alleged in paragraphs 10(a)(vii) through 10(a)(ix) of the Complaint. [GCX 1(ii) p.9, 10]. Further, Respondent admits that it made the mid-contract modifications as alleged in paragraphs 11(a)(i) through 11(a)(iii), 11(a)(v) through 11(a)(viii), 11(a)(xii), 11(a)(xiv) through 11(a)(xxi), 11(a)(xxiii) through 11(a)(xxvi), 11(a)(xxviii) and 11(a)(xxix). [GCX 1(ii) p. 13, 14].

EXHIBIT C

bargaining to impasse, thus these unilateral changes and mid- contract modifications violate Section 8(a)(5) and are therefore unlawful.

**I.      Respondent's Policy Manual rules are unlawful under extant Board law.**

Under current Board law, an analysis of Respondent's Policy Manual rules under *The Boeing Co.*, 365 NLRB No. 154 (2017), is required. In *Boeing*, the Board set a new standard for determining whether a facially neutral work rule or policy, reasonably interpreted, would unlawfully interfere with, restrain, or coerce employees in the exercise of their Section 7 rights. In doing so, the Board overruled the "reasonably construe" prong delineated in *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004), which held that a facially neutral work rule would be found unlawful if employees would reasonably construe it to prohibit Section 7 activity. *Boeing*, 365 No. 154, slip op. at 1-2. Instead, the Board in *Boeing* found:

> [W]hen evaluating a facially neutral policy, rule or handbook provision that, when reasonably interpreted, would potentially interfere with the exercise of NLRA rights, the Board will evaluate two things; (i) the nature and extent of the potential impact on NLRA rights, and (ii) legitimate justifications associated with the rule. *Id.*, slip op. at 3.

In concluding this evaluation, the Board will strike the proper balance between the employer's asserted business justification for the policy against the extent to which the policy interferes with employee rights under the Act, viewing the rule or policy from the employees' perspective. Ibid. Ultimately, the Board places work rules into one of three categories:

> Category 1 will include rules that the Board designates lawful to maintain, either because [(a)] the rule, when reasonably interpreted, does not prohibit or interfere with the exercise of NLRA rights; or [(b)] the potential adverse impact on protected rights is outweighed by justifications associated with the rule.
>
> Category 2 will include rules that warrant individualized scrutiny in each case as to whether the rule would prohibit or interfere with NLRA rights, and if so, whether

any adverse impact on NLRA -protected conduct is outweighed by legitimate justifications.

Category 3 will include rules that that the Board will designate as unlawful to maintain because they would prohibit or limit NLRA-protected conduct, and the adverse impact on NLRA rights is not outweighed by justifications associated with the rule.

The Board explained the categories are not part of the test and:

[W]hen deciding cases in this area, the Board may differentiate among the different types of NLRA-protected activities [some of which may be deemed central to the Act and others more peripheral), and the Board must recognize those instances where the risk is intruding on NLRA rights is "comparatively slight." Similarly, the Board may distinguish between substantial justifications – those that have direct, immediate relevance to employees or the business – and others that that might be regarded as having more peripheral importance. In some instances, the impact of a particular rule on NLRA rights may be self-evident, or the justification associated with particular rules may be apparent from the rule itself or the Board's experience with particular types of workplace issues. [50]
***

[W]hen the Board interprets any rule's impact on employees, the focus should rightfully be on the employee's perspective. This is consistent with established Board and court case law, and it is especially important when evaluating questions regarding alleged interference with protected rights in violation of Section 8(a)(1). As the Board stated in *Cooper Thermometer Co.*, 154 NLRB 502, 503 fn. 2 (1965). Section 8(a)(1) legality turns on "whether the employer engaged in conduct, which, it may reasonable be said, tends to interfere with the free exercise of employee rights under the Act. [51]
Under *Boeing*, as subsequently clarified in *LA Specialty Produce C*o., 368 NLRB No. 93

(2019) it is the General Counsel's initial burden "to prove that a facially neutral rule would in

context be interpreted by a reasonable employee … to potentially interfere with the exercise of

Section 7 rights." *Id*. slip op. at 2. If the General Counsel fails to satisfy this burden, maintenance

of the rule is deemed lawful without further inquiry. *See Id*.; *Boeing*, 365 NLRB No. 154, slip op.

---

[50] *Id.,* slip op. at 11.
[51] *Id.*, slip op. at 17.

at 14; see also *LA Specialty Produce Co.*, 368 NLRB No. 93, slip op. at 3. The rule's maintenance violates Section 8(a)(1) "if the Board determines that the justifications are outweighed by the adverse impact on rights protected by Section 7." *Boeing*, 365 NLRB No. 154, slip op. at 16. Where a rule is likely to have a chilling effect on Section 7 rights, the Board may conclude that its maintenance is an unfair labor practice, even absent evidence of enforcement. See *NLRB v. Vanguard Tours,* 981 F.2d 62, 67 (2d Cir, 1992), citing *Republic Aviation v. NLRB*, 324 U.S. 803, fn. 10 (1945).

All of Respondent's Policy Manual rules alleged in the instant Complaint by their terms, either directly or potentially interfere with employees' exercise of Section 7 rights. As such under Boeing, Respondent was required to provide a business justification for maintenance and promulgation of those rules, which it failed to do. Each of the alleged Policy Manual rules is discussed and analyzed under Boeing separately below:

1.   *University Name, Seal and Logo Policy: Employees are prohibited from using Respondent's name seal or logo for any activity outside the scope of work.*

This rule falls under Boeing Category 2 as it potentially impacts employees' ability to engage in protected activity by prohibiting use of Respondent's name and logo. [JX 2 p. 189]. As discussed in *Schwans Home Serv*., 364 NLRB 170 (2016), citing  *Boch Honda*, supra, 362 NLRB No. 83, slip op. at 2, "employees would reasonably read the prohibition of using the Respondent's logos  'in any manner' to cover protected employee communications".  Such broad language requires Respondent to provide a strong business justification, which it has failed to provide. Thus, Respondent's promulgation and maintenance of its University Name, Seal and Logo policy necessitates a finding that Respondent has violated of Section 8(a)(1) of the Act.

2.   *Confidential Information: Employees are prohibited from disclosing confidential information which is defined broadly as "university business," but also specifies pay and insurance information as confidential information.*

This rule falls under Boeing category 3 as it involves activity that cuts to the heart of what is protected by the Act – communicating with others about pay and other terms and conditions of employment. [JX 2, p. 254]. The Board has consistently held similar rules forbidding disclosure of information about employees--which includes wages and other terms and conditions of employment--to be overbroad and unlawful. See, e.g., *Flex Frac Logistics, LLC*, 358 NLRB 1131, 1131 (2012) (rule prohibiting employees from disclosing "personnel information and documents" to persons "outside the organization" unlawful), enfd. 746 F.3d 205 (5th Cir. 2014) **7**; *Cintas Corp.*, 344 NLRB 943, 943 (2005) (prohibition against releasing "any information" about employees unlawful), enfd. 482 F.3d 463, 375 U.S. App. D.C. 371 (D.C. Cir. 2007); *Flamingo Hilton-Laughlin*, 330 NLRB 287, 287, 291-292 (1999) (rule prohibiting employees from revealing confidential information about "fellow employees" and discussing work with third parties and the media unlawful). Thus, this rule is invalid unless justified by legitimate business reasons, which Respondent did not proffer in the instant case. As such, this rule violates 8(a)(1) of the Act.

3.  *Media Contacts: Employees are prohibited commenting on "university business" to representatives of the media without authorization from Respondent.*

The Media Contacts rule is a Category 2 rule under Boeing, as it may concern NLRA rights involving employees speaking to the media about terms and conditions of employment. [JX 2, p. 255]. Employees have a clear right under the Act to publicize labor disputes. See *Valley Hospital Medical Center*, 351 NLRB 1250, 1252 (2007), enfd. mem. sub nom. *Nevada Service Employees Local 1107 v. NLRB*, 358 Fed.Appx. 783 (9th Cir. 2009). See generally *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565, 98 S. Ct. 2505, 57 L. Ed. 2d 428 (1978) (holding that Section 7 protection extends to employee efforts to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship). The Board has explained that "any rule that requires employees to secure permission from their

employer as a precondition to engaging in protected concerted activity on an employee's free time and in nonwork areas is unlawful." *Brunswick Corp.*, 282 NLRB 794, 795 (1987). See also *Trump Marina Casino Resort*, 355 NLRB 585 (2010) (incorporating by reference 354 NLRB 1027, 1027 fn. 2 (2009)) (finding rule requiring employees to get prior authorization before speaking to media unlawful), enfd. mem. 435 Fed.Appx. 1 (D.C. Cir. 2011). Respondent failed to provide any evidence to justify the need for this overly broad rule so it promulgation and maintenance is a violation of Section 8(a)(1) of the Act.

>    **J.    The Board should abandon the rationale in *The Boeing Company* and return to the standard found in *Lutheran Heritage Village-Livonia*, with modifications, to evaluate facially-neutral work rules.**

The Board's prior standard for evaluating facially neutral work rules in *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004), gave appropriate weight to both employees' Section 7 rights and employers' legitimate business interests in maintaining such rules. In *Boeing Co.*, 365 NLRB No. 154 (2017), the Board replaced *Lutheran Heritage* with a standard that fails to protect employees from the chilling effects of overbroad rules on the exercise of statutory rights. To correct this error, the Board should overrule Boeing in favor of standard based on *Lutheran Heritage*.

Section 7 of the Act protects employees' right to engage in "concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C. § 157. The Board and courts have long recognized that employers' maintenance of overbroad workplace rules may chill employees in the exercise of Section 7 rights. See, *e.g., Lafayette Park Hotel*, 326 NLRB 824, 825 (1998), *enfd. mem.*, 203 F.3d 52 (D.C. Cir. 1999). [52] However overbroad rules are conveyed—through employee

---

[52] Such overbreadth may exist in rules concerning, among many other topics, civility, *see, e.g., William Beaumont Hosp.* 363 NLRB 1543, 1544 (2016) (prohibition on conduct that "impedes harmonious interactions and relationships" reasonably encompassed protected discussions

handbooks, arbitration or severance agreements, or other means—"[e]mployees, who are dependent on the employer for their livelihood, would reasonably take a cautious approach and refrain from engaging in Sec[tion] 7 activity for fear of running afoul of a rule whose coverage is [at best] unclear." *Whole Foods Mkt.*, 363 NLRB 800, 803 n.11 (citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969)), *enfd.*, 691 F. App'x 49 (2d Cir. 2017) (summary order). Indeed, the presence of fear—even just a "dash" of it—magnifies perceived risks and embeds pessimism and paralysis in employees. Michael M. Oswalt, *The Content of Coercion*, 52 U.C. Davis L. Rev. 1585, 1589-90, 1634, 1636 (2019). And the fear necessary to trigger such reactions is generally present when employees must decide whether to engage in Section 7 activity, both because fear is ubiquitous in hierarchical work settings, *see id.* at 1637, 1638 & n.246, 1644 n.277, and because the prospect of challenging authority is an especially potent fear trigger.[53]

Consistent with the foregoing, from 2004 to 2017, the Board appropriately responded to the problem of overbroad work rules with the *Lutheran Heritage* standard. That standard, which had the circuit courts' unanimous approval,[54] generally prohibited the maintenance of employer rules if "employees would reasonably construe the language to prohibit Section 7 activity." 343

---

between employees); confidentiality and non-disclosure, *see, e.g., Victory Casino Cruises II,* 363 NLRB 1578, 1580-81 (2016) (prohibition on disclosing "personnel information" reasonably included protected discussion of employment terms); and non-disparagement, *see, e.g., S. Md. Hosp.,* 293 NLRB 1209, 1222 (1989) (prohibition of "derogatory attacks" on employer representatives overboard where criticisms of working conditions could fairly be regarded as "derogatory" toward employer), *enfd. In relevant part per curiam,* 916 F.2d 932 (4th Cir. 1990).

[53] *See* Jennifer J. Kish-Gephart, et al., *Silenced by Fear: The Nature, Sources, and Consequences of Fear at Work,* 29 Res. Organizational Behav. 163, 169, 173-74 (2009), available at https://www.researchgate.net/publication/238382691_Silenced_by_fear (last visited Mar. 1, 2022).

[54] *Boeing,* 365 NLRB No. 154, slip op. at 24 & n.5 (Member Pearce, dissenting) (collecting circuit court cases); *id.,* slip op. at 30-31 (Member McFerran, dissenting).

NLRB at 647. Adhering closely to the Board's general approach to employer statements,[55] this standard recognized the fact that "a reasonable employee is a vulnerable employee, easily chilled." *LA Specialty Produce Co.,* 368 NLRB No. 93, slip op. at 10 (2019) (Member McFerran, dissenting). And because context affects how employees interpret employer rules*, Lutheran Heritage* also "appropriately t[ook] account of the surrounding circumstances." *The Roomstore*, 357 NLRB 1690, 1690 n.3 (2011).[56]

---

[55] *See Double D Constr. Grp.,* 339 NLRB 303, 303-04 (2003) (employer statements are unlawful if "the words could reasonably be construed as coercive, whether or not that is the only reasonable construction").

[56] Consistent with that principle, the Board has relied on circumstances including:

- specific events revealing the significance of a policy, *see David Van Os & Associates, PC,* 346 NLRB 804, 807 n.10, 813-14 (2006) (relying on employees' awareness of recent, specific problems of employee misconduct in finding lawful rules demanding honesty and loyalty of employees, which were narrowly framed to address that misconduct);

- special characteristics of specific workplaces, *see, e.g., Flagstaff Med. Ctr.,* 357 NLRB 659, 662-63 (2011) (hospital's employees would reasonably construe a no-camera policy as a legitimate means of protecting the "weighty" privacy interests of patients), *enf. Denied in part on other grounds,* 715 F,3d 928 (D.C. Cir. 2013);

- employer statements linking rule language to protected activity, *see The Roomstore,* 357 NLRB at 1690 n.3 (employees would reasonably interpret rule prohibiting "[a]ny type of negative energy or attitudes" as applying to protected activity in part based on employer's repeated warnings linking "negativity" to employees' protected discussions); *Care One at Madison Ave.,* 361 NLRB 1462, 1464 (2014) (employees would understand employer's references to recent union election and their purported failure to treat each other with "dignity and respect" during the campaign as explicitly targeting protected union activity), *enfd.,* 832 F.3d 351 (D.C. Cir> 2016);

- other unfair labor practices, such as unlawful discharges giving an "authoritative indication" of the unlawful scope of a rule, *Triple Play Sports Bar & Grill,* 361 NLRB 308, 314 (2014) (employer indicated prohibition against inappropriate discussions included Section 7 activity by unlawfully discharging employees for participating in protected Facebook discussions about employer), *aff'd,* 629 F. App'x 33 (2d Cir. 2015) (unpublished); *accord Care One,* 361 NLRB at 1465; *First Transit, Inc,* 360 NLRB 619, 622 (2014); *but see Albertson's, Inc.,* 351 NLRB 254, 258 (2007) (rejecting judge's reliance, in evaluating rule, on "unrelated unfair labor practices involving other rules"), *overruled on other grounds, AT&T Mobility,* 370 NLRB No. 121 (2021);

- employees' prior exercise of Section 7 rights, *see Rio All-Suites Hotel & Casino,* 362 NLRB 1690, 1690n.4 (2015) (relying in part on evidence that employees frequently wore union-message clothing to find that employees would no reasonably construe appearance rule to prohibit Section 7 activity); and

EXHIBIT C

While protecting employee rights, *Lutheran Heritage* was also sufficiently responsive to legitimate business interests. The Board under *Lutheran Heritage* routinely considered justifications associated with rules in determining how employees would reasonably interpret the rules. *See Boeing*, 365 NLRB No. 154, slip op. at 24 & n.6, 25 n.12 (Member Pearce, dissenting), When the Board found employees would not reasonably construe a rule to prohibit Section 7 activity, it was typical because the rule was tailored such that the employer's legitimate business interests would be sufficiently apparent to a reasonable employee. *See Id*., slip op. at 35 (Member McFerran, dissenting). *Lutheran Heritage* also left employers free to adopt more narrowly tailored rules instead of overbroad ones, see Id. (Member McFerran, dissenting), and permitted them to achieve this through sufficiently detailed savings clauses, *see First Transit*, 360 NLRB at 621-622.

In addition*, Lutheran Heritage* implicitly permitted employers to maintain narrowly tailored rules that infringe on employees' Section 7 rights in the limited circumstances where conflicting legitimate business interests outweigh those rights. *See Menorah Med. Ctr.*, 362 NLRB 1746, 1746 n.3, 1767 (2015) (applying balancing test to overbroad confidentiality rule), *enfd. in relevant part sub nom. Midwest Div.-MMC, LLC v. NLRB*, 867 F.3d 1288, 1302 (D.C. Cir. 2017) ("An employer presumptively violates the Act 'when it maintains a work rule that . . . tends to chill employees in the exercise of their Section 7 rights.'" (emphasis added) (quoting *Lutheran Heritage*, 343 NLRB at 646)).

---

- employer testimony indicating the unlawful scope of a rule, *see Longs Drug Stores California*, 347 NLRB 500, 500-01 (2006) (relying in part on manager's testimony that wage rates were confidential to find confidentiality provisions unlawful).

However, extrinsic evidence was not required to find a work rule overbroad under *Lutheran Heritage*. *See Hills & Dales Gen. Hosp.*, 360 NLRB 611, 611 (2014); *accord Cintas Corp. v. NLRB*, 482 F.3d 463, 467 (D.C. Cir. 2007),

EXHIBIT C

In 2017, a sharply divided Board in Boeing sua sponte overruled *Lutheran Heritage* and adopted in its stead a standard so forgiving of overbroad work rules as to effectively abdicate the Board's role in protecting employees from their chilling effect.[57] In doing so, the *Boeing* majority mischaracterized the standard it was replacing. Several of the more egregious examples of this are the majority's assertions that *Lutheran Heritage* permitted no consideration of employer justifications underlying rules, *see Boeing*, 365 NLRB No. 154, slip op. at 7, 8 & nn.31-32, [58] no consideration of "events that reveal the importance of a particular policy," *id.*, slip op. at 11, and insufficient consideration of "characteristics of . . . work settings and different industries," *id.*, slip

---

[57] Under *Boeing*, as subsequently clarified in *LA Specialty*, 368 NLRB No. 93, it is the General Counsel's initial burden "to prove that a facially neutral rule *would* in context be interpreted by a reasonable employee . . . to potentially interfere with the exercise of Section 7 rights." *Id.*, slip op. at 2. If the General Counsel fails to satisfy this burden, maintenance of the rule is deemed lawful without further inquiry. *See id.; Boeing*, 365 NLRB No. 154, slip op. at 16. Otherwise, the Board evaluates (i) "the nature and extent of the potential impact on NLRA rights," and (ii) "legitimate justifications" associated with the rule. *Boeing*, 365 NLRB No. 154, slip op. at 14; *see also LA Specialty*, 368 NLRB No. 93, slip op. at 3. The rule's maintenance violates Section 8(a)(1) "if the Board determines that the justifications are outweighed by the adverse impact on rights protected by Section 7." *Boeing*, 365 NLRB No. 154, slip op. at 16. Next, the Board places rules into three categories: Category 1 (rules always lawful to maintain either because (a) when reasonably interpreted, they do not prohibit or interfere with the exercise of NLRA rights or (b) the potential adverse impact on protected rights is outweighed by the justifications associated with the rules); Category 2 (rules warranting individualized scrutiny in each case); and Category 3 (rules never lawful to maintain because they would prohibit or limit NLRA-protected conduct and the adverse impact on NLRA rights is not outweighed by justifications associated with the rules). See id., slip op. at 14-15; *see also LA Specialty*, 368 NLRB No. 93, slip op. at 2 & n.2.

[58] In this respect, the Boeing majority imagined a conflict between Lutheran Heritage and other Board law where no conflict existed. For example, the majority claimed that prohibitions on all employee solicitation during working time and prohibition on off-duty employees accessing the interior of the employer's facility should be unlawful under Lutheran Heritage. See Boeing, 365 NLRB No. 154, slip op. at 8. Unsurprisingly, the majority failed to cite any Lutheran Heritage case where the Board had so held. The majority failed to recognize that Lutheran Heritage implicitly respected balances that the Board strikes between employees' rights to engage in specific Section 7 activities and conflicting legitimate employer interests, e.g., that employers may lawfully maintain facially neutral rules that prohibit union solicitation during working time and certain off-duty access to employer facilities for Section 7 purposes, *see id.*, slip op. at 8 nn.31-32 (collecting cases).

EXHIBIT C

EXHIBIT C

op. at 10-11. All three contentions are refuted above, *supra* pp. 3-5. [59]   The *Boeing* majority's mischaracterization of the *Lutheran Heritage* doctrine is "enough to demonstrate that its reconsideration of the [doctrine was] arbitrary and capricious." *Boeing*, 365 NLRB No. 154, slip op. at 36 (Member McFerran, dissenting).

More importantly, *Boeing* is misguided because it is more complicated, less predictable, and much less protective of employee rights than *Lutheran Heritage*. Indeed, "it simply fails to address the labor-law problem . . . that employees may be chilled from exercising their statutory rights by overbroad employer rules." *Id*., slip op. at 30 (Member McFerran, dissenting). At the outset, the *Boeing* majority promised more certainty and clarity, *see id*., slip op. at 14, but failed to deliver them in any acceptable way. Notably, how employees would reasonably construe a rule is still part of the analysis under *Boeing*. From that starting point, the majority added several

---

[59] The Board members who dissented in Boeing have identified additional mischaracterizations of *Lutheran Heritage* by the majority:

• *Lutheran Heritage* conflicts with *Republic Aviation v. NLRB*, 324 U.S. 793 (1945), and other Supreme Court decisions. *Compare Boeing*, 365 NLRB No. 154, slip op. at 7, *with id*., slip op. at 30 & n.9 (Member McFerran, dissenting).
• *Lutheran Heritage* required impossible "linguistic perfection*." Compare Boeing*, 365 NLRB No. 154, slip op. at 9 & n.41, *with id*., slip op. at 36 (Member McFerran, dissenting).
• The Board under *Lutheran Heritage* consistently misapplied the evidentiary principle that ambiguity in general work rule language must be construed against the drafter. *Compare id*., slip op. at 9 n.43, *with id*., slip op. at 28 n.25 (Member Pearce, dissenting), *and id*., slip op. at 36 n.31 (Member McFerran, dissenting).
• *Lutheran Heritage* was based on the premise that employees are better served by having no rules, and, accordingly, made employees more vulnerable to sexual harassment and assault. *Compare id*., slip op. at 10, 20-21, *with id*., slip op. at 24 n.9 (Member Pearce, dissenting), *and id*., slip op. at 36, 39-40, 40 n.47 (Member McFerran, dissenting).
• The Board has "struggled" when attempting to *apply Lutheran Heritage. Compare id*., slip op. at 2-3, 11-13, *with id*., slip op. at 24 (Member Pearce, dissenting), *and id*., slip op. at 37 (Member McFerran, dissenting).
• *Lutheran Heritage* was not well-received by the courts of appeals. *Compare id*., slip op. at 14, *with id*., slip op. at 24 & nn.5, 7 (Member Pearce, dissenting), *and id*., slip op. at 30-31 (Member McFerran, dissenting).

EXHIBIT C

EXHIBIT C

amorphous moving parts to the test, belying its promise of certainty and clarity. *See Boeing*, 365 NLRB No. 154, slip op. at 26-27 (Member Pearce, dissenting); *id*., slip op. at 38-39 (Member McFerran, dissenting). As shown below, the only certainty under *Boeing* has been the Board's commitment to finding lawful all but the most obviously overbroad rules and even removing them from Board scrutiny altogether.

*Boeing's* skewing against employee rights begins with its "reasonably construe" step. *Boeing* primes this test for irrational results by imagining ostensibly "reasonable" employees who naïvely presume their employers would not apply work rules to prohibit Section 7 activity, concluding otherwise only where a rule's coercive interpretation is the inevitable and necessary result. *See Medic Ambulance Serv., Inc*., 370 NLRB No. 65, slip op. at 8 (2021) (Member McFerran, dissenting); *LA Specialty*, 368 NLRB No. 93, slip op. at 10-11 (Member McFerran, dissenting). *Boeing* also charges employees with constructive knowledge of their rights under the Act—contrary to evidence that many or most employees lack such knowledge [60] -- seemingly to bolster the assumption that employees would interpret rules as consistent with those rights. *See LA Specialty*, 368 NLRB No. 93, slip op. at 10 n.17 (Member McFerran, dissenting). This approach turns on its head the long-established principle that employer conduct violates Section 8(a)(1) if it has a "reasonable tendency" to "interfere with, restrain, or coerce employees" -- not whether it "most likely, much less inevitably, would have that effect." *Medic Ambulance Serv*., 370 NLRB No. 65, slip op. at 8 (Member McFerran, dissenting). Relatedly, it is also inconsistent with the Board's test for unlawful employer statements, which provides that a statement is unlawful if "the words could reasonably be construed as coercive, whether or not that is the only reasonable

---

[60] *See, e.g*., Peter D. DeChiara, *The Right to Know: An Argument for Informing Employees of Their Rights under the National Labor Relations Act*, 32 Harv. J. on Legis. 431, 435-38 (1995).

EXHIBIT C

EXHIBIT C

construction." *Double D Constr.*, 339 NLRB at 303-04. More importantly, it is also inconsistent with core premises of the Act—that "employers have power over their employees" and "employees require countervailing statutory protection" [61] - as well as the reality that employer disregard for Section 7 rights generally [62] and unlawful applications of work rules specifically [63] are widespread. Yet *Boeing* effectively assumes that "reasonable" employees ignore the bounds of English usage and common sense to read rules as consistent with their Section 7 rights (of which those employees are often unaware), even conjuring up clarifying language to compensate for the employer's failure to adopt such language in reality. *See, e.g., LA Specialty*, 368 NLRB No. 93, slip op. at 12-13 (Member McFerran, dissenting) (identifying "distortion of plain English and common sense" in majority's interpretation of media-contact rule prohibiting employees from providing media with "any information" as only prohibiting making statements on behalf of employer). In short, *Boeing's* conception of the "reasonable employee" is anything but reasonable.

Next, *Boeing* further stacks the deck against the protection of employee rights with its balancing step, pursuant to which the Board upholds overbroad rules whose legitimate business reasons it deems to outweigh their infringement of Section 7 rights. In this regard, relying on inapposite Supreme Court decisions addressing motive-based violations, the Board adopted a mechanism of minimizing the significance of Section 7 rights and thus deeming incursions on them "comparatively slight." *Boeing,* 365 NLRB No. 154, slip op. at 26 n.13 (Member Pearce,

---

[61] *LA Specialty*, 368 NLRB No. 93, slip op. at 10 (Member McFerran, dissenting)

[62] *See* Celine McNicholas et al., *Economic Policy Institute, Unlawful: U.S. employers are charged with violating federal law in 41.5% of all union election campaigns*, Dec. 11, 2019, https://www.epi.org/179315.

[63] *See, e.g., AT&T Mobility*, 370 NLRB No. 121, slip op. at 4-5; *BMW Mfg. Co*., 370 NLRB No. 56, slip op. at 7 n.9 (2020) (Member McFerran, dissenting in part) (explaining how facially neutral non-disparagement provisions chill protected activity in light of employers' practice of using "ambiguously-worded condemnations as thinly veiled references to employees' protected activity") (collecting cases).

EXHIBIT C

dissenting). Boeing's balancing step ignores that where employers can narrowly tailor rules to their legitimate interests without chilling Section 7 activity, see *supra* p. 4, those interests cannot justify a rule's overbreadth. *See AT&T Mobility*, 370 NLRB No. 121, slip op. at 14 (Chairman McFerran, dissenting) ("The failure to narrowly tailor a rule does not defeat the employer's justification for a rule, only the justification for the rule as drafted . . . ."). [64] Yet, under *Boeing*, employers may lawfully chill Section 7 activity through facially neutral rules if they have justifications for prohibiting other, unprotected activity that the same rules also prohibit, effectively providing employers with "a how-to manual . . . on stifling protected concerted activity before it begins." 365 NLRB No. 154, slip op. at 23 (Member Pearce, dissenting). [65] As a result, post-*Boeing*, more workers than ever are likely to forego protected activity to avoid violating overbroad workplace rules. *See AT&T Mobility*, 370 NLRB No. 121, slip op. at 10 (Chairman McFerran, dissenting).

     *Boeing's* most arbitrary feature, however, is its categorization step. When the Board finds a rule lawful through the steps discussed above, the Board labels the rule as being of a certain general type (e.g., a "civility" rule), and then frequently places that entire type of rule into the always-lawful Category 1, thus insulating all future rules of the same general type from Board scrutiny "regardless of their exact language or context." *BMW*, 370 NLRB No. 56, slip op. at 8, 10

---

[64] The *Boeing* majority also failed to explain which party has the burden of proof with respect to the balancing. *LA Specialty*, 368 NLRB No. 93, slip op. at 11 (Member McFerran, dissenting). Under Supreme Court precedent, it should be the employer's burden to prove that its legitimate business interests should prevail over Section 7 rights. *See id.* (Member McFerran, dissenting) (collecting cases).

[65] Subsequent to *Boeing*, the Board has further eroded Section 7 rights by selectively extending the reach of its balancing test to displace precedent applying balancing tests more protective of employee rights. *See, e.g., Wal-Mart Stores*, 368 NLRB No. 146, slip op. at 8-10 (2019) (Member McFerran, dissenting); *Apogee,* 368 NLRB No. 144, slip op. at 2-7 (discussed *infra* pp. 16-20); *cf. Medic Ambulance Serv.*, 370 NLRB No. 65, slip op. at 1 n.4 (refusing to disturb precedent concerning rules restricting solicitation and distribution in the workplace, which "already strikes a balance between employee rights and employer interests").

EXHIBIT C

EXHIBIT C

n.52 (Member McFerran, dissenting in part) (collecting cases). Because the Board must analyze a rule's specific language and context to determine its potential chilling effect in every case, *see LA Specialty*, 368 NLRB No. 93, slip op. at 12 (Member McFerran, dissenting), declaring rules lawful merely because they can be mechanically labeled with a general type is clearly arbitrary, *see BMW*, 370 NLRB No. 56, slip op. at 9-10 (Member McFerran, dissenting in part). [66] Given its categorization process, it is ironic that the *Boeing* majority faulted *Lutheran Heritage* for giving insufficient consideration to context. *BMW*, 370 NLRB No. 56, slip op. at 9- 10 (Member McFerran, dissenting in part). And the harm to Section 7 rights cannot be overstated: the categorization step encourages not only the widespread maintenance of chilling work rules, [67] but also the application of those rules to stifle protected activity. *See Boeing*, 365 NLRB No. 154, slip op. at 28 (Member Pearce, dissenting).[68]

---

[66] That is especially so where the Board has declared a type of rule always-lawful in cases not even involving a rule of the relevant type, *see Boeing*, 365 NLRB No. 154, slip op. at 27 (Member Pearce, dissenting); *id.*, slip op. at 33 (Member McFerran, dissenting), or when the Board relies on employer-specific evidence to find lawful a rule that then serves as the basis for declaring an entire type of rule to be lawful, *see, e.g., AT&T Mobility*, 370 NLRB No. 121, slip op. at 13 (Chairman McFerran, dissenting) ("The justifications offered by [an aircraft manufacturer performing security-classified work for the federal government] for its no-camera rule have no obvious bearing in other American workplaces . . . .")

[67] The decisions raised by the Board in Question 3 of its notice and invitation to file briefs further illustrate how *Boeing* improperly validates overbroad rules as categorically lawful. First, some non-disparagement rules chill Section 7 activity because such activity typically involves dissatisfaction with working conditions and thus reflects negatively on employers. *See BMW*, 370 NLRB No. 56, slip op. at 6-8 (Member McFerran, dissenting in part). Second, some rules prohibiting outside employment implicitly prohibit, among other things, working as a paid union salt. *See NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 87 (1995); *cf. Schwan's Home Serv.*, 364 NLRB 170, 173-74 (conflict-of-interest rule). Finally, some investigative-confidentiality rules chill a broad array of protected communications, as explained in detail *infra* pp. 16-20. Although the Board should abandon its practice of finding such types of rules categorically lawful, specific rules of these types may be sufficiently tailored to legitimate business interests to render them lawful.

[68] Employees unlawfully discharged pursuant to an overbroad rule may experience further economic and psychological hardship by losing out on unemployment benefits because the employees, their advocates, and/or administrators may erroneously believe that the employees'

104

EXHIBIT C

EXHIBIT C

In sum, both the *Boeing* majority's decision to overrule *Lutheran Heritage* and the framework it adopted in its stead are arbitrary. "*Boeing* is a blunt instrument . . . us[ed] to force aside the statutory concerns of the [Act] and clear a path for employers to promulgate workplace rules without regard to their impact on employees' statutory rights." *BMW*, 370 NLRB No. 56, slip op. at 6 (Member McFerran, dissenting in part). Accordingly, *Boeing* should be overruled. Instead, the Board should adopt a standard based on *Lutheran Heritage*, under which the Board considered employer rules in context on a case-by-case basis to determine whether "employees would reasonably construe the language to prohibit Section 7 activity." 343 NLRB at 647. However, the Board should also refine that standard as follows.

First, the Board should explicitly define the "reasonable employee" in a manner consistent with Supreme Court and pre-*Boeing* Board precedent. Initially, the Board should not presume that employees—most of whom work in non-unionized workplaces—are aware of their rights under the NLRA. *See, e.g.*, DeChiara, *supra* note 9. Even when they are aware of their rights, "the Board should . . . assum[e] that workers would be inclined to read [rules] to potentially prohibit protected activity, not . . . assum[e] that workers will grasp to find any possible reading that would not be in any way coercive." *Medic Ambulance Serv.*, 370 NLRB No. 65, slip op. at 8 (Member McFerran, dissenting); *see also supra* pp. 2, 7-8. Consistent with the foregoing, the Board should clarify that a presumptive violation occurs when one reasonable interpretation of a rule is to prohibit Section

---

rule violation disqualifies them. *See* Steven A. Mazurak*, Effects of Unemployment Compensation Proceedings on Related Labor Litigation*, 64 Marq. L. Rev. 133, 156 (1980) (describing the post-termination denial of unemployment benefits as a "double blow to [the employee's] psyche"); Monica Halas et al., Massachusetts Law Reform Institute et al., *An Advocate's Guide to Unemployment in Massachusetts*, May 14, 2020, at 66-67, 69, https://www.masslegalservices.org/unemploymentadvocacyguide (follow "Download" hyperlink to obtain PDF) (recognizing generally that claimants may not be disqualified if they were discharged for violating unlawful employer rules, but without mentioning the NLRA).

EXHIBIT C

EXHIBIT C

7 activity, even if that is not the only reasonable interpretation. *See Lutheran Heritage*, 343 NLRB at 650 (Members Liebman and Walsh, dissenting). As before, the Board should consider the surrounding circumstances in conducting this inquiry. *See The Roomstore*, 357 NLRB at 1690 n.3; *supra* p. 3 & note 5.

Second, the Board should adopt two minor modifications to its articulation of the *Lutheran Heritage* standard. First, the Board should substitute the word "could" for "would." Although both terms are arguably equivalent when, as here, they are used in conjunction with the term "reasonably," *see Cintas Corp*., 482 F.3d at 467 n.1, at least one court of appeals has found the difference in terms meaningful, *see T-Mobile USA, Inc. v. NLRB*, 865 F.3d 265, 272 (5th Cir. 2017). To the extent the words differ in meaning, "could" is more consistent with the Board's actual application of *Lutheran Heritage* in subsequent cases, as well as with the Board's general standard for employer statements. *See Double D Constr*., 339 NLRB at 303-04 (employer statements are unlawful if "the words *could* reasonably be construed as coercive, whether or not that is the only reasonable construction") (emphasis added). Second, the Board should add the word "unlawfully" so that the test states as follows: a rule is unlawful if "employees [c]ould reasonably construe the language to [unlawfully] prohibit Section 7 activity." *Lutheran Heritage*, 343 NLRB at 647. The second addition would remove any appearance of a conflict between *Lutheran Heritage* and lawful restrictions of Section 7 activity, such as facially neutral rules limiting solicitation to non-working time. *See supra* note 7.

Relatedly, the Board should make explicit another implicit characteristic of *Lutheran Heritage*: that even when one reasonable reading of a rule is that it prohibits Section 7 activity, in a small minority of situations the rule may be lawful based on overriding employer interests. *See supra* pp. 4-5. In that regard, the Board should apply the well-established *Republic Aviation*

106

EXHIBIT C

EXHIBIT C

framework under which a rule that infringes on Section 7 rights is lawful if the employer demonstrates that this infringement is justified by "special circumstances" outweighing employees' Section 7 rights and that the rule is narrowly tailored to those circumstances. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 & n.10, 804 (1945); *see also, e.g., Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 493 (1978); *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714-15 (5th Cir. 2018). [69] Adopting this framework as a generally available affirmative defense— applicable to rules conveyed not only in employee handbooks but also by means such as arbitration and severance agreements [70] —would avoid any perceived confusion stemming from *Lutheran Heritage's* heretofore implicit approach, assure that employee rights are not unnecessarily subjugated to employer interests, and promote the enforceability of Board decisions in the courts of appeals. *See Midwest Div.-MMC*, 867 F.3d at 1302 (interpreting *Lutheran Heritage* framework as including affirmative defense).

Finally, the Board should formulate a model prophylactic statement of rights, which affirmatively and specifically sets out employee statutory rights and explains that no rule should be interpreted as restricting those rights, that employers may—at their option—include in handbooks to mitigate the potential coercive impact of workplace rules on the exercise of Section

---

[69] This general approach is consistent with context-specific Board law pre-dating *Boeing* explaining how certain types of employer interests may justify certain work rules' infringements on Section 7 rights. *See, e.g., Banner*, 362 NLRB at 1109-13. It also recognizes that certain types of restrictions are presumptively lawful notwithstanding that they infringe on Section 7 rights, in essence because special circumstances apply. *See, e.g., Our Way, Inc.*, 268 NLRB 394, 394-95 (1983)

[70] Although the Board currently evaluates severance agreements under a different standard than handbook rules, *see, e.g., IGT d/b/a International Game Technology*, 370 NLRB No. 50, slip op. at 2 (2020), the same principles should be applied to such agreements, *see S. Freedman & Sons, Inc.*, 364 NLRB 1203, 1204 (2016) ("[A]n employer may condition a settlement on an employee's waiver of Section 7 rights if the waiver is narrowly tailored to the facts giving rise to the settlement and the employee receives some benefit in return for the waiver.*"), enfd. per curiam*, 713 F. App'x. 152 (4th Cir. 2017).

EXHIBIT C

EXHIBIT C

7 rights and simplify compliance. *See Boeing*, 365 NLRB No. 154, slip op. at 43 (Member McFerran, dissenting); *cf. Johnnie's Poultry Co.*, 146 NLRB 770, 775 (1964) (establishing safeguards employers must observe to minimize coercive impact on exercise of Section 7 rights when interrogating employees to prepare defense in unfair labor practice hearings*), enf. denied*, 344 F.2d 617 (8th Cir. 1965). Use of such a statement of rights would mitigate chill "by making explicit that the employer's rules will not be applied to protected concerted activity . . . and by making clear to employees, at an appropriate level of detail, what their basic statutory rights are." *Boeing*, 365 NLRB No. 154, slip op. at 43 (Member McFerran, dissenting). [71] When a statement of rights is prominently placed in a handbook—ordinarily towards the front of a hard-copy handbook and at least referenced in the facially neutral rules under review [72]—the Board should apply a presumption that employees could not reasonably construe those rules to prohibit Section

---

[71] The description of statutory rights should focus on Section 7 activities that are of primary importance toward the fulfillment of the Act's purposes, commonly engaged in by employees (particularly in non-union workplaces, since they do not have union representatives available to bargain over rules and guide employees as to their rights), and likely to be chilled by overbroad rules. The Board may consider including the following rights in its model statement: (1) discussing wages and other working conditions with co-workers or a union; (2) taking action with one or more co-workers to improve working conditions by, among other means, raising work-related complaints directly with the employer or with a government agency, or seeking help from a union; (3) striking and picketing, depending on its purpose and means; (4) taking photographs or other recordings in the workplace, together with co-workers, to document or improve working conditions, except where an overriding employer interest is present; (5) organizing a union to negotiate with your employer concerning your wages, hours, and other terms and conditions of employment; (6) forming, joining, or assisting a union, such as by sharing employee contact information; (7) talking about or soliciting for a union during nonwork time, such as before or after work or during break times, or distributing union literature during non-work time, in non-work areas, such as parking lots or break rooms; (8) wearing union hats, buttons, t-shirts, and pins in the workplace, except under special circumstances; and (9) choosing not to engage in any of these activities.

[72] See *First Transit*, 360 NLRB at 621-22 (finding savings clause insufficient where it was "neither prominent nor proximate to the rules it purports to inform").

EXHIBIT C

EXHIBIT C

7 activity. *See Boeing*, 365 NLRB No. 154, slip op. at 43 (Member McFerran, dissenting). [73] Such presumption may be rebutted by evidence that, under the circumstances, the more reasonable interpretation of such rules is that they unlawfully prohibit Section 7 activity. This approach would "mak[e] compliance with the Act simpler and easier." *Id*. And, in tandem with the above-described standard based on *Lutheran Heritage*, it is consistent with the Board's responsibility to safeguard employees' exercise of Section 7 rights.

In sum, the Board should abandon the flawed framework in *Boeing* and instead readopt standards based on *Lutheran Heritage*. Under the latter standards, the Board should affirm the judge's findings that the Respondent violated Section 8(a)(1) by maintaining overbroad work rules.

## IV.    **Conclusion**

As discussed above, Respondent does not hold itself out to the public as a religious institution, providing a religious educational environment to the prospective students and cannot meet the first prong of the three-part test set forth in *Bethany College*.  Accordingly, the Board should exercise jurisdiction over Respondent and find that it unlawfully withdrew recognition from the Union and made unilateral changes to employees' terms and conditions of employment and mid-term contract modifications as set forth in the Complaint as amended.

Furthermore, the Administrative Law Judge should recommend that the Board return to the test set forth in *Pacific Lutheran University* and that all of an employer's marketing materials be considered when determining whether an employer meets the first prong of that test.  Here, Respondent cannot meet the first or second prong of that test because it cannot show that it "holds

---

[73] If an employer's statement of rights does not strictly adhere to the Board's model, the Board may consider whether the variant statement is appropriate under the circumstances of the workplace at issue such that the same presumption should apply to the employer's rules.

EXHIBIT C

EXHIBIT C

itself out to students, faculty, and community as providing a religious educational environment" or that as "performing a specific role in creating or maintaining the university's religious educational environment."

The Administrative Law Judge should also conclude Respondent's use of University Name, Seal, and logo rule; its confidentiality rule, and media contacts rules are unlawful under *Boeing* and that Respondent violated Section 8(a)(1) of the Act by maintaining those rules. Furthermore, the Administrative Law Judge should recommend that the Board abandon the standard set forth in *Boeing* and return to the standard articulated in *Lutheran Heritage Village of Livonia,* with modifications, when evaluating the lawfulness of facially neutral rules.

Accordingly, Counsel for the General Counsel respectfully submits that the Administrative Law Judge should find the Respondent violated Sections 8(a)(1) and (5) of the Act in all respects alleged in in the Complaint, as amended.

To remedy Respondent's unfair labor practices, Counsel for the General Counsel seeks a Board Order requiring that Respondent immediately cease and desist its unlawful conduct and that it recognizes the Union as the exclusive collective-bargaining representative of its faculty and librarians. Respondent should be further ordered to rescind its unilateral changes, restore the terms and conditions of employment of the Unit that were in effect immediately prior to Respondent's unlawful withdrawal of recognition, and make Unit employees whole for any losses suffered as a result of Respondent's unlawful action, including for any known or foreseeable pecuniary harms. *Thryv, Inc.,* 372 NLRB No, 22 (2022).[74]  Furthermore, in addition to making employees whole for

---

[74] The unfair labor practices at issue here do not involve a cessation of employment status.  Thus, bargaining unit employees did not have a duty to mitigate and interim earnings would not reduce backpay earned.  Thus, the Order should direct that backpay for direct and reasonably foreseeable pecuniary harms caused by Respondent's unfair labor practices should be calculated according to

EXHIBIT C

EXHIBIT C

lost wages, the Order should expressly require that Respondent make affected employees whole for any loss of benefits, including but not limited to any loss of accumulated time off for vacation, sick time, and holidays, loss of work hours and work opportunity.  Respondent should also be directed to consider, or reconsider, for tenure all faculty members who would have been eligible for tenure under the terms and conditions of employment in affect at the time recognition was withdrawn.

Finally, Respondent should be ordered to rescind its unlawful rules and to post the Notice to Employees that is attached hereto.  In addition to the traditional posting, the Notice should be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.

Counsel for the General Counsel also requests that the Administrative Law Judge order any other relief deemed just and proper to effectuate the purposes of the Act.

Dated: February 6, 2023.

  /s/ **John W. Plympton**

John W. Plympton, Esq
Counsel for the General Counsel
National Labor Relations Board
201 East Kennedy Blvd. Suite 530
Tampa, FL 33602
Email: john.plympton@nlrb.gov
Phone: (813)228-2665
Florida Bar No: 101748

---

the formula set forth in *Ogle Protection Service*, 183 NLRB 682, 683 (1970), enfd. 444 F.2d 502 (6th Cir. 1971); see also *Pepsi-America, Inc.*, 339 NLRB 986, 986 fn. 2 (2003).

111

EXHIBIT C

EXHIBIT C

## **ATTACHMENT**

**NOTICE TO EMPLOYEES**
**POSTED BY ORDER OF THE**
**NATIONAL LABOR RELATIONS BOARD**
**An Agency of the United States Government**

**The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.**

**FEDERAL LAW GIVES YOU THE RIGHT TO:**

- Form, join, or assist a union;
- Choose a representative to bargain with us on your behalf;
- Act together with other employees for your benefit and protection;
- Choose not to engage in any of these protected activities.

**WE WILL NOT** withdraw recognition from or otherwise fail or refuse to recognize and bargain in good faith with United Faculty of Saint Leo, National Education Association, Florida Education Association, American Federation of Teachers, AFL-CIO (the Union) as the exclusive collective-bargaining representative of the employees in the following unit:

> All full-time faculty members employed at Saint Leo University at Saint Leo, Florida, only, including faculty librarians, but excluding visiting faculty members, part-time faculty members, school nurse, director of physical education and athletics, graduate program directors, director of library services and other directors, faculty department chairs, academic deans, and all other employees, guards, managers, and supervisors.

**WE WILL NOT** fail or refuse to bargain in good faith over the terms and conditions of a successor collective-bargaining agreement with the Union.

**WE WILL NOT** tell you that we are no longer recognizing the Union as your exclusive collective-bargaining representative in the absence of evidence that a majority of employees no longer support the Union.

**WE WILL NOT** change rates of pay, wages, hours of work, or other terms and conditions of employment of our employees in the above unit during the term of our collective-bargaining agreement with the Union, without the Union's consent.

**WE WILL NOT** change rates of pay, wages, hours of work, or other terms and conditions of employment of our employees in the above unit, without first giving the Union notice and an opportunity to bargain about the decision to make such changes and the effects of the changes, and without reaching a collective-bargaining agreement with the Union or bargaining with the Union to overall good faith impasse in negotiations for a collective-bargaining agreement.

EXHIBIT C

EXHIBIT C

**WE WILL NOT** implement, maintain, or enforce rules that prohibit employees from: using our name, seal or logo; define confidential information as including information about employees, faculty, or adjunct faculty; prohibit employees from commenting on University business to representatives of the media without authorization from the University Communications Office or require employees to refer all media inquiries to the University Communications Officer; or otherwise interfering with, restraining, or coercing our employees in the exercise of the above-stated rights set forth in Section 7 of the National Labor Relations Act.

**WE WILL NOT** in any like or related manner interfere with, restrain, or coerce employees in the exercise of the above rights guaranteed under Section 7 of the National Labor Relations Act.

**WE WILL** rescind the Faculty Handbooks issued in December 2020 and April 2021 and notify you in writing that this has been done.

**WE WILL** rescind or lawfully revise our Use of University Name, Seal, and Logo rule found in our policy manual and **WE WILL** notify you in writing that this has been done and provide you with a copy of any lawfully revised Use of University Name, Seal, and Logo rule.

**WE WILL** rescind from our policy manual the portions of our confidential information rule that define confidential information as including information about current, former and prospective employees, faculty, and adjunct faculty and **WE WILL** notify you in writing that this has been done.and provide you with a copy of any lawfully revised definition of confidential information.

**WE WILL** rescind or lawfully revise the portion of Media Contacts rule in our policy manual that prohibits employees from commenting on University business to representatives of the press (radio, television, or print media) without authorization from the University Communications Office and requires that all inquiries from campus or other media be referred to the University Communications Officer, and **WE WILL** notify you that this has been done and provide you with a copy of any lawfully revised Media Contacts rule .

**WE WILL**, upon request, restore and continue in effect the rates of pay, wages, hours of work, and other terms and conditions of employment set forth in our collective-bargaining agreement with the Union that was extended by written agreement with the Union in October 2019, unless and until we reach a new collective-bargaining agreement with the Union or bargain with the Union to overall good faith impasse in negotiations for a new collective-bargaining agreement.
.
**WE WILL** meet and bargain in good faith with the Union, as the exclusive collective-bargaining representative of our employees in the above appropriate unit, and if an understanding is reached, embody the understanding in a signed agreement.

**WE WILL** make whole our employees in the above unit for any losses suffered by reason of our unlawful unilateral changes to their rates of pay, wages, hours of work, and other terms and conditions of employment implemented on and after October 23, 2020, plus interest. **WE WILL** also make them whole for any other direct or foreseeable pecuniary harms suffered as a result of our unlawful conduct, plus interest.

EXHIBIT C

EXHIBIT C

**WE WILL** compensate affected employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and **WE WILL** file with the Regional Director for Region 12, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar year(s) for each employee.

**WE WILL** file with the Regional Director for Region 12, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each backpay recipient's corresponding W-2 form reflecting the backpay award.

**SAINT LEO UNIVERSITY INCORPORATED**

_____
(Employer)

Dated: _____  By: _____

(Representative)                    (Title)

---

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act.  We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions.  To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-866-667-NLRB (1-866-667-6572). Hearing impaired persons may contact the Agency's TTY service at 1-866-315-NLRB.  You may also obtain information from the Board's website: www.nlrb.gov.

201 E Kennedy Blvd Ste 530          **Telephone:**  (813)228-2641
Tampa, FL 33602-5824               Hours of Operation:  8 a.m. to 4:30 p.m.

---

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**
This notice must remain posted for 60 consecutive days from the date of posting and must not be altered, defaced or covered by any other material.  Any questions concerning this notice or compliance with its provisions may be directed to the above Regional Office's Compliance Officer.

EXHIBIT C

EXHIBIT C

## **CERTIFICATE OF SERVICE**

I hereby certify that the **Counsel for the General Counsel's Brief to the Administrative Law Judge** in the matter of Saint Leo University in Cases 12-CA-2275612, 12-CA-275617, 12-CA-275639, 12-CA-275640, 12-CA-275641, 12-CA 275642, 12-CA-275644, 12-CA-275645and 12-CA-284360 was duly served electronically upon the following individuals on February 6, 2023:

**By electronic filing in www.nlrb.gov to:**
Hon. Robert A. Giannasi
Chief Administrative Law Judge
National Labor Relations Board
1015 Half Street SE
Washington, DC 20570-0001

**By electronic mail to:**
Counsel for Respondent
Scott T. Silverman, Esq.
Akerman, LLP
401 E Jackson St Ste 1700
Tampa, FL 33602-5233
scott.silverman@akerman.com

Amy Gaylord, Esq.
Akerman LPP
71 South Wacker Drive, 47th Floor
Chicago, IL 60606
amy.gaylord@akerman.com

Counsel for Charging Party
Heidi Parker, Esq.
Egan, Lev & Siwica, P.A.
231 E. Colonial Dr.
Orlando, FL 32801
hparker@eganlev.com

                                 **/s/ John W. Plympton**

                                  John W. Plympton, Esq
                                  Counsel for the General Counsel
                                  National Labor Relations Board
                                  201 East Kennedy Blvd. Suite 530
                                  Tampa, FL 33602
                                  Email: john.plympton@nlrb.gov
                                  Phone: (813)228-2665
                                  Florida Bar No: 101748

EXHIBIT C